# EXHIBIT A

**LOAN AGREEMENT**

Between

**OAKLAND CANNERY REAL ESTATE, LLC,**
**5733 SLOCA PARTNERSHIP**, and
**5601 SLOCA, LLC,**
individually and collectively, jointly and severally,
as Borrower

and

**ROMSPEN CALIFORNIA MORTGAGE LIMITED PARTNERSHIP,**
as Lender

Dated:  August 20, 2019

4826-6981-6219.7

**Exhibit A Page - 1**

## TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| I | DEFINITIONS; PRINCIPLES OF CONSTRUCTION | | 4 |
| | Section 1.1 | Capitalized Terms | 4 |
| | Section 1.2 | Principles of Construction | 4 |
| | | | |
| II | GENERAL TERMS | | 4 |
| | Section 2.1 | Loan Commitment; Disbursement to Borrower | 4 |
| | Section 2.2 | Loan Advances | 5 |
| | Section 2.3 | Mandatory Principal Payments | 8 |
| | Section 2.4 | Application of Payments | 8 |
| | Section 2.5 | Fees | 8 |
| | Section 2.6 | Taxes | 8 |
| | | | |
| III | CONDITIONS PRECEDENT | | 9 |
| | | | |
| IV | REPRESENTATIONS AND WARRANTIES | | 10 |
| | Section 4.1 | Borrower Representations | 10 |
| | Section 4.2 | Survival of Representations | 17 |
| | | | |
| V | BORROWER COVENANTS | | 17 |
| | Section 5.1 | Existence; Compliance with Legal Requirements | 17 |
| | Section 5.2 | Hazardous Materials | 18 |
| | Section 5.3 | Certain Prohibited Actions | 18 |
| | Section 5.4 | Taxes and Other Charges | 18 |
| | Section 5.5 | Performance of Agreements | 19 |
| | Section 5.6 | Notices | 19 |
| | Section 5.7 | Access to Property | 19 |
| | Section 5.8 | Compliance | 19 |
| | Section 5.9 | Cooperate in Legal Proceedings | 19 |
| | Section 5.10 | Insurance Benefits and Condemnation Awards | 19 |
| | Section 5.11 | Further Assurances | 19 |
| | Section 5.12 | Financial Reporting | 20 |
| | Section 5.13 | Title to the Property | 20 |
| | Section 5.14 | Estoppel Statements | 21 |
| | Section 5.15 | Business Purposes; Use of Property | 21 |
| | Section 5.16 | Contracts | 21 |
| | Section 5.17 | Maintenance of Property; Payment for Labor and Materials; Alterations | 21 |
| | Section 5.18 | Transfer or Encumbrance of the Property | 22 |
| | Section 5.19 | ERISA | 23 |
| | Section 5.20 | Affiliate Transaction | 24 |
| | Section 5.21 | Service Rights | 24 |
| | Section 5.22 | Purchase Options | 24 |
| | Section 5.23 | Confirmation of Representations, Warranties and Covenants | 24 |
| | Section 5.24 | Subdivision Maps | 24 |
| | Section 5.25 | Equity Contribution | 24 |
| | Section 5.26 | Anti-Terrorism | 25 |
| | Section 5.27 | Leases | 26 |
| | Section 5.28 | After Acquired Property | 27 |
| | Section 5.29 | Independent Consultant | 27 |
| | Section 5.30 | Licenses | 27 |
| | Section 5.31 | Dividends and Distributions | 27 |

VI    CASUALTY; CONDEMNATION; ESCROWS ....................................................28
      Section 6.1    Insurance; Casualty and Condemnation. ..............................28
      Section 6.2    Tax and Insurance Escrows ...........................................33
      Section 6.3    The Management Agreement ...........................................33
      Section 6.4    Prohibition Against Termination or Modification ..............34
      Section 6.5    Replacement of Manager ...............................................34
      Section 6.6    Interest Reserve .........................................................34

VII    DEFAULTS ..............................................................................34
      Section 7.1    Event of Default. .......................................................34
      Section 7.2    Remedies. ................................................................37
      Section 7.3    Right of Entry ...........................................................39
      Section 7.4    Costs of Enforcement ...................................................39
      Section 7.5    Violation of Legal Requirements ....................................39
      Section 7.6    Remedies Cumulative ...................................................40

VIII    TRANSFER OF LOAN AND REFINANCING ...................................40
      Section 8.1    Lender's Transfers .....................................................40
      Section 8.2    Register ...................................................................40
      Section 8.3    Participations ...........................................................40
      Section 8.4    Waiver ....................................................................41
      Section 8.5    Collateral .................................................................41
      Section 8.6    Right of First Opportunity; Right of First Refusal**Error! Bookmark not defined.**

IX    EXCULPATION. .......................................................................41
      Section 9.1    Full Recourse. ...........................................................41
      Section 9.2    No Waiver ................................................................41

X    INDEMNIFICATION. ................................................................41
      Section 10.1    Indemnification .........................................................41
      Section 10.2    Duty to Defend; Attorneys' Fees and Other Fees and Expenses ...........42
      Section 10.3    Changes in Laws Regarding Taxation ..............................42
      Section 10.4    No Credits on Account of the Debt ................................42
      Section 10.5    Recording of Security Instrument ..................................42
      Section 10.6    Brokers and Financial Advisors ....................................43
      Section 10.7    Currency Adjustment .........................................**Error! Bookmark not defined.**

XI    WAIVERS ...............................................................................43
      Section 11.1    Waiver of Counterclaim ..............................................43
      Section 11.2    Marshalling and Other Matters ....................................43
      Section 11.3    Waiver of Notice .......................................................43
      Section 11.4    Trial by Jury ............................................................45
      Section 11.5    Credit Authorization and Consent to Disclosure ..............46
      Section 11.6    California Civil Code ..................................................46

XII    MISCELLANEOUS ...................................................................47
      Section 12.1    Survival ..................................................................47
      Section 12.2    Governing Law. ........................................................47
      Section 12.3    Modification; Waiver in Writing ...................................47
      Section 12.4    Delay Not a Waiver ...................................................47
      Section 12.5    Notices ...................................................................47
      Section 12.6    Headings .................................................................48
      Section 12.7    Severability .............................................................49
      Section 12.8    Preferences ..............................................................49

Section 12.9      Expenses ........................................................................................49
Section 12.10    Relationship of Borrower and Lender ........................................49
Section 12.11    No Joint Venture or Partnership; No Third Party Beneficiaries............50
Section 12.12    Publicity .........................................................................................50
Section 12.13    Subrogation ....................................................................................50
Section 12.14    Duplicate Originals; Counterparts ..............................................50
Section 12.15    Liability ..........................................................................................51
Section 12.16    Prior Agreements ...........................................................................51
Section 12.17    No Usury .........................................................................................51
Section 12.18    Construction ...................................................................................52
Section 12.19    Invalidity of a Provision, Principles of Construction, Lender's Discretion .........52
Section 12.20    Lender..............................................................................................52
Section 12.21    Limitation on Liability ...................................................................53
Section 12.22    Tax Withholding.............................................................................53
Section 12.23    Full Repayment And Reconveyance .............................................53
Section 12.24    Delay Outside Lender's Control....................................................53
Section 12.25    Modification, Waiver in Writing ...................................................53
Section 12.26    Set-Off ............................................................................................53
Section 12.27    Judicial Reference; Referee; Costs ...............................................54
Section 12.28    Multiple Borrowers. .......................................................................55
Section 12.29    California Waivers. .........................................................................58

## SCHEDULES AND EXHIBITS

SCHEDULE I            DEFINITIONS
SCHEDULE II           CONDITIONS PRECEDENT
SCHEDULE III          PENDING LITIGATION
SCHEDULE IV           DISCLOSURE SCHEDULE
SCHEDULE V            ORGANIZATIONAL STRUCTURE CHARTS
SCHEDULE VI           SOURCES AND USES OF FUNDS
SCHEDULE VII          PROJECT BUDGET
SCHEDULE VIII         PROJECT SCHEDULE
SCHEDULE IX           PLANS AND SPECIFICATIONS

**Exhibit A Page - 4**

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of August [__], 2019 (as such agreement may be amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), is between **ROMSPEN CALIFORNIA MORTGAGE LIMITED PARTNERSHIP**, an Ontario limited partnership, having an address at 162 Cumberland Street, Suite 300, Toronto, Ontario M5R 3N5 ("**Lender**"), and **OAKLAND CANNERY, LLC**, a California limited liability company, having an address at 3600 American River Drive, Suite 215, Sacramento, California 95864, **5733 SLOCA PARTNERSHIP**, a California general partnership, having an address at 1137 Bannock Street, Denver, Colorado 80204, and **5601 SLOCA, LLC**, a California limited liability company, having an address at 1137 Bannock Street, Denver, Colorado 80204 (individually and collectively, jointly and severally, "**Borrower**").

## W I T N E S S E T H:

WHEREAS, Borrower desires to obtain the Loan from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the making of the Loan by Lender to Borrower and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

### I   DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1**   <u>Capitalized Terms</u>.  All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in **Schedule I** attached hereto.

**Section 1.2**   <u>Principles of Construction</u>.  All references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Agreement unless otherwise specified.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Whenever the context requires, each gender shall include all other genders.  Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular and to the singular include the plural, the part includes the whole, the term "including" is not limiting (and means, including without limitation), and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  Any reference to any of the following documents includes any and all alterations, amendments, restatements, extensions, modifications, renewals, or supplements thereto or thereof, as applicable:  this Agreement or any of the other Loan Documents.  The parties hereto acknowledge that the defined term "Borrower" has been defined to collectively include each Borrower.  It is the intent of the parties hereto in making any determination under this Agreement, including, without limitation, in determining whether (a) a breach of a representation, warranty or a covenant has occurred or (b) there has occurred a Default or Event of Default, that any such breach, occurrence or event with respect to any Borrower shall be deemed to be such a breach, occurrence or event with respect to each Borrower and that each Borrower need not have been involved with such breach, occurrence or event in order for the same to be deemed such a breach, occurrence or event with respect to each Borrower.

### II   GENERAL TERMS

**Section 2.1**   <u>Loan Commitment; Disbursement to Borrower</u>.

**Section 2.1.1**   <u>The Loan</u>.  Subject to the terms and conditions set forth herein, including satisfaction of the conditions precedent set forth in **Schedule II** hereof and the requirements of <u>Section 2.2</u>, Lender agrees to make the Loan to Borrower in multiple advances from time to time during the Availability

Period in a maximum aggregate principal amount ("**Maximum Principal Amount**") not to exceed at any time the lesser of (i) seventy percent (70%) of the total Project Budget, as determined by Lender in its reasonable discretion, and (ii) Fifty-Four Million Four Hundred Sixty-Five Thousand and No/100 Dollars ($54,465,000.00). The Note evidences the Loan, and the Loan shall bear interest and otherwise be payable as provided in the Note and this Agreement; provided, however, that in any event, the principal balance, all accrued but unpaid interest and all other sums owing on the Loan shall be due and payable in full on the Maturity Date or earlier, if the Loan is accelerated pursuant to this Agreement or any of the other Loan Documents.  The holder of the Note shall be entitled to the benefits of this Agreement and the other Loan Documents.  Borrower may not reborrow any principal amount repaid in respect of the Loan.

> **Section 2.1.2**   Use of Proceeds.  Borrower shall use the proceeds of the Loan in accordance with the terms of the Loan Documents, including, without limitation, the Sources and Uses of Funds, and for no other purpose.

> **Section 2.2**   Loan Advances.  Subject to compliance by Borrower with the terms and conditions of this Agreement, including but not limited to, satisfaction of the conditions precedent set forth in **Schedule II** hereof, (a) Lender shall advance to Borrower, as of the Closing Date, proceeds of the Loan in an amount not to exceed $[_____], and (b) after the Closing Date, Borrower may request additional advances of the Loan by submitting to Lender a written request in form and substance satisfactory to Lender signed by an authorized representative of Borrower (each a "**Request for Advance**"), subject to the following:

>> (i)   each Request for Advance shall state the purpose and use of the funds to be received as a result of such advance, which shall be for the purpose of payment of Project Expenditures to fund the finishing and punch list items necessary to complete the construction of the mixed use improvements on the Property, known as the "Cannery & Tinnery", to be advanced on a cost-to-complete basis;

>> (ii)   each Request for Advance shall include, without limitation, the proposed amount of the requested advance and the proposed disbursement date of the requested advance, which disbursement date must be a Business Day and must be at least ten (10) Business Days after the date of delivery to Lender of the Request for Advance (and delivery of all documents in order for Lender to make such disbursement), and no Request for Advance shall be delivered or advanced for an amount less than $200,000.00 (other than the last requested Request for Advance with respect to any given item if less);

>> (iii)   a Request for Advance, once delivered to Lender, shall not be revocable by Borrower provided, that if Borrower does revoke such request Borrower shall deliver to Lender all costs and expenses incurred by Lender as a result of such revocation;

>> (iv)   each Request for Advance, once delivered to Lender, shall, unless otherwise stated, constitute a representation, warranty, and certification by Borrower as of the date of that Request for Advance that:

>>> (A)   both before and after the making of the requested advance, all of the Loan Documents are valid, binding, and enforceable against each Borrower Party, as applicable;

>>> (B)   all terms and conditions precedent to the making of the requested advance, including the applicable conditions precedent set forth in **Schedule II** hereof are satisfied, and shall remain satisfied through the date of the requested advance;

>>> (C)   no Default or Event of Default has occurred and is in existence, and no Default or Event of Default exists or will arise on the making of the requested advance;

>>> (D)   the representations and warranties contained in this Agreement and the other Loan Documents are true and correct in all material respects and will be true and correct in all material

respects upon the making of the requested advance, including without limitation the representation that the Property is in compliance with all Legal Requirements;

(E)     the requested advance does not violate the terms or conditions of any contract, indenture, agreement, or other borrowing of any Borrower Party; and

(F)     the requested advance will be used for the items set forth on the Sources and Uses of Funds for which Borrower is requesting such advance, and such request shall not exceed the amount allocated for such purpose set forth on the Sources and Uses of Funds (unless otherwise approved by Lender);

(v)     if proceeds from the requested advance will be used to pay contractors for materials or labor at the Property, Lender may require lien waivers, and if Borrower requests a direct payment to such contractors (rather than reimbursement), Lender may make such payment to such contractors, as requested by Borrower, and following receipt of a conditional lien waiver conditioned solely upon payment of the invoices then due, followed by a lien waiver (with no conditions) following such direct payment;

(vi)    each request for advance shall include delivery of copies of all invoices, or other written substantiation of the amount owed, that will be paid upon such advance or that Borrower will receive reimbursement for prior to payment, upon receipt of such advance;

(vii)   each request for advance shall include a title search that shall reflect no liens or encumbrances on the Property (other than the Permitted Encumbrances), and an endorsement to the Title Insurance Policy acceptable to Lender (each at Borrower's cost) and Borrower shall deliver payment to Lender of all Lender's fees and expenses (including the out of pocket fees and expenses of Lender's construction consultants and other costs and expenses relating to the Loan to the extent then due and payable;

(viii)  each Request for Advance for Project Expenditures shall be subject to satisfaction of the following (provided that, absent changes, once a condition has been satisfied it will not require subsequent re-approval with respect to later Requests for Advance for Project Expenditures):

(A)     Lender shall have (1) approved all Plans and Specifications, (2) approved the Project Schedule or any modifications thereto, (3) approved the General Contractor Agreement executed by Borrower with a Lender-approved General Contractor and received a General Contractor Consent from such party, (4) approved the Architect Agreement and Engineer Agreement and received a Consent from each applicable party, (5) approved of any Change Order (to the extent Lender's approval is required hereunder) with respect to an item set forth on the Project Budget for which Borrower is requesting a payment, or confirmed that the request for reimbursement of such Project Expenditure is consistent with the Project Budget; and (6) received confirmation that all Taxes that have become due and payable through such date have been paid and all insurance premiums attributable to any insurance required under the Loan Documents that have become due and payable as of such date have been paid;

(B)     Lender shall have received a certificate of Borrower with respect to any applicable Project Expenditures to be funded by such Request for Advance (1) certifying that whatever portion of such work has been completed to date has been completed in good and workmanlike manner in accordance with all applicable Legal Requirements and the Plans and Specifications, (2) including (in the first Request for Advance for any particular Project Expenditures) a copy of any license, permit or other approval by any Governmental Authority required to commence the applicable Project Expenditures, (3) including copies of all bills, invoices, receipts and other documentation requested by Lender to be reimbursed or paid by the Request for Advance, (4) identifying each Person that supplied materials or labor in connection with the Project Expenditures to be funded by the requested Request for Advance, (5) certifying that each such Person has been paid in full or will be paid in full in respect of such work promptly after receipt of such Request for Advance, (6) accompanied by conditional lien waivers or other evidence of lien release upon payment satisfactory to Lender, (7) stating that all prior Request for Advances have been spent on the expenses for which

such Request for Advances were made, (8) including a reconciliation by Borrower of the progress and cost of the completion of the Project through the date of the Request for Advance with the Project Budget, together with a projection of such progress and cost through to Completion, (9) including an anticipated cost report in a form reasonably acceptable to Lender, which indicates the costs anticipated to Complete the Project, after giving effect to costs incurred during the previous month (or the date of the last preceding Advance Request, as the case may be) (including a description of any reasonably projected cost overruns), (10) including a list of reasonably anticipated Change Orders that may be made within the ensuing sixty (60) days after such Request for Advance (regardless as to whether Lender's approval is required for any such Change Order), and (11) certifying that no Balancing Event then exists;

(C)     Lender shall have determined that the applicable work with respect to which the Request for Advance has been requested has been completed in good and workmanlike manner in accordance with all applicable Legal Requirements and the Plans and Specifications

(D)     If Lender shall have determined that either (1) the sum of the amount of unfunded Request for Advances available to Borrower hereunder for the payment of all of the work comprising the Project set forth in the Project Budget that has not yet been paid for is less than the amount actually necessary (as reasonably determined by Lender) to pay for 100% of the cost of all such uncompleted work (the failure of the foregoing to be true, a "**Balancing Event**") or (2) the Project is more than three (3) months behind schedule as set forth in the Project Schedule, then Borrower shall have delivered immediately available funds (the "**Project Shortfall Reserve Funds**") to Lender in the amount determined by Lender as necessary to cause the sum of the Project Shortfall Reserve Funds plus the amount of unfunded Request for Advances to equal the cost of all such work that has not yet been paid for, which funds shall be held in a reserve account (the "**Project Shortfall Reserve Subaccount**") set up by Lender to hold such funds and disbursed to Borrower for the payment of Project Expenditures prior to the making of any further Request for Advances for the payment of Project Expenditures);

(E)     Upon Completion, the amount of the final advance for the Project shall be equal to the sum of the amount necessary to complete payment of all of the work comprising the Project set forth in the Project Budget that have not been completed plus any amount remaining in the Project Shortfall Reserve Subaccount; and

(F)     Lender shall not be required to disburse any funds for any materials, machinery or other personalty not yet incorporated into the Project (the "**Stored Materials**") or for deposits, unless the following conditions are satisfied: (1) Borrower shall deliver to Lender bills of sale or other evidence reasonably satisfactory to Lender of the cost of, and, subject to the payment therefor, Borrower's title in and to such Stored Materials; (2) the Stored Materials are identified to the Property and Borrower, are segregated so as to adequately give notice to all third parties of Borrower's title in and to such materials, and are components in substantially final form ready for incorporation into the Property; (3) the Stored Materials are stored at the Property or at such other third-party owned and operated site as Lender shall reasonably approve, and are protected against theft and damage in a manner reasonably satisfactory to Lender, including, if requested by Lender, storage in a bonded warehouse in the greater metropolitan area in which the Property is located; (4) the Stored Materials will be paid for in full with the funds to be disbursed, and all lien rights or claims of the supplier will be released upon full payment; (5) Lender has or will have upon payment with disbursed funds a perfected, first priority security interest in the Stored Materials; (6) the Stored Materials are insured for an amount equal to their replacement costs in accordance with Section 6.1 of this Agreement; and (7) the aggregate cost of Stored Materials stored on the Property at any one time for which disbursements have been made shall not exceed ten percent (10%) of the maximum amount of the Loan and the aggregate cost of Stored Materials stored off the Property at any one time shall for which disbursements under the Loan have been made shall not exceed ten percent (10%) of the maximum amount of the Loan unless otherwise approved by Lender.

Even if Borrower is divested, for whatever reason, of any portion of Borrower's interest in the Property, Lender may, at Lender's sole option, but without any obligation to do so, continue to make advances under this Agreement to Borrower or, subject to all terms and conditions of this Agreement, to that Person or Persons that

succeed to Borrower's title and interest in the Property; *provided, however*, that all sums so disbursed shall be deemed advances under this Agreement and be secured by the Security Instrument and all other Liens or security interests securing the Debt.

(b)     Record of Advances.  The amount and date of each advance under this Agreement, the amount from time to time outstanding under the Note, the interest rate with respect to the Loan, and the amount and date of any repayment under this Agreement or under the Note shall be noted on Lender's books and records, which, absent manifest error, shall be conclusive evidence of each such advance; *provided, however*, that any failure by Lender to make that notation or any error in that notation, shall not relieve Borrower of its obligation to pay to Lender all amounts owed to Lender when due under the terms of the Loan Documents.

(c)     Pre-Leasing Requirements.  Section 12(a)(xiii) of the Loan Term Sheet requires, as a condition to the initial advance under the Loan, that Borrower enters into acceptable pre-leasing for no less than 360,000 square feet in the Project.  As of the Closing Date, Borrower has pre-leased approximately 210,000 square feet in the Project.  Notwithstanding the failure of such condition, Lender is willing to make the initial advance under the Loan as set forth above, provided however, that each additional advance under the Loan will be restricted according to the amount of non-contingent pre-leasing in the Project (the tenants and terms of which shall be acceptable to Lender in its reasonable discretion ["**Acceptable Leases**"]) that Borrower has accomplished as of the date of a Request for Advance.  As such, until such time as an additional 150,000 square feet of Acceptable Leases has been executed by Borrower, the amount of $18,750,000.00 of Loan proceeds (the "**Restricted Loan Proceeds**") shall be unavailable to Borrower, except as hereinafter provided.  Lender agrees to proportionately make the Restricted Loan Proceeds available to Borrower in the amount of $125.00 of Restricted Loan Proceeds for every square feet of Acceptable Leases executed by Borrower as of the date of any Request for Advance (i.e., 150,000 square feet total), subject to all other requirements of this Section 2.2.

**Section 2.3**     Mandatory Principal Payments.  If the outstanding principal amount of the Loan at any time exceeds the Maximum Principal Amount, Borrower shall within thirty (30) days after written demand pay to Lender in immediately available funds an amount sufficient to reduce the outstanding principal amount of the Loan so that it does not exceed the Maximum Principal Amount.  Furthermore, Borrower shall promptly pay to Lender all Insurance Proceeds and Awards as more particularly provided in Article VI of this Agreement.

**Section 2.4**     Application of Payments.  Absent a Default or Event of Default, all payments received by Lender shall be applied (i) first, to pay any outstanding costs, expenses, or fees owed to Lender pursuant to this Agreement or any other Loan Documents until such amounts have been paid in full, (ii) second, to pay interest due on the Loan until paid in full, and (iii) third, to pay principal on the Loan, in the inverse order of maturity, until paid in full.  All payments received by Lender, whether or not received during the continuation of a Default or Event of Default, shall be applied by Lender to payment of the Debt in any order or priority that Lender in its sole discretion may elect.

**Section 2.5**     Fees.  On the date of execution of this Agreement, Borrower shall pay to Lender all fees incurred by Lender, including but not limited to the Origination Fee as a fee for Lender arranging the Loan and all other fees listed in the Loan Term Sheet.  Borrower shall pay to Lender an advance fee of $1,000 on the date of each advance of the Loan under this Agreement.

**Section 2.6**     Taxes.

(a)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of Borrower or Lender) requires the deduction or withholding of any Taxes from any such payment by Borrower, then Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable

under this Section) Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)   <u>Payment of Other Taxes by Borrower</u>.   Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Lender timely reimburse it for the payment of, any Other Taxes.

(c)   <u>Indemnification by Borrower</u>.   Borrower shall indemnify Lender, within thirty (30) days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.

(d)   <u>Evidence of Payments</u>. As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority pursuant to this <u>Section 2.6</u>, Borrower shall deliver to Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(e)   <u>Reserved</u>.

(f)   <u>Treatment of Certain Refunds</u>.   If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this <u>Section 2.6</u> (including by the payment of additional amounts pursuant to this <u>Section 2.6</u>), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.   Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.   This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)   <u>Survival</u>. Each party's obligations under this <u>Section 2.6</u> shall survive any assignment of rights by Lender, the termination of this Agreement, and the repayment, satisfaction or discharge of all obligations under any Loan Document.

### III   CONDITIONS PRECEDENT

**Section 3.1**   As a material inducement to Lender to make the initial advance under the Loan on the Closing Date, Borrower hereby represents and warrants to Lender that Borrower has satisfied all of the conditions precedent set forth in Part A on **Schedule II** attached hereto, except as any of the same may have been waived in writing by Lender, and Borrower acknowledges that Lender would not fund the initial advance under the Loan on the Closing Date unless all of such conditions precedent were satisfied (or waived by Lender) by the Closing Date.   The obligation of Lender to make the initial advance under the Loan on the Closing Date is subject to the condition precedent that Borrower has satisfied all of the conditions precedent set forth in Part A on **Schedule II** attached hereto.   Furthermore, the obligation of Lender to make any advances under the Loan after the Closing Date is subject to, in addition to the requirements set forth in <u>Section 2.2</u> hereof, the condition

**Exhibit A Page - 10**

precedent that Borrower has satisfied all of the conditions set forth in Parts A and B on **Schedule II** attached hereto prior to each additional advance.

## IV    REPRESENTATIONS AND WARRANTIES

**Section 4.1**    Borrower Representations. Each Borrower Party represents and warrants to the Lender as of the date hereof and as of the Closing Date (if such date is different), with respect to itself only, except as otherwise disclosed on the Disclosure Schedule attached hereto as **Schedule IV** that:

(a)    Organization. Each Borrower Party has been duly organized and is validly existing and in good standing in the jurisdiction in which it is organized. Each Borrower Party is duly qualified to do business and is in good standing in the state in which the Property is located and in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations. Each Borrower Party has all necessary rights, Licenses, permits, authorizations, approvals, governmental and otherwise, and full power and authority to own the Property and carry on its business as now conducted. Each Borrower Party has the full right, power and authority to operate, construct and develop the Property, to encumber the Property as provided herein and to perform all of the other obligations to be performed by it under the Loan Documents. The sole business of Borrower is the ownership, construction, development, management and operation of the Property.

(b)    Enforceability. Each Borrower Party has taken all necessary action to authorize the execution, delivery and performance of the obligations of this Agreement and the other Loan Documents to which it is a party, and such obligations shall be the valid and binding obligations of the respective Borrower Parties. This Agreement and such other Loan Documents to which each Borrower Party is a party have been duly executed and delivered by or on behalf of each Borrower Party and each Borrower Party has obtained or received all required consents and approvals, corporate, governmental or otherwise, and this Agreement and such other Loan Documents to which each Borrower Party is a party constitute legal, valid and binding obligations of each such Borrower Party enforceable against each such Borrower Party in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization and similar laws affecting rights of creditors generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by any Borrower Party, including the defense of usury or similar doctrines, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable except to the extent such unenforceability may be the result of bankruptcy, insolvency, reorganization or similar laws affecting rights of creditors generally or general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

(c)    No Conflicts. The execution and delivery of this Agreement and the other Loan Documents and the performance of the obligations thereunder by the Borrower Parties will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, operating agreement, certificate of incorporation, bylaws or any other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or Governmental Authority having jurisdiction over Borrower or any of Borrower's properties or assets, and any consent, approval, authorization, order, License, registration or qualification of or with any court or any such regulatory authority or other Governmental Authority or body required for the execution, delivery and performance by the Borrower Parties of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

(d)     <u>Litigation</u>.  There are no actions, suits, proceedings or investigations at law or in equity now pending or, to Borrower's best knowledge, threatened against or affecting any Borrower Party or the Property, other than as described on **Schedule III**.

(e)     <u>Agreements</u>.  No Borrower Party is a party to any agreement or instrument or subject to any restriction, which could have a Material Adverse Effect on Borrower or the Property.  No Borrower Party is in default in any respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which Borrower is a party or by which Borrower or the Property is bound.  No Borrower Party has Indebtedness under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) obligations incurred in the ordinary course of the operation, construction and development of the Property and (b) obligations under the Loan Documents.

(f)     <u>Title</u>.  Borrower has good, marketable and insurable fee simple title to the real property comprising the Property, free and clear of all Liens whatsoever except the Permitted Encumbrances.  There are no options, rights of first refusal, rights of first offer or similar rights, which affect the Property or any portion thereof except as previously disclosed to Lender in writing.

(g)     <u>Boundaries</u>.  All of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property, except those which are insured against by the Title Insurance Policy.

(h)     <u>Purchase Options</u>.  Neither the Property nor any part thereof or interest therein are subject to any purchase options, rights of first refusal or offer to purchase or other similar rights in favor of third parties.

(i)     <u>No Bankruptcy Filing</u>.  (A) (i) Each Borrower Party is solvent (within the meaning of all Bankruptcy Laws) and no bankruptcy, reorganization, insolvency or similar proceeding with respect to any Borrower Party under any Bankruptcy Law has been initiated, and (ii) the entering into the Loan Documents to which any Borrower Party is a party does not constitute a fraudulent conveyance by any Person; and (B) no petition in bankruptcy has been filed by or against any Borrower Party in the last seven (7) years, and no Borrower Party has, in the last seven (7) years, ever made any assignment for the benefit of creditors or taken advantage of any applicable Bankruptcy Laws.  No Borrower Party has entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and each Borrower Party has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities and its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of the obligations of Borrower).

(j)     <u>Full and Accurate Disclosure</u>.  No statement of fact made by any of the Borrower Parties in this Agreement or in any of the other Loan Documents, nor any written materials relating to the business, operations or condition (financial or otherwise) of any of the Borrower Parties or the Property that were supplied to Lender in connection with Lender's due diligence investigation contains (or, in the case of such written material, at the time supplied contained) any untrue statement of a material fact or omits (or omitted, as the case may be) to state any material fact necessary to make the statements contained therein or in any of the Loan Documents not misleading.

(k)  <u>Regulatory</u>.  None of the Borrower Parties is an "**employee benefit plan**" (as defined in Section 3(3) of ERISA), subject to Title I of ERISA, and none of the assets of the Borrower Parties constitutes or will constitute "**plan assets**" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101.  In addition, (i) none of the Borrower Parties is a "**governmental plan**" within the meaning of Section 3(32) of ERISA and (ii) transactions by or with any of the Borrower Parties are not subject to state statutes regulating investments of, and fiduciary obligations with respect to, governmental plans.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "**margin stock**" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.  Borrower is not a "**foreign person**" within the meaning of § 1445(f)(3) of the Code.  Borrower is not (i) an "**investment company**" or a company "**controlled**" by an "**investment company**," within the meaning of the Investment Company Act of 1940, as amended; or (ii) subject to any other federal or state law or regulation which purports to restrict or regulate Borrower's ability to borrow money.

(l)  <u>FIRPTA</u>.  No Borrower Party is a "foreign person" within the meaning of Sections 1445 or 7701 of the Code.

(m)  <u>Compliance</u>.  Subject to the Cannabis Disclosure (as defined below), Borrower and the Property and the uses thereof comply with all applicable Legal Requirements.  Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, and all required zoning, building code, land use, environmental, development plan, preliminary site plan, subdivision, and other similar permits or approvals (collectively, the "**Licenses**") necessary for the operation, construction and development of the Property for its current uses and for the conduct of Borrower's business and all such Licenses remain in full force and effect.  None of the foregoing are subject to revocation, suspension, forfeiture or modification.  Neither Borrower nor the Property is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority.  There has not been committed by Borrower or any other Person in occupancy of or involved with the operation, construction, development, or use of the Property any act or omission affording the federal government or any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  The use and development of the Property contemplated thereby comply and shall at all times comply with applicable Legal Requirements, including all applicable zoning resolutions, zoning ordinances, development requirements, building codes and environmental laws.  There are no outstanding notices of any uncorrected violations of any Legal Requirements with respect to the Property, and Borrower is not aware of the threat of any such notices.

(n)  <u>Financial Information</u>.

(i)  The balance sheet, income statement and statements of cash flow and other financial data that have been delivered to Lender in respect of the Property and each applicable Borrower Party, including those required under <u>Article III</u> (A) are true, complete and correct, (B) accurately represent the financial condition of the Property and/or the applicable Borrower Party as of the date of such reports or statements and contain no misrepresentation or omission, and (C) have been prepared in accordance with Acceptable Accounting Principles consistently applied throughout the periods covered, except as disclosed therein, and (D) have not been amended, modified or revised in any manner. Borrower does not have any Indebtedness, liabilities, contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that could have a Material Adverse Effect, except as referred to or reflected in said financial statements.  Since the date of such financial statements, there has been no Material Adverse Change in the financial condition, operations or business of Borrower, each Borrower Party, or the Property from that set forth in said financial statements.

(ii)  Each Borrower Party has filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by them and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them.  No

Borrower Party knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

(o)      Casualty; Condemnation and Assessments.  The Property is free from any material damage by Casualty.  No Condemnation or other proceeding has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of any roadways providing access to the Property or for any easements or public right-of-ways.  There are no pending or proposed special or other assessments for public improvements affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments, and to Borrower's knowledge, there are no other facts or circumstances which would cause the Taxes and Other Charges for the Property for the Fiscal Year in which the Closing Date occurs or the next following Fiscal Year to be significantly higher than the Taxes and Other Charges for the Property assessed and imposed for the Fiscal Year prior to the Fiscal Year in which the Closing Date occurs.

(p)      Insurance.  Borrower has obtained and has delivered to Lender a certificate of insurance reflecting the insurance coverages, amounts and other requirements set forth in this Agreement and there have been no acts or omissions that would impair the coverage of any such Policies or the benefits of the mortgagee endorsements, and Borrower shall deliver to Lender certified copies of all such Policies within five (5) Business Days following the date of this Agreement.

(q)      Flood Zone.  None of the Improvements on the Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards or, if any portion of the Improvements or the Property is located within such area, Borrower has obtained and will maintain the insurance prescribed in Section 6.1.1(a)(iv).

(r)      Filing and Recording Taxes, Taxes.  All transfer taxes, recording taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes or recording taxes, charges or fees or similar charges required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid or will be paid on the Closing Date.  All mortgage, mortgage recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Security Instrument, have been paid.

(s)      Single-Purpose.

(i)      Each Borrower Party hereby represents and warrants to, and covenants with, Lender that as of the date hereof and until such time as the Debt shall be paid in full:

(A)      Borrower has not owned, does not own and will not own any asset or property other than (1) its interest in the Property, and (2) incidental personal property necessary for the ownership, construction, development, management, or operation of the Property.

(B)      Borrower has not engaged in and will not engage in any business other than the ownership, construction, development, management, and operation of the Property and will continue to conduct and operate its business in accordance with the terms of the Loan Documents.

(C)      Borrower has not incurred and will not incur any Indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than (1) the Debt and, prior to the date hereof, the Prior Loan, and (2) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding one percent (1%) of the outstanding principal amount of the Loan at any time; provided that any Indebtedness incurred pursuant to subclause (2) shall be (x) due not more than sixty (60) days past the date incurred and paid on or prior to such date, and (y) incurred in the ordinary course of business.  No Indebtedness other than the Debt may be secured (superior,

subordinate or pari passu) by the Property. With respect to the Prior Loan, Borrower hereby represents and warrants that the Prior Loan has been repaid in full with the proceeds of the Loan and none of Borrower, Guarantors or any of their respective direct and indirect constituent owners has any remaining liabilities or obligations in connection with the Prior Loan (other than environmental and other limited and customary indemnity obligations which, in each case and by their express terms, survive the repayment of the Prior Loan).

(D)     Borrower has not entered into, is not a party to and will not enter into or be a party to any contract or agreement with any Affiliate of Borrower, any constituent party of Borrower or any Affiliate of any constituent party, except in the ordinary course of business and on terms and conditions that are disclosed to Lender in advance and that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

(E)     Borrower has not made and will not make any loans or advances to any Person (including any Affiliate or constituent party), and has not acquired and shall not acquire obligations or securities of any Borrower Party or any Affiliate of Borrower or any Borrower Party.

(F)     Borrower is and will remain solvent and Borrower has at all times during its existence paid and will continue to pay Borrower's debts, liabilities and expenses (including, as applicable, shared personnel and overhead expenses) only from Borrower's assets as the same shall become due.

(G)     Borrower has not undertaken and will not undertake any Material Action without the prior unanimous written consent of all of its partners or members, as applicable;

(H)     Borrower has done or caused to be done and will do all things necessary to observe all organizational formalities and preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, and will not amend, modify, terminate or fail to comply with the provisions of its Organizational Documents.

(I)     Borrower has at all times during its existence maintained and will continue to maintain all of Borrower's accounts, books, records, financial statements and bank accounts separate from those of its Affiliates and any other Person. Borrower's assets have not been and will not be listed as assets on the financial statement of any other Person, provided, however, that Borrower's assets may be included in a consolidated financial statement of its Affiliates if (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person, and (ii) such assets shall be listed on Borrower's own separate balance sheet. Borrower has and will file its own tax returns (to the extent Borrower is required to file any such tax returns) and will not file a consolidated federal income tax return with any other Person. Borrower has at all times during its existence maintained and will continue to maintain Borrower's books, records, resolutions and agreements as official records.

(J)     Borrower has been and will be, and has held and at all times will hold itself out to the public as, a legal entity separate and distinct from any other Person (including any Affiliate of Borrower or any constituent party of Borrower), has at all times conducted and will continue to conduct business in Borrower's own name, has at all times corrected and shall correct any known misunderstanding regarding Borrower's status as a separate entity, has not identified and shall not identify itself or any of its Affiliates as a division or part of any other Person and has maintained and shall continue to maintain and utilize separate stationery, invoices and checks bearing Borrower's own name.

(K)     Borrower has maintained and will continue to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of Borrower's contemplated business operations.

(L)     Neither Borrower nor any constituent party of Borrower has sought or will seek or effect the liquidation, dissolution, winding up, consolidation, or merger, in whole or in part, of Borrower.

(M)     Borrower has not commingled and will not commingle the funds and other assets of Borrower with those of any Affiliate or constituent party or any other Person, and Borrower has not controlled and will not control the decisions with respect to the daily affairs of any other Person.

(N)     Borrower has maintained and will continue to maintain Borrower's assets in such a manner that it would not be costly or difficult to segregate, ascertain or identify Borrower's assets from those of any Affiliate or constituent party of Borrower or any other Person.

(O)     Borrower has not assumed or guaranteed or become obligated for the debts of any other Person and has not held itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person, and Borrower will not assume or guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(P)     Borrower has at all times during its existence held, and will continue to hold, all of Borrower's assets in Borrower's own name.

(Q)     Except as specifically provided in the Loan Documents or Borrower's Organizational Documents, no other Person has ever guaranteed or become obligated for Borrower's debts at any time during Borrower's existence, and except as specifically provided in the Loan Documents or Borrower's Organizational Documents, Borrower will not permit any other Person to guarantee or become obligated for Borrower's debts at any time in the future.

(R)     No other Person has ever held, and Borrower will not permit any other Person to hold, out Borrower's credit as being available to satisfy the obligations of any other Person.

(S)     Borrower has not at any time during Borrower's existence bought or held, and will not in the future buy or hold, evidence of Indebtedness issued by any of Borrower's Affiliates or equity interest holders (direct or indirect).

(T)     Borrower has at all times during Borrower's existence allocated fairly and reasonably (and paid or charged for, as applicable), and will continue to allocate fairly and reasonably (and pay or charge for, as applicable), any overhead expenses that are shared with an Affiliate of Borrower, including paying for office space provided by and services performed by any employee of an Affiliate of Borrower.

(U)     Borrower will comply with or cause the compliance with all the representations, warranties and covenants in this Section 4.1(s).

(V)     Borrower has not permitted and will not permit any Affiliate or constituent party independent access to its bank accounts.

(W)     Borrower has paid and shall pay the salaries of its own employees (if any) from its own funds and has and maintain a sufficient number of employees (if any) in light of its contemplated business operations.

(X)     Borrower has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred.

(Y)    Except as provided in the Loan Documents or in connection with the Prior Loan, Borrower has not at any time during its existence pledged, and will not in the future pledge, Borrower's assets for the benefit of any other Person.

(Z)    No other Person has ever pledged, and Borrower will not permit any other Person to pledge, Borrower's assets for such other Person's benefit.

(AA)    No other Person has ever identified, and Borrower will not permit any other Person to identify, Borrower as a division of any other Person.

(BB)    Borrower either (i) has no, and will have no, obligation to indemnify its officers, directors, managers, members, shareholders or partners, as the case may be, or (ii) if it has any such obligation, such obligation is fully subordinated to the Debt and will not constitute a claim against Borrower if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation.

(CC)    Borrower will consider the interests of Borrower's creditors in connection with all corporate, limited liability company or limited partnership actions

(t)    Hazardous Materials.  Borrower hereby represents and warrants to Lender that the representations and warranties contained in the Environmental Indemnity are true and correct. Except for any specific limitation contained in the Environmental Indemnity, this representation and warranty shall survive any termination, satisfaction, or assignment of this Agreement and the exercise by Lender of any of its rights or remedies hereunder, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

(u)    Contracts.  Except as set forth on **Schedule IV**, there are no service, maintenance or other contracts affecting the use, operation or maintenance of the Property that are not terminable on one month's notice or less without cause and without a termination fee, penalty or premium.  True and correct copies of all contracts affecting the use, operation or maintenance of the Property (regardless of the dollar amount of such contracts or the termination provision set forth therein) (together with all amendments, modifications or supplements thereto) have been delivered to Lender.  All service, maintenance or other contracts affecting the Property entered into by Borrower or its Affiliates have been entered into at arm's-length in the ordinary course of Borrower's business.

(v)    Principal Place of Business.  Borrower's principal place of business as of the date hereof is at the address set forth in the introductory paragraph of this Agreement.

(w)    Borrower's Ownership Structure.  Borrower has provided to Lender the structure chart attached hereto as **Schedule V**, which structure chart is a true and correct description of Borrower's ownership structure, setting forth all Persons who own, directly or indirectly, ownership interests in Borrower and no other Person (whether disclosed or undisclosed) directly or indirectly owns any ownership interest in Borrower.

(x)    Service Rights.  Except as set forth on **Schedule IV**, no Service Rights have been granted to any Person in connection with or relating to the Property.  To the extent Service Rights have been granted to any Person as set forth on **Schedule IV**, Borrower (and no other Person) is entitled to receive any and all compensation with respect to the Service Rights.

(y)    Affiliate Transaction.  Except as set forth on **Schedule IV**, Borrower has not entered into any Affiliate Transactions.  Any agreement with an Affiliate of Borrower shall provide that such agreement may be terminated on no more than thirty (30) days prior notice, with or without cause, and without penalty, and providing that if Lender acquires the Property or an ownership interest in Borrower, directly or indirectly, then Borrower and such Affiliate agrees that Lender (or such purchaser at foreclosure) may terminate the subject agreement at any time upon notice to the Affiliate with or without cause or the payment of any

premium or penalty. If such agreement is not terminated in accordance with the immediately preceding sentence, Lender shall have the right, and Borrower hereby irrevocably authorizes Lender and irrevocably appoints Lender as Borrower's attorney-in-fact coupled with an interest, at Lender's sole option, to terminate the agreement on behalf of and in the name of Borrower, and Borrower hereby releases and waives any claims against Lender arising out of Lender's exercise of such authority.

(z)   Conditions Precedent. Borrower has used its best effort to provide Lender with all documentation reasonably necessary for Borrower to fulfill and satisfy all of the conditions precedent set forth in Part A on **Schedule II** and will provide Lender with all documentation reasonably necessary for Borrower to fulfill and satisfy all other conditions precedent set forth on **Schedule II** before obtaining any advances after the Closing Date.

(aa)   Easements; Utilities and Public Access. All easements, cross easements, licenses, air rights and rights-of-way or other similar property interests (collectively, "**Easements**"), if any, necessary for the full development of the Property for its intended purposes have been obtained, are described in the Title Insurance Policy and are in full force and effect without default thereunder. The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid easement. All roads necessary for the use and development of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

(bb)   Separate Lots. The Property is comprised of one (1) or more parcels which constitute separate tax lots and do not constitute a portion of any other tax lot not a part of the Property.

(cc)   Taxes and Assessments. All Taxes and governmental assessments owing in respect of the Property have been paid or an escrow of funds in an amount sufficient to cover such payments has been established hereunder. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(dd)   Cole Memo Compliance. Borrower shall operate in strict conformity with the provisions of the Cole Memo.

**Section 4.2**   Survival of Representations. Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents, and as set forth in the Loan Term Sheet shall survive for so long as any Obligations remain owing to Lender under this Agreement or any of the other Loan Documents by Borrower; provided, however, that those particular representations and warranties set forth in this Agreement and/or in the other Loan Documents which by their terms expressly survive the repayment of the Debt shall survive the complete payment of the Debt. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf. Borrower acknowledges that the representations and warranties contained in the Loan Documents are a material inducement to Lender to make the Loan.

## V   BORROWER COVENANTS

From the date hereof and until payment and performance in full of all Obligations of Borrower under the Loan Documents, Borrower hereby covenants and agrees with Lender that:

**Section 5.1**   Existence; Compliance with Legal Requirements. Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect Borrower's existence, rights, Licenses, permits and franchises and to promptly comply with all Legal Requirements applicable to Borrower

and the Property. Borrower shall not dissolve, terminate, liquidate, merge with, consolidate into or acquire another Person, and Borrower shall continue to comply with the provisions of Section 4.1(s) throughout the Term. Borrower shall at all times maintain, preserve and protect all franchises and trade names and preserve all of Borrower's property used or useful in the conduct of Borrower's business. Borrower will not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, partnership or other structure without Lender's prior written consent, except as otherwise expressly provided herein. Borrower will qualify to do business and will remain in good standing under the laws of the state in which the Property is located and in each jurisdiction as and to the extent the same is required for the ownership, maintenance, management and operation of the Property.

Section 5.2    Hazardous Materials.    Borrower shall comply strictly and in all respects with the covenants set forth in the Environmental Indemnity.

Section 5.3    Certain Prohibited Actions.

(a)    Borrower shall not make any change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business. Borrower shall not directly or indirectly do any of the following: (i) change its principal place of business or chief executive office without first giving Lender thirty (30) days' prior written notice thereof and executing, if necessary, and delivering to Lender such additional UCC Financing Statements or financing statement amendments as Lender may require in order to reflect such change in Borrower's principal place of business or chief executive office and to maintain the perfection of all Liens and security interests created by the Loan Documents; or (ii) take any action or permit any action or inaction which could result in Borrower not being in compliance with Section 4.1(s); or (iii) cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business in its reasonable judgment. Borrower shall comply in all respects with Section 4.1(s) of this Agreement.

(b)    Borrower shall not and shall not permit any Borrower Party to make any change, amendment or modification to the Organizational Documents of any Borrower Party without Lender's prior written consent.

Section 5.4    Taxes and Other Charges.    Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof prior to delinquency. Borrower will deliver to Lender or Lender's designee receipts for payment or other evidence satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent no later than ten (10) days prior to the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid. Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien which may be or become a Lien against the Property, other than Permitted Encumbrances, and shall promptly pay for all utility services provided to the Property. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges or the existence of any Lien, provided that (i) no Default or Event of Default exists, (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of all Leases and other documents or instruments to which Borrower is subject and shall not constitute a default thereunder, and such proceeding shall be conducted in accordance with all Legal Requirements, (iii) Borrower shall notify Lender in writing of any such contest and shall diligently and in good faith contest such Taxes, Other Charges or Lien by appropriate legal proceedings which shall operate to prevent the enforcement or collection thereof and the sale of the Property or any part thereof, in satisfaction thereof; (iv) Borrower shall have furnished to Lender a cash deposit, or an indemnity bond satisfactory to Lender with a surety satisfactory to Lender, in an amount equal to 125% of the Taxes, Other Charges or Lien claim, plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred in connection therewith, to assure payment of the matters under contest and to prevent any sale or forfeiture of the Property or any part thereof; and (v) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes, Other Charges or Lien(s), together with all costs, interest and penalties which may be payable in connection therewith. In addition, if the Taxes, Other Charges or Lien(s) are not paid in full when Borrower

commences such contest, then such proceeding shall suspend the collection of Taxes, Other Charges or Lien from the Property. Lender may pay over any such cash deposit or part thereof held by Lender or liquidate any other security and pay same over to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established. Notwithstanding the foregoing, Borrower shall immediately upon request of Lender pay (and if Borrower shall fail so to do, Lender may, but shall not be required to, pay or cause to be discharged or bonded against) any such Taxes, Other Charges or Lien claim notwithstanding such contest, if in the good faith opinion of Lender, the Property or any part thereof or interest therein may be in danger of being sold, forfeited, foreclosed, terminated, canceled or lost. In addition, Borrower shall pay to Lender upon demand, any reasonable costs incurred by Lender in ensuring compliance by Borrower with this Section 5.4, including reasonable attorneys' fees, monitoring and evaluating expenses and any tax service fees.

Section 5.5    Performance of Agreements.  Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all principal, interest, costs, fees and expenses to the extent required under, the Loan Documents. Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any other agreement or recorded instrument affecting or pertaining to Borrower or the Property, or given by Borrower to Lender for the purpose of further securing the Obligations.

Section 5.6    Notices.  Borrower shall immediately upon receipt give written notice to Lender of any litigation or governmental proceedings pending or threatened in writing against Borrower or the Property. Borrower shall promptly advise Lender of any Material Adverse Change and of the occurrence of any Default or Event of Default.

Section 5.7    Access to Property.  Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon not less than forty-eight hours (48) hours advance notice or such shorter period of notice as circumstances may dictate. Without limiting the generality of the foregoing, Borrower agrees that Lender will have the same right, power and authority to enter into and inspect the Property as is granted a secured lender under Section 2929.5 of the California Civil Code and under Section 564(c) of the California Code of Civil Procedure.

Section 5.8    Compliance.  Subject to the Cannabis Disclosure, Borrower shall not commit and shall use its best efforts not to allow any other Person in occupancy of or involved with the operation or use of the Property to commit any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

Section 5.9    Cooperate in Legal Proceedings.  Borrower shall reasonably cooperate with Lender with respect to any proceedings before any court, board or other Governmental Authority, which may in any way affect the rights of Lender hereunder, or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

Section 5.10    Insurance Benefits and Condemnation Awards.  Borrower shall reasonably cooperate with Lender in obtaining for Lender the benefits of any Insurance Proceeds and Awards lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any reasonable expenses incurred in connection therewith (including attorneys' fees and disbursements, expense of an appraisal on behalf of Lender in case of a fire or other Casualty affecting the Property or any part thereof) out of such Insurance Proceeds or Awards, as applicable.

Section 5.11    Further Assurances.  Borrower will, at the cost of Borrower and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers, boundary surveys, footing or foundation surveys, plans and specifications, appraisals, title and other insurance reports and agreements and assurances as Lender shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender, the property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned,

warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of Borrower's covenants under this Agreement or for filing or recording the Security Instrument, or for complying with all Legal Requirements. Borrower, on demand, will execute and deliver one or more financing statements, chattel mortgages or other instruments, to evidence or perfect more effectively the security interest of Lender in the Property, and if Borrower fails to execute and deliver any of the foregoing within five (5) Business Days after such request by Lender, Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the sole purpose of exercising and perfecting any and all rights and remedies available to Lender pursuant to this Section 5.11, and hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, any such financing statements, chattel mortgages or other instruments, and Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of Lender's exercise of Lender's rights under this Section 5.11 or the execution and/or recordation of any instruments by or on behalf of Borrower pursuant to the foregoing power of attorney, unless such claim or cause of action results from Lender's gross negligence or willful misconduct. For the avoidance of any doubt, the foregoing covenants of Borrower extend only to taking such actions as may be reasonably required by Lender to confirm or correct any obligations or undertakings by Borrower otherwise contemplated hereunder and is not intended to impose on Borrower an obligation to undertake any actions that would create new liabilities or obligations not otherwise contemplated by this Agreement.

**Section 5.12** <u>Financial Reporting</u>.

(a)     Borrower will keep and maintain or will cause to be kept and maintained in accordance with Acceptable Accounting Principles, proper and accurate books, records and accounts reflecting all of the financial affairs, income and expenses of Borrower and the Property. Lender shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records as Lender shall determine to be necessary or appropriate in the protection of Lender's interest. Borrower shall furnish or make available to Lender and its agents convenient facilities for the examination and audit of any of Borrower's books and records.

(b)     Borrower will furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year, a complete copy of Financial Statements for Borrower for such Fiscal Year prepared by Borrower and in accordance with Acceptable Accounting Principles. Borrower's annual Financial Statements shall be accompanied by an Officer's Certificate stating that such annual Financial Statements present fairly the financial condition of Borrower and the Property and that the Leases have not been amended, modified or canceled.

(c)     Borrower will furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar quarter the following items accompanied by an Officer's Certificate stating that such items are true, correct and complete in all respects and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (A) quarterly and year to date Financial Statements; (B) intentionally omitted; and (C) the actual capital expenditures for the Property with respect to such period; (D) all new Leases, Lease amendments or other documents affecting the Rents executed since the last such statement; and (E) a comparison of the budgeted income and expenses and the actual income and expenses for such period.

(d)     Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible) such further detailed information, including Borrower's tax returns, with respect to the operation of the Property and the financial affairs of Borrower or the Property as may be requested by Lender.

**Section 5.13** <u>Title to the Property</u>. Borrower will warrant and defend (i) the title to the Property and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances), and (ii) the

validity and priority of the Lien of the Security Instrument on the Property and the perfection and priority of the Liens created by the Loan Documents, including any UCC Financing Statements, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever.   Borrower shall reimburse Lender on demand for any losses, costs, damages or expenses (including attorneys' fees and court costs) incurred by Lender if an interest in the Property, other than as permitted hereunder, is claimed by another Person.

**Section 5.14**    Estoppel Statements.

(a)     At any time within ten (10) days after request by Lender, Borrower shall furnish Lender or any proposed assignee of Lender with a written statement, duly acknowledged and certified by Borrower, setting forth (A) the original principal amount of the Note, (B) the unpaid principal amount of the Note, (C) the then current rate of interest of the Note, (D) the terms of payment, (E) the date installments of interest and/or principal were last paid, (F) that, except as provided in such statement, there are no defaults or events which with the passage of time or the giving of notice or both, would constitute an event of default under the Loan Documents, (G) that the Loan Documents are valid, legal and binding obligations of the Borrower Parties and have not been modified or if modified, giving particulars of such modification, (H) whether any offsets or defenses exist with respect to the Loan or Lender and, if any are alleged to exist, a detailed description thereof, (I) whether or not, to the best knowledge of Borrower, any of the lessees under the Leases are in default under the Leases, and, if any of the lessees are in default, setting forth the specific nature of all such defaults, and (J) as to any other matters reasonably requested by Lender.

(b)     Borrower shall use its best efforts to deliver to Lender, upon request, an estoppel certificate from each Tenant under any Lease in form and substance reasonably satisfactory to Lender (provided that Borrower shall only be required to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant not required to provide an estoppel certificate under its Lease); provided that such certificate may be in the form required under such Lease; and provided, further, that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year.

**Section 5.15**    Business Purposes; Use of Property.  The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.  Borrower shall not change the current use of the Property in any material respect, nor shall Borrower initiate or consent to any zoning re-classification of any portion of the Property or seek any variance as to the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or other applicable land use law, without Lender's prior consent.

**Section 5.16**    Contracts.  Borrower shall deliver or cause to be delivered to Lender copies of all contracts or other agreements (and all amendments, modifications or supplements thereto), whether now existing or hereafter entered into, affecting Borrower or the use, maintenance, construction, development, management or operation of the Property, including any options to purchase or rights of first offer or first refusal to purchase the Property or any portion of the Property.  Borrower shall not enter into any service, maintenance construction, development or other contracts affecting the Property without Lender's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed; provided, however, Lender's prior consent shall not be required with respect to any contracts or agreements unless such contracts or agreements (a) could have a Material Adverse Effect, (b) are not terminable on one month's notice or less without cause and without penalty or premium or (c) are for a period in excess of one year (unless cancellable with thirty (30) days notice), or for an aggregate amount in excess of $50,000.00.

**Section 5.17**    Maintenance of Property; Payment for Labor and Materials; Alterations.

(a)     Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty, or become damaged, worn or dilapidated and shall complete and pay for any structure at any time in the process of construction or repair on the Property.  Borrower will promptly pay when due all bills and costs for labor, materials and specifically fabricated materials incurred in connection

with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any Lien or security interest, even though subordinate to the Liens and the security interests of the Security Instrument, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional Lien or security interest other than the Lien created by the Loan Documents and the Permitted Encumbrances.

(b)     Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements shall not be removed, demolished or altered in any material respect nor shall any additional improvements be constructed without the prior, written consent of Lender.

(c)     Lender's prior approval shall be required in connection with (a) any alterations to any Improvements (i) that may have a Material Adverse Effect, (ii) that could adversely affect any structural component or the exterior of any Improvements or any utility or HVAC system at the Property, or (iii) the cost of which (including any related alteration, improvement or replacement) is reasonably anticipated to exceed the Alteration Threshold, or (b) any alteration to any Improvements during the continuance of an Event of Default (any of the foregoing, a "**Material Alteration**"). If the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's Obligations under the Loan Documents any of the following: (1) cash, (2) a Letter of Credit, or (3) other securities acceptable to Lender. Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements (other than such amounts to be paid or reimbursed by Tenants under the Leases) over the Alteration Threshold. Upon substantial completion of any Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in accordance with applicable Legal Requirements, (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of liens, and (iii) all material licenses and permits necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of tenant improvement work) have been issued.

**Section 5.18**     Transfer or Encumbrance of the Property.

(a)     Borrower acknowledges that Lender, in agreeing to make the Loan, has examined and relied on the creditworthiness and experience of the Borrower Parties in owning and operating and developing properties such as the Property, and that Lender will continue to rely on Borrower's ownership, operation, and development of the Property as a means of maintaining the value of the Property as security for repayment of the Debt. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt, Lender can recover all or a portion of the Debt by a sale of the Property. Accordingly, subject to the terms of this Section 5.18, Borrower shall not, without the prior written consent of Lender, sell, convey, alienate, mortgage, encumber, pledge or otherwise Transfer the Property, or any part thereof or any interest therein, directly or indirectly, or permit the Transfer of the Property, or any part thereof or any interest therein.

(b)     A Transfer of the Property within the meaning of this Section 5.18 shall be deemed to include: (A) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof or any interest therein for a price to be paid in installments; (B) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder, or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents, except as specifically permitted by the Loan Documents; (C) if Borrower or any partner or member of Borrower (or any indirect owner of an interest in Borrower or any constituent partner or member of Borrower no matter how remote) is a corporation, the Transfer of such corporation's stock or any portion thereof (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock in one or a series of transactions by which any of such corporation's stock or any portion thereof shall be vested in a party or parties who are not now existing stockholders as of the date hereof or results in any change in the ultimate ownership or control of such

**Exhibit A Page - 23**

corporation (no matter how remote); (D) if Borrower or any partner or member of Borrower (or other indirect owner of an interest in Borrower or any constituent partner or member of Borrower no matter how remote) is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a partner, joint venturer or member or the Transfer of the partnership or membership interest of any partner or any member or the Transfer of the interest of any joint venturer, partner or member; (E) if Borrower is a limited or general partnership, joint venture, limited liability company, trust, nominee trust, tenancy in common or other unincorporated form of business association or form of ownership interest, the Transfer of any interest (including any economic or profits interest) of any Person having a direct or indirect legal or beneficial ownership interest in Borrower, including any legal or beneficial interest in any constituent partner or member of Borrower; (F) except as otherwise provided in the Loan Documents, any instrument subjecting the Property to a condominium regime or transferring ownership to a cooperative corporation; (G) the dissolution or termination of Borrower or any general partner or managing member of Borrower or any constituent member or partner of Borrower or the merger or consolidation of Borrower or any general partner or member of Borrower with any other Person; (H) any transfer of a direct or indirect ownership interest in Borrower; (I) any other transaction pursuant to which any Person not holding a direct or indirect ownership interest in Borrower on the Closing Date acquires a direct or indirect (and no matter how remote) ownership interest in Borrower; (J) any swap, derivative or other transaction shifting the risks and rewards of ownership of the Property, unless otherwise expressly required by the Loan Documents; (K) any transaction pursuant to which any Person is granted an option to purchase all or any portion of the Property or any direct, indirect or beneficial interest in Borrower; and (L) any transaction, agreement or arrangement pursuant to which any Person is given any right to control, direct or veto any material actions or decisions by Borrower, directly or indirectly, whether through an ownership interest, contract right or otherwise.

      (c)     Lender shall not be required to demonstrate any actual impairment or prejudice of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon any Transfer (other than a Transfer specifically permitted by this Agreement) without Lender's prior written consent which may be granted, withheld, delayed or conditioned in Lender's sole and absolute discretion. This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.

      (d)     Lender's consent to one Transfer of the Property shall not be deemed to be a waiver of Lender's right to require such consent to any future Transfer. Any Transfer of the Property made in contravention of this Section 5.18 shall be null and void and of no force and effect.

      (e)     Borrower agrees to bear and shall pay or reimburse Lender on demand for all costs and expenses (including title search costs, title insurance endorsement premiums and reasonable attorneys' fees and disbursements) incurred by Lender in connection with the review, approval and documentation of any proposed Transfer, whether or not such consent is granted, withheld, conditioned or denied and whether or not such transfer is expressly permitted herein.

      (f)     Borrower shall not create, incur, assume or permit to exist (i) any lien on the Property or any portion of the Property, except for Permitted Encumbrances or (ii) any lien on any direct or indirect interest in Borrower (other than pursuant to a Pledge Agreement).

**Section 5.19**    ERISA.

      (a)     Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, under the Loan Documents (or the exercise by Lender of any of its rights under the Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

      (b)     Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender, that (i) Borrower is not an **"employee benefit plan"** as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or

a **"governmental plan"** within the meaning of Section 3(32) of ERISA or treats as holding assets of any such plan by reason of such plans ownership of an interest in Borrower; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

(i) Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

(ii) Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by **"benefit plan investors"** within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

(iii) Borrower qualifies as an **"operating company"** or a **"real estate operating company"** within meaning of 29 C.F.R. § 2510.3-101(c) or (e) or an investment company registered under The Investment Company Act of 1940.

**Section 5.20** <u>Affiliate Transaction</u>.  Borrower shall not enter into any Affiliate Transaction unless such agreement is on such terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such Affiliate.

**Section 5.21** <u>Service Rights</u>.  Borrower shall not allow any Service Rights to be granted by any Person other than Borrower, and any Service Rights granted by any Person other than Borrower shall be null and avoid ab initio.

**Section 5.22** <u>Purchase Options</u>.  Borrower shall deliver to Lender true and correct copies of any option agreement and any rights of first offer or rights of first refusal to purchase the Property or any portion thereof, or any other similar agreement, together with all amendments and modifications thereto, within five (5) days after the execution thereof.  The requirement for delivery of the foregoing shall not be deemed to imply Lender's consent thereto.

**Section 5.23** <u>Confirmation of Representations, Warranties and Covenants</u>.  In addition to and not in limitation of the covenants and agreements of Borrower contained in this Agreement, if requested by Lender, Borrower shall deliver, one or more Officer's Certificates certifying as to the accuracy of all representations and warranties made by Borrower in the Loan Documents as of the Closing Date.

**Section 5.24** <u>Subdivision Maps</u>.  Prior to entering into, agreeing to or recording any map, plat, parcel map, lot line adjustment or other subdivision map of any kind covering any portion of the Property (collectively, **"Subdivision Map"**), or amending, modifying, terminating or taking any action with respect to any Subdivision Map, Borrower shall submit such Subdivision Map to Lender for Lender's review and approval, which approval may be withheld in Lender's reasonable discretion.  As a condition precedent to approval by Lender, if required by Lender, (i) Borrower shall execute, acknowledge and deliver to Lender such amendments the Loan Documents as Lender may reasonably require to reflect the change in the legal description of the Property resulting from the recordation of any Subdivision Map, and (ii) Borrower shall deliver to Lender, at Borrower's sole expense, a title endorsement to the Title Policy in form and substance satisfactory to Lender insuring the continued first priority lien of the Security Instrument.  Subject to the execution and delivery by Borrower of any documents required under this <u>Section 5.24</u>, Lender shall, if required by applicable law, sign any Subdivision Map approved by Lender pursuant to this <u>Section 5.24</u>.

**Section 5.25** <u>Equity Contribution</u>.  Until such time as the Loan has been indefeasibly paid in full (together with all interest thereon and other sums payable with respect thereto), Borrower shall keep the Equity Contribution invested in the Property as equity and shall not permit any return of the Equity Contribution.  The foregoing shall not prohibit dividends or distributions to members or partners of Borrower permitted under <u>Section 5.31</u>.

**Section 5.26**   Anti-Terrorism.

(a)    Neither Borrower nor any other Person owning a direct or indirect interest in Borrower is in violation of any Legal Requirements, including requirements of The Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and Regulations, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, (the "**Executive Order**") and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56, the "**Patriot Act**").

(b)    None of Borrower, the direct members of Borrower, Guarantors, nor any of their respective constituents, investors or affiliates, any of their respective brokers or other agents, if any, acting or benefiting in any capacity in connection with the Loan is a "**Prohibited Person**" which is defined as follows:

(i)    a Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)    a Person with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Legal Requirements, including the Executive Order and the Patriot Act;

(iv)    a Person who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(v)    a Person that is named as a "**specially designated national and blocked person**" on the most current list published by the U.S. Treasury Department Office of Foreign Assets control at its official website, http://www.treas.gov/ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list; and

(vi)    a Person who is affiliated with a Person listed above.

(c)    None of Borrower, the direct members of Borrower, Guarantors or any of their respective affiliates, investors or constituents or any of their respective brokers or other agents, if any, acting in any capacity in connection with the Loan are or will (i) conduct any business or engage in any transaction or dealing with any Prohibited Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Prohibited Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order; or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purposes of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Patriot Act.

(d)    Borrower covenants and agrees to deliver to Lender any certification or other evidence requested from time to time by Lender in its reasonable discretion, confirming compliance with this Section.

(e)    None of the funds or other assets of Borrower, the sole member of any Borrower Party or Guarantors constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as defined below); (ii) no Embargoed Person has any interest of any nature whatsoever in Borrower or Guarantors, as applicable (whether directly or indirectly); and (iii) none of the funds of Borrower, the sole member of any Borrower Party or Guarantors, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, the sole member of any Borrower Party or Guarantors, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

"**Embargoed Person**" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower, the sole member of any Borrower Party or Guarantors, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of Applicable Law.

**Section 5.27**   Leases.

(a)     Except as may be otherwise approved by Lender in writing, all Leases and all renewals of Leases executed after the date hereof shall (i) to the best of Borrower's knowledge, provide for economic terms, including rental rates and term, comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms,  (iii) provide that such Lease is subordinate to the Security Instrument and the Assignment of Leases and that the Tenant thereunder will attorn to Lender and any purchaser at a foreclosure sale, (iv) be written substantially in accordance with the standard form of Lease which shall have been approved by Lender (subject to any commercially reasonable changes made in the course of negotiations with the applicable Tenant)], (v) not be to an Affiliate of Borrower or Guarantors, (vi) provide that the beneficiary of any mortgage may at any time unilaterally record, in its sole and absolute discretion, a declaration that subordinates and has the effect of subordinating the lien of the mortgage to such Lease, and (vii) not contain any option to purchase, any right of first refusal to purchase, any right to terminate (except in the event of the destruction or condemnation of substantially all of the Property), any requirement for a non-disturbance or recognition agreement, or any other terms which would materially adversely affect Lender's rights under the Loan Documents.  Further, all Major Leases and all renewals, amendments and modifications thereof and waivers thereunder executed after the date hereof shall be subject to Lender's prior approval, which approval shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed.  Lender shall execute and deliver its standard form of subordination, non-disturbance and attornment agreement to Tenants under any future Major Lease approved by Lender promptly upon request, with such commercially reasonable changes as may be requested by such Tenants, and which are reasonably acceptable to Lender.  Borrower shall pay Lender's costs and expenses in connection with any such subordination, non-disturbance and attornment agreement, including, without limitation, reasonable legal fees and expenses.

(b)     Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the terms, covenants and conditions contained in the Leases upon the part of the Tenants thereunder to be observed or performed in a commercially reasonable manner; provided, however, Borrower shall not terminate or accept a surrender of a Lease without Lender's prior approval; (iii) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not alter, modify or change any Lease so as to change the amount of or payment date for rent, change the expiration date, grant any option for additional space or term, materially reduce the obligations of the Tenant or increase the obligations of the lessor; and (vi) shall promptly furnish to Lender any notice of default or termination received by Borrower from any Tenant, and any notice of default or termination given by Borrower to any Tenant.  Upon request, Borrower shall promptly furnish Lender with executed copies of all Leases and a statement of all Tenant security or other deposits.

(c)     All security deposits of Tenants, whether held in cash or any other form, shall not be commingled with any other funds of Borrower and, if cash, shall be deposited by Borrower at a separately designated account under Borrower's control.  Any bond or other instrument which Borrower is permitted to hold in lieu of cash security deposits under any applicable Legal Requirements (i) shall be maintained in full force and effect in the full amount of such deposits unless replaced by cash deposits as hereinabove described, (ii) shall be issued by an institution reasonably satisfactory to Lender, (iii) shall, if permitted pursuant to any Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender), and (iv) shall in all respects comply with any applicable Legal Requirements and otherwise be

**Exhibit A Page - 27**

satisfactory to Lender.  Borrower shall, upon request, provide Lender with evidence satisfactory to Lender of Borrower's compliance with the foregoing.

(d)    Borrower shall not permit or consent to any assignment or sublease of any Major Lease without Lender's prior approval (other than any assignment or sublease expressly permitted under a Major Lease pursuant to a unilateral right of Tenant thereunder not requiring the consent of Borrower).

(e)    Notwithstanding anything to the contrary contained in this Section 5.27, provided no Event of Default shall have occurred and remain uncured, Borrower shall have the right, without the consent or approval of Lender in any instance, to terminate or accept a surrender of any Lease that is not a Major Lease, except that no termination by Borrower or acceptance of surrender by a Tenant of any Leases shall be permitted unless by reason of a Tenant default and then only in a commercially reasonable manner to preserve and protect the Property.

(f)    It is acknowledged and agreed that pursuant to the Master Lease, the master lessee thereunder is responsible for entering into subleases with occupants of that portion of the Property.  Such master lessee shall have the same right to enter into such subleases on the same terms, and subject to the same limitations as Borrower with respect to Leases (including, without limitation, the foregoing requirements with respect to Major Leases).

**Section 5.28**    <u>After Acquired Property</u>.  Borrower will grant to Lender a first lien security interest in and to all Property, easements, entitlements, equipment, licenses, authorizations, permits, and any other personal property owned by Borrower, whether or not used in the construction, maintenance and/or operation of the Improvements, immediately upon acquisition of same or any part of same.

**Section 5.29**    <u>Independent Consultant</u>.  Borrower will pay the reasonable fees and expenses of, and will at all times promptly cooperate with, Lender's independent consultant (if any) and, upon request, will promptly furnish to Lender's independent consultant any documents, instruments, agreements or other information requested by such independent consultant in connection with the performance of such independent consultant's duties relating to the Property.

**Section 5.30**    <u>Licenses</u>.  Borrower will timely obtain all Licenses necessary for the development of the Property and the sale of Lots, and all such Licenses will timely be in full force and effect.  Borrower will deliver to Lender copies of all Licenses or other agreements with a Governmental Authority related to the development of the Property.

**Section 5.31**    <u>Dividends and Distributions</u>.  No Borrower Party will declare or pay any dividends or distributions on any class of its membership interests, partnership interests, or shares, as applicable, make any payment on account of the purchase, redemption or other retirement of any such membership interests, partnership interests, or shares, as applicable, or make any distribution in respect thereof, either directly or indirectly, at any time while any amounts of the Loan remain outstanding under this Agreement or the other Loan Documents or otherwise in any situation or circumstance where such dividend, distribution or payment would (a) violate or constitute a breach of any representation or warranty of any Borrower Party under this Agreement or the other Loan Documents; (b) violate or constitute a breach of any covenant, condition or other term or provision of this Agreement or the other Loan Documents, or (c) otherwise cause, create or constitute a Default or Event of Default under this Agreement or the other Loan Documents.  Notwithstanding the foregoing, once Borrower has maintained, in Lender's reasonable discretion, a Debt Service Coverage Ratio of 1.2 (calculated using the interest rate set forth in the Note) for two (2) consecutive calendar quarters, one or more Borrower Parties may thereafter make distributions to their equity investors.  Such Debt Service Coverage Ratio must be maintained during all subsequent calendar quarters in which a Borrower Party desires to make such distributions, failing which no such distributions shall be made until the requisite Debt Service Coverage Ratio is again maintained for two (2) consecutive calendar quarters.

## VI    CASUALTY; CONDEMNATION; ESCROWS

**Section 6.1**      Insurance; Casualty and Condemnation.

**Section 6.1.1**      Insurance.

(a)      Borrower shall obtain and maintain, or cause to be maintained, during all times that any sum is outstanding under the Note or the other Loan Documents (the "**Term**"), insurance for Borrower and the Property providing at least the following coverages or such other coverages required by and acceptable to the Lender and its insurance consultant:

(i)      Property insurance coverage on a Special Cause of Loss form, including windstorm, in an amount not less than 100% of the replacement cost (as determined by an appraiser approved by Lender) of all insurable elements of the Property and of all tangible personal property, with coinsurance waived, or if a coinsurance clause is in effect, with an agreed amount endorsement acceptable to Lender.  Coverage shall extend to the Property and to all tangible personal property and be on a replacement cost basis.  The deductible shall not exceed $25,000 per loss without prior approval by Lender.

(ii)      If any boiler, pressure vessel or other large machinery is located on or about the Property, broad form boiler and machinery/equipment breakdown coverage, including a form of business income coverage.

(iii)      A form of business income coverage in the amount of 100% of one year's gross income from the Property, including a 60-day extended period of indemnity.  Any time element deductible shall not exceed a 72-hour waiting period without prior approval of Lender.

(iv)      If the Property is located in a special flood hazard area (that is, an area within the 100-year floodplain) according to the most current flood insurance rate map issued by the Federal Emergency Management Agency and if flood insurance is available, flood insurance coverage on all insurable elements of the Property and of all tangible personal property in an amount equal the maximum coverage available through the National Flood Insurance Program.

(v)      In the event that the Property is located in a geographic area which is considered "high risk" by Lender for potential earthquake damage, a Special Earthquake Hazard Report will be ordered by Lender, at Borrower's cost.  The Special Earthquake Hazard Report must be received and approved by Lender in its sole and absolute discretion prior to closing.  The Special Earthquake Hazard Report must indicate that the potential risk of earthquake damage is acceptable to Lender and/or can be adequately insured against.  Earthquake coverage shall be required if the Special Earthquake Hazard Report determines that a material risk exists that a significant earthquake may occur and result in a "probable maximum loss" or "Scenario Expected Loss" due to earthquake in excess of 20% of the value of the Property.

(vi)      Commercial general liability coverage (which may be in the form of umbrella/excess liability insurance) with a $1,000,000 combined single limit per occurrence and a minimum aggregate limit of $2,000,000.

(vii)      Workers compensation insurance, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000.00 per accident and per disease per employee, and $1,000,000.00 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable).

(viii)      If applicable, motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of $1,000,000.00.

(ix)     Such other insurance and in such amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.  Additional coverages may include earthquake, mine subsidence, sinkhole, mold, personal property, supplemental liability, or coverages of other property-specific risks.

(b)     All insurance provided for in Section 6.1.1(a) shall be obtained under valid and enforceable policies ("**Policies**" or in the singular, "**Policy**"), and shall be subject to the approval of Lender as to form and substance including deductibles, loss payees and insureds.  Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance and, if requested by Lender, other documentation, in each case acceptable to Lender evidencing the Policies, accompanied by evidence satisfactory to Lender of payment of the premiums then due thereunder (the "**Insurance Premiums**"), shall be delivered by Borrower to Lender.

(c)     All Insurance policies must require the insurance carrier to give the Lender a minimum of ten (10) days' notice in the event of cancellation or termination for non-payment of premium and a minimum of thirty (30) days' notice of non renewal.  Borrower shall provide current policy documents confirming all required coverages and conditions and Acord 27, Acord 28 (Evidence of Property Insurance ), and Acord 25 (Certificate of Liability Insurance), or another document satisfactory to the Lender conferring on the Lender rights and privileges of mortgagee.  Upon the request of the Lender, Borrower shall supply an original or certified copy of the original policy within ninety (90) days.  Borrower must also provide Lender with a paid insurance agent's receipt for all current coverages.  All insurance policies required hereunder shall be carried by companies rated A-:VIII or better by A.M. Best Company and shall not contain exclusions for terrorism coverage.  All binders, certificates of insurance, and policies must name Borrower as the insured, or as an additional insured, must include the complete and accurate property address and must bear the original signature of the issuing insurance agent.  On all property insurance policies and coverages required under this Section (including coverage against loss of business income), the Lender must be named as "Lenders Loss Payable" under standard mortgagee clause.  On all liability policies and coverages, the Lender must be named as an "additional insured."  The Lender should be referred to verbatim as follows:  "Romspen California Mortgage Limited Partnership, its successors and assigns."

(d)     Each coverage required under this Section shall be primary rather than contributing or secondary to the coverage that Borrower may carry for other properties or risks, provided however, that blanket coverage shall be acceptable if Lender determines, in the exercise of its sole and absolute discretion, that the amount of such coverage is sufficient in light of the other risks and properties insured under the blanket policy.

(e)     Borrower shall furnish to Lender, on or before thirty (30) days after the close of each calendar year, an Officer's Certificate stating the amounts of insurance maintained in compliance herewith, the risks covered by such insurance and the insurance company or companies which carry such insurance and, if requested by Lender, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender.

(f)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, after five (5) Business Days' notice to Borrower, to take such action as Lender deems necessary to protect Lender's interest in the Property, including the obtaining of such insurance coverage as Lender in Lender's sole discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Loan Documents and shall bear interest at the Default Rate.

(g)     In the event of foreclosure of any Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt all right, title and interest of Borrower in and to

such Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(h)     Within thirty (30) days after written request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices of similarly situated lenders, and the like.

(i)     If the Property or any portion of the Property is materially damaged or destroyed, in whole or in part, by fire or other casualty, whether insured or uninsured (a "**Casualty**"), Borrower shall give prompt written notice thereof to Lender.  Following the occurrence of a Casualty, Borrower shall, regardless of whether Insurance Proceeds are available, promptly proceed to restore, repair, replace or rebuild the same to be of at least equal value and of substantially the same character as prior to such damage or destruction, all to be effected in accordance with applicable law and the terms and conditions of the Loan Documents.  The reasonable expenses incurred by Lender in the adjustment and collection of Insurance Proceeds shall become part of the Debt and be secured by the Loan Documents and shall be reimbursed by Borrower to Lender upon demand.

(j)     Borrower shall comply with all insurance requirements of any insurer of the Property or any portion thereof and shall not bring or keep or permit to be brought or kept any article upon any of the Property or any portion thereof or cause or permit any condition to exist thereon which would be prohibited by an insurance requirement, or would invalidate any Policies then in effect or any of the insurance coverage required hereunder to be maintained by Borrower on or with respect to any part of the Property pursuant to this Agreement.

(k)     Any reimbursement due to Lender pursuant to this Section 6.1.1 must be paid within ten (10) Business Days (or sooner if required), or such amount shall accrue interest at the Default Rate until paid to Lender.

(l)     Lender shall not be responsible for nor incur any liability for the insolvency of any insurer or other failure of any insurer to perform, even though Lender has caused the insurance to be placed with the insurer after failure of Borrower to furnish such insurance.  Borrower shall not obtain insurance for the Property in addition to that required by Lender without the prior written consent of Lender, which consent will not be unreasonably withheld provided that (i) Lender is named insured on such insurance, (ii) Lender receives complete copies of all policies evidencing such insurance, and (iii) such insurance complies with all of the applicable requirements set forth herein.

(m)     Borrower acknowledges that Lender has disclosed to Borrower the contents of California Civil Code Section 2955.5(a), which states that no lender shall require a borrower, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the improvements on that real property in an amount exceeding the replacement value of the improvements on the property.

**Section 6.1.2**     Casualty and Application of Proceeds.

(a)     In case of loss or damages covered by any of the Policies, the following provisions shall apply:

(i)     In the event of a Casualty that is less than $250,000, Borrower may settle and adjust any claim without the consent of Lender and retain the proceeds thereof.

(ii)     In the event of a Casualty in excess of $250,000 if each of the following is true at all times: (A) the Insurance Proceeds are sufficient to pay for the Restoration as reasonably determined by Lender; (B) after such Restoration the Property will adequately secure the outstanding balance of

the Loan; (C) no Default or Event of Default exists; (D) the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements; and (E) the Casualty does not result in the loss of access to the Property or the Improvements, then the Insurance Proceeds shall be deposited with Lender and after reimbursement of any expenses incurred by Lender, such Insurance Proceeds shall be maintained and applied to pay for the cost of restoring, repairing, replacing or rebuilding the Property or part thereof subject to the Casualty ("**Restoration**"), in the manner set forth herein.  Borrower hereby covenants and agrees to commence and diligently to prosecute such Restoration; <u>provided</u> that: (A) Borrower shall pay all costs (and if required by Lender, Borrower shall deposit the total thereof with Lender in advance) of such Restoration in excess of the net Insurance Proceeds made available pursuant to the terms hereof; (B) the Restoration shall be done in compliance with all applicable Legal Requirements; (C) Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after settlement with the applicable insurance carrier regarding the Insurance Proceeds arising from the Casualty) and shall diligently pursue the same to satisfactory completion; (D) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements, including any applicable Environmental Laws; and (E) Lender shall have received evidence satisfactory to Lender that, during the period of the Restoration, the sum of (A) income derived from the Property, as reasonably determined by Lender, plus (B) proceeds of rent loss insurance or business interruption insurance, if any, to be paid, will equal or exceed the sum of (1) expenses in connection with the operation of the Property, (2) the required payments of principal and interest on the Loan, and (3) the other payments required pursuant to this Agreement or the Loan Documents.

(b)     Except as provided above in <u>Section 6.1.2(a)</u>, the Insurance Proceeds collected upon any Casualty shall be deposited with Lender and at Lender's option (in its reasonable discretion), be applied to the payment of the Debt after reimbursement of any reasonable expenses incurred by Lender or, if Lender so elects (without any obligation to do so), after reimbursement of any reasonable expenses incurred by Lender, Lender shall hold such amount and such proceeds shall be maintained and applied in accordance with the Loan Documents to pay for the cost of any Restoration in the manner set forth herein.  Any such application to the Debt shall be at Lender's reasonable discretion, except as specifically provided herein to the contrary, and shall be applied in accordance with the provisions of this Agreement.

(c)     In the event Borrower is eligible for reimbursement out of Insurance Proceeds held by Lender, such Insurance Proceeds shall be disbursed from the Lender from time to time (but not more than once per month) upon Lender being furnished with:  (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration; (ii) evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the Title Insurance Company; (iii) sufficient funds, or at Lender's option, assurances satisfactory to Lender that such funds are available, in addition to the Insurance Proceeds, to complete the proposed Restoration; (iv) such architect's certificates, waivers of Lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance as Lender may reasonably require and approve; and (v) all plans and specifications for such Restoration, such plans and specifications to be delivered and approved by Lender prior to commencement of any work.

(d)     All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and, if required by Lender, by an independent consulting engineer selected by Lender.  Lender shall have the use of the plans and specifications and all permits, Licenses and approvals required or obtained in connection with the Restoration.  The identity of the general contractor engaged in the Restoration, as well as the general contract under which it has been engaged, shall be subject to prior review and acceptance by Lender.  All reasonable costs and expenses incurred by

**Exhibit A Page - 32**

Lender in connection with making the insurance proceeds available for the Restoration, including reasonable counsel fees and disbursements, shall be deducted by Lender from such insurance proceeds.

(e)     In addition, no payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than Insurance Proceeds shall be disbursed prior to disbursement of such Insurance Proceeds; and at all times, the undisbursed balance of such Insurance Proceeds remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien.  Any surplus which may remain out of Insurance Proceeds after payment of such costs of Restoration shall be applied to the Loan in accordance with the provisions of this Agreement.

**Section 6.1.3**   Condemnation.

(a)     Borrower shall promptly give Lender written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding against the Property or the Improvements or any part thereof (a "**Condemnation**") and shall deliver to Lender copies of any and all papers served by or on or received by any of the Borrower Parties in connection with such Condemnation.  Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property to the extent practicable to be of at least equal value and of substantially the same character as prior to such Condemnation, all to be effected in accordance with all Legal Requirements.

(b)     Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment ("**Award**") for any taking accomplished through a Condemnation and to make any compromise or settlement in connection with such Condemnation, subject to the provisions of this Section.  Notwithstanding any taking in connection with a Condemnation by any public or quasi-public authority (including any transfer made in lieu of or in anticipation of such a Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Note and the other Loan Documents and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt.  Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note.  Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender.

(c)     The proceeds of the Award collected upon any Condemnation shall be deposited directly with Lender pursuant to Section 6.1.3(b) and at Lender's option (in its sole discretion), shall be applied to the payment of the Debt (after reimbursement of any expenses incurred by Lender) or, if Lender so elects (without any obligation to do so), (after reimbursement of any expenses incurred by Lender), Lender shall hold such amount and such proceeds shall be maintained and applied in accordance with the Loan Documents to pay for the cost of any Restoration in the manner set forth herein.  Any such application to the Debt shall be at Lender's sole discretion and shall be applied in accordance with the provisions of this Agreement.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of said Award sufficient to pay the outstanding balance of the Debt.

(d)     In the event Borrower is entitled to reimbursement out of the Awards held by Lender, such Awards shall be disbursed from Lender from time to time (but not more than once per month) upon Lender being furnished with: (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration; (ii) evidence satisfactory that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the

**Exhibit A Page - 33**

alternative fully insured to the satisfaction of Lender by the Title Insurance Company; (iii) sufficient funds, or at Lender's option, assurances satisfactory to Lender that such funds are available, in addition to the Awards, to complete the proposed Restoration; (iv) such architect's certificates, waivers of Lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance as Lender may reasonably require and approve; and (v) all plans and specifications for such Restoration, such plans and specifications to be delivered and approved by Lender prior to commencement of any work.

        (e)      All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and, if required by Lender, by an independent consulting engineer selected by Lender. Lender shall have the use of the plans and specifications and all permits, Licenses and approvals required or obtained in connection with the Restoration. The identity of the general contractor engaged in the Restoration, as well as the general contract under which it has been engaged, shall be subject to prior review and acceptance by Lender. All costs and expenses incurred by Lender in connection with making the Awards available for the Restoration, including reasonable counsel fees and disbursements, shall be deducted by Lender from such Awards.

        (f)      In addition, no payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than Awards shall be disbursed prior to disbursement of such Awards; and at all times, the undisbursed balance of such Awards remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien. Any surplus, which may remain out of the Awards after payment of such costs of Restoration, shall be applied to the Loan in accordance with the provisions of this Agreement.

**Section 6.2**    <u>Tax and Insurance Escrows</u>. Lender shall have the right to require the establishment of a tax reserve by Borrower ("**Tax Reserve Right**"). In the event that Lender exercises the Tax Reserve Right, Borrower shall pay to Lender on each Scheduled Payment Date (a) one-twelfth of the Taxes that Lender reasonably estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates and (b) one-twelfth of the Insurance Premiums that Lender reasonably estimates will be payable for the renewal of the coverage afforded by the Policies for the succeeding annual period upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (all amounts in clauses (a) and (b) above hereinafter called the "**Tax and Insurance Escrow Fund**"). Borrower shall also deposit with Lender on the Closing Date such amount as is required by Lender in order to provide adequate funds therefor on the first payment date for such Taxes and Insurance Premiums. The Tax and Insurance Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note, shall be added together and shall be paid as an aggregate sum by Borrower to Lender in immediately available funds. Lender will apply the Tax and Insurance Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to <u>Section 5.4</u> and under the other Loan Documents provided no Event of Default has occurred and is continuing. In making any payment relating to the Tax and Insurance Escrow Fund, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax Lien or title or claim thereof. Borrower shall arrange for any such bills, statements or estimates to be delivered to Lender at least fifteen (15) Business Days prior to the date any such payment is due. If the amount of the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to <u>Section 5.4</u>, Lender shall, in its sole discretion, return any excess to Borrower or, at Lender's option, credit such excess against future payments to be made to the Tax and Insurance Escrow Fund. Any amount remaining in the Tax and Insurance Escrow Fund after the Debt has been paid in full shall be returned to Borrower, or at Lender's option, may be deducted from the Loan payoff amount. If at any time Lender reasonably determines that the Tax and Insurance Escrow Fund is not or will not be sufficient to pay the

**Exhibit A Page - 34**

items set forth in clauses (a) and (b) above, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case may be. Borrower hereby pledges, assigns, and grants a security interest to Lender, as security for the Loan in all of Borrower's right, title, and interest in and to the Tax and Insurance Escrow Fund, the Interest Reserve Fund and any other Reserve Fund and all monies, and deposits contained therein.

**Section 6.3**    <u>The Management Agreement</u>.  Borrower hereby agrees that the fee paid to Manager in compensation for Manager's services conducted in connection with the management of the Property shall not exceed five percent (5%) of gross revenue derived from the Property.  Borrower shall (a) cause Manager to manage the Property in accordance with the Management Agreement, (b) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed, (c) promptly notify Lender of any default under the Management Agreement of which it is aware, and (d) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.  If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under the Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed.

**Section 6.4**    <u>Prohibition Against Termination or Modification</u>.  Borrower shall not (a) surrender, terminate, cancel, modify, renew or extend the Management Agreement (other than a renewal or extension provided for in the Management Agreement), (b) enter into any new or other agreement relating to the management or operation of the Property with Manager or any other Person, (c) consent to the assignment by Manager of its interest under the Management Agreement, or (d) waive or release any of its rights and remedies under the Management Agreement, in each case without the express consent of Lender, which consent shall not be unreasonably withheld.  If at any time Lender consents to the appointment of a new manager and/or the execution of a management agreement under this <u>Article 6</u> or under <u>Article 7</u>, such manager and Borrower shall, as a condition of Lender's consent, execute a subordination of management agreement in the form then used by Lender.

**Section 6.5**    <u>Replacement of Manager</u>.  Lender shall have the right to require Borrower to replace Manager with a Person chosen by Borrower and approved by Lender upon the occurrence of any one or more of the following events: (a) from and after the Maturity Date, (b) at any time following the occurrence of an Event of Default, (c) if Manager shall be in default under the Management Agreement beyond any applicable notice and cure period, (d) if Manager shall become insolvent or a debtor in a bankruptcy, reorganization, insolvency or similar proceeding under any Bankruptcy Law, or (e) if at any time Manager has engaged in gross negligence, fraud or willful misconduct.

**Section 6.6**    <u>Interest Reserve</u>.  Contemporaneously with the first advance of the Loan, Borrower will establish with Lender a reserve in the aggregate amount of approximately Four Million and No/100 Dollars ($4,000,000.00) (the "**Interest Reserve Fund**") payable from the Loan proceeds.  For so long as no Event of Default has occurred hereunder or under any of the other Loan Documents, Lender shall on each Scheduled Payment Date (or such other dates as it shall determine) advance from the Interest Reserve Fund to itself the amount of the Monthly Debt Service Payment (as defined in the Note) and other accrued interest then due and payable under the Note, and interest on any amounts advanced from the Interest Reserve Fund shall not accrue until the date of such advance.  Once there are no funds remaining in the Interest Reserve Fund or upon an Event of Default, Lender shall have no further obligation for funding of accrued and unpaid interest, or amounts payable and unpaid, whereupon Borrower shall be and remain responsible for the continuation of all such Monthly Debt Service Payments from funds other than proceeds of the Loan.

## VII    DEFAULTS

**Section 7.1**    Event of Default.

(a)    Each of the following shall constitute an event of default hereunder (an "**Event of Default**"):

(i)    if (A) any payment due pursuant to the Note, this Agreement or any of the other Loan Documents, including the payment due on the Maturity Date (or, if the Maturity Grace Period defined and described in the Note is applicable, due at the end of such Maturity Grace Period), is not paid on or before the date the same is due or (B) any other portion of the Debt is not paid on or before the date the same becomes due and payable by the terms of the Loan Documents;

(ii)    subject to Borrower's right to contest Taxes and Other Charges pursuant to Section 5.4 above, any of the Taxes or Other Charges (other than any of the same payable on a Scheduled Payment Date) are not paid on or before the date the same are due and payable except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with terms of this Agreement and Lender fails to pay same;

(iii)    the Policies are not kept in full force and effect, or copies of the Policies are not delivered to Lender within ten (10) days of written request by Lender;

(iv)    a Transfer (other than a Transfer specifically authorized and permitted by Section 5.18) shall occur without Lender's prior written consent;

(v)    any representation or warranty made by Borrower or any of the Borrower Parties herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender in connection with the Loan, shall have been false or misleading in any respect as of the date the representation or warranty was made; provided, however, if such false or misleading representation or warranty is susceptible of being cured within thirty (30) days, the same shall be an Event of Default hereunder only if the same is not cured within a reasonable time, not to exceed thirty (30) days after notice from Lender;

(vi)    if (a) Borrower or any Borrower Party shall commence any case, proceeding or other action (1) under any existing or future Bankruptcy Laws, or (2) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for Borrower or any Borrower Party or for all or any substantial part of the assets of Borrower or any Borrower Party, or Borrower or any Borrower Party shall make a general assignment for the benefit of creditors; or (b) there shall be commenced against Borrower or any Borrower Party any case, proceeding or other action of a nature referred to in clause (a) above which (1) results in the entry of an order for relief or any such adjudication or appointment or (2) remains undismissed, undischarged or unbonded for a period of ninety (90) days; or (c) there shall be commenced against Borrower or any Borrower Party any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof; or (d) Borrower or any Borrower Party shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (a), (b), or (c) above; or (e) Borrower or any Borrower Party shall generally not, or shall be unable to, or shall admit in writing or in any proceeding its inability to, pay its debts as they become due; or (f) Borrower or any Guarantor files a petition, complaint, answer or other instrument which seeks to effect a suspension of or which has the effect of suspending any of the rights or powers of Lender granted in this Agreement or in any of the other Loan Documents;

(vii)    if Borrower shall be in default under any other permitted mortgage, deed of trust or security agreement covering any part of the Property whether it be superior or junior in Lien to

**Exhibit A Page - 36**

the Security Instrument and whether it be permitted under the Loan Documents or if Borrower shall be in default of any other Indebtedness, secured or unsecured, owed by Borrower to any Person; provided, however, the foregoing shall not be deemed to permit Borrower to incur any other Indebtedness unless expressly permitted by the Loan Documents;

(viii)   if Borrower or any Person owning a direct or indirect interest in Borrower shall be in default under any pledge agreement or security agreement covering any part of the equity interests in Borrower and whether it be permitted or prohibited under the Loan Documents;

(ix)   subject to Borrower's right to contest set forth in the Security Instrument, if the Property becomes subject to any mechanic's or materialman's lien or other Lien except a Lien for local real estate taxes and assessments not then due and payable and the Lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days;

(x)   an event of default under the terms of any other loan made by Lender or any of its Affiliates to Borrower, any Guarantor or any of their respective Affiliates;

(xi)   if any term, covenant or provision of this Agreement or of any of the other Loan Documents specifies a cure period for any breach thereof, if Borrower shall continue to be in default under such term, covenant, or provision of any of the Loan Documents (including this Agreement), beyond such applicable cure periods contained herein or in those documents, or if no cure period is provided by this Agreement or the other Loan Documents, any other default hereunder or thereunder, which default is not cured (i) in the case of any default which can be cured by the payment of a sum of money, within three (3) days after receipt of written notice from Lender to Borrower, or (ii) in the case of any default which cannot be cured by the payment of a sum of money, within fifteen (15) days after written notice from Lender to Borrower; provided, however, if such default is reasonably susceptible of cure, but not within such fifteen (15) day period, then Borrower may be permitted up to an additional thirty (30) days to cure such default provided that Borrower diligently and continuously pursues such cure;

(xii)   if Borrower violates or does not comply with any of the provisions of Section 4.1(s) or if any general partner, managing member or manager of Borrower violates or does not comply with any of the provisions of Section 4.1(s);

(xiii)   the prohibition, enjoining or interruption of Borrower's right to occupy, use or lease the Property for a continuous period of more than thirty (30) days;

(xiv)   the sequestration or attachment of, or any levy or execution upon any of the Property, any other collateral provided by Borrower under any of the Loan Documents, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of thirty (30) days or the sale of the assets affected thereby;

(xv)   the failure at any time of the Security Instrument to be a valid first lien upon the Property or any portion thereof, other than as a result of any release or reconveyance of the Security Instrument with respect to all or any portion of the Property pursuant to the terms and conditions of this Agreement;

(xvi)   the discovery of any significant Hazardous Materials in, on or about the Property subsequent to the Closing Date which did not exist in, or about the Property prior to the Closing Date. Any such Hazardous Materials shall be "**significant**" for this purpose if the presence of said Hazardous Materials, in Lender's reasonable discretion, have, or could have, a Material Adverse Effect on the value of the Property;

(xvii)   a Material Adverse Change in the financial condition, operations or business of Borrower, any Borrower Party, or any portion of the Property;

(xviii)   except as permitted herein, the material alteration, demolition or removal by Borrower of any improvements at the Property without Lender's prior consent;

(xix)   if a Balancing Event is not cured within ten (10) Business Days after written notice thereof from Lender;

(xx)   if there shall be a default under any other Loan Document beyond any applicable notice and cure period, if any, or if any other event shall occur or condition shall exist; and the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the Maturity of any or all of the Debt;

(xxi)   the liquidation, death, termination, dissolution, merger or consolidation of Borrower or any Guarantor;

(xxii)   if Borrower or any Guarantor, or any party acting on behalf of Borrower or any Guarantor, shall take any action which seeks to cause any Loan Document or the liens, mortgages or security interests of Lender in any of the Property to cease to be in full force and effect, be declared null and void or unenforceable in whole or in part, cease to have the priority required herein, or the validity or enforceability thereof, in whole or in part, shall be challenged or denied by Borrower, any Guarantor or any party acting on behalf of Borrower or any Guarantor; or

(xxiii)   if Borrower fails to operate in strict conformity with the provisions of the Cole Memo.

**Section 7.2**   <u>Remedies</u>.

(a)   Upon the occurrence of any Event of Default, Lender may take such action, without notice, demand presentment, protest or other requirements of any kind (all of which are expressly waived by Borrower), as Lender deems advisable to protect and enforce its rights and remedies against Borrower and/or any Borrower Party and in and to the Property, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender (provided that upon the occurrence of an Event of Default under <u>Section 7.1(a)(vi)</u>, all commitments to make further advances shall automatically terminate, and the Debt shall become immediately due and payable, in each case without notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, protest, or other formalities of any kind (all of which are hereby expressly waived by Borrower)):

(i)   declare the entire Debt to be immediately due and payable;

(ii)   terminate all commitments to make further advances;

(iii)   exercise any of the rights or remedies specified in the Security Instrument;

(iv)   apply any sums then deposited with Lender or any third party under the control of Lender and any other sums held in escrow or otherwise by Lender, including the Reserves, in accordance with the terms of this Agreement or any other Loan Document to the payment of the following items in any order in Lender's sole discretion: (i) Taxes and Other Charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of the Note; (iv) amortization of the unpaid principal balance of the Note; and (v) all other sums payable pursuant to the Note, this Agreement and the other Loan Documents, including advances made by Lender pursuant to the terms of this Agreement;

(v)   pursue such other rights and remedies as may be available at law or in equity or under the Uniform Commercial Code including the right to receive and/or establish a lock box for all

Rents, proceeds from the Intangibles (as defined in the Security Instrument) and any other receivables or rights to payments of Borrower relating to the Property;

(vi)     with or without actual or threatened waste to the Property, Lender shall, at Lender's discretion, be entitled, and is hereby expressly and irrevocably authorized, upon application to a court of competent jurisdiction, without notice to Borrower, or any other party (any and all such notice being waived hereby) and without regard to the adequacy of any security for the Debt or the solvency of Borrower or any other party liable for payment of the Debt, to appoint a receiver(s), on an emergency basis or otherwise (and if allowed by applicable law, on an ex parte basis), to take possession of and to operate the Property, and at Lender's option, to collect the Rents.  Borrower irrevocably waives all notice of and defenses and objections to the appointment of such receiver.  Borrower further irrevocably agrees that the occurrence of any Event of Default per se would create an emergency and the necessity for immediate actions; and

(vii)     pursue any other right or remedy allowed by any Loan Document or applicable law.

(b)     Upon the occurrence and during the continuance of an Event of Default, interest on the outstanding principal balance and, to the extent permitted by law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.  Interest at the Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt (or that portion thereof that is then due).  To the extent permitted by applicable law, interest at the Default Rate shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured by the Security Instrument.  This paragraph shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default; the acceptance of any payment by Lender shall not be deemed to cure or constitute a waiver of any Event of Default; and Lender retains its rights under this Agreement and the other Loan Documents to accelerate and to continue to demand payment of the Debt upon the happening of any Event of Default, despite any payments made to Lender after the occurrence of such Event of Default.

(c)     Lender may resort to any remedies and the security given by any of the Loan Documents in whole or in part, and in such portions and in such order as determined by Lender in its sole discretion.  No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by the Note, the Security Instrument or any of the other Loan Documents.  The failure of Lender to exercise any right, remedy or option provided in any of the Loan Documents shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by the Note, the Security Instrument or the other Loan Documents.  No acceptance by Lender of any payment after the occurrence of any Event of Default and no payment by Lender of any obligation for which Borrower is liable hereunder shall be deemed to waive or cure any Event of Default, or Borrower's liability to pay such obligation.  No sale of all or any portion of the Property, no forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Lender to Borrower, shall operate to release or in any manner affect the interest of Lender in the remaining Property or the liability of Borrower to pay the Debt.  No waiver by Lender shall be effective unless it is in writing signed by Lender and then only to the extent specifically stated.

(d)     With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property for the satisfaction of any of the Debt, and Lender may seek satisfaction out of the Property or any part thereof or decline to do so, in Lender's sole and absolute discretion.  In addition, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in Lender's sole and absolute sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the

entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered.

(e)     Additionally, upon the occurrence of any Event of Default or if any Borrower Party fails to make any payment or to do any act as required in any of the Loan Documents, Lender may, but without any obligation to do so and without notice to or demand on any Borrower Party and without releasing any Borrower Party from any obligation under the Loan Documents, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Following an Event of Default, Lender is authorized to enter upon the Property for such purposes or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose the Loan Documents or collect the Debt, and the reasonable cost and expense thereof (including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest at the Default Rate (as defined in the Note) for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by the Loan Documents and shall be due and payable to Lender upon demand.

(f)     No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power of Lender. Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Security Instrument to the extent necessary to foreclose on all or any portion of the Property, the Rents or any other collateral.

**Section 7.3**     Right of Entry.  In addition to any other rights or remedies granted under this Agreement, in the event of any default by Borrower hereunder, Lender and its agents shall, subject to the rights of Tenants under their Leases, have the right without notice to enter and inspect the Property at any reasonable time during the Term. The reasonable cost of such inspections or audits, including the cost of all follow up or additional investigations or inquiries deemed reasonably necessary by Lender, shall be borne by Borrower. The cost of such inspections, if not paid for by Borrower following demand, may, at Lender's option, be added to the principal balance of the sums due under the Note and shall bear interest thereafter until paid at the Default Rate.

**Section 7.4**     Costs of Enforcement.  In the event of the (i) exercise of any remedy by Lender under this Agreement or the other Loan Documents or following the occurrence of an Event of Default, (ii) foreclosure of any mortgage prior to or subsequent to the Security Instrument in which proceeding Lender is made a party, (iii) bankruptcy, insolvency, reorganization, rehabilitation, liquidation or other similar proceeding in respect of any Borrower Party or an assignment by any Borrower Party for the benefit of its creditors, (iv) enforcement of any obligations of or collection of any payments due from any Borrower Party under this Agreement, the other Loan Documents or with respect to the Property, or (v) incurring of any costs or expenses by Lender in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out," then Borrower, its successors or assigns, shall pay to Lender on demand any and all expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting Lender's interest in the Property or in collecting any amount payable hereunder or in enforcing Lender's rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any Default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

**Section 7.5**     Violation of Legal Requirements.  Subject to the Cannabis Disclosure, if the Property is not in compliance with one, some or all of the Legal Requirements, Lender may impose additional requirements

upon Borrower in connection therewith including, without limitation, monetary reserves or financial equivalents.

**Section 7.6**   <u>Remedies Cumulative</u>.   The rights, powers and remedies of Lender under this Agreement and the other Loan Documents shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower or any of the Borrower Parties pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion. Any and all amounts collected or retained by Lender after an Event of Default has occurred, including interest at the Default Rate, late charges or any escrowed amount, may be applied by Lender to payment of the Debt in any order or priority that Lender in its sole discretion may elect.

## VIII    TRANSFER OF LOAN AND REFINANCING

**Section 8.1**   <u>Lender's Transfers</u>.   Lender may, at any time and at its sole cost and expense, (i) sell, transfer or assign the Loan Documents and any servicing rights with respect thereto or (ii) grant participations therein or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (collectively, the "**Securities**"). Lender may forward to any purchaser, transferee, assignee, servicer, participant, or investor in such Securities (collectively, "**Investors**"), to any Rating Agency (defined below) rating such Securities and to any prospective Investor, all documents and information which Lender now has or may later acquire relating to the Obligations, Borrower, guarantor(s), any indemnitor(s), the Leases, and the Property, whether furnished by Borrower, any guarantor(s), any indemnitor(s) or otherwise, as Lender determines advisable. Borrower, any guarantor and any indemnitor agree to cooperate with Lender in connection with any transfer made or any Securities created pursuant to this <u>Section 8.1</u> including the delivery of an estoppel certificate and such other documents as may be reasonably requested by Lender. Borrower shall also furnish consent of any guarantor and any indemnitor in order to permit Lender to furnish such Investors or such prospective Investors or such Rating Agency with any and all information concerning the Property, the Leases, the financial condition of Borrower, any guarantor and any indemnitor, as may be reasonably requested by Lender, any Investor, any prospective Investor or any Rating Agency and which may be complied with without undue expense. "**Rating Agency**" shall mean any one or more credit rating agencies approved by Lender.

**Section 8.2**   <u>Register</u>.   Lender, acting solely for this purpose as an agent of Borrower, shall maintain at one of its offices a register for the recordation of the names and addresses of each Lender, and principal amounts (and stated interest) of the Loans or other Obligations owing to such Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and Borrower and Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

**Section 8.3**   <u>Participations</u>.   Any Lender may at any time, without the consent of, or notice to, Borrower, sell participations to any Person (other than a natural Person or Borrower or any Affiliate of Borrower) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loan owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) Borrower shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that affects such Participant and (i) reduces or forgives the principal amount of any Loan or reduces the rate of interest thereon, or reduces or forgives any interest or fees payable hereunder, (ii) postpones any

scheduled date of payment of the principal amount of any Loan, or any date for the payment of any interest, fees or other Obligations payable hereunder, or reduce the amount of, waive or excuse any such payment, (iii) releases any Guarantor from its obligation under its Guaranty (except as otherwise permitted herein or in the other Loan Documents), or (iv) releases all or substantially all of the collateral securing any Loan. Borrower agrees that each Participant shall be entitled to the benefits of Section 2.6 to the same extent as if it were the Lender and had acquired its interest by assignment; provided that such Participant shall not be entitled to receive any greater payment under Section 2.6, with respect to any participation, than Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation shall, acting solely for this purpose as an agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loan or other Obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

**Section 8.4**    Waiver.  Borrower agrees that upon any assignment or transfer of the Loan Documents by Lender to any third party, Borrower is hereby waiving notice of any such transfer, Lender shall have no obligations or liabilities under the Loan Documents, such third party shall be substituted as the lender under the Loan Documents for all purposes, and Borrower shall look solely to such third party for the performance of any obligations under the Loan Documents or with respect to the Loan.

**Section 8.5**    Collateral.  Upon an assignment or other transfer of the Loan Documents, Lender may, at its discretion, deliver all collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred to Borrower or to the assignee or transferee of the Loan Documents. This provision shall apply to every transfer of any collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to a new assignee or transferee.

### IX    EXCULPATION.

**Section 9.1**    Full Recourse.  The Debt shall be fully recourse to Borrower.  Borrower shall be fully personally liable for all of the Debt.  Each Guarantor shall be, jointly and severally with Borrower, fully personally liable for all of the Debt in accordance with the Guaranty.

**Section 9.2**    No Waiver.  Notwithstanding anything to the contrary in this Agreement or any of the other Loan Documents (including the provisions of this Article IX) Lender shall not be deemed to have waived any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents.

### X    INDEMNIFICATION.

**Section 10.1**    Indemnification.  Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur,

directly or indirectly. Such indemnification shall not be applicable, however, to any Losses incurred by Lender as a result of the use or operation of the Property for cannabis-related purposes that are not legal under Federal law but still specifically applicable to any violation of the law(s) of the State of California with respect to any such use or operation.

        **Section 10.2**    <u>Duty to Defend; Attorneys' Fees and Other Fees and Expenses</u>.  Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals reasonably approved by the Indemnified Parties.  Notwithstanding the foregoing, any of the Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of claim or proceeding.  Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of  attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith; provided, however, that all of the Indemnified Parties shall be defended by one firm of attorneys unless Lender in good faith determines that more than one law firm should be retained because of conflicts of interest or potential conflicts of interest.

        **Section 10.3**    <u>Changes in Laws Regarding Taxation</u>.  If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay such tax, with interest and penalties thereon, if any.  In the event Lender is advised by counsel chosen by Lender that the payment of such tax or interest and penalties by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then in any such event, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

        **Section 10.4**    <u>No Credits on Account of the Debt</u>.  Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of the Loan Documents or the Debt.  In the event such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

        **Section 10.5**    <u>Recording of Security Instrument</u>.  Borrower forthwith upon the execution and delivery of this Agreement and thereafter, from time to time upon five (5) Business Days' notice from Lender, will cause the Security Instrument, and any other Loan Document creating a Lien or security interest or evidencing the Lien thereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by Lender or by any present or future law in order to publish notice of and fully to protect the Lien or security interest thereof upon, and the interest of Lender in, the Property or to correct any error in the legal description of the Property.  Borrower will pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgment of the Security Instrument, any mortgage supplemental thereto, any security instrument with respect to the Property, any such other Loan Document and any instrument of further assurance, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Security Instrument, any mortgage supplemental thereto, any security instrument with respect to the Property, any such other Loan Document or any instrument of further assurance, except where prohibited by law so to do. Borrower shall hold harmless and indemnify Lender, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of the Security Instrument or any other Loan Document.  If at any time any Governmental Authority shall require revenue or other stamps to be affixed to any of the Loan Documents, or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.  Borrower hereby absolutely and irrevocably appoints Lender as Borrower's true and lawful attorney, coupled with an interest, in Borrower's name and stead to make and execute all documents necessary or desirable to effect the provisions of this <u>Section 10.5</u> if Borrower fails to do

so for five (5) days after demand by Lender. Borrower hereby ratifies all that Borrower's said attorney shall do by virtue of such power or authority. Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of Lender's execution and/or recordation of any instruments by or on behalf of Borrower pursuant to the foregoing power of attorney.

**Section 10.6**   <u>Brokers and Financial Advisors</u>.   Borrower hereby represents that, except as previously disclosed to Lender, Borrower has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the loan made to Borrower by Lender hereunder. Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein. The provisions of this <u>Section 10.6</u> shall survive the expiration and termination of this Agreement and the payment of the Debt.

## XI    WAIVERS

**Section 11.1**   <u>Waiver of Counterclaim</u>.   All amounts due under this Agreement or the other Loan Documents shall be payable without setoff, counterclaim or any deduction whatsoever. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against Borrower by Lender or its agents, or otherwise offset any obligations to make payments required under the Loan Documents. Any Investor or assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of the Loan Documents, and no such unrelated offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon the Loan Documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower. If Borrower is indebted to Lender pursuant to more than one note or pursuant to any subordinate loan documents, (i) the preceding provisions shall apply to any note or other loan documents assigned or transferred by Lender, even if one or more notes are retained by Lender, and (ii) Borrower waives and releases any right to assert any claim, cause of action, offset or defense against Lender with respect to the Loan or the Loan Documents which is any way related to such other note or subordinate loan documents.

**Section 11.2**   <u>Marshalling and Other Matters</u>.   Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein and the pleading of any statute of limitations as a defense to payment of the Debt or performance of the Obligations. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Security Instrument on behalf of Borrower, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Agreement and on behalf of all Persons to the extent permitted by applicable law. Borrower hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States and of any state, in and to the Property as against the collection of the Debt, or any part thereof. The interests and rights of Lender under the Note, the Security Instrument or in any of the other Loan Documents shall not be impaired by any indulgence, including (i) any renewal, extension or modification which Lender may grant with respect to any of the Debt, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant with respect to the Property or any portion thereof; or (iii) any release or indulgence granted to any maker, endorser, Borrower Party or surety of any of the Debt.

**Section 11.3**   <u>Waiver of Notice</u>.   Borrower shall not be entitled to, and hereby waives the right to receive, any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Section 11.4**    Trial by Jury.  **BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) EACH HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, THE SECURITY INSTRUMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH RIGHT TO TRIAL BY JURY WOULD OTHERWISE ACCRUE. BORROWER AND LENDER EACH ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY EACH OTHER.  NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, BORROWER HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1 ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE (PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO JUDICIAL REFERENCE SHALL BE APPLICABLE WITH RESPECT TO ANY ACTION IN RESPECT OF THE FORECLOSURE OF THE SECURITY INSTRUMENT). PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE.  IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 AND 640 TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL.  BORROWER ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER.  BORROWER HEREBY AGREES THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARMS-LENGTH BASIS, WITH BORROWER AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE ITS LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN.**

_____
**Borrower's Initials**

_____
**Borrower's Initials**

_____
**Borrower's Initials**

**Section 11.5**   Credit Authorization and Consent to Disclosure.   Lender may collect, retain, release, disclose, exchange, share, transfer and assign from time to time, as it may determine in its sole discretion, all information and materials (including financial statements and information concerning the status of the Loan, such as existing or potential Loan defaults, lease defaults or other facts or circumstances which might affect the performance of the Loan) provided to or obtained by it relating to Borrower, Property or the Loan (both before and after the disbursement of funds and/or default thereunder) without restriction and without notice to or the consent of Borrower and/or any guarantor (and each Borrower hereby irrevocably consents thereto):

      (a)     to any other Lender or investor who has an interest in the Loan;

      (b)     to any proposed purchaser or subsequent owner of the Loan including any subsequent or proposed Lender and their respective third party advisors and agents, such as lawyers, accountants, auditors, consultants, appraisers and credit verification sources;

      (c)     to the public or any private group in any offering memorandum, prospectus or other disclosure document relating to any sale, syndication or securitization of the Loan (including all initial and continuing disclosure requirements), regardless of format or scope of distribution;

      (d)     to the public or other interested persons, directly or indirectly through information service providers or other market participants, for the purpose of providing market information from time to time relating to the status of the Loan or any related securitization or any interest therein, regardless of format or scope of distribution;

      (e)     to any governmental authority having jurisdiction over any sale, syndication or securitization of the Loan or any trade of any interest therein;

      (f)     to any other Person in connection with the sale, syndication or securitization of the Loan, including insurers and rating agencies; and

      (g)     to any other Person in connection with the collection or enforcement proceedings taken under or in respect of the Loan.

Without limiting the foregoing, Borrower hereby consents to the Lender obtaining all information as may be necessary from all available sources as to the creditworthiness of Borrower and acknowledges that the Lender may collect or come into possession of personal information relating to certain individuals either comprising or otherwise connected with the Borrower which information may include contact information (mailing address, e-mail address, telephone number or fax number), financial information and status (bank account numbers, existing debts, personal net worth or credit history), date of birth, place of employment and social security number. Borrower acknowledges and agrees that such personal information may be used by Lender in connection with the processing, approving, funding, servicing and administering the Loan and any sale, syndication or securitization of the Loan, and in so doing the Lender may disclose and otherwise deal with personal information in the same manner and to the same Persons as provided in the preceding paragraph without restriction and without notice to or the consent of Borrower or any related individual. Borrower for itself and on behalf of its directors, officers, shareholders and principals, hereby consents to and authorizes such use and disclosure of all such personal information by the Lender and represents and warrants that it has full power and authority to give such consent and authorization.

**Section 11.6**   California Civil Code.   Borrower hereby waives any rights or defenses available to Borrower based upon Section 2822 of the California Civil Code.

## XII   MISCELLANEOUS

**Section 12.1**   <u>Survival</u>.   This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant to any of the Loan Documents, including the Sources and Uses of Funds and the Loan Term Sheet, shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents.   Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.   All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 12.2**   <u>Governing Law</u>.   Except as otherwise expressly set forth herein, this Agreement shall be governed, construed, applied and enforced in accordance with the laws of the state where the Land is located without regard to the conflicts of law provisions thereof ("**Governing State**").   Borrower hereby consents to personal jurisdiction in the Governing State. JURISDICTION AND VENUE OF ANY ACTION BROUGHT TO ENFORCE THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY ACTION RELATING TO THE LOAN OR THE RELATIONSHIPS CREATED BY OR UNDER THE LOAN DOCUMENTS ("**ACTION**") SHALL, AT THE ELECTION OF LENDER, BE IN (AND IF ANY ACTION IS ORIGINALLY BROUGHT IN ANOTHER VENUE, THE ACTION SHALL AT THE ELECTION OF LENDER BE TRANSFERRED TO) A STATE OR FEDERAL COURT OF APPROPRIATE JURISDICTION LOCATED IN THE GOVERNING STATE.   BORROWER HEREBY CONSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF THE STATE COURTS OF THE GOVERNING STATE AND OF FEDERAL COURTS LOCATED IN THE GOVERNING STATE IN CONNECTION WITH ANY ACTION AND HEREBY WAIVES ANY AND ALL PERSONAL RIGHTS UNDER THE LAWS OF ANY OTHER STATE TO OBJECT TO JURISDICTION WITHIN SUCH GOVERNING STATE FOR PURPOSES OF ANY ACTION.   Borrower hereby waives and agrees not to assert, as a defense to any Action or a motion to transfer venue of any Action, (i) any claim that it is not subject to such jurisdiction, (ii) any claim that any Action may not be brought against it or is not maintainable in those courts or that this Agreement may not be enforced in or by those courts, or that it is exempt or immune from execution, (iii) that the Action is brought in an inconvenient forum, or (iv) that the venue for the Action is in any way improper.

**Section 12.3**   <u>Modification; Waiver in Writing</u>.   No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of any other Loan Document, nor consent by Lender to any departure by any Borrower Party from the Obligations, shall in any event be effective unless the same shall be in a writing signed by the Person against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.   Except as otherwise expressly provided herein, no notice to, or demand on any Borrower Party shall entitle any Borrower Party to any other or future notice or demand in the same, similar or other circumstances.

**Section 12.4**   <u>Delay Not a Waiver</u>.   Neither any failure nor any delay on the part of Lender in insisting upon strict performance or compliance of any term, condition, covenant or agreement, or Lender's delay in exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.   In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.   Lender shall have the right, in its complete and sole discretion, to waive or reduce any time periods to which Lender is entitled under the Loan Documents.

**Section 12.5**   <u>Notices</u>.   All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing (including by facsimile) and shall be effective for

all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (c) by facsimile (with a copy sent contemporaneously by certified or registered United States mail, postage prepaid) answer back acknowledged), addressed as follows:

|                     |                                                |
|---------------------|------------------------------------------------|
| If to Borrower:     | Oakland Cannery Real Estate, LLC               |
|                     | 3600 American River Drive, Suite 215           |
|                     | Sacramento, California 95864                   |
|                     | Attention: Matt Garibaldi                      |
|                     | Telephone: 916-414-1500                        |
|                     | Email: mgaribaldi@follettusa.com               |
|                     |                                                |
|                     | 5733 SLOCA Partnership                         |
|                     | 1137 Bannock Street                            |
|                     | Denver, Colorado 80204                         |
|                     | Attention: Ken Greer                           |
|                     | Telephone: 720-612-7739                        |
|                     | Email: ken@greensagemb.com                     |
|                     |                                                |
|                     | 5601 SLOCA, LLC                                |
|                     | 1137 Bannock Street                            |
|                     | Denver, Colorado 80204                         |
|                     | Attention: Ken Greer                           |
|                     | Telephone: 720-612-7739                        |
|                     | Email: ken@greensagemb.com                     |
|                     |                                                |
| If to Lender:       | Romspen California Mortgage Limited Partnership |
|                     | 162 Cumberland Street, Suite 300               |
|                     | Toronto, Ontario M5R 3N5                       |
|                     | Attention:  Joel Mickelson and Blake Cassidy   |
|                     | Telephone: (416) 928-4870                      |
|                     | Email: joelmickelson@romspen.com               |
|                     | blakecassidy@romspen.com                       |
|                     |                                                |
| with a copy to:     | Foley Gardere                                  |
|                     | 2021 McKinney Ave., Suite 1600                 |
|                     | Dallas, Texas  75201                           |
|                     | Attention:  Clifton M. Dugas, II               |
|                     | Telephone: (214) 999-4004                      |
|                     | Email: cdugas@foley.com                        |

or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section.  A notice shall be deemed to have been given:  in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day, in the case of facsimile, upon completion of transmission (which is confirmed by telephone or by a statement generated by the transmitting machine) with receipt acknowledged by the recipient thereof.

**Section 12.6**   Headings.   The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  "Section" refers to the entire section and not to any particular subsection,

paragraph of other subdivision.  Reference to days for performance shall mean calendar days unless Business Days are expressly indicated.

Section **12.7**     Severability.  If any provision or obligation under this Agreement and the other Loan Documents shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that provision shall be deemed severed from the Loan Documents and the validity, legality and enforceability of the remaining provisions or obligations shall remain in full force as though the invalid, illegal, or unenforceable provision had never been a part of the Loan Documents.

Section **12.8**     Preferences.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by any of the Borrower Parties to any portion of the Obligations.  To the extent any of the Borrower Parties makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Bankruptcy Law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section **12.9**     Expenses.  Borrower covenants and agrees to pay to Lender upon receipt of written notice from Lender for all costs and expenses (including attorneys' fees and disbursements) incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for the Borrower Parties (including any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) the ongoing performance of and compliance with the respective agreements and covenants of the Borrower Parties contained in this Agreement and the other Loan Documents; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents, including Lender's administration and servicing of the Loan; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (v) securing compliance with any requests made by any Borrower Party pursuant to any provision of any of the Loan Documents; (vi) the filing and recording of the Loan Documents, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting any Borrower Party, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; (viii) costs incurred by Lender in the review of easements, lot line agreements or similar matters, the review and approval of or consent to Leases and the negotiation of subordination, non-disturbance and attornment agreements, and other similar items required by Borrower in connection with Borrower's use and enjoyment of the Property; (ix) costs incurred by Lender in responding to any subpoena or participating in, observing or preparing for any deposition or other legal or quasi-legal process; and (x) the amounts described in Section 7.4.  Any cost and expenses due and payable to Lender shall be payable within five (5) Business Days of demand, shall be secured by the Loan Documents, and if not paid when due, shall bear interest at the Default Rate until paid.  Borrower hereby agrees that Lender, in its sole discretion, may make advances under the Loan to pay any costs and expenses due and payable to Lender under the Loan Documents.

Section **12.10**     Relationship of Borrower and Lender.  The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Note, the Security Instrument, this Agreement and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of the debtor and creditor relationship established pursuant to the Loan Documents.  The relationship of Borrower and Lender is created and governed solely by the Loan Documents.

**Section 12.11**    No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)    Any provision herein or in any of the other Loan Documents to the contrary notwithstanding, Lender, by virtue of its acceptance of this Agreement and the making of the Loan or any approval rights Lender may have herein or in any of the Loan Documents shall not be deemed to constitute Lender a mortgagee-in-possession, tenant-in-common, or in control of, or a partner or joint venturer with, or insider (within the meaning of Section 101(31) of the Bankruptcy Code) of, any Borrower Party or any other Person; and Borrower shall indemnify Lender against, shall hold Lender harmless from, and shall reimburse Lender for, any and all claims, demands, judgments, penalties, fines, liabilities, costs, damages and expenses, including court costs and reasonable attorneys' fees incurred by Lender (whether incurred in connection with nonjudicial action, prior to trial, at trial, or on appeal or review) in any action against or involving Lender resulting from such a construction of the Loan Documents.

(b)    Any inspection of the Property, any review or approval of any plans, contracts, subcontracts (including environmental reviews, audits, assessments and/or reports relating to the Property), and review or approval of budgets, expenses or obligations or any analysis of the Property made by Lender or any of its agents, architects or consultants is intended solely for the benefit of Lender and shall not be deemed to create or form the basis of any warranty, representation, covenant, implied promise or liability to Borrower or any of its employees or agents, any guest or invitee upon the Property, or any other Person.

(c)    Except as otherwise provided in Article VIII hereof, this Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained in the Loan Documents.  Except as otherwise provided in Article VIII hereof, all conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

**Section 12.12**    Publicity.  All news releases, publicity or advertising by the Borrower Parties or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents or to Lender, or any of their Affiliates shall be subject to the prior written approval of Lender, which approval shall not be unreasonably withheld. Borrower hereby agrees Lender (together with its Affiliates, "**Romspen**") may publicly identify details of the Loan in Romspen's advertising and public communications of all kinds, including, but not limited to, press releases, direct mail, newspapers, magazines, journals, e-mail, or internet advertising or communications.  Such details may include the name of the Property, the address of the Property, the amount of the Loan, the date of the closing and a description of the size/location of the Property. Lender shall be entitled to place on the Property signage indicating Lender's participation in the funding of the Property.

**Section 12.13**    Subrogation.  If any or all of the proceeds of the Note have been used to extinguish, extend or renew any Indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, Liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such Indebtedness and such former rights, claims, Liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the Lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of the Obligations.

**Section 12.14**    Duplicate Originals; Counterparts.  For the purpose of facilitating the execution of this Agreement and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall

constitute but one and the same instrument. A signature of a party by facsimile or other electronic transmission (including a .pdf copy sent by e-mail) shall be deemed to constitute an original and fully effective signature of such party. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

**Section 12.15** <u>Liability</u>. If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 12.16** <u>Prior Agreements</u>. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, including any term sheets, discussion outlines or commitment letters (as same may be amended) between any of the Borrower Parties and Lender are superseded by the terms of this Agreement and the other Loan Documents. In the event of any conflict between the terms of this Agreement and the Loan Term Sheet, Lender reserves the right to determine in its sole discretion whether the terms of this Agreement or the Loan Term Sheet control.

**Section 12.17** <u>No Usury</u>. Any provision herein, in any Loan Document or any other document executed or delivered in connection with the Loan, or in any other agreement or commitment, whether written or oral, expressed or implied, to the contrary notwithstanding, Lender shall not in any event be entitled to receive or collect, nor shall or may amounts received hereunder be credited, so that Lender shall be paid, as interest, a sum greater than the maximum amount permitted by applicable law to be charged to the Person primarily obligated to pay the Debt and the Obligations at the time in question. If any construction of this Agreement, any other Loan Document, or any other document executed or delivered in connection herewith, indicates a different right given to Lender to ask for, demand or receive any larger sum as interest, such is a mistake in calculation or wording which this clause shall override and control, it being the intention of Borrower and Lender that this Agreement, any other Loan Document and any other documents executed in connection herewith conform strictly to applicable usury laws. In no event shall the amount treated as the total interest exceed the maximum amount of interest which may be lawfully contracted for, charged, taken, received or reserved by Lender in accordance with the applicable usury laws, taking into account all items which are treated as interest under applicable law, computed in the aggregate over the full term of the Loan evidenced hereby. In the event that the aggregate of all consideration which constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Agreement, any other Loan Document and any other documents executed in connection herewith shall ever exceed the maximum nonusurious rate under applicable law, any sum in excess thereof shall be applied to the reduction of the unpaid principal balance of the Debt and the Obligations, and if the Debt and the Obligations are paid in full, any remaining excess shall be paid to Borrower. In determining whether or not the interest paid or payable, under any specific contingency, exceeds the maximum nonusurious rate under applicable law, if any, Borrower and Lender shall, to the maximum extent permitted under applicable law, (a) characterize any nonprincipal amount as an expense or fee rather than as interest, (b) exclude voluntary prepayments and the effects thereof, or (c) "spread" the total amount of interest throughout the entire term of the Debt and the Obligations so that the interest rate is uniform throughout the entire term of the Debt and the Obligations; provided, however, that if the Debt and Obligations are paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds the maximum nonusurious rate, if any, Lender shall refund to Borrower the amount of such excess. If any provision of this Agreement would oblige the Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by any applicable law or would result in a receipt by that Lender of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by that Lender of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

(i)      first, by reducing the amount or rate of interest required to be paid to the Lender; and

(ii)      thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute interest for purposes of section 347 of the Criminal Code (Canada).

**Section 12.18**  <u>Construction</u>.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender by virtue of the fact that this Agreement or any of the Loan Documents has originated with Lender as drafter.  Borrower acknowledges that Borrower has reviewed this Agreement and the other Loan Documents and has had the opportunity to consult with counsel on same.  This Agreement and the other Loan Documents, shall therefore be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties to the Loan Documents. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.

**Section 12.19**  <u>Invalidity of a Provision; Principles of Construction; Lender's Discretion</u>.  If any clause or provision shall be deemed invalid or unenforceable, then this Agreement shall be construed without such clause or provision and the remainder of such provision and this Agreement shall be given full force and effect to the greatest extent permissible by law. All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The term "including" is not limiting (and shall mean "including but not limited to"), and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  Wherever Lender's judgment, consent, approval or discretion is required under this Agreement or any other Loan Document for any matter or thing or Lender shall have an option, election, or right of determination or any other power to decide any matter relating to the terms and conditions of this Agreement, including any right to determine that something is satisfactory or not ("**Decision Power**"), such Decision Power shall be exercised in the sole and absolute, but good faith, discretion of Lender unless otherwise expressly stated to be reasonably exercised.  Such Decision Power and each other power granted to Lender upon this Agreement may be exercised by Lender or by any authorized agent of Lender (including any servicer and/or attorney-in-fact), and Borrower hereby expressly agrees to recognize the exercise of such Decision Power by such authorized agent.

**Section 12.20**  <u>Lender</u>.  The rights of Lender pursuant to this Agreement and the other Loan Documents are in addition to all of the rights of Lender or any Affiliate of Lender may now or hereafter have by virtue of any ownership, directly or indirectly, in Borrower or any Affiliate of Borrower.  In acting as Lender pursuant to this Agreement or the Loan Documents, Borrower acknowledges that Lender shall owe no duties of any kind to Borrower or any other Person (other than those specifically stated in the Loan Documents) on account of such role of Lender or any Affiliate of Lender or by virtue of any ownership interest in Borrower or such Affiliates (directly or indirectly) or otherwise, and there shall be no limitations on Lender's rights or remedies or Lender's ability to act solely in Lender's best interests or in Lender's discretion, notwithstanding the role Lender or any such Affiliate of Lender may have by virtue of any ownership interest in Borrower or any Affiliate of Borrower.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to Lender under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by Lender or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire (directly or indirectly) in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  No assignee of any of Lender's rights with respect to the Loan or the Loan Documents shall be prejudiced or affected by any actions taken or not taken by Lender or its Affiliates prior to the assignment to the then current Lender and upon any such assignment, such assignee shall be in the same position as if such assignee had originated the Loan itself as of the date of such assignment and shall not be subject to any offsets, counterclaims or defenses to which Lender, any other Person which may from time to

**Exhibit A Page - 53**

time be the "Lender" hereunder or their respective Affiliates might be subject. Borrower acknowledges that Lender and its Affiliates engage in the business of real estate financings and other real estate transactions and investments, which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

**Section 12.21** <u>Limitation on Liability</u>.  Notwithstanding anything contained herein to the contrary, Borrower agrees that none of Lender, or its agents or employees shall be liable to Borrower for any monetary damages (including any special, consequential or punitive damages whatsoever), whether in contract, tort (including negligence and strict liability) or any other legal or equitable principle and Borrower's sole remedies shall be limited to commencing an action for specific performance or injunctive relief, as the case may be, except where Lender has been determined by a court of law to have acted fraudulently or in bad faith (in which case Borrower shall be entitled to pursue damages).

**Section 12.22** <u>Tax Withholding</u>.  Borrower shall deliver to Lender any necessary documentation to obtain reduced or no withholding tax as portfolio interest under the Code or any applicable income tax treaty, including Lender providing IRS Form W 8BEN to Borrower.  Under the United States – Canada Income Tax Treaty as in effect on the date of this Agreement, Lender and Borrower agree that there is currently no withholding required on the interest for the Loan.  In order for the interest to qualify as portfolio interest, the Note shall be in registered form as to both principal and interest.  In addition, the Note may be assigned or transferred only by the Lender, and Borrower must either reissue the Note to the new holder or issue a new note to the new holder, if so required by Lender or Lender's assignee.

**Section 12.23** <u>Full Repayment And Reconveyance</u>.  Upon receipt of all sums owing and outstanding under the Loan Documents, Lender shall issue a full reconveyance of the Property from the Lien of the Security Instrument; provided, however, that all of the following conditions shall be satisfied at the time of, and with respect to, such reconveyance: (a) Lender shall have received all escrow, closing and recording costs, the costs of preparing and delivering such reconveyance and any sums then due and payable under the Loan Documents; and (b) Lender shall have received a written release satisfactory to Lender of any set aside letter, letter of credit or other form of undertaking which Lender has issued to any surety, governmental agency or any other party in connection with the Loan and/or the Property.  Lender's obligation to make further disbursements under the Loan shall terminate as to any portion of the Loan undisbursed as of the date of issuance of such release or reconveyance, and any commitment of Lender to lend any undisbursed portion of the Loan shall be cancelled.

**Section 12.24** <u>Delay Outside Control</u>.  Neither Lender nor Borrower shall be liable in any way to the other party hereto or any third party for the failure to perform or delay in performing under the Loan Documents if such failure to perform or delay in performing results directly or indirectly from, or is based upon, the action, inaction, or purported action, of any Governmental Authority, or because of war, rebellion, insurrection, strike, lock-out, boycott or blockage (whether presently in effect, announced or in the sole judgment of Lender deemed probable), or from any Act of God or other cause or event beyond Lender's or Borrower's control, as applicable; provided, however, that in no event shall this Section 12.24 relieve Borrower of liability resulting directly or indirectly from (a) Borrower's failure to pay any Debt or any other amounts payable hereunder or (b) Borrower's failure to perform or delay in performing any obligation hereunder that may be satisfied by the payment of money.

**Section 12.25** <u>Modification, Waiver in Writing</u>.  No modification, amendment, extension, discharge, termination or waiver of any provision of any Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the specific purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 12.26** <u>Set-Off</u>.  In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by Legal Requirements, upon any amount becoming due and

payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in accordance with Legal Requirements, in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower. Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

**Section 12.27** <u>Judicial Reference; Referee; Costs</u>.

(a) <u>Controversies Subject to Judicial Reference; Conduct of Reference</u>. In the event that any action, proceeding and/or hearing on any matter whatsoever, including all issues of fact or law arising out of, or in any way connected with, the Note, this Agreement or any of the Loan Documents, or the enforcement of any remedy under any law, statute, or regulation (hereinafter, a "**Controversy**"), is to be tried in a court of the State of California and the jury trial waiver provisions set forth in Section 11.4 are not permitted or otherwise applicable under then-prevailing law:

(i) Each Controversy shall be determined by a consensual general judicial reference (the "**Reference**") pursuant to the provisions of California Code of Civil Procedure §§ 638 et seq., as such statutes may be amended or modified from time to time.

(ii) Upon a written request, or upon an appropriate motion by either Lender or Borrower, any pending action relating to any Controversy and every Controversy shall be heard by a single Referee (the "Referee") who shall then try all issues (including any and all questions of law and questions of fact relating thereto), and issue findings of fact and conclusions of law and report a statement of decision. The Referee's statement of decision will constitute the conclusive determination of the Controversy. Lender and Borrower agree that the Referee shall have the power to issue all legal and equitable relief appropriate under the circumstances before him/her.

(iii) Lender and Borrower shall promptly and diligently cooperate with one another and the Referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of each Controversy.

(iv) Either Lender or Borrower may file the Referee's findings, conclusions and statement with the clerk or judge of any appropriate court, file a motion to confirm the Referee's report and have judgment entered thereon. If the report is deemed incomplete by such court, the Referee may be required to complete the report and resubmit it.

(v) Lender and Borrower will each have such rights to assert such objections as are set forth in California Code of Civil Procedure §§ 638 et seq.

(vi) All proceedings shall be closed to the public and confidential and all records relating to the Reference shall be permanently sealed when the order thereon becomes final.

(b) <u>Selection of Referee; Powers</u>.

(i) Lender and Borrower shall select a single neutral referee ("**Referee**"), who shall be a retired judge or justice of the courts of the State of California, or a federal court judge, in each case, with at least ten years of judicial experience in civil matters. The Referee shall be appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts).

(ii) If within ten (10) days after the request or motion for the Reference, Lender and Borrower cannot agree upon a Referee, either Lender or Borrower may request or move that the

Referee be appointed by the Presiding Judge of the Marin County Superior Court or of the U.S. District Court for the Northern District of California. The Referee shall determine all issues relating to the applicability, interpretation, legality and enforceability of this Section 12.27.

(c)     Provisional Remedies.

(i)     No provision of this Section 12.27 shall limit the right of either Lender or Borrower, as the case may be, to (1) exercise self-help remedies as might otherwise be available under applicable law (2) initiate judicial or non-judicial foreclosure against any real or personal property collateral, (3) exercise any judicial or power of sale rights, or (4) obtain or oppose provisional or ancillary remedies, including without limitation, injunctive relief, writs of possession, the appointment of a receiver, and/or additional or supplementary remedies from a court of competent jurisdiction before, after or during the pendency of the Reference.

(ii)     The exercise of, or opposition to, any such remedy does not waive the right of Lender or Borrower to the Reference pursuant to this Section 12.27.

(d)     Costs and Fees.

(i)     Promptly following the selection of the Referee, Lender and Borrower shall each advance equal portions of the estimated fees and costs of the Referee.

(ii)     In the statement of decision issued by the Referee, the Referee shall award costs, including reasonable attorneys' fees, to the prevailing party, if any, and may order the Referee's fees to be paid or shared by Borrower and/or Lender in such manner as determined by the Referee deems just.

**Section 12.28**   Multiple Borrowers.

(a)     References. All references to "Borrower" in this Agreement shall be deemed to refer to one or more Borrowers (each, an "**Individual Borrower**"), as the context requires. It is the intent of the parties hereto in making any determination under the Loan Documents (including, without limitation, in determining whether (a) a breach of a representation, warranty or a covenant has occurred, (b) there has occurred an Event of Default, and (c) an event has occurred which would create recourse obligations under Section 9.1 hereof) that any breach, occurrence or event with respect to any Individual Borrower shall be deemed to be a breach, occurrence or event with respect to all Individual Borrowers, and that all Individual Borrowers need not have been involved with or be the subject of such breach, occurrence or event in order for the same to be deemed such a breach, occurrence or event with respect to every Individual Borrower and the Loan.

(b)     Joint and Several Liability. Each Individual Borrower shall be jointly and severally liable for payment of the Debt and performance of all other obligations of all Borrowers (or any of them) under this Agreement and any other Loan Document, and the making of each of the representations, warranties, covenants and obligations under the Loan Document by Borrower.

(c)     Contribution. Each Individual Borrower will benefit, directly and indirectly, from each Individual Borrower's obligation to pay the Debt and perform its obligations under the Loan Documents. In consideration therefor, Individual Borrowers desire to enter into an allocation and contribution agreement among themselves as set forth in this Section 12.28 to allocate such benefits among themselves and to provide a fair and equitable agreement to make contributions among each of the Individual Borrowers in the event any payment is made by any Individual Borrower hereunder to Lender (any such payment, a "**Contribution**"). In order to provide for a fair and equitable contribution among Individual Borrowers in the event that any Contribution is made by an Individual Borrower (a "**Funding Borrower**"), such Funding Borrower shall be entitled to a reimbursement Contribution ("**Reimbursement Contribution**") from all other Individual Borrowers for all payments, damages and expenses incurred by such Funding Borrower in

discharging any of the Debt, in the manner and to the extent set forth in this Section 12.28. Each Individual Borrower shall be liable to a Funding Borrower in an amount equal to the greater of (i) (A) the ratio of the Benefit Amount (as defined below) of such Individual Borrower to the total amount of Debt, multiplied by (B) the amount of the Debt paid by such Funding Borrower, and (ii) ninety-five percent (95%) of the excess of (A) the fair saleable value of such Individual Borrower's interest in the Property and the other collateral for the Loan, over (B) the total liabilities of such Individual Borrower (including the maximum amount reasonably expected to become due in respect of contingent liabilities) determined as of the date on which the payment made by a Funding Borrower is deemed made for purposes hereof (giving effect to all payments made by other Funding Borrowers as of such date in a manner to maximize the amount of such Contributions). For purposes hereof, the "**Benefit Amount**" of any Individual Borrower as of any date of determination shall be the net value of the benefits to such Individual Borrower and its Affiliates from extensions of credit made by Lender to (1) such Individual Borrower and (2) the other Individual Borrowers hereunder and the other Loan Document. In addition:

(i)     If at any time there exists more than one Funding Borrower with respect to any Contribution (in any such case, the "**Applicable Contribution**"), then Reimbursement Contributions from other Individual Borrowers shall be allocated among such Funding Borrowers in proportion to the total amount of the Contribution made for or on account of the other Individual Borrowers by each such Funding Borrower pursuant to the Applicable Contribution. If at any time any Individual Borrower pays an amount hereunder in excess of the amount calculated pursuant to this Section 12.28, such Individual Borrower shall be deemed to be a Funding Borrower to the extent of such excess and shall be entitled to a Reimbursement Contribution from the other Individual Borrowers in accordance with the provisions of this Section.

(ii)     Each Individual Borrower acknowledges that the right to Reimbursement Contribution hereunder shall constitute an asset in favor of such Individual Borrower to which such Reimbursement Contribution is owing.

(iii)     No Reimbursement Contribution payments payable by an Individual Borrower pursuant to the terms of this Section 12.28 shall be paid until all amounts then due and payable by all of Individual Borrowers to Lender, pursuant to the terms of the Loan Documents, are paid in full. Nothing contained in this Section 12.28 shall limit or affect the Debt of any Individual Borrower to Lender under the Note or any other Loan Documents.

(iv)     Any indebtedness of a Borrower now or hereafter owed to any other Borrower (the "**Surety**") is hereby is subordinated to the Obligations owed to the Lender under the Loan Documents. Upon the occurrence and during the continuance of an Event of Default, if Lender so requests, any such indebtedness of a Borrower now or hereafter owed to any Surety shall be collected, enforced and received by such Surety as trustee for Lender and shall be paid over to Lender in kind on account of the Obligations, but without reducing or affecting in any manner the obligations of such Surety under the other provisions of this Agreement. Upon the occurrence and during the continuance of an Event of Default, should such Surety fail to collect or enforce any such indebtedness of a Borrower now or hereafter owed to such Surety and pay the proceeds thereof to Lender in accordance with this subsection, Lender as such Surety's attorney in fact may do such acts and sign such documents in such Surety's name as Lender considers necessary or desirable to effect such collection, enforcement and/or payment. Until the Obligations shall have been paid and performed in full, all the rights, privileges, powers and remedies granted to Lender hereunder shall continue to exist and may be exercised by Lender at any time and from time to time irrespective of the fact that any of the Obligations may have become barred by any statute of limitations. Each Borrower, in its capacity as Surety, expressly waives the benefit of any and all statutes of limitation, and any and all laws providing for exemption of property from execution or for evaluation and appraisal upon foreclosure, to the maximum extent permitted by applicable laws.

(v)     Each Borrower, in its capacity as a Surety, acknowledges that the obligations undertaken herein involve the payment of obligations of persons or entities other than such Surety and, in full recognition of that fact, consents and agrees (and waives any right to object) that Lender may, at any time and from time to time, without notice or demand, and without affecting the enforceability or continuing

effectiveness hereof, in accordance with the terms of the Loan Documents: (A) supplement, modify, amend, extend, renew, accelerate or otherwise change the time for payment or the terms of the Obligations or any part thereof, including any increase or decrease of the rate(s) of interest thereon; (B) supplement, modify, amend or waive, or enter into or give any agreement, approval or consent with respect to, the Obligations or any part thereof, or any of the Loan Documents to which such Surety is not a party or any additional security or guaranties, or any condition, covenant, default, remedy, right, representation or term thereof or thereunder; (C) accept new or additional instruments, documents or agreements in exchange for or relative to any of the Loan Documents or the Obligations or any part thereof; (D) accept partial payments on the Obligations; (E) receive and hold additional security or guaranties for the Obligations or any part thereof; (F) release, reconvey, terminate, waive, abandon, fail to perfect, subordinate, exchange, substitute, transfer and/or enforce any security or guaranties, and apply any security and direct the order or manner of sale thereof as Lender in its sole and absolute discretion may determine; (G) release any party from any personal liability with respect to the Obligations or any part thereof; (H) settle, release on terms satisfactory to Lender or by operation of applicable laws or otherwise liquidate or enforce any Obligations and any security or guaranty therefor in any manner, consent to the transfer of any security and bid and purchase at any sale; and/or (I) consent to the merger, change or any other restructuring or termination of the entity existence of other Borrowers or any other party, and correspondingly restructure the Obligations, and any such merger, change, restructuring or termination shall not affect the liability of any Borrower or the continuing effectiveness hereof, or the enforceability hereof with respect to all or any part of the Obligations.

(vi)     In the event, on account of the Bankruptcy Reform Act of 1978, as amended, the Uniform Fraudulent Conveyance Act, or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, including, without limitation, Section 548 of the Bankruptcy Code and any state fraudulent transfer or fraudulent conveyance act or statute applied in such proceeding, whether by virtue of Section 544 of the Bankruptcy Code or otherwise (collectively, "**Bankruptcy Laws**"), now or hereafter in effect, which may be or become applicable, any Borrower shall be relieved of or fail to incur any debt, obligation or liability as provided herein or in any other Loan Documents to which such Borrower is a party, the other Borrowers shall nevertheless be fully liable therefor. Each Borrower and Lender hereby confirm that it is the intention of all parties hereto that the obligations of each Borrower hereunder, under each Security Instrument, and each other Loan Documents not constitute a fraudulent transfer or fraudulent conveyance for the purposes of any Bankruptcy Laws (a "**Fraudulent Conveyance**"). To give effect to the foregoing intention of the parties, each of such parties hereby irrevocably agrees that the obligations of each Borrower to Lender shall at all times be limited to (but shall not be less than) such maximum amount as will, after giving effect to the maximum amount of such obligations and all other liabilities (whether contingent or otherwise) of such Borrower that are relevant under such Bankruptcy Laws, result in the obligations of such Borrower not constituting a Fraudulent Conveyance as of the date of execution and delivery of this Agreement and the other documents contemplated hereby (provided, however, that the foregoing shall not in any way limit the obligations of any Borrower to Lender pursuant to the Loan Documents in effect prior to the Effective Date). The provisions of this clause (vi) are intended solely to preserve the rights of Lender hereunder to the maximum extent that would not cause the obligations of any Borrower hereunder to be subject to avoidance as a Fraudulent Conveyance, and no Borrower or any other Person shall have any right or claim under this clause (vi) as against Lender that would not otherwise be available to such Person under Bankruptcy Laws.

(vii)     Each Borrower warrants and agrees that each of the waivers and consents set forth herein are made with full knowledge of their significance and consequences, with the understanding that events giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which such Borrower otherwise may have against other Borrowers, Lender or others, or against any collateral, and that, under the circumstances, the waivers and consents herein given are reasonable and not contrary to public policy or law. Each Borrower acknowledges that it has either consulted with legal counsel regarding the effect of this Agreement and the waivers and consents set forth herein, or has made an informed decision not to do so.

(d)   Additional Waivers. Each Individual Borrower waives, to the extent permitted by applicable law:

(i)   any right to require Lender to proceed against any other Individual Borrower or any other person or to proceed against or exhaust any security held by Lender at any time or to pursue any other remedy in Lender's power before proceeding against such Individual Borrower;

(ii)   any defense or rights based upon or arising out of: (A) any legal disability or other defense of any other Individual Borrower, any guarantor of any other person or by reason of the cessation or limitation of the liability of any other Individual Borrower or any guarantor from any cause other than full payment of all sums payable under the Note and the other Loan Documents; (B) any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of any other Individual Borrower or any principal of any other Individual Borrower or any defect in the formation of any other Individual Borrower or any principal of any other Individual Borrower; (C) any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal; (D) any failure by Lender to obtain collateral for the Debt or failure by Lender to perfect a lien on the Property (or any portion thereof); (E) presentment, demand, protest and notice of any kind; (F) any failure of Lender to give notice of sale or other disposition of the Property (or any portion thereof) to any other Individual Borrower or to any other Person or any defect in any notice that may be given in connection with any such sale or disposition; (G) any failure of Lender to comply with applicable laws in connection with the sale or other disposition of the Property (or any portion thereof), including any failure of Lender to conduct a commercially reasonable sale or other disposition of the Property (or any portion thereof); (H) any use of cash collateral under Section 363 of the Bankruptcy Code, and any defense based upon any election by Lender, in any bankruptcy proceeding, of the application or non-application of Section 1111(6)(2) of the Bankruptcy Code or any successor statute; (I) any agreement or stipulation entered into by Lender with respect to the provision of adequate protection in any bankruptcy proceeding; (J) any borrowing or any grant of a security interest under Section 364 of the Federal Bankruptcy Code; (K) the avoidance of any security interest in favor of Lender for any reason; (L) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, liquidation or dissolution proceeding, including any discharge of, or bar or stay against collecting, all or any of the obligations evidenced by the Note or owing under any of the Loan Documents; (M) such Individual Borrower's, or any other party's, resignation of the portion of any obligation secured by the Security Instrument to be satisfied by any payment from any other Individual Borrower or any such party; or (N) an election of remedies by Lender even though the election of remedies, such as non-judicial foreclosure with respect to security for the Loan or any other amounts owing under the Loan Documents, has destroyed such Individual Borrower's rights of subrogation and reimbursement against any other Individual Borrower; and

(iii)   except as may be expressly and specifically permitted herein, any claim or other right which such Individual Borrower might now have or hereafter acquire against any other Individual Borrower or any other person that arises from the existence or performance of any obligations under the Note or the other Loan Documents, including any of the following: (A) any right of subrogation, reimbursement, exoneration, contribution, or indemnification; or (B) any right to participate in any claim or remedy of Lender against any other Individual Borrower or any collateral security therefor, whether or not such claim, remedy or right arises in equity or under contract, statute or common law.

**Section 12.29**   California Waivers.

(a)   Each Borrower expressly waives any and all suretyship defenses that may be available to such Borrower. Without limiting the generality of the foregoing, each Borrower makes the following additional waivers and covenants: except for compulsory cross-claims, such Borrower agrees that its obligations under this Agreement shall not be subject to any counterclaims, offsets or defenses against Lender or against any Borrower of any kind which may arise in the future. Each Borrower agrees that nothing contained herein shall prevent Lender from foreclosing on the lien of the Security Instruments or sale by power of sale, or from exercising any rights available to Lender thereunder, and that the exercise of any of the aforesaid rights shall not constitute a legal or equitable discharge of such Borrower. Each Borrower agrees that it hereby

knowingly waives any defense which may arise in the future to enforcement of this Agreement under California Code of Civil Procedure Sections 580b, 580d, 580a and 726 (or any other statute limiting a Lender's right to a deficiency) based on Lender's election to conduct a private, non-judicial foreclosure sale following a default by any Borrower even though such an election destroyed, diminished or otherwise affected such Borrower's rights of subrogation against such Borrower or other trustor under a deed of trust or the right of contribution, reimbursement or indemnity from any party, with the result that such Borrower's liability under this Agreement became nonreimbursable in whole or in part. Nevertheless, each Borrower hereby authorizes and empowers Lender to exercise, in its sole discretion, any rights and remedies, or any combination thereof, which may then be available, since it is the intent and purpose of each Borrower that the obligations hereunder shall be absolute, independent and unconditional under any and all circumstances. Without limiting the generality of the foregoing, each Borrower hereby expressly waives any and all benefits under California Civil Code Sections 2809, 2810, 2815, 2819, 2822, 2839, 2845, 2846, 2847, 2848, 2849, 2850, 2899 and 3433 and California Code of Civil Procedure Sections 580b, 580a, 580d and 726. Notwithstanding any foreclosure of the lien of the Security Instruments or security agreements with respect to any or all of any real or personal property secured thereby, whether by the exercise of the power of sale contained therein, by an action for judicial foreclosure or by an acceptance of a deed in lieu of foreclosure, each Borrower shall remain bound under this Agreement. Each Borrower further waives any right to cause a fair value hearing to be conducted under Code of Civil Procedure Section 580a, or any other provision of law respecting the amount of any deficiency following a non-judicial foreclosure. Nothing shall discharge or satisfy the liability of any Borrower hereunder except the full performance and payment of the Debt with interest. Each Borrower further waives any rights, defenses, and benefits that are or may become available to such Borrower by reason of California Civil Code Sections 2787 to 2855, inclusive.

(b)    Pursuant to the provisions of Section 2856 of the California Civil Code, each Borrower acknowledges and understands that if Lender forecloses judicially or nonjudicially against any real property security for the Notes, that foreclosure could impair or destroy any ability that such Borrower may have to seek reimbursement, contribution or indemnification from any other Borrower or others based on any right such Borrower may have of subrogation, reimbursement, contribution or indemnification for any amounts paid by such Borrower under this Agreement. Each Borrower further understands and acknowledges that in the absence of this provision, the potential impairment or destruction of such Borrower's rights, if any, may entitle Guarantor to assert a defense to this Agreement based on California Code of Civil Procedure Section 580d as interpreted in Union Bank vs. Gradsky, to the extent applicable. By executing this Agreement, each Borrower freely, irrevocably and unconditionally: (1) waives and relinquishes that defense, and agrees that such Borrower will be fully liable under this Agreement, even though Lender may foreclose judicially or nonjudicially against any real property security for the Notes; (2) agrees that such Borrower will not assert that defense in any action or proceeding that Lender may commence to enforce this Agreement; (3) acknowledges and agrees that the rights and defenses waived by such Borrower under this Agreement include any right or defense that such Borrower may have or be entitled to assert based upon or arising out of any one or more of the following:  (A) California Code of Civil Procedure Sections 580a (which if such Borrower had not given this waiver, would otherwise limit such Borrower's liability after any nonjudicial foreclosure sale to the difference between the obligations for which such Borrower is liable and the fair market value of the property or interests sold at such nonjudicial foreclosure sale rather than the actual proceeds of such sale), 580b and 580d (which if such Borrower had not given this waiver, would otherwise limit Lender's right to recover a deficiency judgment with respect to purchase money obligations and after any nonjudicial foreclosure sale, respectively), or 726 (which, if such Borrower had not given this waiver, among other things, would otherwise require Lender to exhaust all of its security before a personal judgment may be obtained for a deficiency); or (B) California Civil Code Section 2848; and (4) acknowledges and agrees that Lender is relying on this waiver in making the Loan, and that this waiver is a material part of the consideration that Lender is receiving for making the Loan.

(c)    EACH BORROWER WAIVES ALL RIGHTS AND DEFENSES THAT SUCH BORROWER MAY HAVE AGAINST ANY OTHER BORROWER BECAUSE SUCH BORROWER'S DEBT IS SECURED BY REAL PROPERTY. THIS MEANS, AMONG OTHER THINGS:

(i)     LENDER MAY COLLECT FROM ANY BORROWER WITHOUT FIRST FORECLOSING ON ANY REAL OR PERSONAL PROPERTY COLLATERAL PLEDGED BY BORROWER; AND

(ii)     IF LENDER FORECLOSES ON ANY REAL PROPERTY COLLATERAL PLEDGED BY BORROWER:

(A)     THE AMOUNT OF THE DEBT MAY BE REDUCED ONLY BY THE PRICE FOR WHICH THAT COLLATERAL IS SOLD AT THE FORECLOSURE SALE, EVEN IF THE COLLATERAL IS WORTH MORE THAN THE SALE PRICE; AND

(B)     LENDER MAY COLLECT FROM BORROWER EVEN IF LENDER, BY FORECLOSING ON THE REAL PROPERTY COLLATERAL, HAS DESTROYED ANY RIGHT EITHER BORROWER MAY HAVE TO COLLECT FROM THE OTHER BORROWER.

THIS IS AN UNCONDITIONAL AND IRREVOCABLE WAIVER OF ANY RIGHTS AND DEFENSES ANY BORROWER MAY HAVE BECAUSE EACH BORROWER'S DEBT IS SECURED BY REAL PROPERTY. THESE RIGHTS AND DEFENSES INCLUDE, BUT ARE NOT LIMITED TO, ANY RIGHTS OR DEFENSES BASED UPON CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580d, OR 726.

**Section 12.30**  Cannabis Disclosure.  Without limiting any other qualification or acknowledgement otherwise made in this Agreement or any other Loan Document, it is expressly acknowledged and agreed by Borrower and Lender that the sale and cultivation certain types of cannabis and cannabis-related products is illegal under Federal law as of the date of this Agreement. Neither Borrower nor any Guarantor has made any representations, warranties, or covenants to Lender regarding the compliance of the Property with Federal law as it pertains to the sale and cultivation of cannabis and cannabis-related products. Notwithstanding the foregoing, Borrower shall comply in all respects to applicable state and local law in connection with such uses, and a violation thereof shall be an Event of Default hereunder. In no event shall Borrower or any Guaranty be in Default of this Agreement or any other Loan Document, or otherwise incur any liability to Lender under this Agreement or any other Loan Document (including, without limitation, any Guaranty), as a result of non-compliance of the Property with Federal law related to cannabis or the enforcement of any Federal laws or regulations regarding cannabis so long as Borrower and the Property are operated in material compliance with California cannabis laws and regulations. The provisions of this Section 12.30 are sometimes referred to herein as the "**Cannabis Disclosure**."

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

<div align="center">

**BORROWER:**

**OAKLAND CANNERY REAL ESTATE, LLC**,
a California limited liability company

</div>

By:    FOLLETT USA, INC.,
a Delaware corporation,
its Manager

By:_____
Name: *Erik Groh*
Title: *Chief Financial Officer*

<div align="center">

**ACKNOWLEDGMENT**

</div>

STATE OF _____    §
                                  §
COUNTY OF _____    §

This instrument was acknowledged before me this ____ day of August, 2019, by _____, acting in his/her capacity as _____ of FOLLETT USA, INC., a Delaware corporation, Manager of Oakland Cannery Real Estate, LLC, a California limited liability company.

[S E A L]                            _____
                                         Notary Public, State of _____

*See attached California Acknowledgment*

<div align="center">

</div>

4826-6981-6219.5

<div align="right">

**Exhibit A Page - 62**

</div>

# CALIFORNIA ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California _____ }

County of Sacramento _____ }

On Aug. 15, 2019 _____ before me, Martha P. Hodapp, Notary Public _____,
(Here insert name and title of the officer)

personally appeared Erik Grotte _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public Signature            (Notary Public Seal)

MARTHA P. HODAPP
COMM. # 2250418
NOTARY PUBLIC - CALIFORNIA
SACRAMENTO COUNTY
COMM. EXPIRES JULY 19, 2022

---

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

Oakland Cannery Real Estate, LLC
(Title or description of attached document)

Loan Agreement
(Title or description of attached document continued)

Number of Pages _____ Document Date_____

CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☑ Corporate Officer
  Chief Financial Officer
  (Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

www.NotaryClasses.com 800-873-9865

### INSTRUCTIONS FOR COMPLETING THIS FORM

*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

**Exhibit A Page - 63**

**BORROWER:**

**5733 SLOCA PARTNERSHIP,**
a California general partnership

By:   KBP ACQUISITIONS REAL ESTATE, LLC,
a Colorado limited liability company,
its partner

By: _____
Kenneth Edward Greer,   Manager

By:   STRATEGIC ACQUISITIONS II REAL ESTATE,
LLC, a Colorado limited liability company,
its partner

By: _____
Kenneth Edward Greer,   Manager

## ACKNOWLEDGMENT

STATE OF _California_                §
                                     §
COUNTY OF _San Diego_                §

This instrument was acknowledged before me this ____ day of August, 2019, by Kenneth Edward Greer,      acting in his capacity as Manager of both KBP Acquisitions Real Estate, LLC and Strategic Acquisitions II Real Estate, LLC, each a Colorado limited liability company, as the partners of 5733 SLOCA Partnership, a California general partnership.

[S E A L]                          _____
                                   Notary Public, State of _____

" See attached "

BORROWER SIGNATURE PAGE TO LOAN AGREEMENT

4826-6981-6219.5

**Exhibit A Page - 64**

# CALIFORNIA ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of __California__   }

County of __San Diego__   }

On __08/12/2019__ before me, __Farnaz Arvin, a Notary Public__ ,
(Here insert name and title of the officer)

personally appeared __Kenneth Edward Greer__ ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

FARNAZ ARVIN
COMM. # 2169393
NOTARY PUBLIC-CALIFORNIA
SAN DIEGO COUNTY
MY COMM. EXP. OCT. 24, 2020

_____
Notary Public Signature                    (Notary Public Seal)

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT
Balloon Payoff
Loan Agreement
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date_____

### CAPACITY CLAIMED BY THE SIGNER
- ☐ Individual (s)
- ☐ Corporate Officer

  _____
  (Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

2015 Version www.NotaryClasses.com 800-873-9865

### INSTRUCTIONS FOR COMPLETING THIS FORM
*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgement is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

**Exhibit A Page - 65**

**LENDER:**

**ROMSPEN CALIFORNIA MORTGAGE LIMITED PARTNERSHIP,**
an Ontario limited partnership

By:    Romspen Fund GP Inc., its general partner

By:    Blake Cassidy
Name:    Authorized Signing Officer
Title:    

4826-6981-6219.7

**Exhibit A Page - 66**

## SCHEDULE I

## DEFINITIONS

"**Acceptable Accounting Principles**" shall mean GAAP or such other accounting methods or principles acceptable to Lender and consistently applied from time to time.

"**Act**" shall have the meaning specified in Section 4.1(s)(iii).

"**Affiliate**" shall mean as to any Person, (i) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such Person, (ii) any Person (directly or indirectly) owning or controlling 10% or more of the outstanding voting securities of or other ownership interests in such Person, (iii) any officer, director, partner, employee or member (direct or indirect and no matter how remote) of such Person, (iv) if such Person is an individual, any entity for which such Person directly or indirectly acts as an officer, director, partner, employee or member, or (v) any entity in which such Person (together with family members if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of 10% or more. Any reference in this Agreement to a "**Person and an Affiliate**" shall be deemed to refer to such Person and an Affiliate of such Person and any references in this Agreement to a "**Person or an Affiliate**" shall be deemed to refer to such Person or an Affiliate of such Person. As used in this Agreement, the term "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policy and/or policies of a Person, whether through ownership of voting securities or other ownership interests, by contract or otherwise.

"**Affiliate Transaction**" shall mean any contract, agreement or other arrangement between Borrower (or any other Person if such contract, agreement or other arrangement is in any way related to the Property) and any Borrower Party or any Affiliate of a Borrower Party or pursuant to which any Borrower Party or any Affiliate of any Borrower Party or any constituent member, partner or stockholder of Borrower or any Borrower Party or any Affiliate of a Borrower Party (direct or indirect) will receive any benefit of any kind.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alteration Threshold**" shall mean the amount of $250,000.00.

"**Applicable Contribution**" shall have the meaning set forth in Section 12.28(c)(i).

"**Architect Agreement**" shall mean any agreement between Borrower and any architect licensed in California, which shall be reasonably acceptable to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time upon Lender's approval thereof, which shall not be unreasonably withheld.

"**Assignment of Agreements**" shall mean, with respect to the Property, that certain first priority Assignment of Agreements, Licenses, Permit and Contracts dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to contracts, Licenses, permits and approvals necessary for the use and operation and development of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Leases**" shall mean each certain Assignment of Leases and Rents dated even date herewith and from a Borrower to Lender.

"**Authorized Representative**" shall mean a Person at the time designated and authorized to act on behalf of Borrower by a written certificate furnished to Lender containing the specimen signature of such Person and signed by Borrower.

4826-6981-6219.5

"**Availability Period**" means the period from and including the Closing Date to but excluding the Maturity Date.

"**Award**" shall have the meaning set forth in Section 6.1.3(b).

"**Balancing Event**" shall have the meaning set forth in Section 2.2(viii)(D).

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended from time to time.

"**Bankruptcy Laws**" shall mean the Bankruptcy Code together with any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Benefit Amount**" shall have the meaning set forth in Section 12.28(c).

"**Borrower**" has the meaning in the recitals hereto.

"**Borrower Parties**" shall mean the collective reference to each Borrower, each Guarantor, any other guarantor, indemnitor or surety of any of the Obligations and any other Person (other than Lender) that is a party to any of the Loan Documents, other than any Manager that is not an Affiliate of Borrower. Individually, each of the Borrower Parties may be referred to herein as a "**Borrower Party**".

"**Business Day**" shall mean a day on which commercial banks are not authorized or not required by law to close in the State of New York or in the State where the Property is located.

"**Cannabis Disclosure**" shall have the meaning set forth in Section 12.30.

"**Casualty**" shall have the meaning set forth in Section 6.1.1(i).

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Change Order**" shall mean any amendment, supplement or other modification in any respect to the Project Budget.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Cole Memo**" shall mean the memorandum issued to all United States attorneys by Deputy Attorney General James Cole on August 29, 2013, which reiterated the Department of Justice's authority to prosecute violations of federal laws relating to cannabis and outlined specific cannabis enforcement priorities, such as preventing (i) the distribution of cannabis to minors, (ii) revenue from the sale of cannabis from going to

criminal enterprises, gangs and cartels, (iii) the diversion of cannabis from states where it is legal under state law in some form to other states, (iv) state-authorized cannabis activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity, (v) violence and the use of firearms in the cultivation and distribution of cannabis, (vi) drugged driving and the exacerbation of other adverse public health consequences associated with cannabis use, (vii) the growing of cannabis on public lands and the attendant public safety and environmental dangers posed by cannabis production on public lands, and (viii) cannabis possession or use on federal property.

"**Complete**" shall mean (a) that the Project is substantially completed in accordance with the Plans and Specifications and all Legal Requirements, (b) the applicable Governmental Authority has approved the Project for its intended purposes, to the extent such approval is required under applicable Legal Requirements, (c) subject to any contest rights contained herein, the Property is free of all mechanics', materialmen's, and other similar liens (or such liens have otherwise been bonded over to Lender's satisfaction), (d) Lender has received copies of all warranties from suppliers covering materials, equipment and appliances included within the applicable component of the work, and (e) if required by Lender, Borrower shall have provided to Lender executed AIA Form G706 (Contractor's Affidavit of Payments of Debts), AIA Form G706A (Contractor's Affidavit of Release of Liens), and AIA Form G707 (Consent of Surety of Final Payment). The terms "**Completed**" and "**Completion**" shall have the same meaning when used in the Loan Documents.

"**Completion Guaranty**" shall mean that certain Completion and Cost Overrun Guaranty dated of even date herewith, executed by Guarantors in favor of Lender.

"**Condemnation**" shall have the meaning set forth in Section 6.1.3.

"**Contribution**" shall have the meaning set forth in Section 12.28(c).

"**Creditors' Rights Laws**" shall mean any existing or future law (whether statute or case law) of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to debts or debtors, including, without limitation, the Bankruptcy Code.

"**Debt**" shall mean all Indebtedness of Borrower to Lender, including, without limitation, the outstanding principal amount set forth in, and evidenced by, the Note together with all interest accrued and unpaid thereon, and all other sums due to Lender in respect of the Loan under the Note, this Agreement or any other Loan Document.

"**Debt Service**" shall mean interest on the Note (at the then current interest rate), and any other principal or interest payments on any subordinated debt approved by Lender.

"**Debt Service Coverage Ratio**" shall mean the ratio of Net Operating Income for the four (4) month period immediately preceding the date of determination to Debt Service for the four (4) month period immediately following the date of determination.

"**Default**" shall mean the occurrence of any event under this Agreement or under any other Loan Document which, but for the giving of notice or the passage of time, or both, would be an Event of Default.

"**Default Rate**" shall have the meaning set forth in the Note.

"**Easements**" shall have the meaning set forth in Section 4.1(bb).

"**Embargoed Person**" shall have the meaning set forth in Section 5.26(e).

"**Enforcement Costs**" shall mean any and all reasonable expenses, including reasonable legal expenses, attorneys' fees and expert witness fees, (i) described in Section 7.4 of this Agreement, (ii) incurred or paid by

Lender in protecting Lender's interest in the Property, (iii) incurred in collecting any amount payable under this Agreement or the other Loan Documents, or (iv) incurred in enforcing Lender's rights under this Agreement or the other Loan Documents or with respect to the Property, in each of clauses (i) through (iv) whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any Default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such amounts are repaid to Lender.

"**Engineer Agreement**" shall mean any agreement between Borrower and any engineer licensed in California, which shall be reasonably acceptable to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time upon Lender's approval thereof, which shall not be unreasonably withheld.

"**Environmental Indemnity**" shall mean that certain Hazardous Materials Indemnity Agreement dated as of the date hereof, executed by Borrower and Guarantors in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Laws**" has the meaning set forth in the Environmental Indemnity.

"**Equity Contribution**" shall have the meaning set forth in **Schedule II** of this Agreement.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall have the meaning set forth in Section 7.1(a).

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of Lender with respect to an applicable interest in the Loan pursuant to a law in effect on the date on which Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.6, amounts with respect to such Taxes were payable to Lender immediately before it changed its lending office, and (c) any U.S. federal withholding Taxes imposed under FATCA.

"**Executive Order**" shall have the meaning set forth in Section 5.26(a).

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"**Financial Statements**" shall mean a balance sheet, income statement and statements of income and expense and cash flow of changes in financial position prepared in accordance with Acceptable Accounting Principles, and setting forth all items of income and expense and such other information required under Acceptable Accounting Principles to fairly present the financial position and results of operation of Borrower and the Property and which shall at a minimum be consistent in scope, form and content with such statements delivered to Lender prior to the Closing Date, unless otherwise agreed by Lender, and which are otherwise reasonably acceptable to Lender.

"**Fiscal Year**" shall mean each twelve-month period commencing on January 1 and ending on December 31 during the term of the Loan.

"**Fraudulent Conveyance**" shall have the meaning set forth in Section 12.28(c)(vi).

"**Funding Borrower**" shall have the meaning set forth in Section 12.28(c).

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report, consistently applied.

"**General Contractor**" shall mean a general contractor with a valid contractor's license in California and that has been approved by Lender, which approval shall not be unreasonably withheld.

"**General Contractor Agreement**" shall mean a guaranteed maximum price construction contract between Borrower and General Contractor for the completion of the Project in accordance with the Plans and Specifications, in the full amount of the Project Budget, in form and content reasonably acceptable to Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and conditions of this Agreement.

"**General Contractor Consent**" shall mean a consent agreement in form and content reasonably acceptable to Lender executed by the General Contractor with respect to the General Contractor Agreement.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Guarantor**" shall mean, individually and collectively, as the context may require, Green Sage LLC, a Colorado limited liability company, Kenneth Edward Greer, an individual, Bruce Douglas Miller, an individual, and Patrick John Koentges, an individual.

"**Guaranty**" shall mean each Guaranty executed by a Guarantor, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hard Costs**" shall mean, collectively, all costs and expenses set forth in the Project Budget that are not denominated as "soft costs".

"**Hazardous Materials**" has the meaning set forth in the Environmental Indemnity.

"**Improvements**" has the meaning set forth in the Security Instrument.

"**Indebtedness**" of a Person, at a particular date, means the sum (without duplication) at such date of (a) all indebtedness or liability for borrowed money; (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

"**Indemnified Parties**" shall mean (a) Lender, (b) any prior or subsequent owner or holder of the Loan, (c) any Investor or any prior Investor, (d) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (e) any receiver or other fiduciary appointed in a foreclosure or other proceeding, (f) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (g) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or thereafter or as part of or following a foreclosure of the Loan.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document.

"**Individual Borrower**" shall have the meaning set forth in Section 12.28(a).

"**Insurance Premiums**" shall have the meaning set forth in Section 6.1.1(b).

"**Insurance Proceeds**" shall mean all proceeds received under Policies required to be maintained by Borrower.

"**Interest Reserve Fund**" shall have the meaning set forth in Section 6.4.

"**Investor**" shall have the meaning set forth in Section 8.1.

"**Land**" shall have the meaning set forth in the Security Instrument.

"**Lease**" shall have the meaning set forth in the Security Instrument.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, development and redevelopment plans and injunctions of Governmental Authorities affecting the Property or any part thereof or the construction, use, development, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, Licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including (i) applicable restrictive covenants, zoning ordinances, zoning resolutions, and building codes, (ii) subdivision and land use laws and regulations, (iii) all applicable health and Environmental Laws and regulations, and (iv) all standards and regulations of appropriate supervising boards of fire underwriters and similar agencies. The United States federal government regulates drugs through the Controlled Substances Act of 1970, as amended (21 U.S.C. § 811), and regulations promulgated thereunder (collectively, the "**CSA**"), which places controlled substances, including cannabis, in a schedule. Cannabis is classified as a Schedule I drug. Although certain states authorize medical or recreational cannabis production and distribution by licensed or registered entities, under the CSA, the possession, use, cultivation, and transfer of cannabis and any related drug paraphernalia is illegal and any such acts are criminal acts under the CSA. Each of the parties hereby acknowledge that activities of Borrower may be deemed to conflict or violate the CSA. Notwithstanding anything to the contrary in this Agreement and the other Loan Documents, none of Borrower, Guarantor or Lender shall be deemed to have made or be making any representation or warranty or covenant, express or implied, as to compliance with, or violation of, the CSA.

Notwithstanding the foregoing, regardless of whether specifically referenced or not, all representations, warranties, and covenants of Borrower made under this Agreement or any other Loan Document with respect to Legal Requirements are made subject to the Cannabis Disclosure.

"**Lender**" has the meaning in the recitals hereto.

"**Letter of Credit**" shall mean an irrevocable, unconditional, transferable (without the payment of a transfer fee), clean, evergreen (or not expiring until at least thirty (30) Business Days after the Maturity Date, as may be extended in accordance with this Agreement) sight draft letter of credit acceptable to Lender in favor of Lender and entitling Lender to draw thereon based solely on a statement purportedly executed by an officer of Lender stating that it has the right to draw thereon issued by a domestic institution acceptable to Lender and with respect to which Borrower has no reimbursement obligation. The evergreen clause of the Letter of Credit shall provide that the expiration date of such Letter of Credit shall automatically extend (i.e., without requiring a consent, approval, amendment or other modification) for additional periods from the current or each future expiration date unless the issuing bank provides Lender with written notice that such Letter of Credit will not be

renewed at least sixty (60) days, and not more than ninety (90) days, prior to the date on which the outstanding Letter of Credit is scheduled to expire.

"**Licenses**" has the meaning set forth in Section 4.1(m).

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof, or any interest of Borrower therein, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's or materialmen's liens and other similar liens and encumbrances.

"**Loan**" shall mean the advances made by Lender to Borrower pursuant to this Agreement.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Instrument, the Assignment of Leases, each Security Agreement, each Pledge Agreement, the Assignment of Agreements, each Guaranty, the Completion Guaranty, the Pledge of Economic Incentives, all Uniform Commercial Code financing statements filed in connection with the Loan, and all other documents now or hereafter evidencing, securing or otherwise executed and/or delivered by one or more of the Borrower Parties in connection with the Loan, together with all amendments, modifications or replacements thereto.  Each of the Loan Documents may be referred to herein individually as a "**Loan Document**".

"**Loan Term Sheet**" shall mean that certain letter from Lender to Borrower or an affiliate thereof dated June 26, 2019.

"**Loss Proceeds**" shall mean any and all Casualty insurance proceeds, condemnation awards and any settlement payments made in lieu of either which are made to Borrower in connection with or in respect of the Property.

"**Losses**" shall mean any and all claims, suits, liabilities (including strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs (including any and all costs and expenses incurred in the preservation, restoration and protection of the Property), any deficiency claim in connection with the foreclosure of the Security Instrument, expenses, diminution in value of the Property, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement, punitive damages payable by Lender or any Indemnified Party, foreseeable consequential damages payable by Lender or any Indemnified Party, and damages and expenses of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense), including Enforcement Costs or any other amounts expended by Lender in connection with the Loan.

"**Major Lease**" shall mean any Lease which, either individually, or when taken together with any other Lease with the same Tenant or its Affiliates (i) covers more than [[_____] square feet] [[_____] units] at the Property, (ii) constitutes more than [__]% of the total annual Rents, or (iii) is entered into during the continuation of an Event of Default.  For the avoidance of any doubt, the Master Lease constitutes a Major Lease.

"**Manager**" shall mean Green Sage Management, LLC, a Colorado limited liability company.

"**Management Agreement**" shall mean the Commercial Property Management Agreements for the Property appointing Manager.

"**Master Lease**" shall mean that certain Master Lease dated as of November 16, 2017 between 5733 SLOCA Partnership and Oakland Cannery Real Estate, LLC, as lessor, and Oakland Cannery Operations, a California partnership.

"**Material Action**" shall mean, with respect to any Person: (A) to file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors' Rights Laws, (B) to seek or consent

to the appointment of a receiver, liquidator, trustee or any similar official, (C) to take any action that might cause such entity to become insolvent, (D) to make an assignment for the benefit of creditors, (E) admit in writing such Person's inability to pay its debts generally as they become due, (F) declare or effectuate a moratorium on the payment of any obligation, or (G) take action in furtherance of any such action.

"**Material Adverse Change**" shall mean a material adverse change in (i) the assets, operations, or financial condition of Borrower or the Person in question, (ii) the ability to pay the Debt of Borrower or the Person in question in accordance with the terms hereof and otherwise comply with the terms of this Agreement and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement or any other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents, (vi) Lender's Lien on the Property or the priority of such Lien, or (vii) the Loan.

"**Material Adverse Effect**" shall mean a material adverse effect on (i) the assets, operations, or financial condition of Borrower or the Person in question, (ii) the ability to pay the Debt of Borrower or the Person in question in accordance with the terms hereof and otherwise comply with the terms of this Agreement, and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement, or any other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents, (vi) Lender's Lien on the Property or the priority of such Lien, or (vii) the Loan.

"**Material Alteration**" shall have the meaning set forth in Section 5.17.

"**Maturity Date**" shall mean the "Maturity Date" set forth in the Note as may be extended in accordance with the terms of the Note, or the date on which the Loan has been accelerated as herein provided.

"**Maximum Principal Amount**" shall have the meaning set forth in Section 2.1.1.

"**Member**" shall have the meaning set forth in Section 4.1(s)(iii).

"**Net Operating Income**" shall mean the (a) gross income (excluding extraordinary, non-recurring revenue, such as insurance or condemnation proceeds, but including proceeds of business interruption insurance and any forfeited security deposits) actually received by or on behalf of Borrower from the operation of the Property for the applicable testing period, including, without limitation, any and all rents received by or on behalf of Borrower from tenants, utility reimbursements, operating expense reimbursements, non-refundable deposits and administrative or application fees, termination fees and any proceeds of any business interruption or rental loss insurance, less (b) the actual operating expenses to be paid by Borrower in connection with the operation and maintenance of the Property that are allocable to such applicable testing period, computed on an accrual basis without regard to depreciation or debt service on the Loan and annualized as appropriate. Included within expenses shall be prorated ad valorem taxes and insurance premiums for the Property. Operating Expenses shall exclude (1) any capital expenditures; (2) any payment or expense to which any Borrower was or is to be reimbursed (or for which a tenant pays such amount directly to the third party payee) for costs from proceeds of insurance, eminent domain, tenant reimbursements, tenant payments, application of tenant deposits or escrows or any source other than gross receipts; (3) debt service payments made under the Loan; (4) income and franchise taxes attributable to operating income, (5) any non-cash expense item such as depreciation or amortization, as such terms are used for accounting or federal income tax purposes, (6) any fees payable to Lender in connection with the Loan or the Loan Documents, and (7) leasing commissions and other leasing costs. Documentation of Net Operating Income shall be certified by an officer of Borrower with detail satisfactory to Lender and shall be subject to the approval of Lender.

"**Note**" shall mean that certain Promissory Note dated as of the date hereof, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, extended, supplemented or otherwise modified from time to time.

"**Obligations**" shall mean any and all debt, liabilities and other obligations of Borrower, including all affirmative and negative covenants, to Lender or of any of the Borrower Parties in connection with the Loan or pursuant to the Loan Documents, including, without limiting the generality of the foregoing, the Debt.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower, which is signed by an authorized senior officer of the manager, managing member or general partner of Borrower.

"**Organizational Documents**" shall mean (i) with respect to a corporation, such Person's certificate of incorporation and by-laws, and any shareholder agreement, voting trust or similar arrangement applicable to any of such Person's authorized shares of capital stock, (ii) with respect to a partnership, such Person's certificate of limited partnership, partnership agreement, voting trusts or similar arrangements applicable to any of its partnership interests, (iii) with respect to a limited liability company, such Person's certificate of formation, limited liability company agreement or other document affecting the rights of holders of limited liability company interests, and (iv) any and all agreements between any constituent member, partner or shareholder of Borrower, including any contribution agreement or indemnification agreements.  In each case, "Organizational Documents" shall include any indemnity, contribution, shareholders or other agreement among any of the owners of the entity in question.

"**Origination Fee**" shall mean a fee equal to $1,361,625.00, plus Lender's administration fee of $1,000.00.

"**Other Charges**" shall mean all maintenance charges, charges or amounts payable under any reciprocal easement agreement, ground rents, impositions other than Taxes, and any other charges (including any charges, payments or amounts, for which the failure to pay may give rise to a Lien against the Property), including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Other Connection Taxes**" means, with respect to Lender, Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or any Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Patriot Act**" shall have the meaning set forth in Section 5.26(a).

"**Permitted Encumbrances**" shall mean, with respect to the Property, collectively:  (a) the Liens created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Property or any part thereof which have been approved by Lender and which do not in any event have a Material Adverse Effect, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (d) statutory Liens for labor or materials securing sums not yet due and payable, provided Borrower has given advance written notice of same to Lender.

"**Person**" shall mean any individual, entity, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Plans and Specifications**" shall mean each of the plans and specifications approved in writing by Lender for the Completion of the Project listed on **Schedule IX** attached hereto (including, without limitation, a description of the materials, equipment and fixtures necessary for the Completion of the Project), and any other plans and specifications for the Completion of the Project prepared or to be prepared by (or on behalf of) Borrower and approved in writing by Lender after the Closing Date, in each case, as the same may be amended by Change Orders applicable thereto that are permitted under this Agreement.

"**Pledge Agreements**" shall mean those certain Membership Interest Pledge Agreements and Partnership Interest Pledge Agreement dated of even date herewith, in favor of Lender.

"**Pledge of Economic Incentives**" shall mean that certain Pledge of Economic Incentives dated of even date herewith, from Borrower in favor of Lender, if any.

"**Policies**" or "**Policy**" shall have the respective meanings specified in Section 6.1.1(b).

"**Prior Loan**" shall mean, collectively, (i) that certain loan in the original principal amount of $22,900,000.00, secured by a portion of the Property, and (ii) that certain loan in the original principal amount of $13,000,000.00, made to Borrower by YAM Capital III, LLC, an Arizona limited liability company.

"**Professional Consent**" shall mean a consent agreement in form and content reasonably acceptable to Lender executed by any applicable architect, engineer, or other design professional with respect to the related agreement between such professional and Borrower.

"**Prohibited Person**" shall have the meaning set forth in Section 5.26(b).

"**Project**" shall mean the finishing and punch list items necessary to complete the construction of the mixed use improvements on the Property, known as the "Cannery & Tinnery", in accordance with all Legal Requirements and the Project Budget.

"**Project Budget**" shall mean the budget of costs and expenses to be incurred in connection with the Project in an amount sufficient to cause Completion, as attached hereto as **Schedule VII**, as may be modified from time to time with Lender's prior approval (unless such approval is not required hereunder and in such instance, in accordance with the terms of this Agreement).

"**Project Expenditures**" shall mean the Hard Costs and Soft Costs in accordance with the Project Budget, including interest and carrying costs.

"**Project Schedule**" shall mean a schedule for the Project reflecting the projected progress of the Completion. The initial Project Schedule approved by Lender is attached as **Schedule VIII** hereto.

"**Project Shortfall Reserve Funds**" shall have the meaning set forth in Section 2.2(v)(D).

"**Project Shortfall Reserve Subaccount**" shall have the meaning set forth in Section 2.2(v)(D).

"**Property**" shall mean the Land, the Improvements thereof, all personal property owned by Borrower and encumbered by the Security Instrument and its Security Agreement, as applicable, in each case as more particularly described in the Security Instrument and its Security Agreement, as applicable.

"**Rating Agency**" shall have the meaning set forth in Section 8.1.

"**Reimbursement Contribution**" shall have the meaning set forth in Section 12.28(c).

"**Rent(s)**" shall have the meaning set forth in the Security Instrument.

"**Request for Advance**" shall have the meaning set forth in Section 2.2.

"**Restoration**" shall have the meaning set forth in Section 6.1.2(a).

"**Restricted Loan Proceeds**" shall have the meaning set forth in Section 2.2(c).

"**Reserve Funds**" shall mean, collectively, the Tax and Insurance Escrow Reserve Fund, the Interest Reserve Fund, the Project Shortfall Reserve Funds, and any other reserve fund account established pursuant to the Loan Documents.

"**Scheduled Payment Date**" shall mean the first (1st) day of each calendar month, or if such first day is not a Business Day, the next Business Day.

"**Security Agreement**" shall mean each first priority security agreement from Borrower to Lender and from each Guarantor to Lender, each dated as of the date hereof, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Security Deposits**" shall mean all security given to Borrower or any agent or Person acting on behalf of Borrower in connection with the Leases.

"**Security Instrument**" shall mean each certain first priority Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of the date hereof, executed and delivered by a Borrower as security for the Loan made to Lender and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Service Rights**" shall mean any agreements, contracts, rights, licenses or other interests of any type (whether exclusive or non-exclusive) granted or given to any Person to provide any products or services to or for or with respect to the Property, any tenant or any occupants of the Property, including any of the same related to telecommunications, internet products or services, including, but not limited to, personal computer hardware and software, internet hardware and software, internet access services, printers, video display systems, audio sound systems and communication telephonic devices, as well as related and complementary products and services and any substitutes for, and items that are a technological evolution of, any of the foregoing products.

"**Single Purpose Entity**" shall mean Person, other than a natural person, whose structure and organizational and governing documents are in form and substance that comply with the provisions of Section 4.1(s) hereof and are otherwise acceptable to the Rating Agencies and otherwise acceptable to Lender in its discretion.

"**Soft Costs**" shall mean, collectively, all costs and expenses set forth in the Project Budget which are denominated therein as "soft costs".

"**Sources and Uses of Funds**" shall mean the Sources and Uses of Funds delivered to Lender in connection with the Loan and attached hereto as **Schedule VI**.

"**Stored Materials**" shall have the meaning set forth in Section 2.2(v)(F).

"**Subdivision Map**" shall have the meaning set forth in Section 5.24.

"**Surety**" shall have the meaning set forth in Section 12.28(c)(iv).

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the state where the Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"**Taxes**" shall mean (i) for all purposes other than for Section 2.6, all real estate and personal property taxes, assessments, water rates or sewer rents now or hereafter levied or assessed or imposed against the

Property or any part thereof, including (a) any ad valorem real or tangible personal property taxes levied against the Property and (b) any intangible personal property tax levied or imposed on Lender with respect to its ownership in the Loan, and (ii) all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Tenant**" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting the Property.

"**Term**" shall have the meaning set forth in Section 6.1.1(a).

"**Title Insurance Company**" shall mean a title insurance company or authorized agent acceptable to Lender that issues the Title Insurance Policy.

"**Title Insurance Policy**" shall mean the ALTA (or equivalent if ALTA is not available in the state where the Property is located) loan title insurance policy (or mortgagee title insurance policy or policies acceptable to Lender) issued with respect to the Property and insuring Lender (in an amount satisfactory to Lender) of the validity and priority of the Lien of the Security Instrument, with all endorsements thereto as required by Lender.

"**Transfer**" shall mean any sale, assignment, conveyance, alienation, mortgage, encumbrance, pledge, hypothecation or other transfer, including any swap, derivative or other transaction shifting the risks and rewards of ownership, whether voluntary or involuntary.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the applicable state or commonwealth in which the Property is located, as the same may be amended from time to time.

"**UCC Financing Statement**" shall mean a financing statement as defined by and in accordance with the requirements of the Uniform Commercial Code including all original financing statements or original fixture financing statements and any amendments, renewals, continuations or assignments thereof evidencing a security interest granted to Lender.

"**U.S. Person**" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

## SCHEDULE II

## CONDITIONS PRECEDENT

PART A

Each of the following shall be satisfied by Borrower as a condition precedent to the making of the initial advance of the Loan on the Closing Date.

(a)   Representations and Warranties; Compliance with Conditions.   The representations and warranties of each Borrower Party contained in this Agreement and the other Loan Documents shall be true and correct in all respects on and as of the Closing Date and no Material Adverse Change has occurred and no Default or Event of Default shall have occurred and be continuing; and each Borrower Party shall be in compliance in all respects with all terms and conditions set forth in this Agreement and in each other Loan Document on their part to be observed or performed.

(b)   Delivery of Loan Documents; Title Insurance; Reports.

(i)   Note, Loan Agreement, Security Instrument, Assignment of Agreements and other Loan Documents.   Lender shall have received from Borrower fully executed (and acknowledged if required) counterparts of this Agreement, the Note, and all other Loan Documents and evidence that counterparts of the Security Instrument have been delivered to the Title Insurance Company for recording, so as to effectively create upon such recording valid and enforceable first priority Liens upon the Property, in favor of Lender, subject only to the Permitted Encumbrances.

(ii)   UCC Financing Statements.   Lender shall have received from Borrower (i) such UCC financing statements as Lender shall require, and such financing statements shall have been filed of record in the appropriate filing offices in each of the jurisdictions required by Lender or delivered to the Title Insurance Company for filing so as to effectively create upon such filing a valid and enforceable first priority Lien on the Property in favor of Lender, subject only to the Permitted Encumbrances and (ii) a list of the principal places of business, tax identification numbers, organizational identification number issued by its state of organization, and doing business names for Borrower and all other information as Lender may require to properly file such UCC financing statements, all certified by Borrower.

(iii)   Title Insurance.   Lender shall have received the Title Insurance Policy dated as of the Closing Date, with co-insurance and/or reinsurance and direct access agreements acceptable to Lender.   Such Title Insurance Policy shall (A) provide coverage in amounts satisfactory to Lender, (B) insure Lender that the Security Instrument creates a valid first Lien on the Property free and clear of all exceptions from coverage other than Permitted Encumbrances, (C) contain such endorsements and affirmative coverages as Lender may require and which are available in the state where the Property is located, (D) show good and marketable indefeasible fee simple title to the Property vested in Borrower, and (E) name Lender as the insured. The Title Insurance Policy shall be assignable.   Lender also shall have received evidence that all premiums in respect of the Title Insurance Policy have been paid.   The Lender shall have received satisfactory UCC financing statement, tax lien, judgment, bankruptcy, litigation and other Lien searches and reports conducted by a search firm acceptable to the Lender with respect to the Property and the Borrower Parties and all other relevant Persons, such searches to be conducted in each of the locations as shall be required by Lender.

(iv)   Insurance.   Lender shall have received valid certificates of insurance and the required endorsements for all Policies required hereunder or under any of the Loan Documents, and evidence of the payment of all premiums payable for the existing policy period, which shall not be less than one year from the Closing Date.   Lender shall have received a favorable opinion of Lender's insurance consultant on the adequacy of all Policies, certificates of insurance, and endorsements.

(v)   Encumbrances.   Borrower shall have taken or caused to be taken such actions in such a manner so that Lender has a valid and perfected first Lien as of the Closing Date on the Property, subject only to applicable Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents, and Lender shall have received satisfactory evidence thereof.

(vi)   Certificate.   Lender shall have received a certificate signed by Borrower confirming the representations and warranties contained in this Agreement.

(vii)   Opinion of Counsel.   Lender shall have received a satisfactory opinion of legal counsel to Borrower and Guarantors with respect to due execution, authority, enforceability (including no usury) of the Loan Documents and such other matters as Lender may require, all such opinions to be in form, scope and substance satisfactory to Lender and Lender's counsel.

(c)   Delivery of Organizational Documents; Consents.   Borrower shall have delivered or caused to be delivered to Lender certified copies of all Organizational Documents related to the Borrower Parties and if any of the Borrower Parties is a partnership or limited liability company, the partners or members thereof, as Lender may request in its sole discretion, including good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Lender.  The Lender shall have received copies of all consents, resolutions, Licenses and approvals, if any, required in connection with the execution, delivery and performance by the Borrower Parties and the validity and enforceability of the Loan Documents and such consents, resolutions, Licenses and approvals shall be in full force and effect.  Lender shall have received a chart depicting the ownership structure of Borrower, each constituent partner or member of Borrower (including their respective ownership interests, direct or indirect, and capital contributions), which chart shall identify each Person who owns or controls, directly or indirectly, any such partner or member of Borrower.

(d)   Taxes, Insurance Premiums and Other Charges.   Borrower shall have paid all Taxes, Insurance Premiums and Other Charges relating to the Property which are due and payable or in arrears, including (i) accrued but unpaid Insurance Premiums, (ii) currently due Taxes (including any in arrears) relating to the Property, and (iii) currently due Other Charges relating to the Property, which amounts may be funded with proceeds of the Loan if such proceeds are sufficient therefor and as set forth in the Sources and Uses of Funds.

(e)   Payments.   All payments, deposits or escrows required to be made or established by the Borrower under this Agreement, and the other Loan Documents on or before the Closing Date shall have been paid and Lender shall have received (i) a settlement statement setting forth the disbursement of the Loan in form and content satisfactory to Lender and (ii) tax and insurance bills for the two calendar years prior to the Closing Date.

(f)   Third Party Reports.   Lender shall have received a current seismic report, if required by Lender (prepared by a specialist acceptable to Lender), MAI appraisal report (prepared in compliance with FIRREA) (provided that Lender may accept evidence of value other than an MAI appraisal report, as determined by Lender), environmental property condition report (Phase I environmental reports for the Property and, where environmental consultants recommends, Phase II reports and/or further investigation or as Lender otherwise determines are required) or an existing report approved by Lender with a reliance letter in favor of Lender, and property condition / engineering report; each addressed to Lender and in form and substance satisfactory to Lender and dated within three (3) months of the Closing Date, or if approved by Lender, if such third party reports that are not dated within three (3)  months of the Closing Date but are otherwise acceptable to Lender, Borrower has delivered a reliance letter to Lender within three (3) months of the Closing Date that is in form and substance satisfactory to Lender.  An appraiser, engineer and environmental specialist, each satisfactory to Lender, shall perform the appraisal and the structural engineering and environmental property condition reports.

(g)    Survey.  Lender shall have received, reviewed, and be satisfied with an ALTA survey of the Property, prepared by a duly qualified land surveyor and certified to Lender and the Title Insurance Company showing (i) the boundaries and dimensions of the Land and each Parcel, (ii) the locations of all buildings and other improvements (if any) on the Property, (iii) the names and municipal block numbers of adjacent streets, (iv) the location of all recorded easements, rights of way, and other recorded encumbrances of the Property, and (v) anything else required by Lender.

(h)    Contracts with General Contractors.  Lender shall have received, reviewed, and be satisfied with the all contracts between Borrower or any Affiliate of Borrower and any general contractor, and Lender shall have received an assignment of all such contracts in form and substance satisfactory to Lender and acknowledged by each applicable contractor.

(i)    Costs.  Borrower shall have paid all of Lender's cost and expenses associated with the making of the Loan with respect to the Property, including all out-of-pocket due diligence expenses, the cost of all third party reports (such as but not limited to environmental, structural, appraisal and/or market study), legal fees and expenses, survey costs, title costs, etc.

(j)    Authorizations.  Borrower shall provide to the appropriate taxation, municipal, utility, and other authorities an authorization by which Lender or any Person authorized by Lender as its legal counsel, agent, or manager, shall be able to obtain, in the name of Borrower, a confirmation from such authorities that all payments, declarations, and other filings of Borrower are up to date, whether the authorities concerned have issued or will issue a default notice or demand for payment to Borrower and whether any such notice concerns arrears.

(k)    Site Inspection.  Lender has received an acceptable site inspection of the Property.

(l)    Interview.  Lender has completed and is satisfied with an interview of Borrower and has reviewed and is satisfied with the present and intended use of the Property and the income to be generated from the Property.

(m)    Diligence.  Lender has received, reviewed, and is satisfied with all due diligence materials referred to in the Loan Term Sheet.

(n)    Proceeds of Crime and Terrorist Financing Act.  Lender shall have received evidence and be satisfied of Borrower's compliance with The Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and Regulations.

(o)    Closing Date Advance.  Lender shall have received, reviewed, and be satisfied with the amount of the advance to be made on the Closing Date together with copies of invoices for items to be paid with the proceeds of such advance and copies of all other documentation requested by Lender supporting such advance.

(p)    Inspection.  Lender shall have received from Lender's independent consultant (if applicable) an inspection report certifying (or if no independent consultant, Lender shall have determined that) (i) the amount of the requested advance does not exceed the cost of the work completed, (ii) all work typically done at the stage of development when the advance is requested has been completed, and all materials, supplies, and fixtures typically furnished or installed at such stage of development have been furnished and installed, (iii) the undisbursed Loan proceeds are sufficient to complete the proposed development of the Property, (iv) the Request for Advance and all invoices and other supporting documentation delivered to Lender in connection with the Request for Advance have been verified and are in order, (v) Borrower has complied with all Legal Requirements and the requirements of Lender's independent consultant, and (vi) as to such other matters requested by Lender.

(q)    Lien Waivers.  Lender shall have received from each Person providing services or materials for the Property prior to the Closing Date an invoice, a lien waiver, and such other instruments and documents as Lender may require in form and substance satisfactory to Lender.  The invoice, lien waiver, and such other instruments and documents must cover and be based upon work actually completed or materials actually furnished through the Closing Date.

(r)    Licenses, Permits, and Approvals.  To the extent applicable as of the Closing Date, Lender shall have received, reviewed, and be satisfied that all necessary municipal approvals have been received, together with all necessary permits, Licenses, approvals, easements and agreements as may be required from all state, county and local Governmental Authorities and/or public utilities (including building permits and certificates of occupancy) to permit the construction of all Improvements in accordance with all Legal Requirements, including without limitation all approvals and permits for public sewer and water, availability notices from applicable private and public utilities indicating that electric, gas and telephone service will be available, and all sanitary sewer, water, utility, storm sewer, drainage, and other off-site easements necessary for construction and occupancy of such Improvements.

(s)    Project Documents.  Borrower shall have delivered the Plans and Specifications, the Project Schedule and the Project Budget to Lender.

(t)    No Violation of Legal Requirements.  Subject to the Cannabis Disclosure, there shall be no outstanding notices of any uncorrected violations of any Legal Requirements with respect to the Property.

(u)    Equity Contribution.  Lender shall have received an Officer's Certificate and other reasonably satisfactory evidence (including invoices, cancelled checks, etc.) of capital contributions by the members of Borrower or the direct owner of Borrower in an aggregate amount not less than $20,000,000.00 (the "**Equity Contribution**").  No funds loaned to or borrowed by any Borrower Party shall count towards the Equity Contribution.

(v)    Sources and Uses of Funds.  Lender shall have approved the Sources and Uses of Funds for the initial advance.

(w)    Pre-Leasing.  Lender has approved the pre-leasing of no less than 210,000 square feet in the Project.

(x)    Agreement to Advance.  Lender has been advised by its legal counsel that, giving regard to all the circumstances, such advance should be made, it being understood that the preparation of any of the documents contemplated herein shall bind the Lender to advance the funds or any unadvanced portion thereof, and that the advance of funds or any part thereof from time to time shall be subject to the requirements of this Agreement.

PART B

In addition to satisfaction of all items listed in Part A above, each of the following shall be satisfied by Borrower as a condition precedent to the making of any advances after the Closing Date:

(y)     Request for Advance.  Lender shall have received, reviewed, and be satisfied with a Request for Advance for the advance to be made together with copies of invoices for items to be paid with the proceeds of such advance and copies of all other documentation supporting the Request for Advance. Borrower shall not request more than one Request for Advance during any month.

(z)     Inspection.  Lender shall have received from Lender's independent consultant (if applicable) an inspection report certifying (or if no independent consultant, Lender shall have determined that) (i) the amount of the requested advance does not exceed the cost of the work completed, less all prior advances, (ii) all work typically done at the stage of development when the advance is requested  has been completed,  and all materials, supplies, and fixtures typically furnished or installed at such stage of development have been furnished and installed, (iii) the undisbursed Loan proceeds are sufficient to complete the proposed development of the Property, (iv) the Request for Advance and all invoices and other supporting documentation delivered to Lender in connection with the Request for Advance have been verified and are in order, (v) Borrower has complied with all Legal Requirements and the requirements of Lender's independent consultant, and (vi) as to such other matters requested by Lender.

(aa)     Representations and Warranties; Compliance with Conditions.  The representations and warranties of each Borrower Party contained in this Agreement and the other Loan Documents shall be true and correct in all respects on and as of the date of such advance and no Material Adverse Change has occurred and no Default or Event of Default shall have occurred and be continuing; and each Borrower Party shall be in compliance in all respects with all terms and conditions set forth in this Agreement and in each other Loan Document on their part to be observed or performed.  Borrower shall have delivered evidence satisfactory to Lender indicating that Policies in accordance with Section 6.1 of this Agreement are in place as to all of the Property.

(bb)     Title Endorsement.  Lender shall have received a down date endorsement to the Title Insurance Policy showing no state of facts of record objectionable to Lender and affecting the Property from the date of recording of the Security Instrument and increasing the amount of the Title Insurance Policy to include the amount to be advanced.

(cc)     Lien Waivers.  Lender shall have received from each Person providing services or materials for the Property an invoice, a lien waiver, and such other instruments and documents as Lender may require in form and substance satisfactory to Lender.  The invoice, lien waiver, and such other instruments and documents must cover and be based upon work actually completed or materials actually furnished through the date of the requested advance.

(dd)     Licenses, Permits, and Approvals.  To the extent applicable as of the date of such advance, Lender shall have received, reviewed, and be satisfied that all necessary municipal approvals have been received, together with all necessary permits, Licenses, approvals, easements and agreements as may be required from all state, county and local Governmental Authorities and/or public utilities (including building permits and certificates of occupancy) to permit the construction and occupancy of all Improvements in accordance with all Legal Requirements, including without limitation  all approvals and permits for public sewer and water, availability notices from applicable private and public utilities indicating that electric, gas and telephone service will be available, and all sanitary sewer, water, utility, storm sewer, drainage, and other off-site easements necessary for construction of such Improvements.

(ee)     No Violation of Legal Requirements.  Subject to the Cannabis Disclosure, there shall be no outstanding notices of any uncorrected violations of any Legal Requirements with respect to the Property.

(ff)     <u>Pre-Leasing</u>.   Borrower has complied with the provisions of <u>Section 2.2(c)</u> of this Agreement with respect to the Restricted Loan Proceeds.

(gg)     <u>Further Documents</u>.   Lender or its counsel shall have received such other and further approvals, documents and information as Lender or its counsel may have reasonably requested in form and substance satisfactory to Lender and its counsel.

(hh)     <u>Sources and Uses of Funds</u>.   Lender shall have approved the Sources and Uses of Funds for the initial advance.

(ii)     <u>Maturity Date</u>. No Request for Advance shall be requested later than the Maturity Date (and no advance shall be obligated to be made in the event that all conditions precedent to the making of any such advance is not satisfied as of the Maturity Date).

(jj)     <u>Project Documents</u>.   Borrower shall have delivered the Plans and Specifications, the Project Schedule and the Project Budget to Lender.

## SCHEDULE III

## PENDING OR THREATENED LITIGATION

1.  Bakhtiari v. Oakland Cannery Operations et al, Case No. RG19005568, California Superior Court

2.  3CBY Holding Company v. 5601 SL LLC et al, Case No. RG19016402

3.  Yakubova dispute with former tenant.  Mediation settlement reached requiring Green Sage Merchant bank and  5601 SLOCA LLC to pay Yakubova the amount of $500,000 prior to 12/31/19.

4.  Ascent Industries claim against bankrupt former tenant.  Part 1 and 2 claims by Borrower to be heard after mediation in September 2019

**SCHEDULE IV**

**DISCLOSURE SCHEDULE**

**NONE**

## SCHEDULE V

## BORROWER'S OWNERSHIP STRUCTURE

Attached.





Beecroft Revocable Trust
David E. Hills Revocable Trust UAD 6/10/94
KBP Strategic Capital, LLC
Ken Greer
Patrick Koerriges
Bruce Miller
Green Sage Capital Partners I, LP
17.9988%
21.5986%
60.4025%
40.00 %
30.00 %
30.00 %
Strategic Acquisitions I, LLC
Oakland Capital LLC
Millenium Trust Co CUST FBO MC Tinnery LLC
Oakland Tinnery LLC
KBP Strategic Capital, LLC Managing Partner
8.2027%
5.8867%
7.3108%
36.6513%
41.9486%
5601 SLOCA Partnership, CA general partnership
100.00%
5601 SLOCA, LLC, CA limited liability company
100.00%
Title Property
This is the property located at 5601 San Leandro Street in Oakland, CA

Provident Trust Group FBP Garibaldi
Lloyd Family Trust
3.5998%
David E. Hills Revocable Trust UAD 6/10/94
KBP Strategic Capital, LLC
Ken Greer
Patrick Koenigos
Bruce Miller
Beecroft Revocable Trust
2.1599%
21.5986%
54.6429%
40.00 %
30.00 %
30.00 %
17.9988%
Oakland Capital LLC
Millenium Trust Co CUST FBO MC Tinnery LLC
Oakland Tinnery LLC
KBP Strategic Capital, LLC Managing Partner
5.8867%
7.3108%
36.6513%
41.9495%
8.2017%
Strategic Acquisitions I, LLC
5601 SLOCA Partnership, CA general partnership
SAI, LLC is 100% owned by the Fund, GSCP I, PP
100.00%
5601 SLOCA, LLC, CA limited liability company
Green Sage Capital Partners I, LP
100.00%
Title Property
This is the property located at 5601 San Leandro Street in Oakland, CA

## SCHEDULE VI

## SOURCES AND USES OF FUNDS

| | USD Approved Loan Amount | | USD Initial Advance | | USD Balance Remaining to Advance |
|---|---|---|---|---|---|
| Repayment of Existing Loans | $ 35,900,000.00 | $ | 35,900,000.00 | $ | - |
| Loan Fees and Transaction Costs | $ 2,000,000.00 | $ | 1,970,574.87 | $ | 29,425.13 |
| Interest Reserve | $ 1,000,000.00 | $ | 148,790.05 | $ | 851,209.95 |
| Construction Reserve | $ 14,005,261.00 | $ | 1,000,000.00 | $ | 13,005,261.00 |
| Property Taxes | $ 1,049,676.00 | $ | 1,049,676.00 | $ | - |
| Earthquake Insurance Holdback | $ 400,000.00 | $ | 400,000.00 | $ | - |
| Insurance | $ 110,063.00 | $ | 110,063.00 | $ | - |
| TOTAL | $ 54,465,000.00 | $ | 40,579,103.92 | $ | 13,885,896.08 |

## SCHEDULE VII

## PROJECT BUDGET

Attached.



CONSTRUCTION BUDGET

Job: The Cannery, 5733 San Leandro St — Date: 03/15/2017

| Code | Category | Budget | Deposit/DDT | Draw 2 | Draw 3 | Draw 4 | Draw 5 | Draw 6 | Draw 7 | Draw 8 | Draw 9 | Draw 10 | Draw 11 | Draw 12 | Draw 13 | Draw 14 | Draw 15 | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1001 | Land | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1002 | Purchase & Sale Closing Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1003 | Real Estate Taxes | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1004 | Real Estate Commissions | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1005 | Builder's Risk Insurance | $5,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,500.00 |
| 1006 | General Liability Insurance | $4,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $4,500.00 |
| 1007 | Warranty Reserve | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1008 | Storage | $5,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,000.00 |
| 1009 | Marketing | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2001 | Loan Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2002 | Interest | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2003 | Architectural | $49,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $49,000.00 |
| 2004 | Printing/Reproduction | $7,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $7,200.00 |
| 2005 | Soils Test/Engineering | $36,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $36,000.00 |
| 2006 | Surveying | $12,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $12,500.00 |
| 2007 | Building Permits | $7,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $7,500.00 |
| 2008 | Water/Sewer Tap Fees | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2009 | Contractor Fee | $375,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $375,000.00 |
| 2010 | Supervision | $100,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $100,000.00 |
| 2011 | Overhead | $38,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $38,200.00 |
| 2012 | Impact/Utility Fees | $2,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2,500.00 |
| 3001 | Asbestos Testing/Abatement | $130,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $130,000.00 |
| 3002 | Utility Disconnect/Connect Fees | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3003 | Temporary Power | $2,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2,500.00 |
| 3004 | [illegible] | $5,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,500.00 |
| 3005 | Trash/Cleanup | $8,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $8,500.00 |
| 3006 | Fencing/Erosion Control/Tree Protection | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3007 | Demolition | $17,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $17,500.00 |
| 3008 | Tree Removal/Cleanup/Stump Grinding | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3009 | Grading | $1,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,800.00 |
| 3010 | Excavation/Backfill | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3011 | Import/Export | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3012 | Rough Grading | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3013 | Final Grading | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3014 | Concrete Forming | $5,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,500.00 |
| 3015 | Foundation | $14,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $14,000.00 |
| 3016 | Waterproofing/Perimeter Drain | $5,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,500.00 |
| 3017 | Water/Sewer Installation | $29,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $29,000.00 |
| 3018 | Structural Steel Beams/Posts/Welding | $110,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $110,000.00 |
| 3019 | Interior Flatwork | $14,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $14,200.00 |
| 3020 | Exterior Flatwork | $3,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $3,500.00 |
| 3021 | Asphalt | $4,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $4,500.00 |
| 3022 | Trusses | $22,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $22,800.00 |
| 3023 | Framing Materials | $119,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $119,000.00 |
| 3024 | Labor: Framing | $98,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $98,000.00 |
| 3025 | Stairs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3026 | Windows/Exterior Doors | $55,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $55,200.00 |
| 3027 | Entry Door | $4,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $4,000.00 |
| 3028 | Roofing | $125,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $125,000.00 |
| 3029 | Gutters/Flashing | $12,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $12,500.00 |
| 3030 | Garage Doors | $7,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $7,200.00 |
| 3031 | HVAC | $369,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $369,000.00 |
| 3032 | Fireplace | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3033 | Labor: Plumbing | $149,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $149,000.00 |
| 3034 | Plumbing Fixtures | $14,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $14,500.00 |
| 3035 | Labor: Electrical | $232,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $232,000.00 |
| 3036 | Electrical Fixtures | $458,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $458,000.00 |
| 3037 | Building Automation | $128,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $128,000.00 |
| 3038 | Elevator | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3039 | Fire Protection | $149,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $149,000.00 |
| 3040 | Custom Shower Pans | $9,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $9,500.00 |
| 3041 | Decks | $6,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $6,800.00 |
| 3042 | Deck/Stair Railings/Metal Fabrication | $3,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $3,500.00 |
| 3043 | Exterior Trim/Siding/Fascia | $2,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2,800.00 |
| 3044 | Masonry/Stonework | $29,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $29,000.00 |
| 3045 | Stucco | $12,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $12,800.00 |
| 3046 | Insulation | $11,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $11,000.00 |
| 3047 | Drywall/Texture Materials | $157,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $157,000.00 |
| 3048 | Labor: Hang/Tape/Texture | $180,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $180,000.00 |
| 3049 | Cabinets/Vanities | $15,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $15,200.00 |
| 3050 | Labor: Cabinets/Vanity | $5,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,500.00 |
| 3051 | Interior Door/Trim/Closet Materials | $57,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $57,200.00 |
| 3052 | Labor: Interior Door/Trim/Closet | $29,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $29,800.00 |
| 3053 | Door Hardware | $14,230.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $14,230.00 |
| 3054 | Cabinet Hardware | $3,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $3,500.00 |
| 3055 | Labor: Hardware | $8,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $8,500.00 |
| 3056 | Painting | $285,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $285,000.00 |
| 3057 | Appliances | $9,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $9,500.00 |
| 3058 | Hardwood Floors | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3059 | Labor: Hardwood Floors | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3060 | Tile | $8,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $8,800.00 |
| 3061 | Labor: Tile | $14,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $14,800.00 |
| 3062 | Countertops | $8,450.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $8,450.00 |
| 3063 | Shower Doors/Mirrors | $5,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,800.00 |
| 3064 | Carpet | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3065 | Swimming Pool/Hot Tub | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3066 | Landscape/Fence/Sprinkler Materials | $22,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $22,800.00 |
| 3067 | Labor: Landscape/Fence/Sprinkler | $15,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $15,000.00 |
| 3068 | Labor: Company | $45,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $45,000.00 |
| 3069 | Final Cleaning/Duct Cleaning | $7,450.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $7,450.00 |
| 3070 | Contingency | $250,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $250,000.00 |
| 4001 | Options | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | TOTAL | $4,500,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $4,500,000.00 |

# APPLICATION AND CERTIFICATION FOR PAYMENT

| | PAGE ONE OF TWO | PAGES |
|---|---|---|
| | Distribution to: | |
| | x OWNER | |
| | ARCHITECT | |
| | CONTRACTOR | |

TO OWNER: 5733 SLOCA, LLC
1137 Bannock Street
Denver, CO 80204

PROJECT: The Cannery
5733 San Leandro Street
Oakland, CA 94619

APPLICATION #: 4

FROM CONTRACTOR:
Distinctive Developments, LLC
1137 Bannock Street
Denver, CO 80204

VIA ARCHITECT:

PERIOD TO: 4/20/2019

CONTRACT DATE: 8/16/2017

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation page is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 4,500,000.00 |
| 2. Net change by Change Orders | $ | 21,700.36 |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) | $ | 4,521,700.36 |
| 4. TOTAL COMPLETED & STORED TO DATE (Column G on G703) | $ | 4,460,144.77 |
| 5. RETAINAGE: | | |
| a.   5 % of Completed Work (Column D + E on G703) | $ | 223,007.24 |
| b.   0 % of Stored Material (Column F on G703) | | |
| Total Retainage (Lines 5a + 5b or Total in Column I of G703) | $ | 0.00 |
| 6. TOTAL EARNED LESS RETAINAGE (Line 4 Less Line 5 Total) | $ | 223,007.24 |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT (Line 6 from prior Certificate) | $ | 4,237,137.53 |
| 8. CURRENT PAYMENT DUE | $ | 3,876.163 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE (Line 3 less Line 6) | $ | 360,974.24 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | | $ 284,562.83 |
| Total approved this Month | $21,700.36 | $0.00 |
| TOTALS | $21,700.36 | $0.00 |
| NET CHANGES by Change Order | $21,700.36 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge,
information and belief the Work covered by this Application for Payment has been
completed in accordance with the Contract Documents, that all amounts have been paid by
the Contractor for Work for which previous Certificates for Payment were issued and
payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

By: _____ Date: 5/17/19

State of:                County of:
Subscribed and sworn to before me this        day of
Notary Public:
My Commission expires:

AMOUNT CERTIFIED .......... $ _____

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data
comprising the application, the Architect certifies to the Owner that to the best of the
Architect's knowledge, information and belief the Work has progressed as indicated,
the quality of the Work is in accordance with the Contract Documents, and the Contractor
is entitled to payment of the AMOUNT CERTIFIED.

(Attach explanation if amount certified differs from the amount applied. Initial all figures on this
Application and on the Continuation Sheet that are changed to conform with the amount certified.)

ARCHITECT:

By: _____ Date: 5/17/19

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the
Contractor named herein. Issuance, payment and acceptance of payment are without
prejudice to any rights of the Owner or Contractor under this Contract.

**CONTINUATION SHEET**  G703  PAGE OF PAGES

APPLICATION AND CERTIFICATION FOR PAYMENT | APPLICATION NO.: 4
Contractor's signed certification is attached. | APPLICATION DATE: 4/24/2019
In tabulations below, amounts are stated to the nearest dollar. | PERIOD TO: 4/20/2019

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D+E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G÷C) | I BALANCE TO FINISH (C-G) | J RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 1005 | Builder's Risk Insurance | $5,500.00 | $5,500.00 | $0.00 | $0.00 | $5,500.00 | 100.00% | $0.00 | $275.00 |
| 1006 | General Liability Insurance | $4,500.00 | $4,500.00 | $0.00 | $0.00 | $4,500.00 | 100.00% | $0.00 | $225.00 |
| 1008 | Signage | $5,000.00 | $0.00 | $5,000.00 | $0.00 | $5,000.00 | 100.00% | $0.00 | $250.00 |
| 2003 | Architectural | $45,000.00 | $45,000.00 | $0.00 | $0.00 | $45,000.00 | 100.00% | $0.00 | $2,250.00 |
| 2004 | Printing/Reproduction | $1,200.00 | $1,200.00 | $0.00 | $0.00 | $1,200.00 | 100.00% | $0.00 | $60.00 |
| 2005 | Soils Test/Engineering | $36,000.00 | $36,000.00 | $0.00 | $0.00 | $36,000.00 | 100.00% | $0.00 | $1,800.00 |
| 2006 | Surveying | $12,500.00 | $12,500.00 | $0.00 | $0.00 | $12,500.00 | 100.00% | $0.00 | $625.00 |
| 2007 | Building Permits | $7,500.00 | $7,500.00 | $0.00 | $0.00 | $7,500.00 | 100.00% | $0.00 | $375.00 |
| 2009 | Contractor Fee | $375,000.00 | $335,000.00 | $0.00 | $0.00 | $335,000.00 | 89.33% | $40,000.00 | $16,750.00 |
| 2010 | Supervision | $100,000.00 | $80,000.00 | $0.00 | $0.00 | $80,000.00 | 80.00% | $20,000.00 | $4,000.00 |
| 2011 | Overhead | $36,200.00 | $31,000.00 | $0.00 | $0.00 | $31,000.00 | 85.64% | $5,200.00 | $1,550.00 |
| 2012 | Monthly Utility Fees | $2,500.00 | $2,500.00 | $0.00 | $0.00 | $2,500.00 | 100.00% | $0.00 | $125.00 |
| 3001 | Asbestos Testing/Abatement | $135,000.00 | $135,000.00 | $0.00 | $0.00 | $135,000.00 | 100.00% | $0.00 | $6,750.00 |
| 3003 | Temporary Power | $2,500.00 | $2,500.00 | $0.00 | $0.00 | $2,500.00 | 100.00% | $0.00 | $125.00 |
| 3004 | Rentals | $2,500.00 | $2,500.00 | $0.00 | $0.00 | $2,500.00 | 100.00% | $0.00 | $125.00 |
| 3005 | Trash/Cleanup | $6,500.00 | $6,500.00 | $0.00 | $0.00 | $6,500.00 | 100.00% | $0.00 | $325.00 |
| 3008 | Demolition | $17,500.00 | $17,500.00 | $0.00 | $0.00 | $17,500.00 | 100.00% | $0.00 | $875.00 |
| 3009 | Shoring | $1,500.00 | $1,500.00 | $0.00 | $0.00 | $1,500.00 | 100.00% | $0.00 | $75.00 |
| 3014 | Concrete Pumping | $9,500.00 | $9,500.00 | $0.00 | $0.00 | $9,500.00 | 100.00% | $0.00 | $475.00 |
| 3015 | Foundation | $14,000.00 | $14,000.00 | $0.00 | $0.00 | $14,000.00 | 100.00% | $0.00 | $700.00 |
| 3016 | Waterproofing/Perimeter Drain | $5,500.00 | $5,500.00 | $0.00 | $0.00 | $5,500.00 | 100.00% | $0.00 | $275.00 |
| 3017 | Water/Sewer Installation | $29,000.00 | $22,069.05 | $6,930.95 | $0.00 | $29,000.00 | 100.00% | $0.00 | $1,450.00 |
| 3018 | Structural Steel Beams/Posts/Welding | $116,000.00 | $116,000.00 | $0.00 | $0.00 | $116,000.00 | 100.00% | $0.00 | $5,800.00 |
| 3019 | Interior Flatwork | $14,200.00 | $14,200.00 | $0.00 | $0.00 | $14,200.00 | 100.00% | $0.00 | $710.00 |
| 3020 | Exterior Flatwork | $3,500.00 | $3,022.26 | $477.74 | $0.00 | $3,500.00 | 100.00% | $0.00 | $175.00 |
| 3021 | Asphalt | $4,500.00 | $4,500.00 | $0.00 | $0.00 | $4,500.00 | 100.00% | $0.00 | $225.00 |
| 3022 | Trusses | $22,600.00 | $22,600.00 | $0.00 | $0.00 | $22,600.00 | 100.00% | $0.00 | $1,130.00 |
| 3023 | Framing Materials | $119,000.00 | $119,000.00 | $0.00 | $0.00 | $119,000.00 | 100.00% | $0.00 | $5,950.00 |
| 3024 | Labor: Framing | $96,000.00 | $96,000.00 | $0.00 | $0.00 | $96,000.00 | 100.00% | $0.00 | $4,800.00 |
| 3026 | Windows/Exterior Doors | $55,200.00 | $55,200.00 | $0.00 | $0.00 | $55,200.00 | 100.00% | $0.00 | $2,760.00 |
| 3027 | Entry Door | $4,000.00 | $2,000.00 | $2,000.00 | $0.00 | $4,000.00 | 100.00% | $0.00 | $200.00 |
| 3028 | Roofing | $125,000.00 | $125,000.00 | $0.00 | $0.00 | $125,000.00 | 100.00% | $0.00 | $6,250.00 |
| 3029 | Gutters/Flashing | $12,500.00 | $10,000.00 | $2,500.00 | $0.00 | $12,500.00 | 100.00% | $0.00 | $625.00 |
| 3030 | Garage Doors | $7,500.00 | $7,500.00 | $0.00 | $0.00 | $7,500.00 | 100.00% | $0.00 | $375.00 |
| 3031 | HVAC | $689,000.00 | $541,333.34 | $147,666.66 | $0.00 | $689,000.00 | 100.00% | $0.00 | $34,450.00 |
| 3033 | Labor: Plumbing | $186,000.00 | $169,110.00 | $16,890.00 | $0.00 | $186,000.00 | 100.00% | $0.00 | $9,300.00 |
| 3034 | Plumbing Fixtures | $14,800.00 | $4,799.18 | $10,000.82 | $0.00 | $14,800.00 | 100.00% | $0.00 | $740.00 |
| 3035 | Labor: Electrical | $232,000.00 | $232,000.00 | $0.00 | $0.00 | $232,000.00 | 100.00% | $0.00 | $11,600.00 |
| 3036 | Electrical Fixtures | $458,000.00 | $458,000.00 | $0.00 | $0.00 | $458,000.00 | 100.00% | $0.00 | $22,900.00 |
| 3037 | Building Automation | $128,000.00 | $128,000.00 | $0.00 | $0.00 | $128,000.00 | 100.00% | $0.00 | $6,400.00 |
| 3039 | Fire Protection | $146,000.00 | $120,403.29 | $25,596.71 | $0.00 | $146,000.00 | 100.00% | $0.00 | $7,300.00 |
| 3040 | Custom Shower Pans | $8,500.00 | $5,000.00 | $3,500.00 | $0.00 | $8,500.00 | 100.00% | $0.00 | $425.00 |
| 3041 | Decks | $6,500.00 | $6,500.00 | $0.00 | $0.00 | $6,500.00 | 100.00% | $0.00 | $325.00 |
| 3042 | Deck/Stair Railings/Metal Fabrication | $3,500.00 | $2,500.00 | $1,000.00 | $0.00 | $3,500.00 | 100.00% | $0.00 | $175.00 |
| 3043 | Exterior Trim/Siding/Fascia | $2,800.00 | $2,800.00 | $0.00 | $0.00 | $2,800.00 | 100.00% | $0.00 | $140.00 |
| 3044 | Masonry/Stonework | $29,000.00 | $29,000.00 | $0.00 | $0.00 | $29,000.00 | 100.00% | $0.00 | $1,450.00 |
| 3045 | Stucco | $12,000.00 | $12,000.00 | $0.00 | $0.00 | $12,000.00 | 100.00% | $0.00 | $600.00 |
| 3046 | Insulation | $11,000.00 | $11,000.00 | $0.00 | $0.00 | $11,000.00 | 100.00% | $0.00 | $550.00 |
| 3047 | Drywall/Texture Materials | $157,000.00 | $157,000.00 | $0.00 | $0.00 | $157,000.00 | 100.00% | $0.00 | $7,850.00 |
| 3048 | Labor: Hang/Tape/Texture | $180,000.00 | $180,000.00 | $0.00 | $0.00 | $180,000.00 | 100.00% | $0.00 | $9,000.00 |
| 3049 | Cabinets/Vanities | $15,200.00 | $0.00 | $15,200.00 | $0.00 | $15,200.00 | 100.00% | $0.00 | $760.00 |
| 3050 | Labor: Cabinet/Vanity | $5,500.00 | $5,500.00 | $0.00 | $0.00 | $5,500.00 | 100.00% | $0.00 | $275.00 |
| 3051 | Interior Door/Trim/Closet Material | $57,500.00 | $57,500.00 | $0.00 | $0.00 | $57,500.00 | 100.00% | $0.00 | $2,875.00 |
| 3052 | Labor: Interior Door/Trim/Closet | $28,600.00 | $28,600.00 | $0.00 | $0.00 | $28,600.00 | 100.00% | $0.00 | $1,430.00 |
| 3053 | Door Hardware | $14,200.00 | $0.00 | $14,200.00 | $0.00 | $14,200.00 | 100.00% | $0.00 | $710.00 |
| 3054 | Cabinet Hardware | $3,500.00 | $0.00 | $1,838.75 | $0.00 | $1,838.75 | 52.54% | $1,661.25 | $91.94 |
| 3055 | Labor: Hardware | $6,500.00 | $0.00 | $6,450.14 | $0.00 | $6,450.14 | 99.23% | $49.86 | $322.51 |
| 3056 | Painting | $285,000.00 | $280,500.00 | $4,500.00 | $0.00 | $285,000.00 | 100.00% | $0.00 | $14,250.00 |
| 3057 | Appliances | $9,500.00 | $9,500.00 | $0.00 | $0.00 | $9,500.00 | 100.00% | $0.00 | $475.00 |
| 3060 | Tile | $6,800.00 | $0.00 | $6,800.00 | $0.00 | $6,800.00 | 100.00% | $0.00 | $340.00 |
| 3061 | Labor: Tile | $14,600.00 | $14,600.00 | $0.00 | $0.00 | $14,600.00 | 100.00% | $0.00 | $730.00 |
| 3062 | Countertops | $8,450.00 | $0.00 | $8,450.00 | $0.00 | $8,450.00 | 100.00% | $0.00 | $422.50 |
| 3063 | Shower Doors/Mirrors | $5,900.00 | $5,900.00 | $0.00 | $0.00 | $5,900.00 | 100.00% | $0.00 | $295.00 |
| 3066 | Landscape/Fence/Sprinkler Materials | $22,800.00 | $20,000.00 | $2,800.00 | $0.00 | $22,800.00 | 100.00% | $0.00 | $1,140.00 |
| 3067 | Labor: Landscape/Fence/Sprinkler | $15,000.00 | $0.00 | $15,000.00 | $0.00 | $15,000.00 | 100.00% | $0.00 | $750.00 |
| 3068 | Labor: Common | $45,000.00 | $43,234.40 | $1,765.60 | $0.00 | $45,000.00 | 100.00% | $0.00 | $2,250.00 |
| 3069 | Final Cleaning/Duct Cleaning | $7,450.00 | $0.00 | $7,450.00 | $0.00 | $7,450.00 | 100.00% | $0.00 | $372.50 |
| 5000 | Contingency | $250,000.00 | $186,900.00 | $60,000.00 | $0.00 | $246,900.00 | 98.76% | $3,100.00 | $12,345.00 |
| 5000 | COR 1 - Survey | $463.65 | $463.65 | $0.00 | $0.00 | $463.65 | 100.00% | $0.00 | $23.18 |
| 5001 | COR 2 - Permits | $21,236.71 | $21,236.71 | $0.00 | $0.00 | $21,236.71 | 100.00% | $0.00 | $1,061.84 |
| 5002 | COR 2 - Permits 2 | $8,455.52 | $0.00 | $8,455.52 | $0.00 | $8,455.52 | 100.00% | $0.00 | $422.78 |
| | **GRAND TOTALS** | $4,530,155.88 | $4,080,171.88 | $379,972.89 | $0.00 | $4,460,144.77 | 98% | $70,011.11 | $223,007.24 |

**Exhibit A Page - 94**

BUDGET

| Code | Category | Budget | Closing | Draw 1 | Draw 2 | Draw 3 | Draw 4 | Draw 5 | Draw 6 | Draw 7 | Draw 8 | Draw 9 | Draw 10 | Draw 11 | Draw 12 | Draw 13 | Draw 14 | Balance |
|------|----------|--------|---------|--------|--------|--------|--------|--------|--------|--------|--------|--------|---------|---------|---------|---------|---------|---------|

# APPLICATION AND CERTIFICATION FOR PAYMENT

| | |
|---|---|
| TO OWNER: 5601 SLSCA, LLC<br>1337 Bannock Street<br>Denver, CO 80204 | PROJECT: The Timery<br>5601 San Leandro Street<br>Oakland, CA 94619 |

FROM CONTRACTOR:
Distinctive Development, LLC
1337 Bannock Street
Denver, CO 80204

VIA ARCHITECT:

PAGE ONE OF TWO PAGES

| | Distribution to: | |
|---|---|---|
| X | OWNER | |
| X | ARCHITECT | |
| | CONTRACTOR | |

| APPLICATION #: | 16 |
|---|---|
| PERIOD TO: | 3/15/2018 |
| CONTRACT DATE: | 10/5/2016 |

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation page is attached.

| | | | |
|---|---|---|---|
| 1. ORIGINAL CONTRACT SUM | | $ | 14,486,230.00 |
| 2. Net change by Change Orders | | $ | 9,872,213.24 |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) | | $ | 24,358,443.24 |
| 4. TOTAL COMPLETED & STORED TO DATE (Column G on G703) | | $ | 15,651,755.66 |
| 5. RETAINAGE: | | | |
|   a.   5 % of Completed Work<br>    (Column D + E on G703) | $ | 746,054.58 | |
|   b.   0 % of Stored Material<br>    (Column F on G703) | $ | $0.00 | |
|   Total Retainage (Lines 5a + 5b or<br>  Total in Column I of G703) | | $ | 746,054.58 |
| 6. TOTAL EARNED LESS RETAINAGE<br>  (Line 4 Less Line 5 Total) | | $ | 14,905,701.08 |
| 7. LESS PREVIOUS CERTIFICATES FOR<br>  PAYMENT (Line 6 from prior Certificate) | | $ | 13,445,027.43 |
| 8. CURRENT PAYMENT DUE | | $ | 1,460,673.65 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE<br>  (Line 3 less Line 6) | | $ | 9,452,742.16 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved<br>in previous months by Owner | 9,001,687.34 | $0.00 |
| Total approved this Month | $870,525.90 | $0.00 |
| TOTALS | $9,872,213.24 | $0.00 |
| NET CHANGES by Change Order | $9,872,213.24 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge,
information and belief the Work covered by this Application for Payment has been
completed in accordance with the Contract Documents, that all amounts have been paid by
the Contractor for Work for which previous Certificates for Payment were issued and
payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

By: _____ Date: _____

State of:
County of:
Subscribed and sworn to before me this
___ day of
Notary Public:
My Commission expires:

## ARCHITECT'S CERTIFICATE FOR PAYMENT

(attach explanation if amount certified differs from the amount applied. Initial all figures on this
Application and on the Continuation Sheet that are changed to conform with the amount certified.)

AMOUNT CERTIFIED ............ $ _____

In accordance with the Contract Documents, based on on-site observations and the data
comprising the application, the Architect certifies to the Owner that to the best of the
Architect's knowledge, information and belief the Work has progressed as indicated,
the quality of the Work is in accordance with the Contract Documents, and the Contractor
is entitled to payment of the AMOUNT CERTIFIED.

ARCHITECT:

By: _____ Date: 5/31/19

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the
Contractor named herein. Issuance, payment and acceptance of payment are without
prejudice to any rights of the Owner or Contractor under this Contract.

# CONTINUATION SHEET

G703

APPLICATION AND CERTIFICATION FOR PAYMENT
Contractor's signed certification is attached.
In tabulations below, amounts are stated to the nearest dollar.

APPLICATION NO: 16
APPLICATION DATE: 3/20/2019
PERIOD TO: 3/15/2019

| A<br>ITEM NO. | B<br>DESCRIPTION OF WORK | C<br>SCHEDULED VALUE | D<br>WORK COMPLETED FROM PREVIOUS APPLICATION (D+E) | E<br>THIS PERIOD | F<br>MATERIALS PRESENTLY STORED (NOT IN D OR E) | G<br>TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H<br>% (G÷C) | I<br>BALANCE TO FINISH (C-G) | J<br>RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 1003 | Builder's Risk Insurance | $15,000.00 | $15,000.00 | $0.00 | $0.00 | $15,000.00 | 100.00% | $0.00 | $750.00 |
| 1006 | General Liability Insurance | $60,000.00 | $60,000.00 | $0.00 | $0.00 | $60,000.00 | 100.00% | $0.00 | $3,000.00 |
| 1008 | Signage | $225,000.00 | [illegible] | $14,267.16 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 2001 | Architectural | $125,000.00 | $110,000.00 | $0.00 | $15,000.00 | $125,000.00 | 100.00% | $0.00 | $5,500.00 |
| 2004 | Printing/Reproduction | $2,500.00 | $2,210.00 | $0.00 | $0.00 | $2,210.00 | 88.40% | $290.00 | $110.50 |
| 2005 | Soils Test/Engineering | $22,000.00 | $22,000.00 | $0.00 | $0.00 | $22,000.00 | 100.00% | $0.00 | $1,100.00 |
| 2006 | Surveying | $13,000.00 | $10,887.97 | $0.00 | $0.00 | $10,887.97 | [illegible] | $2,112.03 | $544.40 |
| 2007 | Building Permits | $14,600.00 | $11,900.24 | $0.00 | $0.00 | $11,900.24 | 81.51% | $2,699.76 | $595.01 |
| 2009 | Contractor Fee | $950,000.00 | $950,000.00 | $0.00 | $0.00 | $950,000.00 | 100.00% | $0.00 | $47,500.00 |
| 2010 | Supervision | $138,000.00 | $138,000.00 | $0.00 | $0.00 | $138,000.00 | 100.00% | $0.00 | $6,900.00 |
| 2011 | Overhead | $65,000.00 | $65,000.00 | $0.00 | $0.00 | $65,000.00 | 100.00% | $0.00 | $3,250.00 |
| 3001 | Asbestos Testing/Abatement | $7,500.00 | $7,500.00 | $0.00 | $0.00 | $7,500.00 | 100.00% | $0.00 | $375.00 |
| 3002 | Utility Disconnect/Connect Fees | $1,265,000.00 | $603,794.37 | $115,000.00 | $35,000.00 | $753,794.37 | 59.59% | $511,205.63 | [illegible] |
| 3003 | Temporary Power | $44,000.00 | $16,600.00 | $0.00 | $0.00 | $16,600.00 | 37.73% | $27,400.00 | $830.00 |
| 3004 | Rentals | $155,000.00 | $110,076.33 | $0.00 | $0.00 | $110,076.33 | 71.02% | $44,923.67 | $5,503.82 |
| 3005 | Trash/Cleanup | $25,000.00 | $25,000.00 | $0.00 | $0.00 | $25,000.00 | 100.00% | $0.00 | $1,250.00 |
| 3009 | Demolition | $168,000.00 | $168,000.00 | $0.00 | $0.00 | $168,000.00 | 100.00% | $0.00 | $8,400.00 |
| 3014 | Concrete Pumping | $57,000.00 | $40,782.18 | $0.00 | $0.00 | $40,782.18 | 71.55% | $16,217.82 | $2,039.11 |
| 3015 | Foundation | $45,000.00 | $32,607.97 | $0.00 | $0.00 | $32,607.97 | 72.46% | $12,392.03 | $1,630.40 |
| 3016 | [illegible] Perimeter Drain | $65,000.00 | $0.00 | $40,005.37 | $0.00 | $40,005.37 | 61.55% | $24,994.63 | $2,000.27 |
| 3017 | Water/Sewer Installation | $38,000.00 | $5,100.00 | $10,000.00 | $0.00 | $15,100.00 | 39.74% | $22,900.00 | $755.00 |
| 3018 | Structural Steel Beams/Posts/Welding | [illegible] | $214,904.76 | [illegible] | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 3019 | Interior Flatwork | $95,000.00 | $95,000.00 | $0.00 | $0.00 | $95,000.00 | 100.00% | $0.00 | $4,750.00 |
| 3020 | Exterior Flatwork | $45,000.00 | $45,000.00 | $0.00 | $0.00 | $45,000.00 | 100.00% | $0.00 | $2,250.00 |
| 3021 | Asphalt | [illegible] | $9,903.71 | $18,000.00 | $0.00 | $27,903.71 | [illegible] | [illegible] | $1,395.19 |
| 3022 | Trusses | $66,500.00 | $66,500.00 | $0.00 | $0.00 | $66,500.00 | 100.00% | $0.00 | $3,325.00 |
| 3023 | Framing Materials | $178,000.00 | $0.00 | $0.00 | $178,000.00 | $178,000.00 | 100.00% | $0.00 | $0.00 |
| 3024 | Labor:Framing | $185,000.00 | $185,000.00 | $0.00 | $0.00 | $185,000.00 | 100.00% | $0.00 | $9,250.00 |
| 3026 | Windows/Exterior Doors | [illegible] | $134,476.25 | $0.00 | $0.00 | $134,476.25 | 97.45% | $3,523.75 | $6,723.81 |
| 3027 | Entry Door | $12,000.00 | $11,108.92 | $795.99 | $0.00 | $11,904.91 | 99.21% | $95.09 | $595.25 |
| 3028 | Roofing | $1,244,000.00 | $166,623.29 | $33,000.00 | $0.00 | $199,623.29 | 16.05% | $1,044,376.71 | $9,981.16 |
| 3029 | Gutters/Flashing | [illegible] | $35,291.10 | $0.00 | $0.00 | $35,291.10 | 94.11% | $2,208.90 | $1,764.56 |
| 3030 | Garage Doors | [illegible] | $19,761.30 | $2,235.81 | $0.00 | $21,997.11 | [illegible] | $7,802.89 | $1,099.86 |
| 3031 | HVAC | $1,856,000.00 | $1,832,507.82 | $0.00 | $0.00 | $1,832,507.82 | [illegible] | $23,492.18 | [illegible] |
| 3033 | Labor: Plumbing | [illegible] | $312,545.88 | $2,991.10 | $0.00 | $315,536.98 | 60.22% | $208,463.02 | $15,776.85 |
| 3034 | Plumbing Fixtures | $33,500.00 | $33,500.00 | $0.00 | $0.00 | $33,500.00 | 100.00% | $0.00 | $1,675.00 |
| 3035 | Labor: Electrical | $510,000.00 | $510,000.00 | $0.00 | $0.00 | $510,000.00 | 100.00% | $0.00 | $25,500.00 |
| 3036 | Electrical Fixtures | $1,444,000.00 | $966,991.55 | $0.00 | $0.00 | $966,991.55 | 66.97% | [illegible] | $48,349.58 |
| 3037 | Building Automation | [illegible] | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | [illegible] | $0.00 |
| 3038 | Elevator | $275,000.00 | $33,707.69 | $0.00 | $0.00 | $33,707.69 | 12.26% | $241,292.31 | $1,685.38 |
| 3039 | Fire Protection | $371,000.00 | $297,295.91 | $0.00 | $0.00 | $297,295.91 | [illegible] | $73,704.09 | $14,864.80 |
| 3040 | Custom Shower Pans | $5,500.00 | $5,500.00 | $0.00 | $0.00 | $5,500.00 | 100.00% | $0.00 | $275.00 |
| 3041 | Decks | $13,000.00 | $13,000.00 | $0.00 | $0.00 | $13,000.00 | 100.00% | $0.00 | $650.00 |
| 3042 | Deck/Stair Railings/Metal Fabrication | [illegible] | $4,925.00 | $8,091.00 | $0.00 | $13,016.00 | [illegible] | [illegible] | $650.80 |
| 3043 | Exterior Trim/Siding/Fascia | $4,500.00 | $4,500.00 | $0.00 | $0.00 | $4,500.00 | 100.00% | $0.00 | $225.00 |
| 3044 | Masonry/Stonework | [illegible] | $45,799.40 | $0.00 | $0.00 | $45,799.40 | [illegible] | [illegible] | $2,289.97 |
| 3045 | Stucco | [illegible] | $43,069.22 | $0.00 | $0.00 | $43,069.22 | 95.71% | $1,930.78 | $2,153.46 |
| 3046 | Insulation | $11,000.00 | $11,000.00 | $0.00 | $0.00 | $11,000.00 | 100.00% | $0.00 | $550.00 |
| 3047 | Drywall/Texture Materials | $235,000.00 | $0.00 | $0.00 | $235,000.00 | $235,000.00 | 100.00% | $0.00 | $0.00 |
| 3048 | Labor: Hang/Tape/Texture | [illegible] | [illegible] | $0.00 | [illegible] | $335,713.90 | [illegible] | $19,286.10 | [illegible] |
| 3049 | Cabinets/Vanities | [illegible] | [illegible] | [illegible] | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 3050 | Labor: Cabinet/Vanity | [illegible] | $0.00 | [illegible] | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 3051 | Interior Door/Trim/Closet Material | $172,000.00 | [illegible] | $0.00 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 3052 | Labor: Interior [illegible] | $76,000.00 | [illegible] | $0.00 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 3053 | Door Hardware | $42,000.00 | $9,790.00 | $0.00 | $0.00 | $9,790.00 | 23.31% | $32,210.00 | $489.50 |
| 3054 | Cabinet Hardware | $3,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $3,500.00 | $0.00 |
| 3055 | Labor: Hardware | [illegible] | $0.00 | $4,177.00 | $0.00 | $4,177.00 | [illegible] | $11,423.00 | $208.85 |
| 3056 | Painting | [illegible] | [illegible] | [illegible] | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 3057 | Appliances | $38,000.00 | $38,000.00 | $0.00 | $0.00 | $38,000.00 | 100.00% | $0.00 | [illegible] |
| 3058 | Hardwood Floors | $5,500.00 | $5,500.00 | $0.00 | $0.00 | $5,500.00 | 100.00% | $0.00 | $275.00 |
| 3060 | Tile | $12,800.00 | $8,500.00 | $0.00 | $0.00 | $8,500.00 | 66.41% | $4,300.00 | $425.00 |
| 3061 | Labor: Tile | $33,000.00 | $19,072.00 | $0.00 | $0.00 | $19,072.00 | 57.79% | $13,928.00 | $953.62 |
| 3062 | Countertops | $26,000.00 | [illegible] | [illegible] | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 3063 | Shower Doors/Mirrors | [illegible] | $1,110.00 | $0.00 | $0.00 | $1,110.00 | [illegible] | $15,840.00 | $55.50 |
| 3066 | Landscape/Fence/Sprinkler Materials | $76,000.00 | $62,635.25 | $0.00 | $0.00 | $62,635.25 | 82.41% | $13,364.75 | $3,131.76 |
| 3067 | Labor: [illegible] | $14,000.00 | $9,414.22 | $0.00 | $0.00 | $9,414.22 | 67.24% | [illegible] | $470.71 |
| 3068 | Labor: Common | [illegible] | [illegible] | $0.00 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 3069 | Final Cleaning/Duct Cleaning | $24,000.00 | [illegible] | $1,399.64 | $0.00 | [illegible] | 99.34% | $159.36 | $1,192.03 |
| 3070 | Contingency | $250,000.00 | [illegible] | $0.00 | $0.00 | [illegible] | [illegible] | $915.37 | $12,454.23 |
| 5001 | Change Order Request 001- Elapsed Time | [illegible] | [illegible] | $17,853.00 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 5002 | Change Order Request 002- Fire Wall | $1,120,000.00 | [illegible] | $0.00 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 5003 | Change Order Request 003- Title 24 | [illegible] | $1,393,815.18 | $0.00 | $0.00 | $1,393,815.18 | [illegible] | [illegible] | [illegible] |
| 5004 | Change Order Request 004- General Changes | [illegible] | $153,856.74 | $0.00 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 5005 | [illegible] | [illegible] | $213,920.10 | $0.00 | $0.00 | $213,920.10 | [illegible] | [illegible] | [illegible] |
| 5006 | Change Order Request [illegible] Permit Fees | [illegible] | $25,316.06 | $0.00 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 5007 | [illegible] | [illegible] | [illegible] | $0.00 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 5008 | Change Order Request 008- Demo and Debris Haul | [illegible] | $94,720.72 | $3,760.45 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 5009 | Change Order Request 009 - Graffiti Paint | $3,329.01 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | [illegible] | $0.00 |
| 5010 | Change Order Request 010 - Remove 1st floor debris | $68,755.41 | $7,943.73 | $0.00 | $0.00 | $7,943.73 | [illegible] | [illegible] | $397.19 |
| 5011 | Change Order Request 011 - Misc. | [illegible] | $51,387.87 | $15,443.76 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 5012 | Change Order Request 012 - Misc. | [illegible] | $453,730.40 | $53,303.00 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 5013 | Change Order Request 013 - Electrical Supplies | [illegible] | $207,075.84 | $51,364.80 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 5014 | Change Order Request 014 - Permit Fees 2 | $1,775.14 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $1,775.14 | $0.00 |
| 5015 | Change Order Request 015 - Asbestos at stairwell & storage | $55,898.71 | [illegible] | $0.00 | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 5016 | Change Order Request 016 - Conduit, lights, ceiling [illegible] | [illegible] | [illegible] | $11,788.58 | $0.00 | [illegible] | [illegible] | [illegible] | $1,401.43 |
| 5017 | Change Order Request 017 - Epoxy | $203,475.15 | [illegible] | $67,146.80 | $0.00 | [illegible] | 100.00% | [illegible] | [illegible] |
| 5018 | Change Order Request 018 - Drain waterproofing | $7,576.75 | $0.00 | $7,576.75 | $0.00 | $7,576.75 | 100.00% | $0.00 | $378.84 |
| 5019 | Change Order Request 019 - Misc. | $145,000.00 | $72,782.01 | $72,217.99 | $0.00 | $145,000.00 | 100.00% | $0.00 | $7,250.00 |
| 5020 | Change Order Request 020 - Fence Permit | $2,364.22 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $2,364.22 | $0.00 |
| 5021 | Change Order Request 021 - Plumbing | $7,271.91 | $3,183.50 | $0.00 | $0.00 | $3,183.50 | [illegible] | $4,088.41 | $159.18 |
| 5022 | Change Order Request 022 - Electrical Supplies 2 | $322,377.52 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $322,377.52 | $0.00 |
| 5023 | [illegible] | $204,360.27 | $204,360.27 | $0.00 | $0.00 | $204,360.27 | 100.00% | $0.00 | $10,218.01 |
| 5024 | Change Order Request 024 - Elevator Decomission | $12,915.00 | $12,915.00 | $0.00 | $0.00 | $12,915.00 | 100.00% | $0.00 | $645.75 |
| 5025 | Change Order Request 025 - Low Voltage - 2nd Floor | $147,084.63 | $147,084.63 | $0.00 | $0.00 | $147,084.63 | 100.00% | $0.00 | $7,354.23 |
| 5026 | Change Order Request 026 - Sewer Investigation | $738.00 | $738.00 | $0.00 | $0.00 | $738.00 | 100.00% | $0.00 | $36.90 |
| 5027 | Change Order Request 027 - Plumbing 2 | $48,079.53 | $48,079.53 | $0.00 | $0.00 | $48,079.53 | 100.00% | $0.00 | $2,403.98 |
| 5028 | Change Order Request 028 - Electrical Supplies 3 | $99,900.00 | $99,900.00 | $0.00 | $0.00 | $99,900.00 | 100.00% | $0.00 | $4,995.00 |
| 5029 | Change Order Request 029 - ADA Ramp at front of building | $45,511.23 | $0.00 | $45,511.23 | $0.00 | $45,511.23 | 100.00% | $0.00 | $2,275.56 |
| 5030 | Change Order Request 030 - 1st Floor Exit Corridor | [illegible] | $0.00 | [illegible] | $0.00 | [illegible] | [illegible] | [illegible] | [illegible] |
| 5031 | Change Order Request 031 - Stairways | [illegible] | $0.00 | $206,419.33 | $0.00 | $206,419.33 | [illegible] | [illegible] | [illegible] |
| 5032 | Change Order Request 032 - Cleanroom door | [illegible] | $0.00 | [illegible] | $0.00 | [illegible] | 100.00% | $0.00 | [illegible] |
| 5033 | Change Order Request 033. - 2nd floor plan check | $8,756.86 | $0.00 | [illegible] | $0.00 | [illegible] | 100.00% | $0.00 | [illegible] |
| 5034 | Change Order Request 034 - Forklift reconditioning | [illegible] | $0.00 | $7,998.36 | $0.00 | $7,998.36 | 100.00% | $0.00 | $399.92 |
| 5035 | Change Order Request 035 - replace 8" back flow valve | $43,907.54 | $0.00 | $43,907.54 | $0.00 | $43,907.54 | 100.00% | $0.00 | [illegible] |
| 5036 | Change Order Request 036 - roof leak repair | $1,599.14 | $0.00 | $1,599.14 | $0.00 | $1,599.14 | 100.00% | $0.00 | [illegible] |
| 5037 | Change Order Request 037 - overhead garage door repair | [illegible] | $0.00 | $1,447.75 | $0.00 | [illegible] | 100.00% | $0.00 | [illegible] |
| 5038 | Change Order Request 038 - Roofing - wall flashing & [illegible] | [illegible] | $0.00 | $6,526.17 | $0.00 | [illegible] | 100.00% | $0.00 | $326.31 |
| 5039 | Change Order Request 039 - EBMUD sewer compliance work | [illegible] | $0.00 | $106,303.98 | $0.00 | [illegible] | 100.00% | $0.00 | [illegible] |
| 5040 | Change Order Request 040 - 2nd floor low voltage | [illegible] | $0.00 | $45,391.09 | $0.00 | [illegible] | 100.00% | $0.00 | [illegible] |
| 5041 | Change Order Request 041- fencing | [illegible] | $0.00 | $54,532.67 | $0.00 | [illegible] | 100.00% | $0.00 | [illegible] |
| 5042 | Change Order Request 042 - ADA elevator design | [illegible] | $0.00 | $7,080.20 | $0.00 | [illegible] | 100.00% | $0.00 | [illegible] |
| 5043 | Change Order Request 043 - surveying | [illegible] | $0.00 | $14,637.00 | $0.00 | $14,637.00 | 100.00% | $0.00 | [illegible] |
| 5044 | Change Order Request 044 - oakland Salem tax | [illegible] | $0.00 | $4,182.03 | $0.00 | [illegible] | 100.00% | $0.00 | [illegible] |
| 5045 | Change Order Request 045 - demo & debris haul 3 | [illegible] | $0.00 | $10,458.03 | $0.00 | [illegible] | 100.00% | $0.00 | [illegible] |
| 5046 | Change Order Request 046 - [illegible] | [illegible] | $0.00 | [illegible] | $0.00 | [illegible] | 100.00% | $0.00 | [illegible] |
| | GRAND TOTALS | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

## SCHEDULE VIII

## PROJECT SCHEDULE

The balance of construction is anticipated to be completed within 120 days (depending on leasing). specific tenant buildout schedules have not yet been prepared as Borrower continues to work with tenants, however updated Gantt charts/schedules will be prepared and provided to lender for review upon preparation.

# SCHEDULE IX

# PLANS AND SPECIFICATIONS

Attached.





## front elevation
scale 1"=20'-0"

NEW AWNINGS

NEW MOUNTED FLAGS

## side elevation
scale 1"=20'-0"

the tinnery
5601 san leandro street
oakland, ca

Green Sage MB, LLC
1137 Bannock Street
Denver, CO 80204
(303)435-0064

# first floor

scale 1"=20'-0"

the tinnery
5601 san leandro street
oakland, ca

Green Sage MB, LLC
1137 Bannock Street
Denver, CO 80204
(303)435-0064

# second floor

scale 1"=20'-0"

the tinnery
5601 san leandro street
oakland, ca

CONSTRUCTION LEGEND

EXISTING CONSTRUCTION TO REMAIN

NEW CONSTRUCTION TO CEILING

SCOPE OF CONSTRUCTION

CONSTRUCTION GENERAL NOTES

1. [illegible]
2. [illegible]
3. [illegible]
4. [illegible]
5. [illegible]
6. [illegible]
7. All work shall be of first class workmanship.
8. [illegible]
9. DO NOT SCALE DRAWINGS, dimensions govern. Large scale details govern over small scale.
10. Dimensions shown are as-built for reference only.
11. Contractor shall submit all shop drawings to Architect for review prior to fabrication.
12. Paint all partitions, perimeter, bulkheads finished to be three coats minimum prepared according to manufacturer's recommendations.
13. Refer to Mechanical/ Electrical drawings for exact Mechanical/ Electrical information and for Mechanical and Electrical General Notes & Specifications.

N

Green Sage MB, LLC
1137 Bannock Street
Denver, CO 80204
(303)435-0064

# third floor

scale 1"=20'-0"

the tinnery
5601 san leandro street
oakland, ca

N

Green Sage MB, LLC
1137 Bannock Street
Denver, CO 80204
(303)435-0064

CONSTRUCTION LEGEND

EXISTING CONSTRUCTION TO REMAIN

NEW CONSTRUCTION TO CEILING

SCOPE OF CONSTRUCTION

CONSTRUCTION GENERAL NOTES

1. [illegible]

2. [illegible]

3. [illegible]

4. [illegible]

5. [illegible]

6. [illegible]

7. All work shall be of first class workmanship.

8. [illegible]

9. DO NOT SCALE DRAWINGS, dimensions govern. Large scale details govern over small scale.

10. Dimensions shown are as-built for reference only.

11. Contractor shall submit all shop drawings to Architect for review prior to fabrication.

12. Paint all partitions, perimeter, bulkheads finished to be three coats minimum prepared according to manufacturer's recommendations.

13. Refer to Mechanical/ Electrical drawings for exact Mechanical/ Electrical information and for Mechanical and Electrical General Notes & Specifications

CONSTRUCTION LEGEND

EXISTING CONSTRUCTION TO REMAIN

NEW CONSTRUCTION TO CEILING

SCOPE OF CONSTRUCTION

CONSTRUCTION GENERAL NOTES

1. [illegible]
2. [illegible]
3. [illegible]
4. [illegible]
5. [illegible]
6. [illegible]
7. [illegible]
8. [illegible]
9. DO NOT SCALE DRAWINGS. dimensions govern. Large scale details govern over small scale.
10. Dimensions shown are as-built for reference only.
11. Contractor shall submit all shop drawings to Architect for review prior to fabrication.
12. Paint all partitions, perimeter, bulkheads finished to be three coats minimum prepared according to manufacturer's recommendations.
13. Refer to Mechanical/ Electrical drawings for exact Mechanical/ Electrical information and for Mechanical and Electrical General Notes & Specifications.

fire and security plan

# first floor

scale 1"=20'-0"

CAMERA LOCATION, TYP 24 HOUR SURVEILLANCE SHALL BE PROVIDED ADDITIONAL CAMERAS MAY BE PLACED PER SITE CONDITIONS

SPRINKLERS SHALL BE MODIFIED AS REQUIRED FOR CURRENT FIRE CODE. SPACING TO BE 15' O.C. UNO FINAL PLACEMENT AND ADDITIONAL SPRINKLER HEADS SHALL BE AT THE DISCRETION OF THE FIRE MARSHALL.

N

the tinnery
5601 san leandro street
oakland, ca

Green Sage MB, LLC
1137 Bannock Street
Denver, CO 80204
(303)435-0064

CAMERA LOCATION, TYP. 24 HOUR SURVEILLANCE SHALL BE PROVIDED ADDITIONAL CAMERAS MAY BE PLACED PER SITE CONDITIONS

SPRINKLERS SHALL BE MODIFIED AS REQUIRED FOR CURRENT FIRE CODE. SPACING TO BE 15' O.C. UNO FINAL PLACEMENT AND ADDITIONAL SPRINKLER HEADS SHALL BE AT THE DISCRETION OF THE FIRE MARSHALL.

fire and security plan

# second floor

scale 1"=20'-0"

the tinnery
5601 san leandro street
oakland, ca

N

Green Sage MB, LLC
1137 Bannock Street
Denver, CO 80204
(303)435-0064

CONSTRUCTION LEGEND

EXISTING CONSTRUCTION TO REMAIN

NEW CONSTRUCTION TO CEILING

SCOPE OF CONSTRUCTION

## CONSTRUCTION GENERAL NOTES

1. All work shall comply with applicable codes. The Electrical Code and the National Board of Fire Underwriters Code. All necessary permits, licenses, tests, certificates, etc. shall be submitted to local authorities and be paid for by the Contractor.
2. All material furnished under this contract shall be new, unless otherwise noted. All work shall be guaranteed against defective materials and workmanship for period of one (1) year after completion and acceptance. The Contractor shall repair or replace at his own expense when ordered to do so, all work that may develop defects in material and workmanship within said time period.
3. The General Contractor and each Sub-Contractor shall be responsible for checking existing conditions at the job site before submitting proposal. Submission of proposal shall be taken as evidence that such inspections have been made. Claims for extra compensation for work that could have been foreseen by such inspection, whether shown on contract documents or not, shall not be accepted or paid.
4. Contractors shall dispose of all debris resulting from demolition or execution of their work.
5. Insurance shall be provided by various Contractors in accordance with the direction of the owner.
6. The General Contractor and each Sub-Contractor shall be responsible for checking all dimensions and conditions at the job site before fabricating any material and for reporting any and all discrepancies to Architect.
7. All work shall be of first class workmanship.
8. Contractor shall be responsible for adequately storing all materials and for bracing and protecting all work during construction against damage, breakage, collapse, distortion and misalignment according to applicable codes, standards and good practice.
9. DO NOT SCALE DRAWINGS, dimensions govern. Large scale details govern over small scale.
10. Dimensions shown are as-built for reference only.
11. Contractor shall submit all shop drawings to Architect for review prior to fabrication.
12. Paint all partitions, perimeter, bulkheads finished to be three coats minimum prepared according to manufacturer's recommendations.
13. Refer to Mechanical/ Electrical drawings for exact Mechanical/ Electrical information and for Mechanical and Electrical General Notes & Specifications.

fire and security plan

# third floor

scale 1"=20'-0"

CAMERA LOCATION, TYP. 24 HOUR SURVEILLANCE SHALL BE PROVIDED ADDITIONAL CAMERAS MAY BE PLACED PER SITE CONDITIONS

SPRINKLERS SHALL BE MODIFIED AS REQUIRED FOR CURRENT FIRE CODE. SPACING TO BE 15' O.C. UNO FINAL PLACEMENT AND ADDITIONAL SPRINKLER HEADS SHALL BE AT THE DISCRETION OF THE FIRE MARSHALL

the tinnery
5601 san leandro street
oakland, ca

CONSTRUCTION LEGEND

EXISTING CONSTRUCTION TO REMAIN

NEW CONSTRUCTION TO CEILING

SCOPE OF CONSTRUCTION

CONSTRUCTION GENERAL NOTES

1. All work shall comply with applicable codes. The Electrical Code and the National Board of Fire Underwriters Code. All necessary permits, licenses, [illegible], certificates, etc. shall be submitted to [illegible] and be paid for by the Contractor.
2. All material furnished under this contract shall be new, unless otherwise noted. All work shall be guaranteed against defective materials and workmanship for period of one (1) year after completion and acceptance. The Contractor shall repair or replace at his own expense when ordered to do so, all work that may develop defects in materials and workmanship within said time period.
3. The General Contractor and each Sub-Contractor shall be responsible for checking existing conditions at the job site before submitting proposal. Submission of proposal shall be taken as evidence that such inspections have been made. Claims for extra compensation for work that could have been foreseen by such inspection, whether shown on contract documents or not, shall not be accepted or paid.
4. Contractors shall dispose of all debris resulting from demolition or execution of their work.
5. Insurance shall be provided by various Contractors in accordance with the direction of the owner.
6. The General Contractor and each Sub-Contractor shall be responsible for checking all dimensions and conditions at the job site before fabricating any material and for reporting any and all discrepancies to Architect.
7. All work shall be of first class workmanship.
8. Contractor shall be responsible for adequately storing all materials and for bracing and protecting all work during construction against damage, breakage, collapse, distortion and misalignment according to applicable codes, standards and good practice.
9. DO NOT SCALE DRAWINGS. [illegible]
10. Dimensions shown are as-built for reference only.
11. Contractor shall submit all shop drawings to Architect for review prior to fabrication.
12. Paint all partitions, perimeter, bulk-heads finished to be three coats minimum prepared according to manufacturer's recommendations.
13. Refer to Mechanical/ Electrical drawings for exact Mechanical/ Electrical information and for Mechanical and Electrical General Notes & Specifications.

N

Green Sage MB, LLC
1137 Bannock Street
Denver, CO 80204
(303)435-0064







fire and security plan

# third floor

scale 1"=20'-0"

CAMERA LOCATION, TYP 24 HOUR SURVEILLANCE SHALL BE PROVIDED ADDITIONAL CAMERAS MAY BE PLACED PER SITE CONDITIONS

SPRINKLERS SHALL BE MODIFIED AS REQUIRED FOR CURRENT FIRE CODE. SPACING TO BE 15' O C UNO FINAL PLACEMENT AND ADDITIONAL SPRINKLER HEADS SHALL BE AT THE DISCRETION OF THE FIRE MARSHALL.

the tinnery
5601 san leandro street
oakland, ca

CONSTRUCTION LEGEND

EXISTING CONSTRUCTION TO REMAIN

NEW CONSTRUCTION TO CEILING

SCOPE OF CONSTRUCTION

CONSTRUCTION GENERAL NOTES

1. All work shall comply with applicable codes. The Electrical Code and the National Board of Fire Underwriters Code. All necessary permits, licenses, fees, certificates, etc. shall be submitted to local authorities and be paid for by the Contractor.
2. All material furnished under this contract shall be new, unless otherwise noted. All work shall be guaranteed against defective materials and workmanship for period of one (1) year after completion and acceptance. The Contractor shall repair or replace at his own expense when ordered to do so, all work that may develop defects in material and workmanship within said time period.
3. The General Contractor and each Sub-Contractor shall be responsible for checking existing conditions at the job site before submitting proposal. Submission of proposal shall be taken as evidence that such inspections have been made. Claims for extra compensation for work that could have been foreseen by such inspection, whether shown on contract documents or not, shall not be accepted or paid.
4. Contractors shall dispose of all debris resulting from demolition or execution of their work.
5. Insurance shall be provided by various Contractors in accordance with the direction of the owner.
6. The General Contractor and each Sub-Contractor shall be responsible for checking all dimensions and conditions at the job site before fabricating any material and for reporting any and all discrepancies to Architect.
7. All work shall be of first class workmanship.
8. Contractor shall be responsible for adequately storing all materials and for bracing and protecting all work during construction against damage, breakage, collapse, distortion and misalignment according to applicable codes, standards and good practice.
9. DO NOT SCALE DRAWINGS, dimensions govern. Large scale details govern over small scale.
10. Dimensions shown are as-built for reference only.
11. Contractor shall submit all shop drawings to Architect for review prior to fabrication.
12. Paint all partitions, perimeter, bulkheads finished to be three coats minimum prepared according to manufacturer's recommendations.
13. Refer to Mechanical/ Electrical drawings for exact Mechanical/ Electrical information and for Mechanical and Electrical General Notes & Specifications.

N

Green Sage MB, LLC
1137 Bannock Street
Denver, CO 80204
(303)435-0064

SECOND FLOOR RCP
NORTH
NEW TENANT IMPROVEMENT
5601 SAN LEANDRO ST
SUITE 200
OAKLAND, CA 94621
GROW BUILDERS
DISTINCTIVE DEVELOPMENT, LLC
PERKINS, WILLIAMS & COTTERILL
A·R·C·H·I·T·E·C·T·S
ISSUE TYPE
REVISIONS
A2.2.1

NEW TENANT IMPROVEMENT
5601 SAN LEANDRO ST
SUITE 200
OAKLAND, CA 94621

A2.2













ENLARGED FLOOR PLAN
NORTH
LEGEND
KEYNOTES
APPROVED FOR CONSTRUCTION
BY CODA SIGNATURE
ON 6/21/18
NEW TENANT IMPROVEMENT
5601 SAN LEANDRO ST
PHASE 3
OAKLAND, CA 94621
DISTINCTIVE DEVELOPMENT, LLC
PERKINS, WILLIAMS & COTTERILL
ARCHITECTS
REVISIONS
ISSUE TYPE
A2.1

5601 A, LLC
5601 B, LLC
SECOND FLOOR PLAN
NORTH
EXIT
EXIT ROUTE
EXIT SIGNAGE
LEGEND
SIGN & IDENTIFICATION REQUIREMENTS
NEW TENANT IMPROVEMENT
5601 SAN LEANDRO ST
PHASE 2
OAKLAND, CA 94621
GROW BUILDERS
DISTINCTIVE DEVELOPMENT, LLC
PERKINS, WILLIAMS & COTTERILL
A·R·C·H·I·T·E·C·T·S
A2.2

# EXHIBIT B

## GUARANTY

THIS GUARANTY (this "**Guaranty**") is made as of August 21, 2019, by **BRUCE DOUGLAS MILLER**, an individual ("**Guarantor**"), for the benefit of **ROMSPEN CALIFORNIA MORTGAGE LIMITED PARTNERSHIP**, an Ontario limited partnership ("**Lender**").

### RECITALS

The following recitals are a material part of this Agreement.

A.     Pursuant to the terms of a Loan Agreement dated of even date herewith between **OAKLAND CANNERY REAL ESTATE, LLC**, a California limited liability company, **5733 SLOCA PARTNERSHIP**, a California general partnership, and **5601 SLOCA, LLC**, a California limited liability company (individually and collectively, jointly and severally, "**Borrower**"), and Lender (as the same may be modified, amended or restated from time to time, the "**Loan Agreement**"), Lender is making a loan to Borrower in the maximum principal amount of Fifty-Four Million Four Hundred Sixty-Five Thousand and No/100 Dollars ($54,465,000.00) (the "**Loan**") for the purposes specified in the Loan Agreement, said purposes relating to the real property and improvements described in the Loan Agreement (which real property and improvements are collectively referred to herein as the "**Property**"). Each capitalized term used herein and not otherwise defined herein shall have the meaning given to such term in the Loan Agreement.

B.     The Loan Agreement provides that the Loan shall be evidenced by the Note and shall be secured by the Security Instrument and by other security instruments, if any, specified in the Loan Agreement.

C.     Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined).

D.     Guarantor is a direct or indirect owner of Borrower and will derive substantial direct and indirect benefits from the Loan and the transactions contemplated by the Loan Agreement, and the making of this Guaranty and such benefits are at least equal to the obligations incurred under this Guaranty.

### AGREEMENT

NOW, THEREFORE, to induce Lender to enter into the Loan Agreement and make the Loan, and in consideration thereof and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor unconditionally, absolutely and irrevocably guarantees and agrees as follows:

1.     Guaranty. Guarantor absolutely, unconditionally, and irrevocably guarantees to Lender, as primary obligor and not merely as surety, the due, prompt, and full payment and performance of all liabilities, obligations, or undertakings owing by Borrower to Lender of any kind or description arising out of or outstanding under, advanced or issued pursuant to, or evidenced by the Loan Agreement or the other Loan Documents or in any other agreement between Borrower and Lender, irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, voluntary or involuntary, whether now existing or hereafter arising, and including all interest (including interest that accrues after the filing of a case under the Bankruptcy Code) and any and all costs, fees (including attorneys' fees), and expenses which Borrower is required to pay pursuant to any of the

foregoing, by law, or otherwise (collectively, the "**Guaranteed Obligations**"). Guarantor unconditionally agrees to pay to Lender the full amount of the Guaranteed Obligations. Guarantor further agrees that all or part of the Guaranteed Obligations may be increased, extended, substituted, amended, renewed or otherwise modified without notice to or consent from Guarantor and such actions shall not affect the liability of Guarantor hereunder. Without limiting the generality of the foregoing, Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Person to Lender under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Person. If there shall be more than one guarantor with respect to any of the Guaranteed Obligations, then the obligations of each such guarantor (including Guarantor) shall be joint and several.

2.      Remedies. If Guarantor fails to promptly perform its obligations under this Guaranty, Lender may from time to time, and without first requiring performance by Borrower or exhausting any or all security for the Loan, bring any action at law or in equity or both to compel Guarantor to perform its obligations hereunder, and to collect in any such action compensation for all loss, cost, damage, injury and expense sustained or incurred by Lender as a direct or indirect consequence of the failure of Guarantor to perform its obligations together with interest thereon at the rate of interest applicable to the principal balance of the Note.

3.      Rights of Lender. Lender may at any time, without the consent of or notice to Guarantor, without incurring responsibility to Guarantor and without impairing, releasing, reducing or affecting the obligations of Guarantor hereunder: (a) change the manner, place or terms of payment of all or any part of the Guaranteed Obligations, or renew, extend, modify, rearrange or alter all or any part of the Guaranteed Obligations; (b) change the interest rate accruing on any of the Guaranteed Obligations (including, without limitation, any periodic change in such interest rate that occurs because such Guaranteed Obligations accrue interest at a variable rate which may fluctuate from time to time); (c) declare all sums owing to Lender under the Note and the other Loan Documents due and payable upon the occurrence of a Default or Event of Default under the Loan Documents; (d) amend, restate, or otherwise modify the terms of any Loan Document; (e) sell, exchange, release, surrender, subordinate, realize upon or otherwise deal with in any manner and in any order any collateral for all or any part of the Guaranteed Obligations; (f) neglect, delay, omit, fail or refuse to take or prosecute any action for the collection of all or any part of the Guaranteed Obligations or this Guaranty or to take or prosecute any action in connection with any of the Loan Documents; (g) exercise or refrain from exercising any rights against Borrower or others, or otherwise act or refrain from acting; (h) release, substitute or add any one or more endorsers of the Note or guarantors of Borrower's obligations under the Note or the other Loan Documents; (i) settle or compromise all or any part of the Guaranteed Obligations and subordinate the payment of all or any part of the Guaranteed Obligations to the payment of any obligations, indebtedness or liabilities which may be due or become due to Lender or others; (j) apply any deposit balance, fund, payment, collections through process of law or otherwise or other collateral of Borrower to the satisfaction and liquidation of the Guaranteed Obligations; (k) apply any sums paid to Lender by Guarantor, Borrower or others to the Guaranteed Obligations in such order and manner as Lender, in its sole discretion, may determine; (l) assign this Guaranty in whole or in part in accordance with an assignment of the Loan; and (m) assign, transfer or negotiate all or any part of the Guaranteed Obligations.

4.      Guarantor's Waivers.

(a)      Regardless of whether Guarantor may have made any payments to Lender, Guarantor hereby waives: (i) all rights of subrogation, indemnification, contribution, and any other rights to collect reimbursement from Borrower or any other party for any sums paid to Lender, whether

contractual or arising by operation of law (including, without limitation, under any provisions of the Bankruptcy Code, or any successor or similar statutes) or otherwise, (ii) all rights to enforce any remedy that Lender may have against Borrower, and (iii) all rights to participate in any security now or later to be held by Lender for the Loan.  Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification, and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement, indemnification, and contribution Guarantor may have against Borrower or against any collateral or security, shall be junior and subordinate to any rights Lender may have against Borrower, and to all right, title and interest Lender may have in any such collateral or security.

(b)    Guarantor understands and acknowledges that if Lender forecloses judicially or nonjudicially against any real property security for the Loan, that foreclosure could impair or destroy any ability that Guarantor may have to seek reimbursement, contribution, or indemnification from Borrower or others based on any right Guarantor may have of subrogation, reimbursement, contribution or indemnification for any amounts paid by Guarantor under this Guaranty.  By executing this Guaranty, Guarantor freely, irrevocably, and unconditionally: (i) waives and relinquishes that defense and agrees that Guarantor shall be fully liable under this Guaranty even though Lender may foreclose judicially or nonjudicially against any real property security for the Loan; (ii) acknowledges and agrees that the rights and defenses waived by Guarantor under this Guaranty include any right or defense that Guarantor may have or be entitled to assert based upon or arising out of any one-action, anti-deficiency, reimbursement, or other borrower or guarantor protective statute (including, without limitation, any defense that any exercise by Lender of any right or remedy hereunder or under the Loan Documents violates, or would, in combination with the previous or subsequent exercise by Guarantor of any rights of subrogation, reimbursement, contribution, or indemnification against Borrower or any other person, directly or indirectly result in, or be deemed to be, a violation of any of such statutory provisions); and (iii) acknowledges and agrees that Lender is relying on this waiver in making the Loan, and that this waiver is a material part of the consideration which Lender is receiving for making the Loan.

(c)    Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, may destroy Guarantor's rights of subrogation and reimbursement against Borrower.

(d)    Guarantor waives any rights and defenses that are or may become available to Guarantor by reason of any statute governing guaranties or suretyship.

(e)    Guarantor waives all rights and defenses that Guarantor may have because the Loan is secured by real property.  This means, among other things:

(i)    Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower.

(ii)    If Lender forecloses on any real property collateral pledged by Borrower:

(A)    The amount of the Loan may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(B)    Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

(f)      This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the Loan is secured by real property.

(g)      Guarantor waives any right or defense it may have at law or equity, which may provide, among other things: that a creditor must file a complaint for deficiency within a specified period of time after a nonjudicial foreclosure sale or judicial foreclosure sale, as applicable; that a fair market value hearing must be held; and that the amount of the deficiency judgment shall be limited to the amount by which the unpaid debt exceeds the fair market value of the security, but not more than the amount by which the unpaid debt exceeds the sale price of the security.

(h)      Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all presently existing and future Guaranteed Obligations.

(i)      Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, intention to accelerate, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that Lender protect, secure, perfect or insure any Lien or any property subject thereto.

(j)      Guarantor hereby unconditionally and irrevocably waives any defense based on any right of set-off or recoupment or counterclaim against or in respect of the Guaranteed Obligations.

(k)      No provision or waiver in this Guaranty shall be construed as limiting the generality of any other provision or waiver contained in this Guaranty.

(l)      Guarantor agrees that the payment or performance of any act which tolls any statute of limitations applicable to any Loan Document shall similarly operate to toll the statute of limitations applicable to Guarantor's liability hereunder.

5.      Guarantor's Warranties.  Guarantor warrants and acknowledges that: (a) Lender would not make the Loan but for this Guaranty; (b) there are no conditions precedent to the effectiveness of this Guaranty; (c) Guarantor has established adequate means of obtaining from sources other than Lender, on a continuing basis, financial and other information pertaining to Borrower's financial condition, the Property and Borrower's activities relating thereto and the status of Borrower's performance of obligations under the Loan Documents, and Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks hereunder and Lender has made no representation to Guarantor as to any such matters; (d) the most recent financial statements of Guarantor previously delivered to Lender are true and correct in all respects, have been prepared in accordance with generally accepted accounting principles consistently applied (or other principles acceptable to Lender) and fairly present the financial condition of Guarantor as of the respective dates thereof, and no material adverse change has occurred in the financial condition of Guarantor since the respective dates thereof; and (e) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein, other than in the ordinary course of Guarantor's business.  Notwithstanding the foregoing, the calculation of Guarantor's liabilities shall NOT include any fair value adjustments to the carrying value of liabilities to record such liabilities at fair value pursuant to electing the fair value option election under FASB ASC 825-10-25 (formerly known as FAS 159, The Fair Value Option for Financial Assets and Financial Liabilities) or other FASB standards allowing entities to elect fair value option for financial liabilities.  Therefore, the amount of liabilities shall be the historical cost basis, which generally is the contractual amount owed adjusted for

amortization or accretion of any premium or discount. Guarantor acknowledges and agrees that Lender may request and obtain additional information from third parties regarding any of the above, including, without limitation, credit reports.

6.      Subordination.   Guarantor subordinates all present and future indebtedness owing by Borrower to Guarantor to the obligations at any time owing by Borrower to Lender under the Note and the other Loan Documents.   Guarantor assigns all such indebtedness to Lender, as security for this Guaranty, the Note and the other Loan Documents.   Guarantor agrees to make no claim for such indebtedness until all obligations of Borrower under the Note and the other Loan Documents have been fully and indefeasibly discharged.   Guarantor further agrees not to assign all or any part of such indebtedness unless Lender is given prior notice and such assignment is expressly made subject to the terms of this Guaranty.  If Lender so requests, (a) all instruments evidencing such indebtedness shall be duly endorsed and delivered to Lender, (b) all security for such indebtedness shall be duly assigned and delivered to Lender, (c) such indebtedness shall be enforced, collected and held by Guarantor as trustee for Lender and shall be paid over to Lender on account of the Loan but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty, and (d) Guarantor shall execute, file and record such documents and instruments and take such other action as Lender deems reasonably necessary or appropriate to perfect, preserve and enforce Lender's rights in and to such indebtedness and any security therefor. If Guarantor fails to take any such action, Lender, as attorney-in-fact for Guarantor, is hereby authorized to do so in the name of Guarantor.  The foregoing power of attorney is coupled with an interest and cannot be revoked.  The foregoing shall not be interpreted to require Guarantor to take any action that would increase the scope of its liability to Lender or under the Loan beyond that which is contemplated hereunder.

7.      Bankruptcy of Borrower.  In any bankruptcy or other proceeding in which the filing of claims is required by law, Guarantor shall file all claims which Guarantor may have against Borrower relating to any indebtedness of Borrower to Guarantor and shall assign to Lender all rights of Guarantor thereunder. If Guarantor does not file any such claim, Lender, as attorney-in-fact for Guarantor, is hereby authorized to do so in the name of Guarantor or, in Lender's discretion, to assign the claim to a nominee and to cause proof of claim to be filed in the name of Lender's nominee.  The foregoing power of attorney is coupled with an interest and cannot be revoked.  Lender or its nominee shall have the right, in its reasonable discretion, to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do.  In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Lender the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Lender all of Guarantor's rights to any such payments or distributions; provided, however, Guarantor's obligations hereunder shall not be satisfied except to the extent that Lender receives cash by reason of any such payment or distribution.  If Lender receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty.  The liability of Guarantor hereunder shall be reinstated and revised, and the rights of Lender shall continue, with respect to any amount at any time paid by Borrower on account of the Note or the other Loan Documents which Lender shall be required to restore or return upon the bankruptcy, insolvency or reorganization of Borrower or for any other reasons, all as though such amount had not been paid.  If all or any portion of the obligations guaranteed hereunder are paid or performed, the obligations of Guarantor hereunder shall continue and shall remain in full force and effect in the event that all or any part of such payment or performance is avoided or recovered directly or indirectly from Lender as a preference, fraudulent transfer or otherwise under the Bankruptcy Code or other similar laws, irrespective of (a) any notice of revocation given by Guarantor prior to such avoidance or recovery, or (b) full payment and performance of all of the indebtedness and obligations evidenced and secured by the Loan Documents.

8.     <u>Loan Sales and Participations; Disclosure of Information</u>.  Guarantor agrees that Lender may elect, at any time, to sell, assign, or grant participations in all or any portion of its rights and obligations under the Loan Documents and this Guaranty in accordance with the terms of the Loan Agreement, and that any such sale, assignment or participation may be to one or more financial institutions, private investors, and/or other entities, at such Lender's sole discretion.  Guarantor further agrees that Lender may disseminate to any such actual or potential purchaser(s), assignee(s) or participant(s) all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to Lender with respect to: (a) the Property and its operation; (b) any party connected with the Loan (including, without limitation, Guarantor, Borrower, any partner, joint venturer or member of Borrower, any constituent partner, joint venturer or member of Borrower, any other guarantor and any non-borrower trustor); and/or (c) any lending relationship other than the Loan which Lender may have with any party connected with the Loan.  In the event of any such sale, assignment or participation, Lender and the parties to such transaction shall share in the rights and obligations of Lender as set forth in the Loan Documents only as and to the extent they agree among themselves.  In connection with any such sale, assignment or participation, Guarantor further agrees that the Guaranty shall be sufficient evidence of the obligations of Guarantor to each purchaser, assignee, or participant, and upon written request by Lender, Guarantor shall within ten (10) days after such request by Lender, (x) deliver to Lender and any other party designated by Lender an estoppel certificate, in form and substance acceptable to Lender verifying for the benefit of Lender and any such other party the status, terms and provisions of this Guaranty and (y) enter into such amendments or modifications to this Guaranty and the Loan Documents as Lender may reasonably request in order to evidence and facilitate any such sale, assignment, or participation without impairing Guarantor's rights or increasing Guarantor's obligations hereunder.

Anything in this Guaranty to the contrary notwithstanding, and without the need to comply with any of the formal or procedural requirements of this Guaranty, including this <u>Section 8</u>, Lender may at any time and from time to time pledge and assign all or any portion of its rights under all or any of the Loan Documents; <u>provided</u> that no such pledge or assignment shall release Lender from its obligations thereunder.

9.     <u>Additional, Independent, and Absolute Obligations</u>.  This Guaranty is a continuing guaranty of payment and not of collection and cannot be revoked by Guarantor and shall continue to be effective with respect to any indebtedness referenced in <u>Section 1</u> hereof arising or created after any attempted revocation hereof or after the death of Guarantor (if Guarantor is a natural person, in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The obligations of Guarantor hereunder shall be in addition to and shall not limit or in any way affect the obligations of Guarantor under any other existing or future guaranties unless said other guaranties are expressly modified or revoked in writing. This Guaranty is independent of the obligations of Borrower under the Note, the Security Instrument, and the other Loan Documents.  Lender may bring a separate action to enforce the provisions hereof against Guarantor without taking action against Borrower or any other party or joining Borrower or any other party as a party to such action.  The liability of Guarantor hereunder is irrevocable, continuing, absolute and unconditional and the obligations of Guarantor hereunder, shall not be discharged or impaired or otherwise effected by, and Guarantor hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

(a)     any illegality or lack of validity or enforceability of any Guaranteed Obligation or any Loan Document or any related agreement or instrument;

(b)     any change in the time, place or manner of payment of, or in any other term of, the Guaranteed Obligations or any other obligation of any Borrower Party under any Loan Document, or any rescission, waiver, amendment or other modification of any Loan Document or any other agreement,

including any increase in the Guaranteed Obligations resulting from any extension of additional credit or otherwise;

(c)    any taking, exchange, substitution, release, impairment or non-perfection of any collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for the Guaranteed Obligations;

(d)    any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the Guaranteed Obligations;

(e)    any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations;

(f)    any change, restructuring or termination of the corporate, company, partnership, or other entity structure, ownership or existence of Borrower or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Borrower or its assets or any resulting release or discharge of any Guaranteed Obligation;

(g)    any failure of Lender to disclose to Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of Borrower or any other guarantor now or hereafter known to Lender, the Guarantor waiving any duty of Lender to disclose such information;

(h)    the failure of any other Person to execute or deliver any other guaranty or agreement or the release or reduction of liability of any other guarantor or surety with respect to the Guaranteed Obligations;

(i)    the failure of Lender to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Loan Document or otherwise;

(j)    any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, Borrower against Lender; or

(k)    any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loan or any existence of or reliance on any representation by Lender that might vary the risk of Guarantor or otherwise operate as a defense available to, or a legal or equitable discharge of, Borrower or any other guarantor or surety.

10.    <u>Attorneys' Fees; Enforcement</u>.  If any attorney is engaged by Lender to enforce or defend any provision of this Guaranty, or any of the other Loan Documents, or as a consequence of any Default under the Loan Documents, with or without the filing of any legal action or proceeding, Guarantor shall pay to Lender, within thirty (30) days after written demand from Lender all attorneys' fees and costs incurred by Lender in connection therewith, together with interest thereon from the date of such demand until paid at the rate of interest applicable to the principal balance of the Note as specified therein.  This provision is separate and several, and shall survive the merger of this provision into any judgment.

11.    <u>Rules of Construction</u>.  The word "Borrower" as used herein shall include both the named Borrower and any other person at any time assuming or otherwise becoming primarily liable for all or any part of the obligations of the named Borrower under the Notes and the other Loan Documents. Section and subsection headings in this Guaranty are included in this Guaranty for convenience of reference only and shall not constitute a part of this Guaranty or be given any substantive effect.  Unless

the context of this Guaranty clearly requires otherwise, references to the plural include the singular and to the singular include the plural, the part includes the whole, the term "including" is not limiting (and means, including without limitation), and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and other similar terms in this Guaranty refer to this Guaranty as a whole and not exclusively to any particular provision of this Guaranty. Article, section, subsection, exhibit, and schedule references are to this Guaranty unless otherwise specified. All of the exhibits or schedules attached to this Guaranty shall be deemed incorporated in this Guaranty by reference. Any reference to any of the following documents includes any and all alterations, amendments, restatements, extensions, modifications, renewals, or supplements thereto or thereof, as applicable: this Guaranty or any of the other Loan Documents. No inference in favor of, or against, any party shall be drawn from the fact that such party has drafted any portion of this Guaranty, each party having been represented by counsel of its choice in connection with the negotiation and preparation of this Guaranty and the other Loan Documents.

12.  <u>Credit Reports</u>.  Guarantor hereby authorizes Lender to order and obtain, from a credit reporting agency of Lender's choice, third party credit reports on Guarantor.

13.  <u>Governing Law; Venue</u>.  This Guaranty shall be governed, construed, applied and enforced in accordance with the laws of the State of California without regard to the conflicts of law provisions thereof ("**Governing State**"). Guarantor hereby consents to personal jurisdiction in the Governing State. JURISDICTION AND VENUE OF ANY ACTION BROUGHT TO ENFORCE THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY ACTION RELATING TO THE LOAN OR THE RELATIONSHIPS CREATED BY OR UNDER THE LOAN DOCUMENTS ("**ACTION**") SHALL, AT THE ELECTION OF LENDER, BE IN (AND IF ANY ACTION IS ORIGINALLY BROUGHT IN ANOTHER VENUE, THE ACTION SHALL AT THE ELECTION OF LENDER BE TRANSFERRED TO) A STATE OR FEDERAL COURT OF APPROPRIATE JURISDICTION LOCATED IN THE GOVERNING STATE. GUARANTOR HEREBY CONSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF THE STATE COURTS OF THE GOVERNING STATE AND OF FEDERAL COURTS LOCATED IN THE GOVERNING STATE IN CONNECTION WITH ANY ACTION AND HEREBY WAIVES ANY AND ALL PERSONAL RIGHTS UNDER THE LAWS OF ANY OTHER STATE TO OBJECT TO JURISDICTION WITHIN SUCH GOVERNING STATE FOR PURPOSES OF ANY ACTION. Guarantor hereby waives and agrees not to assert, as a defense to any Action or a motion to transfer venue of any Action, (i) any claim that it is not subject to such jurisdiction, (ii) any claim that any Action may not be brought against it or is not maintainable in those courts or that this Agreement may not be enforced in or by those courts, or that it is exempt or immune from execution, (iii) that the Action is brought in an inconvenient forum, or (iv) that the venue for the Action is in any way improper.

14.  <u>Waiver of Jury Trial</u>.  **GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH RIGHT TO TRIAL BY JURY WOULD OTHERWISE ACCRUE. GUARANTOR AND LENDER EACH ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY EACH OTHER.**

NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, GUARANTOR HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1 ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE (PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO JUDICIAL REFERENCE SHALL BE APPLICABLE WITH RESPECT TO ANY ACTION IN RESPECT OF THE FORECLOSURE (OR SALE BY POWER OF SALE) OF THE SECURITY INSTRUMENT). PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 AND 640 TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER. GUARANTOR HEREBY AGREES THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARMS-LENGTH BASIS, WITH GUARANTOR AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE ITS LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN.

_____
Guarantor's Initials

15. Waiver of Special Damages. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, GUARANTOR AGREES THAT NONE OF LENDER, OR ITS AGENTS OR EMPLOYEES SHALL BE LIABLE TO GUARANTOR FOR ANY MONETARY DAMAGES (INCLUDING ANY SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR ANY OTHER LEGAL OR EQUITABLE PRINCIPLE AND GUARANTOR'S SOLE REMEDIES SHALL BE LIMITED TO COMMENCING AN ACTION FOR SPECIFIC PERFORMANCE.

16. Miscellaneous. The provisions of this Guaranty will bind and benefit the heirs, executors, administrators, legal representatives, nominees, successors and assigns of Guarantor and Lender. If any provision of this Guaranty shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that portion shall be deemed severed from this Guaranty and the remaining parts shall remain in full force as though the invalid, illegal or unenforceable portion had never been part of this Guaranty. Time is of the essence with respect to each provision of this Guaranty. The recitals to this Guaranty are hereby incorporated by this reference.

17. Additional Provisions. Such additional terms, covenants and conditions as may be set forth on any exhibit executed by Guarantor and attached hereto, if any, which recites that it is an exhibit to this Guaranty are incorporated herein by this reference.

18.     Enforceability.  Guarantor hereby acknowledges that: (a) the obligations undertaken by Guarantor in this Guaranty are complex in nature, (b) numerous possible defenses to the enforceability of these obligations may presently exist and/or may arise hereafter, (c) as part of Lender's consideration for entering into this transaction, Lender has specifically bargained for the waiver and relinquishment by Guarantor of all such defenses, and (d) Guarantor has had the opportunity to seek and receive legal advice from skilled legal counsel in the area of financial transactions of the type contemplated herein.  Given all of the above, Guarantor does hereby represent and confirm to Lender that Guarantor is fully informed regarding, and that Guarantor does thoroughly understand: (i) the nature of all such possible defenses, (ii) the circumstances under which such defenses may arise, (iii) the benefits which such defenses might confer upon Guarantor, and (iv) the legal consequences to Guarantor of waiving such defenses.  Guarantor acknowledges that Guarantor makes this Guaranty with the intent that this Guaranty and all of the informed waivers herein shall each and all be fully enforceable by Lender, and that Lender is induced to enter into this transaction in material reliance upon the presumed full enforceability thereof.

19.     Counterparts.  For the purpose of facilitating the execution of this Guaranty and for other purposes, this Guaranty may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.  A signature of a party by facsimile or other electronic transmission (including a .pdf copy sent by e-mail) shall be deemed to constitute an original and fully effective signature of such party.

20.     Notices.  All notices, consents, approvals and requests required or permitted hereunder shall be given in writing (including by facsimile) and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (c) by facsimile (with a copy sent contemporaneously by certified or registered United States mail, postage prepaid) answer back acknowledged, addressed as follows:

| | |
|---|---|
| If to Guarantor: | Bruce Douglas Miller<br>125 S. King St., Suite 2A<br>Jackson, Wyoming 83001<br>Telephone: (720) 612-7739<br>Email: bruce@greensagemb.com |
| If to Lender: | Romspen California Mortgage Limited Partnership<br>162 Cumberland Street, Suite 300<br>Toronto, Ontario M5R 3N5<br>Telephone: (416) 928-4870<br>Facsimile: (416) 966-1161<br>Email: JoelMickelson@romspen.com<br>BlakeCassidy@romspen.com |
| with a copy to: | Foley Gardere<br>2021 McKinney Avenue, Suite 1600<br>Dallas, Texas 75201<br>Attention:  Clifton M. Dugas, II<br>Telephone: (214) 999-4004<br>Email: cdugas@foley.com |

or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section.  A notice shall be deemed to have been given:  in the case of hand delivery, at the time of delivery; in the

case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day, in the case of facsimile, upon completion of transmission (which is confirmed by telephone or by a statement generated by the transmitting machine) with receipt acknowledged by the recipient thereof.

21.     **Principles of Construction.**  To the extent any of the provisions of this Section 21 conflict with any of the other provisions of this Guaranty, the terms and provisions of this Section 21 shall control.  Notwithstanding the foregoing, nothing in this Section 21 shall be deemed to contradict or supersede the terms and provisions of Section 13 hereof with respect to the governing law applicable to this Guaranty.

(a)     **Waiver.**  Guarantor expressly waives any and all suretyship defenses that may be available to Guarantor.  Without limiting the generality of the foregoing, Guarantor makes the following additional waivers and covenants:  Guarantor agrees that its obligations under this Guaranty shall not be subject to any counterclaims, offsets or defenses against Lender or against Borrower of any kind which may arise in the future.  Guarantor agrees that nothing contained herein shall prevent Lender from foreclosing on the lien of the Security Instrument, or from exercising any rights available to Lender thereunder, and that the exercise of any of the aforesaid rights shall not constitute a legal or equitable discharge of Guarantor.  Guarantor agrees that it hereby knowingly waives any defense which may arise in the future to enforcement of this Guaranty under California Code of Civil Procedure Sections 580b, 580d, 580a and 726 (or any other statute limiting a Lender's right to a deficiency) based on Lender's election to conduct a private, non-judicial foreclosure sale following a default by Borrower even though such an election destroyed, diminished or otherwise affected Guarantor's rights of subrogation against Borrower or other trustor under a deed of trust or the right of contribution, reimbursement or indemnity from any party, with the result that Guarantor's liability under this Guaranty became nonreimbursable in whole or in part.  Nevertheless, Guarantor hereby authorizes and empowers Lender to exercise, in its sole discretion, any rights and remedies, or any combination thereof, which may then be available, since it is the intent and purpose of Guarantor that the obligations hereunder shall be absolute, independent and unconditional under any and all circumstances.  Without limiting the generality of the foregoing, Guarantor hereby expressly waives any and all benefits under California Civil Code Sections 2809, 2810, 2815, 2819, 2822, 2839, 2845, 2846, 2847, 2848, 2849, 2850, 2899 and 3433 and California Code of Civil Procedure Sections 580b, 580a, 580d and 726.  Notwithstanding any foreclosure of the lien of the Security Instrument or security agreement with respect to any or all of any real or personal property secured thereby, whether by the exercise of the power of sale contained therein, by an action for judicial foreclosure or by an acceptance of a deed in lieu of foreclosure, Guarantor shall remain bound under this Guaranty.  Guarantor further waives any right to cause a fair value hearing to be conducted under Code of Civil Procedure Section 580a, or any other provision of law respecting the amount of any deficiency following a non-judicial foreclosure, and agrees that Guarantor's liability hereunder shall not be limited to the excess of the Guaranteed Obligations over the fair or market value of any real property which secured the indebtedness of Borrower.  Nothing shall discharge or satisfy the liability of Guarantor hereunder except the full performance and payment of the Guaranteed Obligations of Borrower with interest.

22.     **Additional Waivers.**  In addition to and not in limitation of the other waivers agreed to and made by Guarantor set forth in this Guaranty, and pursuant to the provisions of Section 2856 of the California Civil Code, Guarantor acknowledges and understands that if Lender forecloses judicially or nonjudicially against any real property security for the Note, that foreclosure could impair or destroy any ability that Guarantor may have to seek reimbursement, contribution or indemnification from Borrower or others based on any right Guarantor may have of subrogation, reimbursement, contribution or indemnification for any amounts paid by Guarantor under this Guaranty.  Guarantor further understands and acknowledges that in the absence of this provision, the potential impairment or destruction of Guarantor's rights, if any, may entitle Guarantor to assert a defense to this Guaranty based on California

Code of Civil Procedure Section 580d as interpreted in Union Bank vs. Gradsky, to the extent applicable. By executing this Guaranty, Guarantor freely, irrevocably and unconditionally: (a) waives and relinquishes that defense, and agrees that Guarantor will be fully liable under this Guaranty, even though Lender may foreclose judicially or nonjudicially against any real property security for the Note; (b) agrees that Guarantor will not assert that defense in any action or proceeding that Lender may commence to enforce this Guaranty; (c) acknowledges and agrees that the rights and defenses waived by Guarantor under this Guaranty include any right or defense that Guarantor may have or be entitled to assert based upon or arising out of any one or more of the following: (i) California Code of Civil Procedure Sections 580a (which if Guarantor had not given this waiver, would otherwise limit Guarantor's liability after any nonjudicial foreclosure sale to the difference between the obligations for which Guarantor is liable and the fair market value of the property or interests sold at such nonjudicial foreclosure sale rather than the actual proceeds of such sale), 580b and 580d (which if Guarantor had not given this waiver, would otherwise limit Lender's right to recover a deficiency judgment with respect to purchase money obligations and after any nonjudicial foreclosure sale, respectively), or 726 (which, if Guarantor had not given this waiver, among other things, would otherwise require Lender to exhaust all of its security before a personal judgment may be obtained for a deficiency); or (ii) California Civil Code Section 2848; and (d) acknowledges and agrees that Lender is relying on this waiver in making the Loan, and that this waiver is a material part of the consideration that Lender is receiving for making the Loan.  In addition, and without limiting the foregoing, GUARANTOR WAIVES ALL RIGHTS AND DEFENSES THAT GUARANTOR MAY HAVE BECAUSE BORROWER'S DEBT IS SECURED BY REAL PROPERTY. THIS MEANS, AMONG OTHER THINGS:

> (i) LENDER MAY COLLECT FROM GUARANTOR WITHOUT FIRST FORECLOSING ON ANY REAL OR PERSONAL PROPERTY COLLATERAL PLEDGED BY BORROWER.

> (ii) IF THE CREDITOR FORECLOSES ON ANY REAL PROPERTY COLLATERAL PLEDGED BY BORROWER:

>> (A) THE AMOUNT OF THE DEBT MAY BE REDUCED ONLY BY THE PRICE FOR WHICH THAT COLLATERAL IS SOLD AT THE FORECLOSURE SALE, EVEN IF THE COLLATERAL IS WORTH MORE THAN THE SALE PRICE.

>> (B) LENDER MAY COLLECT FROM GUARANTOR EVEN IF LENDER, BY FORECLOSING ON THE REAL PROPERTY COLLATERAL, HAS DESTROYED ANY RIGHT GUARANTOR MAY HAVE TO COLLECT FROM BORROWER.

THIS IS AN UNCONDITIONAL AND IRREVOCABLE WAIVER OF ANY RIGHTS AND DEFENSES GUARANTOR MAY HAVE BECAUSE BORROWER'S DEBT IS SECURED BY REAL PROPERTY.  THESE RIGHTS AND DEFENSES INCLUDE, BUT ARE NOT LIMITED TO, ANY RIGHTS OR DEFENSES BASED UPON CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580d, or 726.

*[Separate Signature Page Follows]*

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the date appearing on the first page of this Guaranty.

GUARANTOR: 

**BRUCE DOUGLAS MILLER**, an individual

## ACKNOWLEDGEMENT

STATE OF Montana     §
             §
COUNTY OF Gallatin    §

This instrument was acknowledged before me this 12th day of August, 2019, by Bruce Douglas Miller, an individual.

[SEAL]

KRISTEN JOHNSON
NOTARY PUBLIC for the
State of Montana
Residing at Bozeman, Montana
My Commission Expires
October 11, 2021

_____
Notary Public

# EXHIBIT C

## GUARANTY

THIS GUARANTY (this "**Guaranty**") is made as of August 21, 2019, by **PATRICK JOHN KOENTGES**, an individual ("**Guarantor**"), for the benefit of **ROMSPEN CALIFORNIA MORTGAGE LIMITED PARTNERSHIP**, an Ontario limited partnership ("**Lender**").

### RECITALS

The following recitals are a material part of this Agreement.

A.     Pursuant to the terms of a Loan Agreement dated of even date herewith between **OAKLAND CANNERY REAL ESTATE, LLC**, a California limited liability company, **5733 SLOCA PARTNERSHIP**, a California general partnership, and **5601 SLOCA, LLC**, a California limited liability company (individually and collectively, jointly and severally, "**Borrower**"), and Lender (as the same may be modified, amended or restated from time to time, the "**Loan Agreement**"), Lender is making a loan to Borrower in the maximum principal amount of Fifty-Four Million Four Hundred Sixty-Five Thousand and No/100 Dollars ($54,465,000.00) (the "**Loan**") for the purposes specified in the Loan Agreement, said purposes relating to the real property and improvements described in the Loan Agreement (which real property and improvements are collectively referred to herein as the "**Property**"). Each capitalized term used herein and not otherwise defined herein shall have the meaning given to such term in the Loan Agreement.

B.     The Loan Agreement provides that the Loan shall be evidenced by the Note and shall be secured by the Security Instrument and by other security instruments, if any, specified in the Loan Agreement.

C.     Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined).

D.     Guarantor is a direct or indirect owner of Borrower and will derive substantial direct and indirect benefits from the Loan and the transactions contemplated by the Loan Agreement, and the making of this Guaranty and such benefits are at least equal to the obligations incurred under this Guaranty.

### AGREEMENT

NOW, THEREFORE, to induce Lender to enter into the Loan Agreement and make the Loan, and in consideration thereof and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor unconditionally, absolutely and irrevocably guarantees and agrees as follows:

1.     Guaranty. Guarantor absolutely, unconditionally, and irrevocably guarantees to Lender, as primary obligor and not merely as surety, the due, prompt, and full payment and performance of all liabilities, obligations, or undertakings owing by Borrower to Lender of any kind or description arising out of or outstanding under, advanced or issued pursuant to, or evidenced by the Loan Agreement or the other Loan Documents or in any other agreement between Borrower and Lender, irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, voluntary or involuntary, whether now existing or hereafter arising, and including all interest (including interest that accrues after the filing of a case under the Bankruptcy Code) and any and all costs, fees (including attorneys' fees), and expenses which Borrower is required to pay pursuant to any of the

**Exhibit C Page - 1**

foregoing, by law, or otherwise (collectively, the "**Guaranteed Obligations**"). Guarantor unconditionally agrees to pay to Lender the full amount of the Guaranteed Obligations. Guarantor further agrees that all or part of the Guaranteed Obligations may be increased, extended, substituted, amended, renewed or otherwise modified without notice to or consent from Guarantor and such actions shall not affect the liability of Guarantor hereunder. Without limiting the generality of the foregoing, Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Person to Lender under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Person. If there shall be more than one guarantor with respect to any of the Guaranteed Obligations, then the obligations of each such guarantor (including Guarantor) shall be joint and several.

2.      Remedies.  If Guarantor fails to promptly perform its obligations under this Guaranty, Lender may from time to time, and without first requiring performance by Borrower or exhausting any or all security for the Loan, bring any action at law or in equity or both to compel Guarantor to perform its obligations hereunder, and to collect in any such action compensation for all loss, cost, damage, injury and expense sustained or incurred by Lender as a direct or indirect consequence of the failure of Guarantor to perform its obligations together with interest thereon at the rate of interest applicable to the principal balance of the Note.

3.      Rights of Lender.  Lender may at any time, without the consent of or notice to Guarantor, without incurring responsibility to Guarantor and without impairing, releasing, reducing or affecting the obligations of Guarantor hereunder:  (a) change the manner, place or terms of payment of all or any part of the Guaranteed Obligations, or renew, extend, modify, rearrange or alter all or any part of the Guaranteed Obligations; (b) change the interest rate accruing on any of the Guaranteed Obligations (including, without limitation, any periodic change in such interest rate that occurs because such Guaranteed Obligations accrue interest at a variable rate which may fluctuate from time to time); (c) declare all sums owing to Lender under the Note and the other Loan Documents due and payable upon the occurrence of a Default or Event of Default under the Loan Documents; (d) amend, restate, or otherwise modify the terms of any Loan Document; (e) sell, exchange, release, surrender, subordinate, realize upon or otherwise deal with in any manner and in any order any collateral for all or any part of the Guaranteed Obligations; (f) neglect, delay, omit, fail or refuse to take or prosecute any action for the collection of all or any part of the Guaranteed Obligations or this Guaranty or to take or prosecute any action in connection with any of the Loan Documents; (g) exercise or refrain from exercising any rights against Borrower or others, or otherwise act or refrain from acting; (h) release, substitute or add any one or more endorsers of the Note or guarantors of Borrower's obligations under the Note or the other Loan Documents; (i) settle or compromise all or any part of the Guaranteed Obligations and subordinate the payment of all or any part of the Guaranteed Obligations to the payment of any obligations, indebtedness or liabilities which may be due or become due to Lender or others; (j) apply any deposit balance, fund, payment, collections through process of law or otherwise or other collateral of Borrower to the satisfaction and liquidation of the Guaranteed Obligations; (k) apply any sums paid to Lender by Guarantor, Borrower or others to the Guaranteed Obligations in such order and manner as Lender, in its sole discretion, may determine; (l) assign this Guaranty in whole or in part in accordance with an assignment of the Loan; and (m) assign, transfer or negotiate all or any part of the Guaranteed Obligations.

4.      Guarantor's Waivers.

(a)      Regardless of whether Guarantor may have made any payments to Lender, Guarantor hereby waives: (i) all rights of subrogation, indemnification, contribution, and any other rights to collect reimbursement from Borrower or any other party for any sums paid to Lender, whether

contractual or arising by operation of law (including, without limitation, under any provisions of the Bankruptcy Code, or any successor or similar statutes) or otherwise, (ii) all rights to enforce any remedy that Lender may have against Borrower, and (iii) all rights to participate in any security now or later to be held by Lender for the Loan.  Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification, and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement, indemnification, and contribution Guarantor may have against Borrower or against any collateral or security, shall be junior and subordinate to any rights Lender may have against Borrower, and to all right, title and interest Lender may have in any such collateral or security.

(b)      Guarantor understands and acknowledges that if Lender forecloses judicially or nonjudicially against any real property security for the Loan, that foreclosure could impair or destroy any ability that Guarantor may have to seek reimbursement, contribution, or indemnification from Borrower or others based on any right Guarantor may have of subrogation, reimbursement, contribution or indemnification for any amounts paid by Guarantor under this Guaranty.  By executing this Guaranty, Guarantor freely, irrevocably, and unconditionally: (i) waives and relinquishes that defense and agrees that Guarantor shall be fully liable under this Guaranty even though Lender may foreclose judicially or nonjudicially against any real property security for the Loan; (ii) acknowledges and agrees that the rights and defenses waived by Guarantor under this Guaranty include any right or defense that Guarantor may have or be entitled to assert based upon or arising out of any one-action, anti-deficiency, reimbursement, or other borrower or guarantor protective statute (including, without limitation, any defense that any exercise by Lender of any right or remedy hereunder or under the Loan Documents violates, or would, in combination with the previous or subsequent exercise by Guarantor of any rights of subrogation, reimbursement, contribution, or indemnification against Borrower or any other person, directly or indirectly result in, or be deemed to be, a violation of any of such statutory provisions); and (iii) acknowledges and agrees that Lender is relying on this waiver in making the Loan, and that this waiver is a material part of the consideration which Lender is receiving for making the Loan.

(c)      Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, may destroy Guarantor's rights of subrogation and reimbursement against Borrower.

(d)      Guarantor waives any rights and defenses that are or may become available to Guarantor by reason of any statute governing guaranties or suretyship.

(e)      Guarantor waives all rights and defenses that Guarantor may have because the Loan is secured by real property.  This means, among other things:

(i)      Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower.

(ii)      If Lender forecloses on any real property collateral pledged by Borrower:

(A)      The amount of the Loan may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(B)      Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

(f)     This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the Loan is secured by real property.

(g)     Guarantor waives any right or defense it may have at law or equity, which may provide, among other things: that a creditor must file a complaint for deficiency within a specified period of time after a nonjudicial foreclosure sale or judicial foreclosure sale, as applicable; that a fair market value hearing must be held; and that the amount of the deficiency judgment shall be limited to the amount by which the unpaid debt exceeds the fair market value of the security, but not more than the amount by which the unpaid debt exceeds the sale price of the security.

(h)     Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all presently existing and future Guaranteed Obligations.

(i)     Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, intention to accelerate, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that Lender protect, secure, perfect or insure any Lien or any property subject thereto.

(j)     Guarantor hereby unconditionally and irrevocably waives any defense based on any right of set-off or recoupment or counterclaim against or in respect of the Guaranteed Obligations.

(k)     No provision or waiver in this Guaranty shall be construed as limiting the generality of any other provision or waiver contained in this Guaranty.

(l)     Guarantor agrees that the payment or performance of any act which tolls any statute of limitations applicable to any Loan Document shall similarly operate to toll the statute of limitations applicable to Guarantor's liability hereunder.

5.      Guarantor's Warranties.  Guarantor warrants and acknowledges that: (a) Lender would not make the Loan but for this Guaranty; (b) there are no conditions precedent to the effectiveness of this Guaranty; (c) Guarantor has established adequate means of obtaining from sources other than Lender, on a continuing basis, financial and other information pertaining to Borrower's financial condition, the Property and Borrower's activities relating thereto and the status of Borrower's performance of obligations under the Loan Documents, and Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks hereunder and Lender has made no representation to Guarantor as to any such matters; (d) the most recent financial statements of Guarantor previously delivered to Lender are true and correct in all respects, have been prepared in accordance with generally accepted accounting principles consistently applied (or other principles acceptable to Lender) and fairly present the financial condition of Guarantor as of the respective dates thereof, and no material adverse change has occurred in the financial condition of Guarantor since the respective dates thereof; and (e) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein, other than in the ordinary course of Guarantor's business.  Notwithstanding the foregoing, the calculation of Guarantor's liabilities shall NOT include any fair value adjustments to the carrying value of liabilities to record such liabilities at fair value pursuant to electing the fair value option election under FASB ASC 825-10-25 (formerly known as FAS 159, The Fair Value Option for Financial Assets and Financial Liabilities) or other FASB standards allowing entities to elect fair value option for financial liabilities.  Therefore, the amount of liabilities shall be the historical cost basis, which generally is the contractual amount owed adjusted for

amortization or accretion of any premium or discount. Guarantor acknowledges and agrees that Lender may request and obtain additional information from third parties regarding any of the above, including, without limitation, credit reports.

6.      <u>Subordination</u>.  Guarantor subordinates all present and future indebtedness owing by Borrower to Guarantor to the obligations at any time owing by Borrower to Lender under the Note and the other Loan Documents.  Guarantor assigns all such indebtedness to Lender, as security for this Guaranty, the Note and the other Loan Documents.  Guarantor agrees to make no claim for such indebtedness until all obligations of Borrower under the Note and the other Loan Documents have been fully and indefeasibly discharged.  Guarantor further agrees not to assign all or any part of such indebtedness unless Lender is given prior notice and such assignment is expressly made subject to the terms of this Guaranty.  If Lender so requests, (a) all instruments evidencing such indebtedness shall be duly endorsed and delivered to Lender, (b) all security for such indebtedness shall be duly assigned and delivered to Lender, (c) such indebtedness shall be enforced, collected and held by Guarantor as trustee for Lender and shall be paid over to Lender on account of the Loan but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty, and (d) Guarantor shall execute, file and record such documents and instruments and take such other action as Lender deems reasonably necessary or appropriate to perfect, preserve and enforce Lender's rights in and to such indebtedness and any security therefor.  If Guarantor fails to take any such action, Lender, as attorney-in-fact for Guarantor, is hereby authorized to do so in the name of Guarantor.  The foregoing power of attorney is coupled with an interest and cannot be revoked.  The foregoing shall not be interpreted to require Guarantor to take any action that would increase the scope of its liability to Lender or under the Loan beyond that which is contemplated hereunder.

7.      <u>Bankruptcy of Borrower</u>.  In any bankruptcy or other proceeding in which the filing of claims is required by law, Guarantor shall file all claims which Guarantor may have against Borrower relating to any indebtedness of Borrower to Guarantor and shall assign to Lender all rights of Guarantor thereunder.  If Guarantor does not file any such claim, Lender, as attorney-in-fact for Guarantor, is hereby authorized to do so in the name of Guarantor or, in Lender's discretion, to assign the claim to a nominee and to cause proof of claim to be filed in the name of Lender's nominee.  The foregoing power of attorney is coupled with an interest and cannot be revoked.  Lender or its nominee shall have the right, in its reasonable discretion, to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do.  In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Lender the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Lender all of Guarantor's rights to any such payments or distributions; <u>provided</u>, <u>however</u>, Guarantor's obligations hereunder shall not be satisfied except to the extent that Lender receives cash by reason of any such payment or distribution.  If Lender receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty.  The liability of Guarantor hereunder shall be reinstated and revised, and the rights of Lender shall continue, with respect to any amount at any time paid by Borrower on account of the Note or the other Loan Documents which Lender shall be required to restore or return upon the bankruptcy, insolvency or reorganization of Borrower or for any other reasons, all as though such amount had not been paid.  If all or any portion of the obligations guaranteed hereunder are paid or performed, the obligations of Guarantor hereunder shall continue and shall remain in full force and effect in the event that all or any part of such payment or performance is avoided or recovered directly or indirectly from Lender as a preference, fraudulent transfer or otherwise under the Bankruptcy Code or other similar laws, irrespective of (a) any notice of revocation given by Guarantor prior to such avoidance or recovery, or (b) full payment and performance of all of the indebtedness and obligations evidenced and secured by the Loan Documents.

**Exhibit C Page - 5**

8.      <u>Loan Sales and Participations; Disclosure of Information</u>.  Guarantor agrees that Lender may elect, at any time, to sell, assign, or grant participations in all or any portion of its rights and obligations under the Loan Documents and this Guaranty in accordance with the terms of the Loan Agreement, and that any such sale, assignment or participation may be to one or more financial institutions, private investors, and/or other entities, at such Lender's sole discretion. Guarantor further agrees that Lender may disseminate to any such actual or potential purchaser(s), assignee(s) or participant(s) all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to Lender with respect to: (a) the Property and its operation; (b) any party connected with the Loan (including, without limitation, Guarantor, Borrower, any partner, joint venturer or member of Borrower, any constituent partner, joint venturer or member of Borrower, any other guarantor and any non-borrower trustor); and/or (c) any lending relationship other than the Loan which Lender may have with any party connected with the Loan.  In the event of any such sale, assignment or participation, Lender and the parties to such transaction shall share in the rights and obligations of Lender as set forth in the Loan Documents only as and to the extent they agree among themselves.  In connection with any such sale, assignment or participation, Guarantor further agrees that the Guaranty shall be sufficient evidence of the obligations of Guarantor to each purchaser, assignee, or participant, and upon written request by Lender, Guarantor shall within ten (10) days after such request by Lender, (x) deliver to Lender and any other party designated by Lender an estoppel certificate, in form and substance acceptable to Lender verifying for the benefit of Lender and any such other party the status, terms and provisions of this Guaranty and (y) enter into such amendments or modifications to this Guaranty and the Loan Documents as Lender may reasonably request in order to evidence and facilitate any such sale, assignment, or participation without impairing Guarantor's rights or increasing Guarantor's obligations hereunder.

Anything in this Guaranty to the contrary notwithstanding, and without the need to comply with any of the formal or procedural requirements of this Guaranty, including this <u>Section 8</u>, Lender may at any time and from time to time pledge and assign all or any portion of its rights under all or any of the Loan Documents; <u>provided</u> that no such pledge or assignment shall release Lender from its obligations thereunder.

9.      <u>Additional, Independent, and Absolute Obligations</u>.  This Guaranty is a continuing guaranty of payment and not of collection and cannot be revoked by Guarantor and shall continue to be effective with respect to any indebtedness referenced in <u>Section 1</u> hereof arising or created after any attempted revocation hereof or after the death of Guarantor (if Guarantor is a natural person, in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The obligations of Guarantor hereunder shall be in addition to and shall not limit or in any way affect the obligations of Guarantor under any other existing or future guaranties unless said other guaranties are expressly modified or revoked in writing. This Guaranty is independent of the obligations of Borrower under the Note, the Security Instrument, and the other Loan Documents.  Lender may bring a separate action to enforce the provisions hereof against Guarantor without taking action against Borrower or any other party or joining Borrower or any other party as a party to such action.  The liability of Guarantor hereunder is irrevocable, continuing, absolute and unconditional and the obligations of Guarantor hereunder, shall not be discharged or impaired or otherwise effected by, and Guarantor hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

(a)     any illegality or lack of validity or enforceability of any Guaranteed Obligation or any Loan Document or any related agreement or instrument;

(b)     any change in the time, place or manner of payment of, or in any other term of, the Guaranteed Obligations or any other obligation of any Borrower Party under any Loan Document, or any rescission, waiver, amendment or other modification of any Loan Document or any other agreement,

including any increase in the Guaranteed Obligations resulting from any extension of additional credit or otherwise;

(c)      any taking, exchange, substitution, release, impairment or non-perfection of any collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for the Guaranteed Obligations;

(d)      any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the Guaranteed Obligations;

(e)      any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations;

(f)      any change, restructuring or termination of the corporate, company, partnership, or other entity structure, ownership or existence of Borrower or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Borrower or its assets or any resulting release or discharge of any Guaranteed Obligation;

(g)      any failure of Lender to disclose to Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of Borrower or any other guarantor now or hereafter known to Lender, the Guarantor waiving any duty of Lender to disclose such information;

(h)      the failure of any other Person to execute or deliver any other guaranty or agreement or the release or reduction of liability of any other guarantor or surety with respect to the Guaranteed Obligations;

(i)      the failure of Lender to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Loan Document or otherwise;

(j)      any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, Borrower against Lender; or

(k)      any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loan or any existence of or reliance on any representation by Lender that might vary the risk of Guarantor or otherwise operate as a defense available to, or a legal or equitable discharge of, Borrower or any other guarantor or surety.

10.      Attorneys' Fees; Enforcement.  If any attorney is engaged by Lender to enforce or defend any provision of this Guaranty, or any of the other Loan Documents, or as a consequence of any Default under the Loan Documents, with or without the filing of any legal action or proceeding, Guarantor shall pay to Lender, within thirty (30) days after written demand from Lender all attorneys' fees and costs incurred by Lender in connection therewith, together with interest thereon from the date of such demand until paid at the rate of interest applicable to the principal balance of the Note as specified therein.  This provision is separate and several, and shall survive the merger of this provision into any judgment.

11.      Rules of Construction.  The word "Borrower" as used herein shall include both the named Borrower and any other person at any time assuming or otherwise becoming primarily liable for all or any part of the obligations of the named Borrower under the Notes and the other Loan Documents. Section and subsection headings in this Guaranty are included in this Guaranty for convenience of reference only and shall not constitute a part of this Guaranty or be given any substantive effect.  Unless

the context of this Guaranty clearly requires otherwise, references to the plural include the singular and to the singular include the plural, the part includes the whole, the term "including" is not limiting (and means, including without limitation), and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and other similar terms in this Guaranty refer to this Guaranty as a whole and not exclusively to any particular provision of this Guaranty. Article, section, subsection, exhibit, and schedule references are to this Guaranty unless otherwise specified. All of the exhibits or schedules attached to this Guaranty shall be deemed incorporated in this Guaranty by reference. Any reference to any of the following documents includes any and all alterations, amendments, restatements, extensions, modifications, renewals, or supplements thereto or thereof, as applicable: this Guaranty or any of the other Loan Documents. No inference in favor of, or against, any party shall be drawn from the fact that such party has drafted any portion of this Guaranty, each party having been represented by counsel of its choice in connection with the negotiation and preparation of this Guaranty and the other Loan Documents.

12. <u>Credit Reports</u>. Guarantor hereby authorizes Lender to order and obtain, from a credit reporting agency of Lender's choice, third party credit reports on Guarantor.

13. <u>Governing Law; Venue</u>. This Guaranty shall be governed, construed, applied and enforced in accordance with the laws of the State of California without regard to the conflicts of law provisions thereof ("**Governing State**"). Guarantor hereby consents to personal jurisdiction in the Governing State. JURISDICTION AND VENUE OF ANY ACTION BROUGHT TO ENFORCE THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY ACTION RELATING TO THE LOAN OR THE RELATIONSHIPS CREATED BY OR UNDER THE LOAN DOCUMENTS ("**ACTION**") SHALL, AT THE ELECTION OF LENDER, BE IN (AND IF ANY ACTION IS ORIGINALLY BROUGHT IN ANOTHER VENUE, THE ACTION SHALL AT THE ELECTION OF LENDER BE TRANSFERRED TO) A STATE OR FEDERAL COURT OF APPROPRIATE JURISDICTION LOCATED IN THE GOVERNING STATE. GUARANTOR HEREBY CONSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF THE STATE COURTS OF THE GOVERNING STATE AND OF FEDERAL COURTS LOCATED IN THE GOVERNING STATE IN CONNECTION WITH ANY ACTION AND HEREBY WAIVES ANY AND ALL PERSONAL RIGHTS UNDER THE LAWS OF ANY OTHER STATE TO OBJECT TO JURISDICTION WITHIN SUCH GOVERNING STATE FOR PURPOSES OF ANY ACTION. Guarantor hereby waives and agrees not to assert, as a defense to any Action or a motion to transfer venue of any Action, (i) any claim that it is not subject to such jurisdiction, (ii) any claim that any Action may not be brought against it or is not maintainable in those courts or that this Agreement may not be enforced in or by those courts, or that it is exempt or immune from execution, (iii) that the Action is brought in an inconvenient forum, or (iv) that the venue for the Action is in any way improper.

14. <u>Waiver of Jury Trial</u>. **GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH RIGHT TO TRIAL BY JURY WOULD OTHERWISE ACCRUE. GUARANTOR AND LENDER EACH ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY EACH OTHER.**

NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, GUARANTOR HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1 ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE (PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO JUDICIAL REFERENCE SHALL BE APPLICABLE WITH RESPECT TO ANY ACTION IN RESPECT OF THE FORECLOSURE (OR SALE BY POWER OF SALE) OF THE SECURITY INSTRUMENT). PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 AND 640 TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER. GUARANTOR HEREBY AGREES THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARMS-LENGTH BASIS, WITH GUARANTOR AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE ITS LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN.

Guarantor's Initials

15. Waiver of Special Damages. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, GUARANTOR AGREES THAT NONE OF LENDER, OR ITS AGENTS OR EMPLOYEES SHALL BE LIABLE TO GUARANTOR FOR ANY MONETARY DAMAGES (INCLUDING ANY SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR ANY OTHER LEGAL OR EQUITABLE PRINCIPLE AND GUARANTOR'S SOLE REMEDIES SHALL BE LIMITED TO COMMENCING AN ACTION FOR SPECIFIC PERFORMANCE.

16. Miscellaneous. The provisions of this Guaranty will bind and benefit the heirs, executors, administrators, legal representatives, nominees, successors and assigns of Guarantor and Lender. If any provision of this Guaranty shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that portion shall be deemed severed from this Guaranty and the remaining parts shall remain in full force as though the invalid, illegal or unenforceable portion had never been part of this Guaranty. Time is of the essence with respect to each provision of this Guaranty. The recitals to this Guaranty are hereby incorporated by this reference.

17. Additional Provisions. Such additional terms, covenants and conditions as may be set forth on any exhibit executed by Guarantor and attached hereto, if any, which recites that it is an exhibit to this Guaranty are incorporated herein by this reference.

18.    Enforceability.  Guarantor hereby acknowledges that: (a) the obligations undertaken by Guarantor in this Guaranty are complex in nature, (b) numerous possible defenses to the enforceability of these obligations may presently exist and/or may arise hereafter, (c) as part of Lender's consideration for entering into this transaction, Lender has specifically bargained for the waiver and relinquishment by Guarantor of all such defenses, and (d) Guarantor has had the opportunity to seek and receive legal advice from skilled legal counsel in the area of financial transactions of the type contemplated herein.  Given all of the above, Guarantor does hereby represent and confirm to Lender that Guarantor is fully informed regarding, and that Guarantor does thoroughly understand:  (i) the nature of all such possible defenses, (ii) the circumstances under which such defenses may arise, (iii) the benefits which such defenses might confer upon Guarantor, and (iv) the legal consequences to Guarantor of waiving such defenses.  Guarantor acknowledges that Guarantor makes this Guaranty with the intent that this Guaranty and all of the informed waivers herein shall each and all be fully enforceable by Lender, and that Lender is induced to enter into this transaction in material reliance upon the presumed full enforceability thereof.

19.    Counterparts.  For the purpose of facilitating the execution of this Guaranty and for other purposes, this Guaranty may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.  A signature of a party by facsimile or other electronic transmission (including a .pdf copy sent by e-mail) shall be deemed to constitute an original and fully effective signature of such party.

20.    Notices.  All notices, consents, approvals and requests required or permitted hereunder shall be given in writing (including by facsimile) and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (c) by facsimile (with a copy sent contemporaneously by certified or registered United States mail, postage prepaid) answer back acknowledged, addressed as follows:

|  |  |
|---|---|
| If to Guarantor: | Patrick John Koentges<br>3391 Oak St.<br>Wheat Ridge, Colorado 80033<br>Telephone: (720) 612-7739<br>Email: patrick@greensagemb.com |
| If to Lender: | Romspen California Mortgage Limited Partnership<br>162 Cumberland Street, Suite 300<br>Toronto, Ontario M5R 3N5<br>Telephone: (416) 928-4870<br>Facsimile: (416) 966-1161<br>Email: JoelMickelson@romspen.com<br>BlakeCassidy@romspen.com |
| with a copy to: | Foley Gardere<br>2021 McKinney Avenue, Suite 1600<br>Dallas, Texas 75201<br>Attention:  Clifton M. Dugas, II<br>Telephone: (214) 999-4004<br>Email: cdugas@foley.com |

or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section.  A notice shall be deemed to have been given:  in the case of hand delivery, at the time of delivery; in the

Exhibit C Page - 10

case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day, in the case of facsimile, upon completion of transmission (which is confirmed by telephone or by a statement generated by the transmitting machine) with receipt acknowledged by the recipient thereof.

21.     **Principles of Construction.**  To the extent any of the provisions of this Section 21 conflict with any of the other provisions of this Guaranty, the terms and provisions of this Section 21 shall control.  Notwithstanding the foregoing, nothing in this Section 21 shall be deemed to contradict or supersede the terms and provisions of Section 13 hereof with respect to the governing law applicable to this Guaranty.

(a)     **Waiver.**  Guarantor expressly waives any and all suretyship defenses that may be available to Guarantor.  Without limiting the generality of the foregoing, Guarantor makes the following additional waivers and covenants:  Guarantor agrees that its obligations under this Guaranty shall not be subject to any counterclaims, offsets or defenses against Lender or against Borrower of any kind which may arise in the future.  Guarantor agrees that nothing contained herein shall prevent Lender from foreclosing on the lien of the Security Instrument, or from exercising any rights available to Lender thereunder, and that the exercise of any of the aforesaid rights shall not constitute a legal or equitable discharge of Guarantor.  Guarantor agrees that it hereby knowingly waives any defense which may arise in the future to enforcement of this Guaranty under California Code of Civil Procedure Sections 580b, 580d, 580a and 726 (or any other statute limiting a Lender's right to a deficiency) based on Lender's election to conduct a private, non-judicial foreclosure sale following a default by Borrower even though such an election destroyed, diminished or otherwise affected Guarantor's rights of subrogation against Borrower or other trustor under a deed of trust or the right of contribution, reimbursement or indemnity from any party, with the result that Guarantor's liability under this Guaranty became nonreimbursable in whole or in part.  Nevertheless, Guarantor hereby authorizes and empowers Lender to exercise, in its sole discretion, any rights and remedies, or any combination thereof, which may then be available, since it is the intent and purpose of Guarantor that the obligations hereunder shall be absolute, independent and unconditional under any and all circumstances.   Without limiting the generality of the foregoing, Guarantor hereby expressly waives any and all benefits under California Civil Code Sections 2809, 2810, 2815, 2819, 2822, 2839, 2845, 2846, 2847, 2848, 2849, 2850, 2899 and 3433 and California Code of Civil Procedure Sections 580b, 580a, 580d and 726.  Notwithstanding any foreclosure of the lien of the Security Instrument or security agreement with respect to any or all of any real or personal property secured thereby, whether by the exercise of the power of sale contained therein, by an action for judicial foreclosure or by an acceptance of a deed in lieu of foreclosure, Guarantor shall remain bound under this Guaranty.  Guarantor further waives any right to cause a fair value hearing to be conducted under Code of Civil Procedure Section 580a, or any other provision of law respecting the amount of any deficiency following a non-judicial foreclosure, and agrees that Guarantor's liability hereunder shall not be limited to the excess of the Guaranteed Obligations over the fair or market value of any real property which secured the indebtedness of Borrower.  Nothing shall discharge or satisfy the liability of Guarantor hereunder except the full performance and payment of the Guaranteed Obligations of Borrower with interest.

22.     **Additional Waivers.**  In addition to and not in limitation of the other waivers agreed to and made by Guarantor set forth in this Guaranty, and pursuant to the provisions of Section 2856 of the California Civil Code, Guarantor acknowledges and understands that if Lender forecloses judicially or nonjudicially against any real property security for the Note, that foreclosure could impair or destroy any ability that Guarantor may have to seek reimbursement, contribution or indemnification from Borrower or others based on any right Guarantor may have of subrogation, reimbursement, contribution or indemnification for any amounts paid by Guarantor under this Guaranty.  Guarantor further understands and acknowledges that in the absence of this provision, the potential impairment or destruction of Guarantor's rights, if any, may entitle Guarantor to assert a defense to this Guaranty based on California

**Exhibit C Page - 11**

Code of Civil Procedure Section 580d as interpreted in Union Bank vs. Gradsky, to the extent applicable. By executing this Guaranty, Guarantor freely, irrevocably and unconditionally: (a) waives and relinquishes that defense, and agrees that Guarantor will be fully liable under this Guaranty, even though Lender may foreclose judicially or nonjudicially against any real property security for the Note; (b) agrees that Guarantor will not assert that defense in any action or proceeding that Lender may commence to enforce this Guaranty; (c) acknowledges and agrees that the rights and defenses waived by Guarantor under this Guaranty include any right or defense that Guarantor may have or be entitled to assert based upon or arising out of any one or more of the following: (i) California Code of Civil Procedure Sections 580a (which if Guarantor had not given this waiver, would otherwise limit Guarantor's liability after any nonjudicial foreclosure sale to the difference between the obligations for which Guarantor is liable and the fair market value of the property or interests sold at such nonjudicial foreclosure sale rather than the actual proceeds of such sale), 580b and 580d (which if Guarantor had not given this waiver, would otherwise limit Lender's right to recover a deficiency judgment with respect to purchase money obligations and after any nonjudicial foreclosure sale, respectively), or 726 (which, if Guarantor had not given this waiver, among other things, would otherwise require Lender to exhaust all of its security before a personal judgment may be obtained for a deficiency); or (ii) California Civil Code Section 2848; and (d) acknowledges and agrees that Lender is relying on this waiver in making the Loan, and that this waiver is a material part of the consideration that Lender is receiving for making the Loan.  In addition, and without limiting the foregoing, GUARANTOR WAIVES ALL RIGHTS AND DEFENSES THAT GUARANTOR MAY HAVE BECAUSE BORROWER'S DEBT IS SECURED BY REAL PROPERTY. THIS MEANS, AMONG OTHER THINGS:

(i)  LENDER MAY COLLECT FROM GUARANTOR WITHOUT FIRST FORECLOSING ON ANY REAL OR PERSONAL PROPERTY COLLATERAL PLEDGED BY BORROWER.

(ii)  IF THE CREDITOR FORECLOSES ON ANY REAL PROPERTY COLLATERAL PLEDGED BY BORROWER:

(A)  THE AMOUNT OF THE DEBT MAY BE REDUCED ONLY BY THE PRICE FOR WHICH THAT COLLATERAL IS SOLD AT THE FORECLOSURE SALE, EVEN IF THE COLLATERAL IS WORTH MORE THAN THE SALE PRICE.

(B)  LENDER MAY COLLECT FROM GUARANTOR EVEN IF LENDER, BY FORECLOSING ON THE REAL PROPERTY COLLATERAL, HAS DESTROYED ANY RIGHT GUARANTOR MAY HAVE TO COLLECT FROM BORROWER.

THIS IS AN UNCONDITIONAL AND IRREVOCABLE WAIVER OF ANY RIGHTS AND DEFENSES GUARANTOR MAY HAVE BECAUSE BORROWER'S DEBT IS SECURED BY REAL PROPERTY.  THESE RIGHTS AND DEFENSES INCLUDE, BUT ARE NOT LIMITED TO, ANY RIGHTS OR DEFENSES BASED UPON CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580d, or 726.

*[Separate Signature Page Follows] [Separate Signature Page Follows]*

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the date appearing on the first page of this Guaranty.

**GUARANTOR:**

_____

**PATRICK JOHN KOENTGES**, an individual

## ACKNOWLEDGEMENT

STATE OF _Colorado_          §
                                          §
COUNTY OF _Denver_           §

This instrument was acknowledged before me this _12_ day of August, 2019, by Patrick John Koentges, an individual.

[S E A L]

> Levi Martinez
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20164019471
> MY COMMISSION EXPIRES 05/20/20

**Exhibit C Page - 13**

# EXHIBIT D

## GUARANTY

THIS GUARANTY (this "**Guaranty**") is made as of August 21, 2019, by **KENNETH EDWARD GREER, JR.**, an individual ("**Guarantor**"), for the benefit of **ROMSPEN CALIFORNIA MORTGAGE LIMITED PARTNERSHIP**, an Ontario limited partnership ("**Lender**").

### RECITALS

The following recitals are a material part of this Agreement.

A.      Pursuant to the terms of a Loan Agreement dated of even date herewith between **OAKLAND CANNERY REAL ESTATE, LLC**, a California limited liability company, **5733 SLOCA PARTNERSHIP**, a California general partnership, and **5601 SLOCA, LLC**, a California limited liability company (individually and collectively, jointly and severally, "**Borrower**"), and Lender (as the same may be modified, amended or restated from time to time, the "**Loan Agreement**"), Lender is making a loan to Borrower in the maximum principal amount of Fifty-Four Million Four Hundred Sixty-Five Thousand and No/100 Dollars ($54,465,000.00) (the "**Loan**") for the purposes specified in the Loan Agreement, said purposes relating to the real property and improvements described in the Loan Agreement (which real property and improvements are collectively referred to herein as the "**Property**"). Each capitalized term used herein and not otherwise defined herein shall have the meaning given to such term in the Loan Agreement.

B.      The Loan Agreement provides that the Loan shall be evidenced by the Note and shall be secured by the Security Instrument and by other security instruments, if any, specified in the Loan Agreement.

C.      Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined).

D.      Guarantor is a direct or indirect owner of Borrower and will derive substantial direct and indirect benefits from the Loan and the transactions contemplated by the Loan Agreement, and the making of this Guaranty and such benefits are at least equal to the obligations incurred under this Guaranty.

### AGREEMENT

NOW, THEREFORE, to induce Lender to enter into the Loan Agreement and make the Loan, and in consideration thereof and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor unconditionally, absolutely and irrevocably guarantees and agrees as follows:

1.      Guaranty. Guarantor absolutely, unconditionally, and irrevocably guarantees to Lender, as primary obligor and not merely as surety, the due, prompt, and full payment and performance of all liabilities, obligations, or undertakings owing by Borrower to Lender of any kind or description arising out of or outstanding under, advanced or issued pursuant to, or evidenced by the Loan Agreement or the other Loan Documents or in any other agreement between Borrower and Lender, irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, voluntary or involuntary, whether now existing or hereafter arising, and including all interest (including interest that accrues after the filing of a case under the Bankruptcy Code) and any and all costs, fees (including attorneys' fees), and expenses which Borrower is required to pay pursuant to any of the

foregoing, by law, or otherwise (collectively, the "**Guaranteed Obligations**"). Guarantor unconditionally agrees to pay to Lender the full amount of the Guaranteed Obligations. Guarantor further agrees that all or part of the Guaranteed Obligations may be increased, extended, substituted, amended, renewed or otherwise modified without notice to or consent from Guarantor and such actions shall not affect the liability of Guarantor hereunder. Without limiting the generality of the foregoing, Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Person to Lender under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Person. If there shall be more than one guarantor with respect to any of the Guaranteed Obligations, then the obligations of each such guarantor (including Guarantor) shall be joint and several.

2.      Remedies. If Guarantor fails to promptly perform its obligations under this Guaranty, Lender may from time to time, and without first requiring performance by Borrower or exhausting any or all security for the Loan, bring any action at law or in equity or both to compel Guarantor to perform its obligations hereunder, and to collect in any such action compensation for all loss, cost, damage, injury and expense sustained or incurred by Lender as a direct or indirect consequence of the failure of Guarantor to perform its obligations together with interest thereon at the rate of interest applicable to the principal balance of the Note.

3.      Rights of Lender. Lender may at any time, without the consent of or notice to Guarantor, without incurring responsibility to Guarantor and without impairing, releasing, reducing or affecting the obligations of Guarantor hereunder: (a) change the manner, place or terms of payment of all or any part of the Guaranteed Obligations, or renew, extend, modify, rearrange or alter all or any part of the Guaranteed Obligations; (b) change the interest rate accruing on any of the Guaranteed Obligations (including, without limitation, any periodic change in such interest rate that occurs because such Guaranteed Obligations accrue interest at a variable rate which may fluctuate from time to time); (c) declare all sums owing to Lender under the Note and the other Loan Documents due and payable upon the occurrence of a Default or Event of Default under the Loan Documents; (d) amend, restate, or otherwise modify the terms of any Loan Document; (e) sell, exchange, release, surrender, subordinate, realize upon or otherwise deal with in any manner and in any order any collateral for all or any part of the Guaranteed Obligations; (f) neglect, delay, omit, fail or refuse to take or prosecute any action for the collection of all or any part of the Guaranteed Obligations or this Guaranty or to take or prosecute any action in connection with any of the Loan Documents; (g) exercise or refrain from exercising any rights against Borrower or others, or otherwise act or refrain from acting; (h) release, substitute or add any one or more endorsers of the Note or guarantors of Borrower's obligations under the Note or the other Loan Documents; (i) settle or compromise all or any part of the Guaranteed Obligations and subordinate the payment of all or any part of the Guaranteed Obligations to the payment of any obligations, indebtedness or liabilities which may be due or become due to Lender or others; (j) apply any deposit balance, fund, payment, collections through process of law or otherwise or other collateral of Borrower to the satisfaction and liquidation of the Guaranteed Obligations; (k) apply any sums paid to Lender by Guarantor, Borrower or others to the Guaranteed Obligations in such order and manner as Lender, in its sole discretion, may determine; (l) assign this Guaranty in whole or in part in accordance with an assignment of the Loan; and (m) assign, transfer or negotiate all or any part of the Guaranteed Obligations.

4.      Guarantor's Waivers.

(a)      Regardless of whether Guarantor may have made any payments to Lender, Guarantor hereby waives: (i) all rights of subrogation, indemnification, contribution, and any other rights to collect reimbursement from Borrower or any other party for any sums paid to Lender, whether

contractual or arising by operation of law (including, without limitation, under any provisions of the Bankruptcy Code, or any successor or similar statutes) or otherwise, (ii) all rights to enforce any remedy that Lender may have against Borrower, and (iii) all rights to participate in any security now or later to be held by Lender for the Loan.  Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification, and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement, indemnification, and contribution Guarantor may have against Borrower or against any collateral or security, shall be junior and subordinate to any rights Lender may have against Borrower, and to all right, title and interest Lender may have in any such collateral or security.

(b)     Guarantor understands and acknowledges that if Lender forecloses judicially or nonjudicially against any real property security for the Loan, that foreclosure could impair or destroy any ability that Guarantor may have to seek reimbursement, contribution, or indemnification from Borrower or others based on any right Guarantor may have of subrogation, reimbursement, contribution or indemnification for any amounts paid by Guarantor under this Guaranty.  By executing this Guaranty, Guarantor freely, irrevocably, and unconditionally: (i) waives and relinquishes that defense and agrees that Guarantor shall be fully liable under this Guaranty even though Lender may foreclose judicially or nonjudicially against any real property security for the Loan; (ii) acknowledges and agrees that the rights and defenses waived by Guarantor under this Guaranty include any right or defense that Guarantor may have or be entitled to assert based upon or arising out of any one-action, anti-deficiency, reimbursement, or other borrower or guarantor protective statute (including, without limitation, any defense that any exercise by Lender of any right or remedy hereunder or under the Loan Documents violates, or would, in combination with the previous or subsequent exercise by Guarantor of any rights of subrogation, reimbursement, contribution, or indemnification against Borrower or any other person, directly or indirectly result in, or be deemed to be, a violation of any of such statutory provisions); and (iii) acknowledges and agrees that Lender is relying on this waiver in making the Loan, and that this waiver is a material part of the consideration which Lender is receiving for making the Loan.

(c)     Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, may destroy Guarantor's rights of subrogation and reimbursement against Borrower.

(d)     Guarantor waives any rights and defenses that are or may become available to Guarantor by reason of any statute governing guaranties or suretyship.

(e)     Guarantor waives all rights and defenses that Guarantor may have because the Loan is secured by real property.  This means, among other things:

(i)     Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower.

(ii)     If Lender forecloses on any real property collateral pledged by Borrower:

(A)     The amount of the Loan may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(B)     Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

(f)     This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the Loan is secured by real property.

(g)     Guarantor waives any right or defense it may have at law or equity, which may provide, among other things: that a creditor must file a complaint for deficiency within a specified period of time after a nonjudicial foreclosure sale or judicial foreclosure sale, as applicable; that a fair market value hearing must be held; and that the amount of the deficiency judgment shall be limited to the amount by which the unpaid debt exceeds the fair market value of the security, but not more than the amount by which the unpaid debt exceeds the sale price of the security.

(h)     Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all presently existing and future Guaranteed Obligations.

(i)     Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, intention to accelerate, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that Lender protect, secure, perfect or insure any Lien or any property subject thereto.

(j)     Guarantor hereby unconditionally and irrevocably waives any defense based on any right of set-off or recoupment or counterclaim against or in respect of the Guaranteed Obligations.

(k)     No provision or waiver in this Guaranty shall be construed as limiting the generality of any other provision or waiver contained in this Guaranty.

(l)     Guarantor agrees that the payment or performance of any act which tolls any statute of limitations applicable to any Loan Document shall similarly operate to toll the statute of limitations applicable to Guarantor's liability hereunder.

5.     Guarantor's Warranties.  Guarantor warrants and acknowledges that: (a) Lender would not make the Loan but for this Guaranty; (b) there are no conditions precedent to the effectiveness of this Guaranty; (c) Guarantor has established adequate means of obtaining from sources other than Lender, on a continuing basis, financial and other information pertaining to Borrower's financial condition, the Property and Borrower's activities relating thereto and the status of Borrower's performance of obligations under the Loan Documents, and Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks hereunder and Lender has made no representation to Guarantor as to any such matters; (d) the most recent financial statements of Guarantor previously delivered to Lender are true and correct in all respects, have been prepared in accordance with generally accepted accounting principles consistently applied (or other principles acceptable to Lender) and fairly present the financial condition of Guarantor as of the respective dates thereof, and no material adverse change has occurred in the financial condition of Guarantor since the respective dates thereof; and (e) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein, other than in the ordinary course of Guarantor's business.  Notwithstanding the foregoing, the calculation of Guarantor's liabilities shall NOT include any fair value adjustments to the carrying value of liabilities to record such liabilities at fair value pursuant to electing the fair value option election under FASB ASC 825-10-25 (formerly known as FAS 159, The Fair Value Option for Financial Assets and Financial Liabilities) or other FASB standards allowing entities to elect fair value option for financial liabilities.  Therefore, the amount of liabilities shall be the historical cost basis, which generally is the contractual amount owed adjusted for

amortization or accretion of any premium or discount. Guarantor acknowledges and agrees that Lender may request and obtain additional information from third parties regarding any of the above, including, without limitation, credit reports.

      6.    <u>Subordination</u>.  Guarantor subordinates all present and future indebtedness owing by Borrower to Guarantor to the obligations at any time owing by Borrower to Lender under the Note and the other Loan Documents.  Guarantor assigns all such indebtedness to Lender, as security for this Guaranty, the Note and the other Loan Documents.  Guarantor agrees to make no claim for such indebtedness until all obligations of Borrower under the Note and the other Loan Documents have been fully and indefeasibly discharged.  Guarantor further agrees not to assign all or any part of such indebtedness unless Lender is given prior notice and such assignment is expressly made subject to the terms of this Guaranty.  If Lender so requests, (a) all instruments evidencing such indebtedness shall be duly endorsed and delivered to Lender, (b) all security for such indebtedness shall be duly assigned and delivered to Lender, (c) such indebtedness shall be enforced, collected and held by Guarantor as trustee for Lender and shall be paid over to Lender on account of the Loan but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty, and (d) Guarantor shall execute, file and record such documents and instruments and take such other action as Lender deems reasonably necessary or appropriate to perfect, preserve and enforce Lender's rights in and to such indebtedness and any security therefor. If Guarantor fails to take any such action, Lender, as attorney-in-fact for Guarantor, is hereby authorized to do so in the name of Guarantor. The foregoing power of attorney is coupled with an interest and cannot be revoked. The foregoing shall not be interpreted to require Guarantor to take any action that would increase the scope of its liability to Lender or under the Loan beyond that which is contemplated hereunder.

      7.    <u>Bankruptcy of Borrower</u>.  In any bankruptcy or other proceeding in which the filing of claims is required by law, Guarantor shall file all claims which Guarantor may have against Borrower relating to any indebtedness of Borrower to Guarantor and shall assign to Lender all rights of Guarantor thereunder. If Guarantor does not file any such claim, Lender, as attorney-in-fact for Guarantor, is hereby authorized to do so in the name of Guarantor or, in Lender's discretion, to assign the claim to a nominee and to cause proof of claim to be filed in the name of Lender's nominee. The foregoing power of attorney is coupled with an interest and cannot be revoked. Lender or its nominee shall have the right, in its reasonable discretion, to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Lender the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Lender all of Guarantor's rights to any such payments or distributions; <u>provided</u>, <u>however,</u> Guarantor's obligations hereunder shall not be satisfied except to the extent that Lender receives cash by reason of any such payment or distribution. If Lender receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty. The liability of Guarantor hereunder shall be reinstated and revised, and the rights of Lender shall continue, with respect to any amount at any time paid by Borrower on account of the Note or the other Loan Documents which Lender shall be required to restore or return upon the bankruptcy, insolvency or reorganization of Borrower or for any other reasons, all as though such amount had not been paid. If all or any portion of the obligations guaranteed hereunder are paid or performed, the obligations of Guarantor hereunder shall continue and shall remain in full force and effect in the event that all or any part of such payment or performance is avoided or recovered directly or indirectly from Lender as a preference, fraudulent transfer or otherwise under the Bankruptcy Code or other similar laws, irrespective of (a) any notice of revocation given by Guarantor prior to such avoidance or recovery, or (b) full payment and performance of all of the indebtedness and obligations evidenced and secured by the Loan Documents.

8.    <u>Loan Sales and Participations; Disclosure of Information</u>.  Guarantor agrees that Lender may elect, at any time, to sell, assign, or grant participations in all or any portion of its rights and obligations under the Loan Documents and this Guaranty in accordance with the terms of the Loan Agreement, and that any such sale, assignment or participation may be to one or more financial institutions, private investors, and/or other entities, at such Lender's sole discretion. Guarantor further agrees that Lender may disseminate to any such actual or potential purchaser(s), assignee(s) or participant(s) all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to Lender with respect to: (a) the Property and its operation; (b) any party connected with the Loan (including, without limitation, Guarantor, Borrower, any partner, joint venturer or member of Borrower, any constituent partner, joint venturer or member of Borrower, any other guarantor and any non-borrower trustor); and/or (c) any lending relationship other than the Loan which Lender may have with any party connected with the Loan.  In the event of any such sale, assignment or participation, Lender and the parties to such transaction shall share in the rights and obligations of Lender as set forth in the Loan Documents only as and to the extent they agree among themselves.  In connection with any such sale, assignment or participation, Guarantor further agrees that the Guaranty shall be sufficient evidence of the obligations of Guarantor to each purchaser, assignee, or participant, and upon written request by Lender, Guarantor shall within ten (10) days after such request by Lender, (x) deliver to Lender and any other party designated by Lender an estoppel certificate, in form and substance acceptable to Lender verifying for the benefit of Lender and any such other party the status, terms and provisions of this Guaranty and (y) enter into such amendments or modifications to this Guaranty and the Loan Documents as Lender may reasonably request in order to evidence and facilitate any such sale, assignment, or participation without impairing Guarantor's rights or increasing Guarantor's obligations hereunder.

Anything in this Guaranty to the contrary notwithstanding, and without the need to comply with any of the formal or procedural requirements of this Guaranty, including this <u>Section 8</u>, Lender may at any time and from time to time pledge and assign all or any portion of its rights under all or any of the Loan Documents; <u>provided</u> that no such pledge or assignment shall release Lender from its obligations thereunder.

9.    <u>Additional, Independent, and Absolute Obligations</u>.   This Guaranty is a continuing guaranty of payment and not of collection and cannot be revoked by Guarantor and shall continue to be effective with respect to any indebtedness referenced in <u>Section 1</u> hereof arising or created after any attempted revocation hereof or after the death of Guarantor (if Guarantor is a natural person, in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The obligations of Guarantor hereunder shall be in addition to and shall not limit or in any way affect the obligations of Guarantor under any other existing or future guaranties unless said other guaranties are expressly modified or revoked in writing. This Guaranty is independent of the obligations of Borrower under the Note, the Security Instrument, and the other Loan Documents.  Lender may bring a separate action to enforce the provisions hereof against Guarantor without taking action against Borrower or any other party or joining Borrower or any other party as a party to such action.  The liability of Guarantor hereunder is irrevocable, continuing, absolute and unconditional and the obligations of Guarantor hereunder, shall not be discharged or impaired or otherwise effected by, and Guarantor hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

(a)    any illegality or lack of validity or enforceability of any Guaranteed Obligation or any Loan Document or any related agreement or instrument;

(b)    any change in the time, place or manner of payment of, or in any other term of, the Guaranteed Obligations or any other obligation of any Borrower Party under any Loan Document, or any rescission, waiver, amendment or other modification of any Loan Document or any other agreement,

including any increase in the Guaranteed Obligations resulting from any extension of additional credit or otherwise;

(c)     any taking, exchange, substitution, release, impairment or non-perfection of any collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for the Guaranteed Obligations;

(d)     any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the Guaranteed Obligations;

(e)     any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations;

(f)     any change, restructuring or termination of the corporate, company, partnership, or other entity structure, ownership or existence of Borrower or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Borrower or its assets or any resulting release or discharge of any Guaranteed Obligation;

(g)     any failure of Lender to disclose to Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of Borrower or any other guarantor now or hereafter known to Lender, the Guarantor waiving any duty of Lender to disclose such information;

(h)     the failure of any other Person to execute or deliver any other guaranty or agreement or the release or reduction of liability of any other guarantor or surety with respect to the Guaranteed Obligations;

(i)     the failure of Lender to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Loan Document or otherwise;

(j)     any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, Borrower against Lender; or

(k)     any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loan or any existence of or reliance on any representation by Lender that might vary the risk of Guarantor or otherwise operate as a defense available to, or a legal or equitable discharge of, Borrower or any other guarantor or surety.

10.     Attorneys' Fees; Enforcement. If any attorney is engaged by Lender to enforce or defend any provision of this Guaranty, or any of the other Loan Documents, or as a consequence of any Default under the Loan Documents, with or without the filing of any legal action or proceeding, Guarantor shall pay to Lender, within thirty (30) days after written demand from Lender all attorneys' fees and costs incurred by Lender in connection therewith, together with interest thereon from the date of such demand until paid at the rate of interest applicable to the principal balance of the Note as specified therein. This provision is separate and several, and shall survive the merger of this provision into any judgment.

11.     Rules of Construction. The word "Borrower" as used herein shall include both the named Borrower and any other person at any time assuming or otherwise becoming primarily liable for all or any part of the obligations of the named Borrower under the Notes and the other Loan Documents. Section and subsection headings in this Guaranty are included in this Guaranty for convenience of reference only and shall not constitute a part of this Guaranty or be given any substantive effect. Unless

the context of this Guaranty clearly requires otherwise, references to the plural include the singular and to the singular include the plural, the part includes the whole, the term "including" is not limiting (and means, including without limitation), and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and other similar terms in this Guaranty refer to this Guaranty as a whole and not exclusively to any particular provision of this Guaranty. Article, section, subsection, exhibit, and schedule references are to this Guaranty unless otherwise specified. All of the exhibits or schedules attached to this Guaranty shall be deemed incorporated in this Guaranty by reference. Any reference to any of the following documents includes any and all alterations, amendments, restatements, extensions, modifications, renewals, or supplements thereto or thereof, as applicable: this Guaranty or any of the other Loan Documents. No inference in favor of, or against, any party shall be drawn from the fact that such party has drafted any portion of this Guaranty, each party having been represented by counsel of its choice in connection with the negotiation and preparation of this Guaranty and the other Loan Documents.

12.     <u>Credit Reports</u>.  Guarantor hereby authorizes Lender to order and obtain, from a credit reporting agency of Lender's choice, third party credit reports on Guarantor.

13.     <u>Governing Law; Venue</u>.  This Guaranty shall be governed, construed, applied and enforced in accordance with the laws of the State of California without regard to the conflicts of law provisions thereof ("**Governing State**").  Guarantor hereby consents to personal jurisdiction in the Governing State. JURISDICTION AND VENUE OF ANY ACTION BROUGHT TO ENFORCE THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY ACTION RELATING TO THE LOAN OR THE RELATIONSHIPS CREATED BY OR UNDER THE LOAN DOCUMENTS ("**ACTION**") SHALL, AT THE ELECTION OF LENDER, BE IN (AND IF ANY ACTION IS ORIGINALLY BROUGHT IN ANOTHER VENUE, THE ACTION SHALL AT THE ELECTION OF LENDER BE TRANSFERRED TO) A STATE OR FEDERAL COURT OF APPROPRIATE JURISDICTION LOCATED IN THE GOVERNING STATE. GUARANTOR HEREBY CONSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF THE STATE COURTS OF THE GOVERNING STATE AND OF FEDERAL COURTS LOCATED IN THE GOVERNING STATE IN CONNECTION WITH ANY ACTION AND HEREBY WAIVES ANY AND ALL PERSONAL RIGHTS UNDER THE LAWS OF ANY OTHER STATE TO OBJECT TO JURISDICTION WITHIN SUCH GOVERNING STATE FOR PURPOSES OF ANY ACTION.  Guarantor hereby waives and agrees not to assert, as a defense to any Action or a motion to transfer venue of any Action, (i) any claim that it is not subject to such jurisdiction, (ii) any claim that any Action may not be brought against it or is not maintainable in those courts or that this Agreement may not be enforced in or by those courts, or that it is exempt or immune from execution, (iii) that the Action is brought in an inconvenient forum, or (iv) that the venue for the Action is in any way improper.

14.     <u>Waiver of Jury Trial</u>.  **GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH RIGHT TO TRIAL BY JURY WOULD OTHERWISE ACCRUE. GUARANTOR AND LENDER EACH ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY EACH OTHER.**

NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, GUARANTOR HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1 ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE (PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO JUDICIAL REFERENCE SHALL BE APPLICABLE WITH RESPECT TO ANY ACTION IN RESPECT OF THE FORECLOSURE (OR SALE BY POWER OF SALE) OF THE SECURITY INSTRUMENT). PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 AND 640 TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER. GUARANTOR HEREBY AGREES THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARMS-LENGTH BASIS, WITH GUARANTOR AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE ITS LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN.

*KEG*

Guarantor's Initials

15. <u>Waiver of Special Damages</u>. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, GUARANTOR AGREES THAT NONE OF LENDER, OR ITS AGENTS OR EMPLOYEES SHALL BE LIABLE TO GUARANTOR FOR ANY MONETARY DAMAGES (INCLUDING ANY SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR ANY OTHER LEGAL OR EQUITABLE PRINCIPLE AND GUARANTOR'S SOLE REMEDIES SHALL BE LIMITED TO COMMENCING AN ACTION FOR SPECIFIC PERFORMANCE.

16. <u>Miscellaneous</u>. The provisions of this Guaranty will bind and benefit the heirs, executors, administrators, legal representatives, nominees, successors and assigns of Guarantor and Lender. If any provision of this Guaranty shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that portion shall be deemed severed from this Guaranty and the remaining parts shall remain in full force as though the invalid, illegal or unenforceable portion had never been part of this Guaranty. Time is of the essence with respect to each provision of this Guaranty. The recitals to this Guaranty are hereby incorporated by this reference.

17. <u>Additional Provisions</u>. Such additional terms, covenants and conditions as may be set forth on any exhibit executed by Guarantor and attached hereto, if any, which recites that it is an exhibit to this Guaranty are incorporated herein by this reference.

18.   Enforceability.  Guarantor hereby acknowledges that: (a) the obligations undertaken by Guarantor in this Guaranty are complex in nature, (b) numerous possible defenses to the enforceability of these obligations may presently exist and/or may arise hereafter, (c) as part of Lender's consideration for entering into this transaction, Lender has specifically bargained for the waiver and relinquishment by Guarantor of all such defenses, and (d) Guarantor has had the opportunity to seek and receive legal advice from skilled legal counsel in the area of financial transactions of the type contemplated herein.  Given all of the above, Guarantor does hereby represent and confirm to Lender that Guarantor is fully informed regarding, and that Guarantor does thoroughly understand:  (i) the nature of all such possible defenses, (ii) the circumstances under which such defenses may arise, (iii) the benefits which such defenses might confer upon Guarantor, and (iv) the legal consequences to Guarantor of waiving such defenses. Guarantor acknowledges that Guarantor makes this Guaranty with the intent that this Guaranty and all of the informed waivers herein shall each and all be fully enforceable by Lender, and that Lender is induced to enter into this transaction in material reliance upon the presumed full enforceability thereof.

19.   Counterparts.  For the purpose of facilitating the execution of this Guaranty and for other purposes, this Guaranty may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.  A signature of a party by facsimile or other electronic transmission (including a .pdf copy sent by e-mail) shall be deemed to constitute an original and fully effective signature of such party.

20.   Notices.  All notices, consents, approvals and requests required or permitted hereunder shall be given in writing (including by facsimile) and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (c) by facsimile (with a copy sent contemporaneously by certified or registered United States mail, postage prepaid) answer back acknowledged, addressed as follows:

| | |
|---|---|
| If to Guarantor: | Kenneth Edward Greer, Jr.<br>1250 N. Humboldt St., Apt. 1203<br>Denver, Colorado 80218<br>Telephone: (720) 612-7739<br>Email: ken@greensagemb.com |
| If to Lender: | Romspen California Mortgage Limited Partnership<br>162 Cumberland Street, Suite 300<br>Toronto, Ontario M5R 3N5<br>Telephone: (416) 928-4870<br>Facsimile: (416) 966-1161<br>Email: JoelMickelson@romspen.com<br>BlakeCassidy@romspen.com |
| with a copy to: | Foley Gardere<br>2021 McKinney Avenue, Suite 1600<br>Dallas, Texas 75201<br>Attention:  Clifton M. Dugas, II<br>Telephone: (214) 999-4004<br>Email: cdugas@foley.com |

or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section. A notice shall be deemed to have been given:  in the case of hand delivery, at the time of delivery; in the

case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day, in the case of facsimile, upon completion of transmission (which is confirmed by telephone or by a statement generated by the transmitting machine) with receipt acknowledged by the recipient thereof.

21.    Principles of Construction.  To the extent any of the provisions of this Section 21 conflict with any of the other provisions of this Guaranty, the terms and provisions of this Section 21 shall control.  Notwithstanding the foregoing, nothing in this Section 21 shall be deemed to contradict or supersede the terms and provisions of Section 13 hereof with respect to the governing law applicable to this Guaranty.

(a)    Waiver.  Guarantor expressly waives any and all suretyship defenses that may be available to Guarantor.  Without limiting the generality of the foregoing, Guarantor makes the following additional waivers and covenants:  Guarantor agrees that its obligations under this Guaranty shall not be subject to any counterclaims, offsets or defenses against Lender or against Borrower of any kind which may arise in the future.  Guarantor agrees that nothing contained herein shall prevent Lender from foreclosing on the lien of the Security Instrument, or from exercising any rights available to Lender thereunder, and that the exercise of any of the aforesaid rights shall not constitute a legal or equitable discharge of Guarantor.  Guarantor agrees that it hereby knowingly waives any defense which may arise in the future to enforcement of this Guaranty under California Code of Civil Procedure Sections 580b, 580d, 580a and 726 (or any other statute limiting a Lender's right to a deficiency) based on Lender's election to conduct a private, non-judicial foreclosure sale following a default by Borrower even though such an election destroyed, diminished or otherwise affected Guarantor's rights of subrogation against Borrower or other trustor under a deed of trust or the right of contribution, reimbursement or indemnity from any party, with the result that Guarantor's liability under this Guaranty became nonreimbursable in whole or in part.  Nevertheless, Guarantor hereby authorizes and empowers Lender to exercise, in its sole discretion, any rights and remedies, or any combination thereof, which may then be available, since it is the intent and purpose of Guarantor that the obligations hereunder shall be absolute, independent and unconditional under any and all circumstances.  Without limiting the generality of the foregoing, Guarantor hereby expressly waives any and all benefits under California Civil Code Sections 2809, 2810, 2815, 2819, 2822, 2839, 2845, 2846, 2847, 2848, 2849, 2850, 2899 and 3433 and California Code of Civil Procedure Sections 580b, 580a, 580d and 726.  Notwithstanding any foreclosure of the lien of the Security Instrument or security agreement with respect to any or all of any real or personal property secured thereby, whether by the exercise of the power of sale contained therein, by an action for judicial foreclosure or by an acceptance of a deed in lieu of foreclosure, Guarantor shall remain bound under this Guaranty.  Guarantor further waives any right to cause a fair value hearing to be conducted under Code of Civil Procedure Section 580a, or any other provision of law respecting the amount of any deficiency following a non-judicial foreclosure, and agrees that Guarantor's liability hereunder shall not be limited to the excess of the Guaranteed Obligations over the fair or market value of any real property which secured the indebtedness of Borrower.  Nothing shall discharge or satisfy the liability of Guarantor hereunder except the full performance and payment of the Guaranteed Obligations of Borrower with interest.

22.    Additional Waivers.  In addition to and not in limitation of the other waivers agreed to and made by Guarantor set forth in this Guaranty, and pursuant to the provisions of Section 2856 of the California Civil Code, Guarantor acknowledges and understands that if Lender forecloses judicially or nonjudicially against any real property security for the Note, that foreclosure could impair or destroy any ability that Guarantor may have to seek reimbursement, contribution or indemnification from Borrower or others based on any right Guarantor may have of subrogation, reimbursement, contribution or indemnification for any amounts paid by Guarantor under this Guaranty.  Guarantor further understands and acknowledges that in the absence of this provision, the potential impairment or destruction of Guarantor's rights, if any, may entitle Guarantor to assert a defense to this Guaranty based on California

Code of Civil Procedure Section 580d as interpreted in Union Bank vs. Gradsky, to the extent applicable. By executing this Guaranty, Guarantor freely, irrevocably and unconditionally: (a) waives and relinquishes that defense, and agrees that Guarantor will be fully liable under this Guaranty, even though Lender may foreclose judicially or nonjudicially against any real property security for the Note; (b) agrees that Guarantor will not assert that defense in any action or proceeding that Lender may commence to enforce this Guaranty; (c) acknowledges and agrees that the rights and defenses waived by Guarantor under this Guaranty include any right or defense that Guarantor may have or be entitled to assert based upon or arising out of any one or more of the following: (i) California Code of Civil Procedure Sections 580a (which if Guarantor had not given this waiver, would otherwise limit Guarantor's liability after any nonjudicial foreclosure sale to the difference between the obligations for which Guarantor is liable and the fair market value of the property or interests sold at such nonjudicial foreclosure sale rather than the actual proceeds of such sale), 580b and 580d (which if Guarantor had not given this waiver, would otherwise limit Lender's right to recover a deficiency judgment with respect to purchase money obligations and after any nonjudicial foreclosure sale, respectively), or 726 (which, if Guarantor had not given this waiver, among other things, would otherwise require Lender to exhaust all of its security before a personal judgment may be obtained for a deficiency); or (ii) California Civil Code Section 2848; and (d) acknowledges and agrees that Lender is relying on this waiver in making the Loan, and that this waiver is a material part of the consideration that Lender is receiving for making the Loan. In addition, and without limiting the foregoing, GUARANTOR WAIVES ALL RIGHTS AND DEFENSES THAT GUARANTOR MAY HAVE BECAUSE BORROWER'S DEBT IS SECURED BY REAL PROPERTY. THIS MEANS, AMONG OTHER THINGS:

(i)     LENDER MAY COLLECT FROM GUARANTOR WITHOUT FIRST FORECLOSING ON ANY REAL OR PERSONAL PROPERTY COLLATERAL PLEDGED BY BORROWER.

(ii)    IF THE CREDITOR FORECLOSES ON ANY REAL PROPERTY COLLATERAL PLEDGED BY BORROWER:

(A)    THE AMOUNT OF THE DEBT MAY BE REDUCED ONLY BY THE PRICE FOR WHICH THAT COLLATERAL IS SOLD AT THE FORECLOSURE SALE, EVEN IF THE COLLATERAL IS WORTH MORE THAN THE SALE PRICE.

(B)    LENDER MAY COLLECT FROM GUARANTOR EVEN IF LENDER, BY FORECLOSING ON THE REAL PROPERTY COLLATERAL, HAS DESTROYED ANY RIGHT GUARANTOR MAY HAVE TO COLLECT FROM BORROWER.

THIS IS AN UNCONDITIONAL AND IRREVOCABLE WAIVER OF ANY RIGHTS AND DEFENSES GUARANTOR MAY HAVE BECAUSE BORROWER'S DEBT IS SECURED BY REAL PROPERTY. THESE RIGHTS AND DEFENSES INCLUDE, BUT ARE NOT LIMITED TO, ANY RIGHTS OR DEFENSES BASED UPON CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580d, or 726.

*[Separate Signature Page Follows]*

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the date appearing on the first page of this Guaranty.

<div align="center">

**GUARANTOR:**

_(signature)_

**KENNETH EDWARD GREER,**      an individual

**ACKNOWLEDGEMENT**

</div>

STATE OF _California_     §
                             §
COUNTY OF _San Diego_    §

     This instrument was acknowledged before me this ____ day of August, 2019, by Kenneth Edward Greer,      an individual.

[S E A L]                         _____

                            Notary Public, State of _____

"_See attach_"

**Exhibit D Page - 13**

# CALIFORNIA ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California _____ }

County of ___ San Diego _____ }

On ___ 08/12/2019 ___ before me, ___ Farnaz Arvin, a Notary Public ___,
(Here insert name and title of the officer)

personally appeared ___ Kenneth Edward Greer _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public Signature                          (Notary Public Seal)

FARNAZ ARVIN
COMM. # 2163393
NOTARY PUBLIC - CALIFORNIA
San Diego County
My Comm. Exp. Oct. 24, 2020

---

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

Signature Page to Guaranty
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date_____

### CAPACITY CLAIMED BY THE SIGNER
☐ Individual (s)
☐ Corporate Officer
_____
(Title)
☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other

2015 Version www.NotaryClasses.com 800-873-9865

### INSTRUCTIONS FOR COMPLETING THIS FORM
*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

**Exhibit D Page - 14**

# EXHIBIT E

## GUARANTY

THIS GUARANTY (this "**Guaranty**") is made as of August *21*, 2019, by **GREEN SAGE, LLC**, a Colorado limited liability company ("**Guarantor**"), for the benefit of **ROMSPEN CALIFORNIA MORTGAGE LIMITED PARTNERSHIP**, an Ontario limited partnership ("**Lender**").

### RECITALS

The following recitals are a material part of this Agreement.

A.      Pursuant to the terms of a Loan Agreement dated of even date herewith between **OAKLAND CANNERY REAL ESTATE, LLC**, a California limited liability company, **5733 SLOCA PARTNERSHIP**, a California general partnership, and **5601 SLOCA, LLC**, a California limited liability company (individually and collectively, jointly and severally, "**Borrower**"), and Lender (as the same may be modified, amended or restated from time to time, the "**Loan Agreement**"), Lender is making a loan to Borrower in the maximum principal amount of Fifty-Four Million Four Hundred Sixty-Five Thousand and No/100 Dollars ($54,465,000.00) (the "**Loan**") for the purposes specified in the Loan Agreement, said purposes relating to the real property and improvements described in the Loan Agreement (which real property and improvements are collectively referred to herein as the "**Property**"). Each capitalized term used herein and not otherwise defined herein shall have the meaning given to such term in the Loan Agreement.

B.      The Loan Agreement provides that the Loan shall be evidenced by the Note and shall be secured by the Security Instrument and by other security instruments, if any, specified in the Loan Agreement.

C.      Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined).

D.      Guarantor is a direct or indirect owner of Borrower and will derive substantial direct and indirect benefits from the Loan and the transactions contemplated by the Loan Agreement, and the making of this Guaranty and such benefits are at least equal to the obligations incurred under this Guaranty.

### AGREEMENT

NOW, THEREFORE, to induce Lender to enter into the Loan Agreement and make the Loan, and in consideration thereof and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor unconditionally, absolutely and irrevocably guarantees and agrees as follows:

1.      Guaranty.  Guarantor absolutely, unconditionally, and irrevocably guarantees to Lender, as primary obligor and not merely as surety, the due, prompt, and full payment and performance of all liabilities, obligations, or undertakings owing by Borrower to Lender of any kind or description arising out of or outstanding under, advanced or issued pursuant to, or evidenced by the Loan Agreement or the other Loan Documents or in any other agreement between Borrower and Lender, irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, voluntary or involuntary, whether now existing or hereafter arising, and including all interest (including interest that accrues after the filing of a case under the Bankruptcy Code) and any and all costs, fees

(including attorneys' fees), and expenses which Borrower is required to pay pursuant to any of the foregoing, by law, or otherwise (collectively, the "**Guaranteed Obligations**").   Guarantor unconditionally agrees to pay to Lender the full amount of the Guaranteed Obligations.  Guarantor further agrees that all or part of the Guaranteed Obligations may be increased, extended, substituted, amended, renewed or otherwise modified without notice to or consent from Guarantor and such actions shall not affect the liability of Guarantor hereunder. Without limiting the generality of the foregoing, Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Person to Lender under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving such other Person.  If there shall be more than one guarantor with respect to any of the Guaranteed Obligations, then the obligations of each such guarantor (including Guarantor) shall be joint and several.

2.      Remedies.  If Guarantor fails to promptly perform its obligations under this Guaranty, Lender may from time to time, and without first requiring performance by Borrower or exhausting any or all security for the Loan, bring any action at law or in equity or both to compel Guarantor to perform its obligations hereunder, and to collect in any such action compensation for all loss, cost, damage, injury and expense sustained or incurred by Lender as a direct or indirect consequence of the failure of Guarantor to perform its obligations together with interest thereon at the rate of interest applicable to the principal balance of the Note.

3.      Rights of Lender.  Lender may at any time, without the consent of or notice to Guarantor, without incurring responsibility to Guarantor and without impairing, releasing, reducing or affecting the obligations of Guarantor hereunder:  (a) change the manner, place or terms of payment of all or any part of the Guaranteed Obligations, or renew, extend, modify, rearrange or alter all or any part of the Guaranteed Obligations; (b) change the interest rate accruing on any of the Guaranteed Obligations (including, without limitation, any periodic change in such interest rate that occurs because such Guaranteed Obligations accrue interest at a variable rate which may fluctuate from time to time); (c) declare all sums owing to Lender under the Note and the other Loan Documents due and payable upon the occurrence of a Default or Event of Default under the Loan Documents; (d) amend, restate, or otherwise modify the terms of any Loan Document; (e) sell, exchange, release, surrender, subordinate, realize upon or otherwise deal with in any manner and in any order any collateral for all or any part of the Guaranteed Obligations; (f) neglect, delay, omit, fail or refuse to take or prosecute any action for the collection of all or any part of the Guaranteed Obligations or this Guaranty or to take or prosecute any action in connection with any of the Loan Documents; (g) exercise or refrain from exercising any rights against Borrower or others, or otherwise act or refrain from acting; (h) release, substitute or add any one or more endorsers of the Note or guarantors of Borrower's obligations under the Note or the other Loan Documents; (i) settle or compromise all or any part of the Guaranteed Obligations and subordinate the payment of all or any part of the Guaranteed Obligations to the payment of any obligations, indebtedness or liabilities which may be due or become due to Lender or others; (j) apply any deposit balance, fund, payment, collections through process of law or otherwise or other collateral of Borrower to the satisfaction and liquidation of the Guaranteed Obligations; (k) apply any sums paid to Lender by Guarantor, Borrower or others to the Guaranteed Obligations in such order and manner as Lender, in its sole discretion, may determine; (l) assign this Guaranty in whole or in part in accordance with an assignment of the Loan; and (m) assign, transfer or negotiate all or any part of the Guaranteed Obligations.

4.      Guarantor's Waivers.

(a)      Regardless of whether Guarantor may have made any payments to Lender, Guarantor hereby waives:  (i) all rights of subrogation, indemnification, contribution, and any other rights

to collect reimbursement from Borrower or any other party for any sums paid to Lender, whether contractual or arising by operation of law (including, without limitation, under any provisions of the Bankruptcy Code, or any successor or similar statutes) or otherwise, (ii) all rights to enforce any remedy that Lender may have against Borrower, and (iii) all rights to participate in any security now or later to be held by Lender for the Loan.  Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification, and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement, indemnification, and contribution Guarantor may have against Borrower or against any collateral or security, shall be junior and subordinate to any rights Lender may have against Borrower, and to all right, title and interest Lender may have in any such collateral or security.

(b)     Guarantor understands and acknowledges that if Lender forecloses judicially or nonjudicially against any real property security for the Loan, that foreclosure could impair or destroy any ability that Guarantor may have to seek reimbursement, contribution, or indemnification from Borrower or others based on any right Guarantor may have of subrogation, reimbursement, contribution or indemnification for any amounts paid by Guarantor under this Guaranty.  By executing this Guaranty, Guarantor freely, irrevocably, and unconditionally: (i) waives and relinquishes that defense and agrees that Guarantor shall be fully liable under this Guaranty even though Lender may foreclose judicially or nonjudicially against any real property security for the Loan; (ii) acknowledges and agrees that the rights and defenses waived by Guarantor under this Guaranty include any right or defense that Guarantor may have or be entitled to assert based upon or arising out of any one-action, anti-deficiency, reimbursement, or other borrower or guarantor protective statute (including, without limitation, any defense that any exercise by Lender of any right or remedy hereunder or under the Loan Documents violates, or would, in combination with the previous or subsequent exercise by Guarantor of any rights of subrogation, reimbursement, contribution, or indemnification against Borrower or any other person, directly or indirectly result in, or be deemed to be, a violation of any of such statutory provisions); and (iii) acknowledges and agrees that Lender is relying on this waiver in making the Loan, and that this waiver is a material part of the consideration which Lender is receiving for making the Loan.

(c)     Guarantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, may destroy Guarantor's rights of subrogation and reimbursement against Borrower.

(d)     Guarantor waives any rights and defenses that are or may become available to Guarantor by reason of any statute governing guaranties or suretyship.

(e)     Guarantor waives all rights and defenses that Guarantor may have because the Loan is secured by real property.  This means, among other things:

(i)      Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower.

(ii)     If Lender forecloses on any real property collateral pledged by Borrower:

(A)     The amount of the Loan may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(B)  Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

(f)     This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because the Loan is secured by real property.

(g)     Guarantor waives any right or defense it may have at law or equity, which may provide, among other things: that a creditor must file a complaint for deficiency within a specified period of time after a nonjudicial foreclosure sale or judicial foreclosure sale, as applicable; that a fair market value hearing must be held; and that the amount of the deficiency judgment shall be limited to the amount by which the unpaid debt exceeds the fair market value of the security, but not more than the amount by which the unpaid debt exceeds the sale price of the security.

(h)     Guarantor hereby unconditionally and irrevocably waives any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all presently existing and future Guaranteed Obligations.

(i)     Guarantor hereby unconditionally and irrevocably waives promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, default, acceleration, intention to accelerate, protest or dishonor and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that Lender protect, secure, perfect or insure any Lien or any property subject thereto.

(j)     Guarantor hereby unconditionally and irrevocably waives any defense based on any right of set-off or recoupment or counterclaim against or in respect of the Guaranteed Obligations.

(k)     No provision or waiver in this Guaranty shall be construed as limiting the generality of any other provision or waiver contained in this Guaranty.

(l)     Guarantor agrees that the payment or performance of any act which tolls any statute of limitations applicable to any Loan Document shall similarly operate to toll the statute of limitations applicable to Guarantor's liability hereunder.

5.     Guarantor's Warranties.  Guarantor warrants and acknowledges that: (a) Lender would not make the Loan but for this Guaranty; (b) there are no conditions precedent to the effectiveness of this Guaranty; (c) Guarantor has established adequate means of obtaining from sources other than Lender, on a continuing basis, financial and other information pertaining to Borrower's financial condition, the Property and Borrower's activities relating thereto and the status of Borrower's performance of obligations under the Loan Documents, and Guarantor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect Guarantor's risks hereunder and Lender has made no representation to Guarantor as to any such matters; (d) the most recent financial statements of Guarantor previously delivered to Lender are true and correct in all respects, have been prepared in accordance with generally accepted accounting principles consistently applied (or other principles acceptable to Lender) and fairly present the financial condition of Guarantor as of the respective dates thereof, and no material adverse change has occurred in the financial condition of Guarantor since the respective dates thereof; and (e) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein, other than in the ordinary course of Guarantor's business. Notwithstanding the foregoing, the calculation of Guarantor's liabilities shall NOT include any fair value adjustments to the carrying value of liabilities to record such liabilities at fair value

pursuant to electing the fair value option election under FASB ASC 825-10-25 (formerly known as FAS 159, The Fair Value Option for Financial Assets and Financial Liabilities) or other FASB standards allowing entities to elect fair value option for financial liabilities. Therefore, the amount of liabilities shall be the historical cost basis, which generally is the contractual amount owed adjusted for amortization or accretion of any premium or discount. Guarantor acknowledges and agrees that Lender may request and obtain additional information from third parties regarding any of the above, including, without limitation, credit reports.

6.      Subordination.   Guarantor subordinates all present and future indebtedness owing by Borrower to Guarantor to the obligations at any time owing by Borrower to Lender under the Note and the other Loan Documents. Guarantor assigns all such indebtedness to Lender, as security for this Guaranty, the Note and the other Loan Documents. Guarantor agrees to make no claim for such indebtedness until all obligations of Borrower under the Note and the other Loan Documents have been fully and indefeasibly discharged. Guarantor further agrees not to assign all or any part of such indebtedness unless Lender is given prior notice and such assignment is expressly made subject to the terms of this Guaranty. If Lender so requests, (a) all instruments evidencing such indebtedness shall be duly endorsed and delivered to Lender, (b) all security for such indebtedness shall be duly assigned and delivered to Lender, (c) such indebtedness shall be enforced, collected and held by Guarantor as trustee for Lender and shall be paid over to Lender on account of the Loan but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty, and (d) Guarantor shall execute, file and record such documents and instruments and take such other action as Lender deems reasonably necessary or appropriate to perfect, preserve and enforce Lender's rights in and to such indebtedness and any security therefor. If Guarantor fails to take any such action, Lender, as attorney-in-fact for Guarantor, is hereby authorized to do so in the name of Guarantor. The foregoing power of attorney is coupled with an interest and cannot be revoked. The foregoing shall not be interpreted to require Guarantor to take any action that would increase the scope of its liability to Lender or under the Loan beyond that which is contemplated hereunder.

7.      Bankruptcy of Borrower.   In any bankruptcy or other proceeding in which the filing of claims is required by law, Guarantor shall file all claims which Guarantor may have against Borrower relating to any indebtedness of Borrower to Guarantor and shall assign to Lender all rights of Guarantor thereunder. If Guarantor does not file any such claim, Lender, as attorney-in-fact for Guarantor, is hereby authorized to do so in the name of Guarantor or, in Lender's discretion, to assign the claim to a nominee and to cause proof of claim to be filed in the name of Lender's nominee. The foregoing power of attorney is coupled with an interest and cannot be revoked. Lender or its nominee shall have the right, in its reasonable discretion, to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Lender the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Lender all of Guarantor's rights to any such payments or distributions; provided, however, Guarantor's obligations hereunder shall not be satisfied except to the extent that Lender receives cash by reason of any such payment or distribution. If Lender receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty. The liability of Guarantor hereunder shall be reinstated and revised, and the rights of Lender shall continue, with respect to any amount at any time paid by Borrower on account of the Note or the other Loan Documents which Lender shall be required to restore or return upon the bankruptcy, insolvency or reorganization of Borrower or for any other reasons, all as though such amount had not been paid. If all or any portion of the obligations guaranteed hereunder are paid or performed, the obligations of Guarantor hereunder shall continue and shall remain in full force and effect in the event that all or any part of such payment or performance is avoided or recovered directly or indirectly from Lender as a preference, fraudulent transfer or otherwise under the Bankruptcy Code or other similar laws, irrespective of (a) any notice of revocation given by Guarantor prior to such

avoidance or recovery, or (b) full payment and performance of all of the indebtedness and obligations evidenced and secured by the Loan Documents.

8.        Loan Sales and Participations; Disclosure of Information.  Guarantor agrees that Lender may elect, at any time, to sell, assign, or grant participations in all or any portion of its rights and obligations under the Loan Documents and this Guaranty in accordance with the terms of the Loan Agreement, and that any such sale, assignment or participation may be to one or more financial institutions, private investors, and/or other entities, at such Lender's sole discretion. Guarantor further agrees that Lender may disseminate to any such actual or potential purchaser(s), assignee(s) or participant(s) all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to Lender with respect to: (a) the Property and its operation; (b) any party connected with the Loan (including, without limitation, Guarantor, Borrower, any partner, joint venturer or member of Borrower, any constituent partner, joint venturer or member of Borrower, any other guarantor and any non-borrower trustor); and/or (c) any lending relationship other than the Loan which Lender may have with any party connected with the Loan.  In the event of any such sale, assignment or participation, Lender and the parties to such transaction shall share in the rights and obligations of Lender as set forth in the Loan Documents only as and to the extent they agree among themselves.  In connection with any such sale, assignment or participation, Guarantor further agrees that the Guaranty shall be sufficient evidence of the obligations of Guarantor to each purchaser, assignee, or participant, and upon written request by Lender, Guarantor shall within ten (10) days after such request by Lender, (x) deliver to Lender and any other party designated by Lender an estoppel certificate, in form and substance acceptable to Lender verifying for the benefit of Lender and any such other party the status, terms and provisions of this Guaranty and (y) enter into such amendments or modifications to this Guaranty and the Loan Documents as Lender may reasonably request in order to evidence and facilitate any such sale, assignment, or participation without impairing Guarantor's rights or increasing Guarantor's obligations hereunder.

Anything in this Guaranty to the contrary notwithstanding, and without the need to comply with any of the formal or procedural requirements of this Guaranty, including this Section 8, Lender may at any time and from time to time pledge and assign all or any portion of its rights under all or any of the Loan Documents; provided that no such pledge or assignment shall release Lender from its obligations thereunder.

9.        Additional, Independent, and Absolute Obligations.  This Guaranty is a continuing guaranty of payment and not of collection and cannot be revoked by Guarantor and shall continue to be effective with respect to any indebtedness referenced in Section 1 hereof arising or created after any attempted revocation hereof or after the death of Guarantor (if Guarantor is a natural person, in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The obligations of Guarantor hereunder shall be in addition to and shall not limit or in any way affect the obligations of Guarantor under any other existing or future guaranties unless said other guaranties are expressly modified or revoked in writing. This Guaranty is independent of the obligations of Borrower under the Note, the Security Instrument, and the other Loan Documents.  Lender may bring a separate action to enforce the provisions hereof against Guarantor without taking action against Borrower or any other party or joining Borrower or any other party as a party to such action.  The liability of Guarantor hereunder is irrevocable, continuing, absolute and unconditional and the obligations of Guarantor hereunder, shall not be discharged or impaired or otherwise effected by, and Guarantor hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

        (a)        any illegality or lack of validity or enforceability of any Guaranteed Obligation or any Loan Document or any related agreement or instrument;

(b)      any change in the time, place or manner of payment of, or in any other term of, the Guaranteed Obligations or any other obligation of any Borrower Party under any Loan Document, or any rescission, waiver, amendment or other modification of any Loan Document or any other agreement, including any increase in the Guaranteed Obligations resulting from any extension of additional credit or otherwise;

(c)      any taking, exchange, substitution, release, impairment or non-perfection of any collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for the Guaranteed Obligations;

(d)      any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the Guaranteed Obligations;

(e)      any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations;

(f)      any change, restructuring or termination of the corporate, company, partnership, or other entity structure, ownership or existence of Borrower or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Borrower or its assets or any resulting release or discharge of any Guaranteed Obligation;

(g)      any failure of Lender to disclose to Guarantor any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of Borrower or any other guarantor now or hereafter known to Lender, the Guarantor waiving any duty of Lender to disclose such information;

(h)      the failure of any other Person to execute or deliver any other guaranty or agreement or the release or reduction of liability of any other guarantor or surety with respect to the Guaranteed Obligations;

(i)      the failure of Lender to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Loan Document or otherwise;

(j)      any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, Borrower against Lender; or

(k)      any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loan or any existence of or reliance on any representation by Lender that might vary the risk of Guarantor or otherwise operate as a defense available to, or a legal or equitable discharge of, Borrower or any other guarantor or surety.

10.      <u>Attorneys' Fees; Enforcement</u>.  If any attorney is engaged by Lender to enforce or defend any provision of this Guaranty, or any of the other Loan Documents, or as a consequence of any Default under the Loan Documents, with or without the filing of any legal action or proceeding, Guarantor shall pay to Lender, within thirty (30) days after written demand from Lender all attorneys' fees and costs incurred by Lender in connection therewith, together with interest thereon from the date of such demand until paid at the rate of interest applicable to the principal balance of the Note as specified therein.  This provision is separate and several, and shall survive the merger of this provision into any judgment.

11.      <u>Rules of Construction</u>.  The word "Borrower" as used herein shall include both the named Borrower and any other person at any time assuming or otherwise becoming primarily liable for

all or any part of the obligations of the named Borrower under the Notes and the other Loan Documents. Section and subsection headings in this Guaranty are included in this Guaranty for convenience of reference only and shall not constitute a part of this Guaranty or be given any substantive effect. Unless the context of this Guaranty clearly requires otherwise, references to the plural include the singular and to the singular include the plural, the part includes the whole, the term "including" is not limiting (and means, including without limitation), and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and other similar terms in this Guaranty refer to this Guaranty as a whole and not exclusively to any particular provision of this Guaranty. Article, section, subsection, exhibit, and schedule references are to this Guaranty unless otherwise specified. All of the exhibits or schedules attached to this Guaranty shall be deemed incorporated in this Guaranty by reference. Any reference to any of the following documents includes any and all alterations, amendments, restatements, extensions, modifications, renewals, or supplements thereto or thereof, as applicable: this Guaranty or any of the other Loan Documents. No inference in favor of, or against, any party shall be drawn from the fact that such party has drafted any portion of this Guaranty, each party having been represented by counsel of its choice in connection with the negotiation and preparation of this Guaranty and the other Loan Documents.

12.     Credit Reports.  Guarantor hereby authorizes Lender to order and obtain, from a credit reporting agency of Lender's choice, third party credit reports on Guarantor.

13.     Governing Law; Venue.  This Guaranty shall be governed, construed, applied and enforced in accordance with the laws of the State of California without regard to the conflicts of law provisions thereof ("**Governing State**").  Guarantor hereby consents to personal jurisdiction in the Governing State. JURISDICTION AND VENUE OF ANY ACTION BROUGHT TO ENFORCE THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY ACTION RELATING TO THE LOAN OR THE RELATIONSHIPS CREATED BY OR UNDER THE LOAN DOCUMENTS ("**ACTION**"), AT THE ELECTION OF LENDER, BE IN (AND IF ANY ACTION IS ORIGINALLY BROUGHT IN ANOTHER VENUE, THE ACTION SHALL AT THE ELECTION OF LENDER BE TRANSFERRED TO) A STATE OR FEDERAL COURT OF APPROPRIATE JURISDICTION LOCATED IN THE GOVERNING STATE. GUARANTOR HEREBY CONSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF THE STATE COURTS OF THE GOVERNING STATE AND OF FEDERAL COURTS LOCATED IN THE GOVERNING STATE IN CONNECTION WITH ANY ACTION AND HEREBY WAIVES ANY AND ALL PERSONAL RIGHTS UNDER THE LAWS OF ANY OTHER STATE TO OBJECT TO JURISDICTION WITHIN SUCH GOVERNING STATE FOR PURPOSES OF ANY ACTION.  Guarantor hereby waives and agrees not to assert, as a defense to any Action or a motion to transfer venue of any Action, (i) any claim that it is not subject to such jurisdiction, (ii) any claim that any Action may not be brought against it or is not maintainable in those courts or that this Agreement may not be enforced in or by those courts, or that it is exempt or immune from execution, (iii) that the Action is brought in an inconvenient forum, or (iv) that the venue for the Action is in any way improper.

14.     Waiver of Jury Trial.  **GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH**

RIGHT TO TRIAL BY JURY WOULD OTHERWISE ACCRUE. GUARANTOR AND LENDER EACH ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY EACH OTHER. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, GUARANTOR HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1 ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE (PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO JUDICIAL REFERENCE SHALL BE APPLICABLE WITH RESPECT TO ANY ACTION IN RESPECT OF THE FORECLOSURE (OR SALE BY POWER OF SALE) OF THE SECURITY INSTRUMENT). PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 AND 640 TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER. GUARANTOR HEREBY AGREES THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARMS-LENGTH BASIS, WITH GUARANTOR AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE ITS LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN.

_____
Guarantor's Initials

15.    Waiver of Special Damages. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, GUARANTOR AGREES THAT NONE OF LENDER, OR ITS AGENTS OR EMPLOYEES SHALL BE LIABLE TO GUARANTOR FOR ANY MONETARY DAMAGES (INCLUDING ANY SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR ANY OTHER LEGAL OR EQUITABLE PRINCIPLE AND GUARANTOR'S SOLE REMEDIES SHALL BE LIMITED TO COMMENCING AN ACTION FOR SPECIFIC PERFORMANCE.

16.    Miscellaneous. The provisions of this Guaranty will bind and benefit the heirs, executors, administrators, legal representatives, nominees, successors and assigns of Guarantor and Lender. If any provision of this Guaranty shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that portion shall be deemed severed from this Guaranty and the remaining parts shall remain in full force as though the invalid, illegal or unenforceable portion had never been part of this Guaranty. Time is of the essence with respect to each provision of this Guaranty. The recitals to this Guaranty are hereby incorporated by this reference.

RIGHT TO TRIAL BY JURY WOULD OTHERWISE ACCRUE. GUARANTOR AND LENDER EACH ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY EACH OTHER. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, GUARANTOR HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1 ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE (PROVIDED, HOWEVER, THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO JUDICIAL REFERENCE SHALL BE APPLICABLE WITH RESPECT TO ANY ACTION IN RESPECT OF THE FORECLOSURE (OR SALE BY POWER OF SALE) OF THE SECURITY INSTRUMENT). PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 AND 640 TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER. GUARANTOR HEREBY AGREES THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARMS-LENGTH BASIS, WITH GUARANTOR AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE ITS LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN.



Guarantor's Initials

15. <u>Waiver of Special Damages</u>. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, GUARANTOR AGREES THAT NONE OF LENDER, OR ITS AGENTS OR EMPLOYEES SHALL BE LIABLE TO GUARANTOR FOR ANY MONETARY DAMAGES (INCLUDING ANY SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR ANY OTHER LEGAL OR EQUITABLE PRINCIPLE AND GUARANTOR'S SOLE REMEDIES SHALL BE LIMITED TO COMMENCING AN ACTION FOR SPECIFIC PERFORMANCE.

16. <u>Miscellaneous</u>. The provisions of this Guaranty will bind and benefit the heirs, executors, administrators, legal representatives, nominees, successors and assigns of Guarantor and Lender. If any provision of this Guaranty shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that portion shall be deemed severed from this Guaranty and the remaining parts shall remain in full force as though the invalid, illegal or unenforceable portion had never been part of this Guaranty. Time is of the essence with respect to each provision of this Guaranty. The recitals to this Guaranty are hereby incorporated by this reference.

17.    Additional Provisions.  Such additional terms, covenants and conditions as may be set forth on any exhibit executed by Guarantor and attached hereto, if any, which recites that it is an exhibit to this Guaranty are incorporated herein by this reference.

18.    Enforceability.  Guarantor hereby acknowledges that: (a) the obligations undertaken by Guarantor in this Guaranty are complex in nature, (b) numerous possible defenses to the enforceability of these obligations may presently exist and/or may arise hereafter, (c) as part of Lender's consideration for entering into this transaction, Lender has specifically bargained for the waiver and relinquishment by Guarantor of all such defenses, and (d) Guarantor has had the opportunity to seek and receive legal advice from skilled legal counsel in the area of financial transactions of the type contemplated herein.  Given all of the above, Guarantor does hereby represent and confirm to Lender that Guarantor is fully informed regarding, and that Guarantor does thoroughly understand: (i) the nature of all such possible defenses, (ii) the circumstances under which such defenses may arise, (iii) the benefits which such defenses might confer upon Guarantor, and (iv) the legal consequences to Guarantor of waiving such defenses. Guarantor acknowledges that Guarantor makes this Guaranty with the intent that this Guaranty and all of the informed waivers herein shall each and all be fully enforceable by Lender, and that Lender is induced to enter into this transaction in material reliance upon the presumed full enforceability thereof.

19.    Counterparts.  For the purpose of facilitating the execution of this Guaranty and for other purposes, this Guaranty may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.  A signature of a party by facsimile or other electronic transmission (including a .pdf copy sent by e-mail) shall be deemed to constitute an original and fully effective signature of such party.

20.    Notices.  All notices, consents, approvals and requests required or permitted hereunder shall be given in writing (including by facsimile) and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (c) by facsimile (with a copy sent contemporaneously by certified or registered United States mail, postage prepaid) answer back acknowledged, addressed as follows:

If to Guarantor:    Green Sage, LLC
                    1137 Bannock Street
                    Denver, Colorado 80204
                    Attention: Ken Greer
                    Telephone: (720) 612-7739
                    Email: ken@greensagemb.com

If to Lender:       Romspen California Mortgage Limited Partnership
                    162 Cumberland Street, Suite 300
                    Toronto, Ontario M5R 3N5
                    Telephone: (416) 928-4870
                    Facsimile: (416) 966-1161
                    Email: JoelMickelson@romspen.com
                    BlakeCassidy@romspen.com

with a copy to:        Foley Gardere
                       2021 McKinney Avenue, Suite 1600
                       Dallas, Texas 75201
                       Attention:  Clifton M. Dugas, II
                       Telephone: (214) 999-4004
                       Email: cdugas@foley.com

or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section.  A notice shall be deemed to have been given:  in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day, in the case of facsimile, upon completion of transmission (which is confirmed by telephone or by a statement generated by the transmitting machine) with receipt acknowledged by the recipient thereof.

21.    Principles of Construction.  To the extent any of the provisions of this Section 21 conflict with any of the other provisions of this Guaranty, the terms and provisions of this Section 21 shall control.  Notwithstanding the foregoing, nothing in this Section 21 shall be deemed to contradict or supersede the terms and provisions of Section 13 hereof with respect to the governing law applicable to this Guaranty.

(a)    Waiver.  Guarantor expressly waives any and all suretyship defenses that may be available to Guarantor.  Without limiting the generality of the foregoing, Guarantor makes the following additional waivers and covenants:  Guarantor agrees that its obligations under this Guaranty shall not be subject to any counterclaims, offsets or defenses against Lender or against Borrower of any kind which may arise in the future.  Guarantor agrees that nothing contained herein shall prevent Lender from foreclosing on the lien of the Security Instrument, or from exercising any rights available to Lender thereunder, and that the exercise of any of the aforesaid rights shall not constitute a legal or equitable discharge of Guarantor.  Guarantor agrees that it hereby knowingly waives any defense which may arise in the future to enforcement of this Guaranty under California Code of Civil Procedure Sections 580b, 580d, 580a and 726 (or any other statute limiting a Lender's right to a deficiency) based on Lender's election to conduct a private, non-judicial foreclosure sale following a default by Borrower even though such an election destroyed, diminished or otherwise affected Guarantor's rights of subrogation against Borrower or other trustor under a deed of trust or the right of contribution, reimbursement or indemnity from any party, with the result that Guarantor's liability under this Guaranty became nonreimbursable in whole or in part.  Nevertheless, Guarantor hereby authorizes and empowers Lender to exercise, in its sole discretion, any rights and remedies, or any combination thereof, which may then be available, since it is the intent and purpose of Guarantor that the obligations hereunder shall be absolute, independent and unconditional under any and all circumstances.  Without limiting the generality of the foregoing, Guarantor hereby expressly waives any and all benefits under California Civil Code Sections 2809, 2810, 2815, 2819, 2822, 2839, 2845, 2846, 2847, 2848, 2849, 2850, 2899 and 3433 and California Code of Civil Procedure Sections 580b, 580a, 580d and 726.  Notwithstanding any foreclosure of the lien of the Security Instrument or security agreement with respect to any or all of any real or personal property secured thereby, whether by the exercise of the power of sale contained therein, by an action for judicial foreclosure or by an acceptance of a deed in lieu of foreclosure, Guarantor shall remain bound under this Guaranty.  Guarantor further waives any right to cause a fair value hearing to be conducted under Code of Civil Procedure Section 580a, or any other provision of law respecting the amount of any deficiency following a non-judicial foreclosure, and agrees that Guarantor's liability hereunder shall not be limited to the excess of the Guaranteed Obligations over the fair or market value of any real property which secured the indebtedness of Borrower.  Nothing shall discharge or satisfy the liability of Guarantor hereunder except the full performance and payment of the Guaranteed Obligations of Borrower with interest.

22.   Additional Waivers.  In addition to and not in limitation of the other waivers agreed to and made by Guarantor set forth in this Guaranty, and pursuant to the provisions of Section 2856 of the California Civil Code, Guarantor acknowledges and understands that if Lender forecloses judicially or nonjudicially against any real property security for the Note, that foreclosure could impair or destroy any ability that Guarantor may have to seek reimbursement, contribution or indemnification from Borrower or others based on any right Guarantor may have of subrogation, reimbursement, contribution or indemnification for any amounts paid by Guarantor under this Guaranty.  Guarantor further understands and acknowledges that in the absence of this provision, the potential impairment or destruction of Guarantor's rights, if any, may entitle Guarantor to assert a defense to this Guaranty based on California Code of Civil Procedure Section 580d as interpreted in Union Bank vs. Gradsky, to the extent applicable.  By executing this Guaranty, Guarantor freely, irrevocably and unconditionally:  (a) waives and relinquishes that defense, and agrees that Guarantor will be fully liable under this Guaranty, even though Lender may foreclose judicially or nonjudicially against any real property security for the Note; (b) agrees that Guarantor will not assert that defense in any action or proceeding that Lender may commence to enforce this Guaranty; (c) acknowledges and agrees that the rights and defenses waived by Guarantor under this Guaranty include any right or defense that Guarantor may have or be entitled to assert based upon or arising out of any one or more of the following:  (i) California Code of Civil Procedure Sections 580a (which if Guarantor had not given this waiver, would otherwise limit Guarantor's liability after any nonjudicial foreclosure sale to the difference between the obligations for which Guarantor is liable and the fair market value of the property or interests sold at such nonjudicial foreclosure sale rather than the actual proceeds of such sale), 580b and 580d (which if Guarantor had not given this waiver, would otherwise limit Lender's right to recover a deficiency judgment with respect to purchase money obligations and after any nonjudicial foreclosure sale, respectively), or 726 (which, if Guarantor had not given this waiver, among other things, would otherwise require Lender to exhaust all of its security before a personal judgment may be obtained for a deficiency); or (ii) California Civil Code Section 2848; and (d) acknowledges and agrees that Lender is relying on this waiver in making the Loan, and that this waiver is a material part of the consideration that Lender is receiving for making the Loan.  In addition, and without limiting the foregoing, GUARANTOR WAIVES ALL RIGHTS AND DEFENSES THAT GUARANTOR MAY HAVE BECAUSE BORROWER'S DEBT IS SECURED BY REAL PROPERTY. THIS MEANS, AMONG OTHER THINGS:

(i)   LENDER MAY COLLECT FROM GUARANTOR WITHOUT FIRST FORECLOSING ON ANY REAL OR PERSONAL PROPERTY COLLATERAL PLEDGED BY BORROWER.

(ii)   IF THE CREDITOR FORECLOSES ON ANY REAL PROPERTY COLLATERAL PLEDGED BY BORROWER:

(A)   THE AMOUNT OF THE DEBT MAY BE REDUCED ONLY BY THE PRICE FOR WHICH THAT COLLATERAL IS SOLD AT THE FORECLOSURE SALE, EVEN IF THE COLLATERAL IS WORTH MORE THAN THE SALE PRICE.

(B)   LENDER MAY COLLECT FROM GUARANTOR EVEN IF LENDER, BY FORECLOSING ON THE REAL PROPERTY COLLATERAL, HAS DESTROYED ANY RIGHT GUARANTOR MAY HAVE TO COLLECT FROM BORROWER.

THIS IS AN UNCONDITIONAL AND IRREVOCABLE WAIVER OF ANY RIGHTS AND DEFENSES GUARANTOR MAY HAVE BECAUSE BORROWER'S DEBT IS SECURED BY

REAL PROPERTY.   THESE RIGHTS AND DEFENSES INCLUDE, BUT ARE NOT LIMITED TO, ANY RIGHTS OR DEFENSES BASED UPON CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580d, or 726.

*[Separate Signature Page Follows] [Separate Signature Page Follows]*

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the date appearing on the first page of this Guaranty.

<div align="center">

**GUARANTOR:**

</div>

**GREEN SAGE, LLC,**
a Colorado limited liability company

By: _____

Kenneth Edward Greer,      Manager

By:    ***SIGNED IN COUNTERPART***___

Bruce Miller, Manager

<div align="center">

**ACKNOWLEDGEMENT**

</div>

STATE OF California                  §
                                     §
COUNTY OF San Diego                  §

  This instrument was acknowledged before me this _____ day of July, 2019, by Kenneth Edward Greer,      acting in his capacity as Manager of Green Sage, LLC, a Colorado limited liability company.

"See attach"

[S E A L]                          _____
                                   Notary Public, State of _____

<div align="center">

**ACKNOWLEDGEMENT**

</div>

STATE OF _____             §
                                     §
COUNTY OF _____            §

  This instrument was acknowledged before me this _____ day of July, 2019, by Bruce Douglas Miller, acting in his capacity as Manager of Green Sage, LLC, a Colorado limited liability company.

[S E A L]                          _____
                                   Notary Public, State of _____

<div align="center">

SIGNATURE PAGE TO GUARANTY

</div>

<div align="right">

**Exhibit E Page - 15**

</div>

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the date appearing on the first page of this Guaranty.

GUARANTOR:



_____

**BRUCE DOUGLAS MILLER**, an individual

## ACKNOWLEDGEMENT

STATE OF <u>Montana</u>              §
                                    §
COUNTY OF <u>Gallatin</u>            §

This instrument was acknowledged before me this 12th day of August, 2019, by Bruce Douglas Miller, an individual.

[SEAL]

KRISTEN JOHNSON
NOTARY PUBLIC for the
State of Montana
Residing at Bozeman, Montana
My Commission Expires
October 11, 2021

_____
Notary Public

**Exhibit E Page - 16**

# CALIFORNIA ALL- PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California _____ }

County of ___San Diego_____ }

On ___08/12/2019_____ before me, ___Farnaz Arvin, a Notary Public___
                                              (Here insert name and title of the officer)

personally appeared _____Kenneth Edward Greer_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____                              FARNAZ ARVIN
Notary Public Signature          (Notary Public Seal)   COMM. # 2169393
                                                        NOTARY PUBLIC-CALIFORNIA
                                                        SAN DIEGO COUNTY
                                                        My Comm. Exp. Oct. 24, 2020

---

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

_Signature Page to Guaranty_
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date _____

CAPACITY CLAIMED BY THE SIGNER
☐ Individual (s)
☐ Corporate Officer
   _____
          (Title)
☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other _____

2015 Version www.NotaryClasses.com 800-873-9865

### INSTRUCTIONS FOR COMPLETING THIS FORM

*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  ❖ Indicate title or type of attached document, number of pages and date.
  ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

**Exhibit E Page - 17**

# EXHIBIT F

## OMNIBUS ASSIGNMENT OF LOAN DOCUMENTS

ROMPSEN CALIFORNIA MORTGAGE LIMITED PARTNERSHIP**,** an Ontario, Canada limited partnership ("**Assignor**"), having a mailing address of 162 Cumberland Street, Suite 300, Toronto, Ontario M5R 3N5, is the current owner and holder of that certain loan made on August 20, 2019 (the "**Loan**"), in the original principal amount of Fifty Four Million, Four Hundred Sixty Five Thousand Dollars ($54,465,000.00)   (the "**Original Loan Amount**"), Assignor, to OAKLAND CANNERY REAL ESTATE, LLC, a California limited liability company, 5733 SLOCA PARTNERSHIP, a California general partnership and 5601 SLOCA, LLC, a California limited liability company ("**Original Borrower**"). The Loan is evidenced by a Promissory Note dated August 21, 2019, executed by Original Borrower and payable to the order of Assignor, in the original principal amount of FIFTY-FOUR MILLION FOUR HUNDRED SIXTY FIVE THOUSAND DOLLARS ($54,465,000.00) (as the same may from time to time have been amended, consolidated, renewed, replaced and/or endorsed, collectively, the "**Note**"), and secured by a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, made by Original Borrower, Orange Coast Title Company, as Trustee, for the benefit of Assignor ("**Security Instrument**"), and by other documents and instruments that evidence and secure the Loan (the Note, the Security Instrument and such other documents and instruments evidencing and securing the Loan, as the same may from time to time be amended, consolidated, renewed or replaced, being collectively referred to herein as the "**Loan Documents**").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby grant, bargain, sell, assign, deliver, convey, transfer and set over unto RIC (SAN LEANDRO), LLC, a California limited liability company ("**Assignee**"), having a mailing address of 162 Cumberland Street, Suite 300, Toronto, Ontario M5R 3N5, all of Assignor's right, title and interest in and to the Loan and obligations with respect to the Loan, together with all rights, remedies, collateral, instruments or other documents made or granted in favor of Assignor or its predecessors in interest in connection with the Loan, including, without limitation: (i) all right, title and interest in and to the Note; (ii) all guaranties, pledges, security interests, mortgages, deeds of trust, or other rights, interests, or other collateral securing or guaranteeing repayment of the Loan; and (iii) all other rights, remedies and obligations of Assignor in connection with the Loan, whether provided by contract or otherwise available under applicable law or in equity, including, without limitation, all rights and remedies provided, and obligations arising, under any loan agreements, indemnities or other instruments or documents made, issued or delivered to or in favor of Assignor or its predecessors in interest in connection with the Loan, all as the same may have been amended from time to time.

This assignment is an agreement between the parties hereto and no other party shall be deemed to be a third party beneficiary hereof.

To have and to hold the same unto the Assignee and to the successors and assigns of the Assignee forever.

IN WITNESS WHEREOF, this Omnibus Assignment of Loan Documents has been duly executed and sealed on behalf of Assignor on September _____, 2022.

*[END OF TEXT – SIGNATURE AND ACKNOWLEDGMENT PAGES FOLLOW]*

**Exhibit F Page - 1**

**ASSIGNOR:**

ROMPSEN CALIFORNIA MORTGAGE LIMITED
PARTNERSHIP, an Ontario limited partnership

By: _____
Name: Trevor A. Jenkins
Title: Attorney in Fact

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF ~~CALIFORNIA~~ Missouri   )

COUNTY OF _Jackson_   )

On _September 2_, 20~~22~~, before me, _Molly A. Forge, Notary Public_,
_(Date)_ _(Here Insert Name and Title of the Officer)_

personally appeared _Trevor A. Jenkins_
_Name(s) of Signer(s)_

_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Molly A. Forge_
_Signature of Notary Public_

> MOLLY A. FORGE
> Notary Public - Notary Seal
> STATE OF MISSOURI
> Jackson County
> My Commission Expires: Mar. 16, 2023
> Commission # 15451757

_Place Notary Seal Above_

**Exhibit F Page - 3**

# EXHIBIT G

**DEFICIENCY STATEMENT**


R O M S P E N

| ACCOUNT NO. | 8766 |
|---|---|
| STATEMENT DATE | 2022-12-19 |

| STATEMENT SUMMARY | |
|---|---|
| Outstanding Amount | **$51,507,018.29** |
| Effective Date | **2023-12-19** |

After 12-19-2023 interest accrues at **$24,215.39 per day.**

**Property:**
5601 and 5733 San Leandro Street Oakland CA

| BORROWER |
|---|
| Oakland Cannery Real Estate LLC<br>3031 Tisch Way, Suite 90<br>San Jose CA 95128 |

### ACCOUNT ACTIVITY

| Date | Description | Charges | Credits | Balance |
|---|---|---|---|---|
| 09/14/2022 | Principal balance | $54,426,570.64 | | $54,426,570.64 |
| 09/14/2022 | Note rate interest outstanding to and including 09/14/2022 | $9,263,145.72 | | $63,689,716.36 |
| 09/14/2022 | Additional Default interest 03/15/2021 – 09/14/2022 | $5,152,940.14 | | $68,842,656.50 |
| 09/14/2022 | Late charges on note rate interest during default period | $432,662.90 | | $69,275,319.40 |
| ███████ | ████████████████ | █████████ | | ███████████ |
| ███████ | ████████████████ | █████████ | | ███████████ |
| ███████ | ████████████ | █████████ | | ███████████ |
| 09/14/2022 | Unbilled Disbursements to Aug. 29, 2022 | $234,261.35 | | $69,835,623.11 |
| 09/14/2022 | Late charge upon Maturity (Sec 2.1 of Promissory Note) | $2,749,413.72 | | $72,585,036.83 |
| 09/14/2022 | Statement Fee x4 | $1,400.00 | | $72,586,436.83 |
| 09/14/2022 | Credit Bid | | $25,000,000.00 | $47,586,436.83 |
| **03/23/2023** | Note rate interest from 09/15/2022 to and including 03/23/2023 on new balance | $2,306,525.79 | | $49,892,962.62 |
| **03/23/2023** | Additional Default interest 09/15/2022 to and including 03/23/2023 on new balance | $1,592,399.42 | | $51,485,362.04 |
| **03/23/2023** | Additional Unbilled Disbursements to date of Credit Bid (Sept. 14, 2022) | $21,656.25 | | $51,507,018.29 |
| **12/19/2023** | Note rate interest from 03/24/2023 to and including 12/19/2023 | $3,529,217.00 | | $55,036,235.29 |
| **12/19/2023** | Additional Default interest 03/24/2023 to and including 12/19/2023 | $2,629,386.05 | | $57,665,621.34 |
| **12/19/2023** | Additional Expenses incurred but not previously billed/reported for period prior to date of Credit Bid | $18,109.28 | | $57,683,730.62 |
| ███████ | ███████████████ | █████████ | | ███████████ |

ALL FUNDS ARE EXPRESSED IN US DOLLARS.

THIS STATEMENT HAS BEEN PREPARED FOR LOAN DEFICIENCY PURPOSES AND MAY NOT BE USED FOR ANY OTHER PURPOSE WITHOUT THE EXPRESS WRITTEN CONSENT OF THE LENDER.

THE AMOUNT DUE ASSUMES NO FURTHER ACTIVITY ON THE MORTGAGE ACCOUNT AND NO FURTHER EXPENSES AND/OR FEES ARE INCURRED OTHER THAN LEGAL FEES.  ROMSPEN RESERVES THE RIGHT TO AMEND THIS STATEMENT IN THE EVENT OF CHANGE.

**Exhibit G Page - 1**

Yours truly,
**ROMSPEN INVESTMENT CORPORATION**
**PER:**

Mary Gianfriddo
Managing Partner

E. & O. E.
HST Registration No. 135897494

**Exhibit G Page - 2**